IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROBIN G. THORNTON, on behalf of
herself and others similarly situated,

       Plaintiffs,

vs.                                   No. CIV 20-1040 JB/JFR

THE KROGER COMPANY,
ALBERTSONS, and PAY AND SAVE
INC.,

       Defendants.

**MEMORANDUM OPINION AND AMENDED ORDER[1]**

    **THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Dismiss with

Prejudice, filed November 13, 2020 (Doc. 14)("MTD"); (ii) the Plaintiff's Opposed Emergency

Motion to Vacate and Stay, filed August 23, 2021 (Doc. 22)("Stay Motion"); and (iii) the

Plaintiff's Motion for Preliminary Injunction, filed November 10, 2021 (Doc. 36)("PI Motion").

The Court held a status conference on August 24, 2021, see Clerk's Minutes at 1, filed August 24,

2021 (Doc. 25); a hearing on the MTD on August 25, 2021, see Clerk's Minutes at 1, filed August

25 2021 (Doc. 26); and a hearing on the PI Motion on December 17, 2021, see Clerk's Minutes at

1, filed December 17, 2021 (Doc. 71).  The Court orally denied the Stay Motion on August 25,

2021.  See Clerk's Minutes at 2, filed August 24, 2021 (Doc. 25).  The Court entered an Order

---

[1]This Memorandum Opinion and Order follows the Court's Order, filed September 30, 2021 (Doc. 28), disposing of the Defendant's Motion to Dismiss with Prejudice.  In the Order, the Court denied the MTD, and indicated that it would, at a later date, issue a Memorandum Opinion more fully detailing its rationale for its decision.  Order at 1. This Memorandum Opinion and Amended Order includes the promised Memorandum Opinion on the MTD, as well as the Court's Memorandum Opinion and Order on the PI Motion and the Order on the Stay Motion.

denying the MTD on September 30, 2021.  See Order at 1, filed September 30, 2021 (Doc. 28).

The main issues in deciding the MTD are: (i) whether collateral estoppel bars the Plaintiff Robin

G. Thornton from bringing similar claims to those that the Honorable Kea W. Riggs, United States

District Judge for the United States District Court for the District of New Mexico, dismissed with

prejudice in the consolidated case, Thornton v. Tyson Foods, Inc., 482 F. Supp. 3d 1147 (D.N.M.

2020)(Riggs, J.)("Tyson Foods"); (ii) whether federal law preempts Thornton's State law claims

where the Federal Meat Inspection Act, 21 U.S.C. §§ 601-695 ("FMIA"), regulates meat labeling,

and the Food Safety and Inspection Services ("FSIS") division of the United States Department of

Agriculture ("USDA") issued guidance in 2005 and 2020 on food product labeling; (iii) whether

Thornton's New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1 through 57-12-26

("NMUPA") claims are actionable under State law where § 57-12-7 of the NMUPA exempts

"actions or transactions expressly permitted under laws administered by a regulatory body

of . . . the United States," but not "actions and transactions forbidden by the regulatory body, and

about which the regulatory body remains silent . . ."; (iv) whether Thornton's breach of express

warranty claims are actionable, where Thornton did not provide Defendants the Kroger Company

and Albertsons Companies notice of the alleged breach of express warranty before filing this case;

(v) whether Thornton's claims fail under the Dormant Commerce Clause; and (vi) whether

Thornton's Class Action Complaint, filed February 5, 2020 (Doc. 1-1), states a plausible claim for

relief under the standards in Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)("Twombly")

and Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)("Iqbal").  See MTD at 6-23.  The main issues in

deciding the PI Motion are: (i) whether Thornton demonstrates that she has a substantial likelihood

of success on the merits of her claim; (ii) whether Thornton will face irreparable injury should the

Court not issue an injunction, where Thornton no longer purchases beef products from the

Defendants; (iii) whether the balance of equities weigh in Thornton's favor, where Thornton does not demonstrate irreparable injury; and (iv) whether a PI is in the public interest, where the PI targets the Defendants' use of the official USDA grade shields.  The Court grants the MTD on Thornton's claims relating to the official USDA grade shields, but denies the rest of the MTD, because, although: (i) collateral estoppel does not bar Thornton's claims in this case; (ii) federal law does not preempt Thornton's claims insofar as she is not seeking the reinstatement of country-of-origin labeling requirements; (iii) NMUPA's safe harbor clause does not exempt the Defendants' conduct; (iv) Thornton's lack of pre-suit notice does not preclude her breach-of-express-warranty claims; and (v) Thornton's claims do not fail under the Dormant Commerce Clause; nevertheless (vi) Thornton does not state a claim upon which relief may be granted as to the Defendants' use of the official USDA grade shields in their advertisements, because the grade shields are not misleading facially.  The Court denies the PI Motion enjoining the Defendants from using color versions of the official USDA grade shields, because: (i) Thornton does not demonstrate a substantial likelihood of success on the merits of her official USDA grade shield claims, which the Court dismisses for failure to state a claim; (ii) Thornton has not shown that she will suffer irreparable injury, should the Court not grant the PI; (iii) the balance of equities weighs in the Defendants' favor; and (iv) a PI would not be in the public interest, given that the purpose of the grade shields is to inform consumers about the beef's grade and not its origin.  Finally, for the reasons stated on the record at the August 24, 2021, status conference, the Court denies

Thornton's Stay Motion.  <u>See</u> Transcript of Hearing at 11:15-16 (Court)(taken August 24, 2021)("Status Conf. Tr.").[2]

## **FACTUAL BACKGROUND**

Because the Court addresses two separate motions which are subject to separate standards, the Court includes two factual sections.  First, the Court provides the facts that Thornton alleges in her Complaint, which govern the MTD, and any other facts about which the Court may take judicial notice.  Second, the Court provides findings of fact that govern the PI Motion.

### I.    **Facts Governing the MTD.**

The Defendants filed a MTD under rule 12(b)(6) of the Federal Rules of Civil Procedure. <u>See</u> MTD at 1.  The Court may consider the "sufficiency of the allegations within the four corners of the complaint after taking those allegations as true" when evaluating a motion to dismiss under rule 12(b)(6).  <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994).  The Court also may consider: (i) documents that the complaint incorporates by reference, <u>see</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the Plaintiffs' claim and the parties do not dispute the documents' authenticity," <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. at 322. <u>See</u> <u>Armstrong v. N.M. Disability Det. Servs.</u>, 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the Court could consider notices attached to the motion and not to the complaint, because the

---

[2]The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  See also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.").  The Court takes its facts from the Plaintiff's Class Action Complaint, see Joint Notice of Removal at 19-94, filed October 8, 2020 (Doc. 1)("Complaint"), and the Plaintiff's Amended Class Action Complaint, filed October 15, 2021 (Doc. 30)("Amended Complaint").  The Court provides these facts for background to test the Complaint's sufficiency.  It does not adopt them for the truth, and it recognizes that the Complaint reflects largely Thornton's version of events.

Thornton is a resident of Bernalillo County, New Mexico, and is "a long-time purchaser of beef Products."  Complaint ¶ 12, at 22.  "Thornton has purchased beef products in New Mexico from Smith's Grocery Store and Albertsons grocery store."  Complaint ¶ 12, at 22.  Thornton "actively seek[s] products that provide assurances regarding animal welfare, food safety standards, environmentally sound production methods and support for domestic producers."  Complaint ¶ 17, at 23.  Thornton is willing to pay more for products marketed with those assurances.  See Complaint ¶ 18, at 23.

Defendant the Kroger Company is an Ohio limited liability company with its principal place of business in Cincinnati, Ohio, and the Kroger Company operates Smith's grocery stores and City Market grocery stores in New Mexico.  See Complaint ¶ 14, at 23.  Defendant Albertsons Companies, Inc., is a Delaware limited liability company with its principal place of business in Boise, Idaho, and operates Albertsons, Albertsons Market, Safeway, and Albertsons Market Street grocery stores in New Mexico.  See Complaint ¶ 15, at 23.  Both Albertsons Companies and the

Kroger Company "market or advertise and sell"[3] beef products "throughout most of the United States, including in New Mexico." Complaint ¶ 16, at 23. The Kroger Company "markets to consumers that they are concerned about the sustainability." Complaint ¶ 17, at 23. The Defendants "advertise a variety of product from the muscle cuts of beef and ground beef . . . that are derived both from cattle born and raised in the United States and from imported beef either live or slaughtered elsewhere." Complaint ¶ 19, at 24. The Defendants use the same advertising for products that derive from cattle born, raised, and slaughtered in the United States, as those that "never drew a breath of American air, much less were born here." Complaint ¶ 20, at 24. Thornton alleges that the Defendants use "[t]he 'Product of the U.S.' packaging or similar advertising omitting the truth of where the Product actually originated from," and this "leads consumers to believe that the beef they are purchasing was born and raised on an American ranch or farm." Complaint ¶ 20, at 24.

"Country of Origin Labeling (COOL) is a mandatory U.S. labeling law enforced by the U.S. Department of Agriculture (USDA) that requires retailers notify their customers with information regarding the source of certain foods." Complaint ¶ 2, at 19-20 (citing 7 U.S.C. §§ 1638-1638d). In 2016, the USDA's Agricultural Marketing Service ("AMS") issued a final rule that amends COOL "by removing the requirements for muscle cuts of beef and pork, and ground beef and pork." Complaint ¶ 4, at 20 (citing 7 U.S.C. §§ 1638, 1638a; Pub. L. No. 114-

---

[3]Thornton draws a distinction between her labeling claims -- which were before the Honorable Kea Riggs, United States District Judge for the United States District for the District of New Mexico in <u>Tyson Foods</u> -- and her false advertising claims before the Court in this case. Neither of the parties define the term "advertisement" or "advertising," and the NMUPA's definition section does not define specifically what is meant by advertising. <u>See</u> N.M.S.A. § 57-12-2. The Court of Appeals of New Mexico has stated that "the focus on advertising suggests that the UPA addresses representations directed at the public at large, as consumers." <u>Lohman v. Daimler-Chrysler Corp.</u>, 2007-NMCA-100, ¶ 22, 142 N.M. 437, 442, 166 P.3d 1091, 1096.

113, 759, 129 Stat. 2242, 2284-85 (2016); <u>Removal of Mandatory Country of Origin Labeling Requirements for Beef and Pork Muscle Cuts, Ground Beef, and Ground Pork</u>, 81 Fed. Reg. 10,755, 10,755 (March 2, 2016)(removing 7 C.F.R. § 65.155)).  "USDA is thus considered to be silent as to COOL regulations regarding beef and pork . . . ."  Complaint ¶ 4, at 20.   The Defendants have benefited from American ranchers' and farmers' "reputation as an environmentally and socially conscious beef industry."  Complaint ¶ 26, at 27.  Approximately 3.06 billion pounds of beef were imported into the United States every year between 2014 and 2020.  <u>See</u> Complaint ¶ 21, at 24.  Approximately 1.94 million head of cattle were imported into the United States between 2014 and 2020.  <u>See</u> Complaint ¶ 21, at 24.

The Kroger Company advertises beef products using the "U.S.D.A. CHOICE/Produced in the USA" graphic, which is in the shape of a shield bearing the stars and stripes of the American flag.  <u>Figure 1</u>, <u>infra</u>.  <u>See</u> Complaint at 25-26; Advertisements from Smiths/Kroger, filed October 15, 2021 (Doc. 30-1).



<u>Figure 1</u>: Close-up of the "U.S.D.A. CHOICE/Produced in the USA" graphic used in the Kroger

Company's advertisements.  Advertisements from Smiths/Kroger at 1.  Albertsons Companies advertises its beef with the "'USDA Choice' red white and blue graphic."  Complaint ¶ 24, at 27; Albertsons Advertisement, filed October 15, 2021 (Doc. 30-2); Figure 2, infra.



Figure 2: Close-up of the "USDA CHOICE" graphic used in Albertsons Companies' advertisements.  Albertsons Advertisement at 2.

"Reasonable consumers rely on grocers, their reputation, and the information provided in grocers' marketing in making purchase decisions," but "lack the information and scientific knowledge necessary to ascertain the true source, quality, and nature of the beef products they purchase."  Complaint ¶¶ 27-28, at 27.  "Reasonable consumers "rely on Defendants to advertise honestly where the products originate."  Complaint ¶ 29, at 27.  Consumers receive the Defendants' advertisements "in the mail or in their newspapers."  Complaint ¶ 30, at 27.

Thornton and other potential class members

have continuously purchased beef products in New Mexico from Smith's Grocery Store and Albertsons grocery stores as well as from other locations for Defendants' grocery stores across the nation regularly and continuously, specifically including the steaks, roast, ground beef and other beef products specifically featured in advertisement[s] from Defendants that featured promotional stickers either explicitly or implicitly designating the products as being produced in the United States, following the delivery of the advertisements . . . .

Am. Compl. ¶ 12, at 4-5.   Thornton received advertisements in the mail or in the Sunday Albuquerque Journal "at least as far back as January of 2018 and as recent as" October 13, 2021. Am. Compl. ¶ 13, at 5 (citing Advertisements received by Plaintiff 10/13/2021, filed October 30, 2021 (Doc. 30-3)).   Thornton "received these advertisements on a monthly basis in the mail and every Sunday in the paper, and then purchased the products contained in the pictures in the Exhibits in the days after receiving these advertisements."  Am. Compl. ¶ 13, at 5.  Thornton believed that the advertisements with wording such as "'Product of the U.S.' or similar statements on red, white and blue flag like images" meant that "the Products being advertised that she eventually purchased were from cattle produced (meaning born, raised and slaughtered) in the United States."  Am. Compl. ¶ 13, at 5.

## II.   Findings of Fact for the PI Motion.

"'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'"  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.)(quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only).  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union  No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.).  The United States Court of Appeals for the Tenth Circuit notes that "when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits."  Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d at 1188.

Thus, while the Court does the best it can to make findings from the record that it has and in the short time that it has to make findings, these findings of fact are only to determine whether to issue a PI.  These facts do not bind the Court or the parties at trial.  Accordingly, the Court finds as follows:

        1.    **The Parties**.

        1.    Plaintiff Robin G. Thornton is a resident of Bernalillo County, New Mexico, "and a long-time purchaser of beef products."  Complaint ¶ 12, at 19.  See Declaration of Robin Thornton ¶ 1, at 1 (executed November 5, 2021), filed November 10, 2021 (Doc. 36-1)("Thornton Decl.").

        2.    Thornton has purchased beef products from grocery stores operated by the Kroger Company and Albertsons Companies, Inc.  See Complaint ¶ 12, at 22.

        3.    Thornton "relied on the red[,] white[,] and blue USDA stickers to indicate that I was purchasing American beef and when I saw advertisements in the mail or the newspaper it caused me to purchase those products believing I was supporting American ranchers and farmers . . . ."  Thornton Decl. ¶ 4, at 1-2.

        4.    The Kroger Company is an Ohio limited liability company with its principal place of business in Cincinnati, Ohio.  See Complaint ¶ 14, at 23.

        5.    The Kroger Company operates Smith's and City Market grocery stores in New Mexico.  See Complaint ¶ 14, at 23.

        6.    Albertsons Companies, Inc., is a Delaware limited liability company with its principal place of business in Boise, Idaho.  See Complaint ¶ 15, at 23.

        7.    Albertsons Companies operates Albertsons, Albertsons Market, Safeway, and Albertsons Market Street grocery stores in New Mexico.  See Complaint ¶ 15, at 23.

8.      Both Albertsons Companies and the Kroger Company "market or advertise and sell"[4] beef products "throughout most of the United States, including in New Mexico."  Complaint ¶ 16, at 23.

9.      The Kroger Company and Albertsons Companies "were the two largest supermarket chains in the United States in 2020, and in 2017 were the 2nd and 3rd largest grocery retailers respectively."  PI Motion at 3.

**2.      The Beef Industry.**

10.      "Country of Origin Labeling (COOL) is a mandatory U.S. labeling law enforced by the U.S. Department of Agriculture (USDA) that requires retailers notify their customers with information regarding the source of certain foods."  Complaint ¶ 2, at 19-20 (citing 7 U.S.C. §§ 1638-1638d).

11.      In 2016, the USDA's Agricultural Marketing Service ("AMS") issued a final rule that amends COOL "by removing the requirements for muscle cuts of beef and pork, and ground beef and pork."  Complaint ¶ 4, at 20 (citing 7 U.S.C. §§ 1638, 1638a; Pub. L. No. 114-113, 759, 129 Stat. 2242, 2284-85 (2016); Removal of Mandatory Country of Origin Labeling Requirements for Beef and Pork Muscle Cuts, Ground Beef, and Ground Pork, 81 Fed. Reg. 10,755, 10,755 (March 2, 2016)(removing 7 C.F.R. § 65.155)).

---

[4]Thornton draws a distinction between her labeling claims -- which were before Judge Riggs in Tyson Foods -- and her false advertising claims before the Court in this case.  Neither of the parties define the term "advertisement" or "advertising," and the UPA's definition section does not define specifically what is meant by advertising.  See N.M.S.A. § 57-12-2.  The Court of Appeals of New Mexico has stated that "the focus on advertising suggests that the UPA addresses representations directed at the public at large, as consumers."  Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 142 N.M. 437, 442, 166 P.3d 1091, 1096.

12.     "USDA is thus considered to be silent as to COOL regulations regarding beef and pork . . . ."  Complaint ¶ 4, at 20.

13.     Approximately 3.06 billion pounds of beef were imported into the United States every year between 2014 and 2020.  See Complaint ¶ 21, at 24.

14.     Approximately 1.94 million head of cattle were imported into the United States between 2014 and 2020.  See Complaint ¶ 21, at 24.

15.     3.343 billion pounds of beef and veal were imported into the United States during 2020.  See Plaintiff's Motion for Preliminary Injunction at 1, filed November 10, 2021 (Doc. 36)("PI Motion")(citing Total U.S. beef and veal imports and exports from 2006 to 2021 (in million pounds), Statista (Feb. 24, 2021), https://www.statista.com/statistics/194702/us-total-beef-and-veal-imports-and-exports-since-2001/).

16.     In 2020, about 4.4 billion pounds of beef and beef products were imported into the United States.  See PI Motion at 2 (citing Imports of cattle and beef hit historical high in 2020, The Fence Post (Feb. 11, 2021), available at https://www.thefencepost.com/news/imports-of-cattle-and-beef-hit-historical-high-in-2020/).

17.     Imported beef from Brazil rose sharply in 2021.  See PI Motion at 3 (citing Tatiana Freitas and Dominic Carey, U.S. Beef Craze Gives Brazil's Meatpackers Relief Amid China Ban, Bloomberg (Nov. 8, 2021), https://www.bloomberg.com/news/articles/2021-11-08/u-s-beef-craze-gives-brazil-s-meatpackers-relief-amid-china-ban).

**3.    Tyson Foods.**

18.     Thornton brought a proposed class action complaint against several nationwide meatpackers in the County of Bernalillo, Second Judicial District, State of New Mexico, on January 7, 2020.  See Thornton v. Tyson Foods, Inc., No. CIV 20-0105 KMR-SMV, 482 F. Supp.

3d 1147 (D.N.M.)(Riggs, J.)("Tyson Foods"), Class Action Complaint at 3, filed February 5, 2020 (Doc. 1-1)("Tyson Complaint").

19.    In the Tyson Complaint, Thornton brings claims against Defendants Tyson Foods, Inc., Cargill Meat Solutions, Corp., JBS USA Food Company, and National Beef Packing Company ("Meatpacker Defendants"), alleging that the Meatpacker Defendants are deceptively labeling and marketing their beef products.  See Tyson Complaint ¶ 1, at 3.

20.    Thornton alleges that "[s]ince 2015, [the Meatpacker] Defendants have breached consumer trust by representing that some of their beef products are a 'Product of the U.S.' when in fact, the products are not derived from domestically originating cattle."  Tyson Complaint ¶ 6, at 4 (no citation for quotation).

21.    Thornton alleges that the Meatpacker Defendants' "misrepresentations  about beef that is a 'Product of the U.S.' prompts consumers to buy beef products with more confidence than they might otherwise have, and to pay more for them than they otherwise would."  Tyson Complaint ¶ 8, at 4 (no citation for quotation).

22.    Thornton alleges that she, "like other reasonable consumers who see [the Meatpacker] Defendants' representations about beef that is a 'Product of the U.S.' did not expect the Products to be derived from non-domestic cattle."  Tyson Complaint ¶ 9, at 5 (no citation for quotation).

23.    Thornton alleges that she and others "purchased the Products believing that they were supporting [the] American beef industry," Tyson Complaint ¶ 9, at 5, and that the Meatpacker Defendants are "able to sell a greater volume of the Products" by using deceptive practices, Tyson Complaint ¶ 10, at 5.

24.     In the Tyson Complaint, Thornton displays images of beef labeling, and argues that the "packaging, with its 'Product of United States' or 'USDA Choice' with no accurate representation of country of origin, prominently directs purchaser to assume that the Products are actually derived from domestically born and raised cattle when in fact that may not be true at all." Tyson Complaint, ¶ 25, at 15 (no citation for quotation).

25.     Thornton argues that the "requirements of Federal Rule of Civil Procedure 23 are satisfied," because the "member of the Class and the New Mexico Sub-Class are so numerous that joinder of all members is impracticable," "there are questions of law and fact that are common to the Class members and that predominate over individual questions," "Plaintiff Thornton's claims are typical of the claims of the Class and New Mexico Sub-Class because Plaintiff Thornton suffered the same injury," and "Plaintiff Thornton will fairly and adequately represent and protect the interests" of the class members, does not have any interests that are adverse to those class members, and has retained "competent counsel experienced in class action litigation."  Tyson Complaint ¶ 48, at 19-20.

26.     Finally, Thornton argues that a class action is "superior to other available methods for the fair and efficient adjudication of this controversy."  Tyson Complaint ¶ 48, at 21.  Thornton also argues that the "prerequisites for maintaining a class action for injunctive or equitable relief under NMRA 1-023 are met."  Tyson Complaint ¶ 49, at 21.

27.     In her first Count, Thornton alleges that the Meatpacker Defendants have violated the NMUPA by "unfairly and deceptively . . . misrepresent[ing] to consumers that the muscle cuts of beef in the Products exclusively originates from American Ranchers and Farmers" "by omitting information about the actual origination of the beef in the Products," Tyson Complaint ¶ 53, at 22,

and that these representations and omissions are material in causing consumers like Thornton to purchase the beef products, see Tyson Complaint ¶ 55, at 22.

28.     Thornton accuses the Meatpacker Defendants of "capitaliz[ing] on the reputation of domestic beef producers to make material representations and omissions to consumers in New Mexico and across the nation," Tyson Complaint ¶ 56, at 23, and of acting "with malice, ill will, or wanton conduct," Tyson Complaint ¶ 57, at 23.

29.     Thornton requests equitable relief, actual damages, exemplary damages, and attorneys' fees and costs.  See Tyson Complaint ¶ 60, at 23-24.

30.     Thornton's Second Count alleges breach of express warranty claims, because the Meatpacker "Defendants provided Plaintiff Thornton and members of the Class with written express warranties including, but not limited to, warranties that Products originated exclusively from domestic beef producers."  Tyson Complaint ¶ 63, at 24.

31.     In Count Three, Thornton alleges that the Meatpacker Defendants are "unjustly enriched through sales of imported Products at the expense of Plaintiff Thornton and the Class members."  Tyson Complaint ¶ 70, at 25.

32.     Thornton requests certification of the class action, declaratory, injunctive relief, and an award of actual and exemplary damages, plus restitution, fees and costs.  Tyson Complaint ¶¶ A-N, at 25-26.

33.     On the same day that Thornton filed her Tyson Complaint in the Second Judicial District Court, State of New Mexico, Plaintiff Michael Lucero filed a near-identical complaint in the Thirteenth Judicial District, State of New Mexico, against the same Meatpacker Defendants, proposing a class action "on behalf of one class and one subclass . . . comprising ranchers and farmers who domestically sell cattle for beef that is born, raised, and slaughtered in the United

States" who are "placed in unfair competition with the muscle cuts of beef from imported live[] cattle and beef sold by Defendants." Lucero v. Tyson Foods, Inc., No. CIV 20-0106 KMR-SMV, Class Action Complaint at 4-5, filed February 5, 2020 (Doc. 1-1)("Lucero Complaint").

34.     On February 5, 2020, the Meatpacker Defendants removed Thornton's and Lucero's cases to the United States District Court for the District of New Mexico. See Thornton v. Tyson Foods, No. CIV 20-0105 KMR-SMV, Notice of Removal, filed February 5, 2020 (Doc. 1)("Thornton-Tyson Removal Notice"); Lucero v. Tyson Foods, Inc., No. CIV 20-0106 KMR-SMV, Notice of Removal, filed February 5, 2020 (Doc. 1)("Lucero-Tyson Removal Notice").

35.     In the Thornton-Tyson Removal Notice, the defendants assert federal jurisdiction under 28 U.S.C. § 1453, CAFA, and 28 U.S.C. § 1332(d). See Thornton-Tyson Removal Notice at 1-2.

36.      In the Lucero-Tyson Removal Notice, the defendants assert federal jurisdiction under 28 U.S.C. § 1453, CAFA, and 28 U.S.C. § 1332(d). See Lucero-Tyson Removal Notice at 1-2.

37.     Judge Riggs ordered the two cases' consolidation on March 11, 2020: Thornton's case was designated as the lead case, and Lucero's the member case. See Tyson Foods, No. CIV 20-0150 KWR-SMV, Stipulated Order Granting Joint Motion to Consolidate Related Cases at 1-2, filed March 11, 2020 (Doc. 45).

**4.     Tyson Foods MOO.**

38.     On August 27, 2020, Judge Riggs issued a Memorandum Opinion and Order dismissing the consolidated cases with prejudice. See Tyson Foods, 482 F. Supp. 3d at 1152.

39.     In the background discussion of the consolidated cases, Judge Riggs concludes that "[l]abels on beef products are regulated under the Federal Meat Inspection Act ('FMIA')," which prohibits meat products from being sold "'under any labeling which is false or misleading, but . . . labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.'" Tyson Foods, 482 F. Supp. 3d at 1153 (quoting 21 U.S.C. § 607(d)).

40.     Judge Riggs also concludes that "[t]he USDA regulates beef labels through its Food Safety and Inspection Service ('FSIS')," which

> administers a label approval program which ensures that no meat products "bear any false or misleading marking, label, or other labeling and [that] no statement, word, picture, design or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling."

Tyson Foods, 482 F. Supp. 3d at 1153 (quoting 9 C.F.R. § 317.8(a))(alteration in Tyson Foods).

41.     Judge Riggs also concludes that "the label at issue has been approved by FSIS and found to be not misleading or false," because FSIS regulations state that "'no final label may be used on any [meat] product unless the label has been submitted for approval to FSIS Labeling and Program Delivery Staff, accompanied by FSIS form 7234-1 . . . ." Tyson Foods, 482 F. Supp. 3d at 1153 (quoting 9 C.F.R. § 412.1(a))(brackets added in Tyson Foods).

42.     Judge Riggs notes that "Congress made country o[f] origin labeling optional for beef products" in 2016. Tyson Foods, 482 F. Supp. 3d at 1153 (citing Pub. L. No. 114-113, 759, 129 Stat. 2242, 2284-85 (2016)).

43.     Judge Riggs also concludes that the USDA treats country of origin labels as optional, "but continues to approve beef labels; if a producer wants to label its beef with a country of origin, it must comply with FSIS's approved standard before doing so." Tyson Foods, 482 F.

Supp. 3d at 1153-54 (citing 21 U.S.C. § 607(d); Food Safety Inspection Service, <u>Food Standards and Labeling Policy Book</u> (August 2005), https://www.fsis.usda.gov/guidelines/2005-0003);

44.   Judge Riggs also concludes that the USDA approved the beef labels at issue, because the <u>Food Standards and Labeling Policy Book</u> states that "'labeling may bear the phrase "product of USA". . . if . . . [t]he product is processed in the U.S. . . .'" <u>Tyson Foods</u>, 482 F. Supp. 3d at 1154 (quoting <u>Food Standards and Labeling Policy Book</u> at 147)(no citation for quotation);

45.   Judge Riggs concludes that the term, "Product of the U.S.A." "'has been applied to products that, at a minimum, have been prepared in the United States.  It has never been construed by FSIS to mean that the product is derived only from animals that were born, raised, slaughtered, and prepared in the United States.'" <u>Tyson Foods</u>, 482 F. Supp. 3d at 1154 (quoting 66 Fed. Reg. 41,160, at 41,160-61 (Aug. 7, 2001)).

46.   Judge Riggs concludes that federal law preempts Thornton's claims, because "FMIA is clear that labeling requirements in addition to or different than those under the FMIA or approved by the USDA are preempted." <u>Tyson Foods</u>, 482 F. Supp. 3d at 1155 (citing 21 U.S.C. § 678).

47.   Judge Riggs takes judicial notice of FSIS' "comprehensive label approval program," of the fact that FSIS necessarily approved the labels at issue, and of the fact that FSIS "permits a beef product label to bear the phrase 'Product of the USA' if the product is processed in the United States." <u>Tyson Foods</u>, 482 F. Supp. 3d at 1156-57 (citing 9 C.F.R. 317.8(a); 412.1(a); 66 Fed. Reg. 41,160, at 41,160-61 (Aug. 7, 2001)).

48.   Judge Riggs concludes that federal law preempts a state law claim which requires "labeling different than the USDA approved labels," because "'FSIS's preapproval of a label must be given preemptive effect over state-law claims that would effectively require the label to include

different or additional markings.'" Tyson Foods, 482 F. Supp. 3d at 1157 (quoting Barnes v. Campbell Soup Co., No. CIV 12-05185 JSW, 2013 WL 5530017, at *5 (N.D. Cal. July 25, 2013)(White, J.)).

49.     Judge Riggs also cites several district court cases -- predominantly from the Ninth Circuit -- for the proposition that allowing a jury to weigh in on preapproved USDA labels would conflict with the federal regulatory scheme or improperly trump USDA authority. See Tyson Foods, 482 F. Supp. 3d at 1157 (citing, e.g., Trazo v. Nestle USA, Inc., 2013 WL 4083218, at *7-8 (N.D. Cal. Aug. 9, 2013)(Grewal, J.); Meaunrit v. Pinnacle Foods Grp., 2010 WL 1838715, at *7 (N.D. Cal. May 5, 2010)(Wilken, J.)).

50.     In response to Thornton's argument that federal law does not preempt her claims, because the Meatpacker Defendants' advertising is misleading, Judge Riggs reasons that Thornton pled that "third-parties and not the [Meatpacker] Defendants themselves produced the false advertisements," and cites Kuenzig v. Hormel Foods Corp., 505 F. App'x 937 (11th Cir. 2013), for the proposition that labels "'could not become unfair or deceptive simply by virtue of being depicted in an advertisement.'" Tyson Foods, 482 F. Supp. 3d at 1158 (quoting Kuenzig v. Hormel Foods Corp., 505 F. App'x at 939).

51.     Judge Riggs concludes that 21 U.S.C. § 678's grant of concurrent jurisdiction to the states to prevent the distribution of misbranded products and misleading meat labeling "must be read in conjunction with language in § 678 which provides that no state may impose labeling requirements 'in addition to, or different than' those issued under the FMIA," Tyson Foods, 482 F. Supp. 3d at 1159 (quoting 21 U.S.C. § 678), and that "'the states' concurrent jurisdiction has been interpreted to mean that states can impose sanctions for violations of state requirements that are equivalent to the FMIA . . . ,'" Tyson Foods, 482 F. Supp. 3d at 1159 (quoting Kuenzig v.

Kraft Foods, Inc., No. 8:11-CV-838-T-24 TGW, 2011 WL 4031141, at *4 (M.D. Fla. Sept. 12, 2011)(Bucklew, J.)).

52.     Next, Judge Riggs declines the Meatpacker Defendants' request that she stay or refer the matter to the USDA under the primary-jurisdiction doctrine, because she is dismissing the case with prejudice.  See Tyson Foods, 482 F. Supp. 3d at 1160.

53.     Because Judge Riggs concludes that federal law preempts Thornton's claims, she concludes that Thornton's claims fail under the NMUPA, because the NMUPA contains a safe harbor provision which "preclude[es] UPA liability for conduct that is permissible under federal law." Tyson Foods, 482 F. Supp. 3d at 1160 (citing N.M.S.A. § 57-12-7).

54.     Judge Riggs concludes that Thornton's unjust enrichment claims fail, "even if they are not preempted," because the Meatpacker Defendants' compliance with USDA regulations, and use of USDA-approved labels cannot be unjust.  Tyson Foods, 482 F. Supp. 3d at 1161.

55.     Furthermore, Judge Riggs concludes that, because Thornton "does not explain why she does not have a breach of contract claim with the retailers" from whom she purchased the "offending beef," her claims cannot lie for unjust enrichment. Tyson Foods, 482 F. Supp. 3d at 1161.

56.     Judge Riggs also concludes that Thornton's breach-of-warranty claims fail, because Thornton did not give pre-suit notice to the seller.  See Tyson Foods, 482 F. Supp. 3d at 1161-62.

57.     Finally, Judge Riggs declines to address the Meatpacker Defendants' arguments that she should dismiss the case on dormant commerce clause grounds, because "the Court avoid[s] unnecessarily reaching constitutional issues when a case fails on other grounds."  Tyson Foods, 482 F. Supp. 3d at 1162.

5.      **Images Used in the Defendants' Advertising and Marketing.**

58.     Until October 14, 2021, the Kroger Company's advertisements for beef products included a red, white, and blue label in the shape of a shield, depicting the American flag, and with the words: "U.S.D.A. CHOICE/Produced in the U.S.A."  Complaint at 25.  See Declaration of Will Zimmerman ¶ 2, at 1 (executed December 7, 2021), filed December 8, 2021 (Doc. 64-1)("Zimmerman Decl."); Figure 3, infra:



Figure 3: Close-up of "U.S.D.A. CHOICE/Produced in the USA" graphic used in advertisement from the Kroger Company.  PI Motion at 4-5.  See Figure 4, infra.



Figure 4: "U.S.D.A. CHOICE/Produced in the USA" graphic.  PI Reply at 2.

59.    "On October 14, 2021, Kroger elected to cease using 'Produced in the USA'

language in connection with any beef advertisements."  Zimmerman Decl. ¶ 2, at 1.[5]

60.    The Kroger Company "now uses the USDA grading shield in its advertisements for

beef," and gives an example of one "which ran in the most recent weekly advertising circular."

Zimmerman Decl. ¶ 3, at 2 (citing Figure 5, infra).

---

[5]The Court notes that its local Smith's grocery store is still using "U.S.D.A.
CHOICE/Produced in the USA" promotional stickers on beef products in the store.  The Court,
therefore, understands Zimmerman's statement -- that the Kroger Company is no longer using
"'Produced in the USA' language in connection with any beef advertisements" -- to refer to
advertisements mailed or otherwise given to consumers outside the store.  The Court notes,
therefore, that the Kroger Company is still using these promotional stickers inside its stores.



Figure 5: The Kroger Company's circular advertisement using USDA CHOICE grade shield. Zimmerman Decl. at 2.

61.     Albertsons Companies "halted [its] use of the red, white and blue label alleged by Plaintiff to give the false impression that the beef is of domestic origin . . . ." PI Motion at 5.  See MTD at 17 ("Thornton does not allege that Albertsons advertised its beef as a 'Product of the USA' at all, but argues only that this was implied because the advertising she does not include in her complaint features a "'USDA Choice' red[,] white and blue graphic.").

62.     Both the Kroger Company and Albertsons Companies are advertising beef products by using a graphic a red, white, and blue label in the shape of a shield, with the words, "USDA CHOICE."  PI Motion at 6.

**6.      Food Safety and Inspection Service Regulations.**

63.     The Food Safety and Inspection Service ("FSIS") is "an agency of the United States Department of Agriculture (USDA)."  9 C.F.R. § 300.1.

64.     The FSIS has responsibility and the statutory authority to implement regulations pursuant to FMIA.  See 9 C.F.R. § 300.2(a)-(b)(1).

65.     "Under the Federal Meat Inspection Act, the Food Safety Inspection Service inspects all raw beef sold in interstate and foreign commerce, including imported products." U.S. Meat Export Federation, <u>USDA Beef Grading</u> (December 11, 2012), https://www.youtube.com/watch?v=tEHwm1gIj-w&t=1195s.

66.     FSIS' inspection "includes the inspection of live cattle during the ante-mortem inspection procedures, monitoring animal handling, the inspection of visceral organs immediately following harvest, monitoring the compliance and adherence to food safety programs, specifically HACCP, and oversight of production practices and product labeling." U.S. Meat Export Federation, <u>USDA Beef Grading</u>.

67.     FMIA contains a preemption clause which states:

> Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this Act may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements under title I of this Act, but any State or Territory may, consistent with the requirements under this Act, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said title, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment . . .

21 U.S.C. § 678.

68.     In general, FSIS requires inspection at

> Every establishment, except as provided in § 303.1(a) and (b), or (d) of this subchapter, within any State or organized Territory which is designated pursuant to paragraph 301(c) of the Act, at which any livestock are slaughtered or any products of any livestock are prepared, for use as human food solely for distribution within such jurisdiction.

9 C.F.R. § 302.1(a)(2).

69.     9 C.F.R. § 303.1(d) exempts retail stores from 9 C.F.R. 302.1's inspection requirement:

      (1)     The requirements of the Act and the regulations in this subchapter for inspection of the preparation of products do not apply to operations of types traditionally and usually conducted at retail stores and restaurants, when conducted at any retail store or restaurant or similar retail-type establishment for sale in normal retail quantities or service of such articles to consumers at such establishments.

      (2)     For purposes of paragraph (d)(1) of this section:

          (i)     Operations of types traditionally and usually conducted at retail stores and restaurants are the following:

              (a)     Cutting up, slicing, and trimming carcasses, halves, quarters, or wholesale cuts into retail cuts such as steaks, chops, and roasts, and freezing such cuts;

9 C.F.R. § 303.1(d).

70.     The FSIS defines an "official establishment" as "[a]ny slaughtering, cutting, boning, meat canning, curing, smoking, salting, packing, rendering, or similar establishment at which inspection is maintained under the regulations in this subchapter."   9 C.F.R. § 301.2.

71.     FMIA and FSIS define a "label" as "[a] display of written, printed, or graphic matter upon the immediate container (not including package liners) of any article."   9 C.F.R. § 301.2; 21 U.S.C. § 601(o).

72.     FSIS also states that "[a] label within the meaning of this part shall mean a display of any printing, embossing, stickers, seals, or other written, printed, or graphic matter upon the immediate container (not including package liners) of any product."  9 C.F.R 317.2.

73.     FSIS defines an "immediate container" as "[t]he receptacle or other covering in which any product is directly contained or wholly or partially enclosed." 9 C.F.R. § 301.2.

74.     The FSIS defines "labeling" as "[a]ll labels and other written, printed, or graphic matter: (1) Upon any article or any of its containers or wrappers, or (2) Accompanying such article."  9 C.F.R. § 301.2.  See 21 U.S.C. § 601(p).

75.     In pertinent part, the FSIS states that the term "misbranded" "applies to any carcass, part thereof, meat or meat food product under one or more of the following circumstances: (1) If its labeling is false or misleading in any particular."  9 C.F.R. § 301.2.  See 21 U.S.C. § 601(n).

76.     FMIA extends its prohibition on false or misleading labeling beyond just official establishments or establishments subject to FSIS inspection, to retail stores:

> No article subject to this title shall be sold or offered for sale by any person, firm, or corporation, in commerce, under any name or other marking or labeling which is false or misleading, or in any container of a misleading form or size, but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.

21 U.S.C. § 607(d).

77.     The FSIS changed its label approval regulations on November 7, 2013, "to expand the circumstances in which certain types of labels are generically approved."  FSIS, Compliance Guideline for Label Approval at 2 (July 2020), https://www.fsis.usda.gov/sites/default/file s/media_file/2020-10/Label-Approval-Guide.pdf.

78.     "FSIS has interpreted [21 U.S.C. § 607] as requiring that the Secretary of Agriculture or his or her representative approve all labels used on federally inspected and passed, and imported, meat and poultry products before the products are distributed in commerce."  Prior Label Approval System: Generic Label Approval, 78 Fed. Reg. 66,826, 66,827 (Nov. 7, 2013).

79.     FSIS' Labeling and Program Delivery Staff ("LPDS") operates a label approval program pursuant to 9 C.F.R. § 412.1(a).  See 9 C.F.R. § 412.1(a).

80.     FSIS requires submission of labeling applications for, among other things, "[s]pecial statements and claims as defined in paragraph (e) of this section and presented in the context of a final label."  9 C.F.R. § 412.1(c)(3).

81.     In pertinent part, FSIS defines "[s]pecial statements and claims" as:

[C]laims, logos, trademarks, and other symbols on labels that are not defined in the Federal meat and poultry products inspection regulations or the Food Standards and Labeling Policy Book, (except for "natural" and negative claims (e.g., "gluten free")), health claims, ingredient and processing method claims (e.g., high-pressure processing), structure-function claims, claims regarding the raising of animals, organic claims, and instructional or disclaimer statements concerning pathogens (e.g., "for cooking only" or "not tested for E. coli O157:H7").  Examples of logos and symbols include graphic representations of hearts and geographic landmarks. . . .

9 C.F.R. § 412.1(e).

82.     Generically approved labels need not be submitted for review to LPDS:

An official establishment . . . is authorized to use generically approved labels, as defined in paragraph (b) of this section, and thus is free to use such labels without submitting them to the Food Safety and Inspection Service for approval, provided the label, in accordance with this section, displays all mandatory features in a prominent manner in compliance with part 317 or part 381, and is not otherwise false or misleading in any particular.

9 C.F.R. § 412.2 (a).

### 7.     The Agricultural Marketing Service's Regulations.

83.     The Agricultural Marketing Service ("AMS"), is a USDA department which "administers programs that create domestic and international marketing opportunities for U.S. producers of food, fiber, and specialty crops," and "provides the agriculture industry with valuable services to ensure the quality and availability of wholesome food for consumers across the country."  AMS, Our Mission, https://www.ams.usda.gov/about-ams (last visited December 30, 2021).

84.     "The first official United States standards for grades of carcass beef were approved under an Act of Congress in February of 1925, [43 Stat. 822, 844-845, 68th Congress (February 10, 1925)], and voluntary beef grading services were offered by the United States government and USDA in May of 1927."  U.S. Meat Export Federation, USDA Beef Grading.

85.     AMS promulgates rules and regulations under the authority of the Department of Agriculture, pursuant to the Agricultural Marketing Act of 1946.  See 7 U.C.S. §§ 1621-1627.

86.      "The practice of beef grading has remained voluntary throughout its history, and the Agricultural Marketing Act of 1946 requires the USDA to provide grading services to any group or company requesting it."  U.S. Meat Export Federation, USDA Beef Grading.

87.     "Even though the USDA Food Safety Inspection Service and the USDA Agricultural Marketing Service both work together in beef processing facilities, they serve the beef industry and beef consumers in different roles."   U.S. Meat Export Federation, USDA Beef Grading.

88.     "After beef is inspected for wholesomeness, producers and processors may request to have the products graded for quality by a licensed federal grader." U.S. Meat Export Federation, USDA Beef Grading.

89.     "USDA's AMS is the agency responsible for grading beef, and the oversight of product specifications[;] [t]hose who request grading must pay for this service." U.S. Meat Export Federation, USDA Beef Grading.

90.     "USDA beef grades are based on the United States standards for carcass grades of beef," and "[t]he grade is stamped on the carcass or side of beef, and is usually not visible on retail cuts[;] [h]owever, retail packages of beef will show the US grademark if they have been officially graded."  U.S. Meat Export Federation, USDA Beef Grading.

91.    "U.S. grades are based on nationally uniform standards of quality developed by AMS," which "promote uniformity and assurance of product quality on a continuous basis regardless of supplier."   AMS, <u>Beef Grading Shields</u>, https://www.ams.usda.gov/grades-standards/beef/shields-and-marbling-pictures (last visited December 30, 2021).

92.    "The USDA grade shields are highly regarded as symbols of high-quality American beef."  AMS, <u>Beef Grading Shields</u>.

93.     "The official USDA grade shield indicates the product's quality level."  AMS, <u>Beef Grading Shields</u>.

94.    AMS "provides impartial grading and certification services that ensure agricultural products meet specified requirements."   <u>Amendments to the Regulations Governing Meats, Prepared Meats, and Meat Products (Grading, Certification, and Standards)</u>, 84 Fed. Reg. 48,551, 48,552 (September 16, 2019)(codified at 7 C.F.R. pt. 54).

95.    AMS' grading and certification "services are voluntary, with users paying for the cost of the requested service."  84 Fed. Reg. 48,551, 48,552.

96.    "AMS grading services verify that product meets USDA grade standards (*e.g.,* USDA Choice) and certify that products meet requirements defined by the company or another third-party."  84 Fed. Reg. 48,551, 48,552.

97.     "AMS Product characteristics such as manner of cut, color, and other quality attributes can be directly examined by an AMS employee or an authorized agent to determine if product requirements have been met."  84 Fed. Reg. 48,551, 48,552.

98.    AMS can identify meat products "as 'USDA Prime,' 'USDA Choice,' 'USDA Select,' 'USDA Certified,' 'USDA Accepted as Specified,' or 'USDA Further Processing Certification Program.'"  84 Fed. Reg. 48551, 48552 (no citations for quotations).

99.     "Meat grading and certification activities are carried out under 7 CFR 54."  84 Fed. Reg. 48551, 48552.

100.    USDA "official marks" or "official identifications" are "any form of mark or other identification, including those prescribed in [7 C.F.R.] § 54.17," which are "used under the regulations in marking any products, or the immediate or shipping containers thereof, to show inspection class, grade quality, size quantity, or condition of the products . . . or to maintain the identity of products for which service is provided under the regulations."  7 C.F.R. § 54.2.

101.    An "[i]mmediate container" is the "carton, can, pot, tin, casing, wrapper, or other receptacle or covering constituting the basic unit in which products are directly contained or wrapped when packed in the customary manner for delivery to the meat trade or to consumers."  7 C.F.R. § 54.1.

102.    AMS' grading service

> may be made available to products shipped or received in interstate commerce[] . . . [and] also may be made available to the products not shipped or received if the Director or Chief determines that the furnishing of service for such products will facilitate the marketing, distribution, processing, or utilization of agricultural products through commercial channels.

7 C.F.R. § 54.5.

103.    AMS' grading service "will be furnished for products only if they were derived from animals slaughtered in federally inspected establishments or establishments operated under state meat inspection in a state other than one designated in 9 CFR 331.2."  7 C.F.R. § 54.5.

104.    "Service may be furnished for imported carcasses only if an exemption to do so is granted by the Director as described in § 54.20."  7 C.F.R. § 54.5.

105.    "All products examined for class and grade under the official standards, or the immediate containers and the shipping containers, shall be stamped, branded, or otherwise marked with an appropriate official identification."  7 C.F.R. § 54.16.

106.    Imported carcasses are exempt from 7 C.F.R. § 54.16's requirements, if:

(1)    The imported carcass is marked so that the name of the country of origin is conspicuous to the USDA grader. The mark of foreign origin shall be imprinted by roller brand, handstamp, tag, or other approved method.

(2)    The imprints of the mark of foreign origin have been submitted to the Chief for the determination of compliance with these regulations prior to use on meats offered for Federal grading.

(3)    The applicant notifies the official grader performing the service whenever imported carcasses are offered for grading.

7 C.F.R. § 54.20(e).

107.    7 C.F.R. § 54.17 lists the "official identifications" the AMS permits for grading.

## PROCEDURAL BACKGROUND

Thornton filed her Class Action Complaint in this case on September 3, 2020, in the Second Judicial District Court, State of New Mexico.  See Joint Notice of Removal at 19, filed October 8, 2020 (Doc. 1)("Complaint").  The Defendants removed Thornton's Complaint to the United States District Court for the District of New Mexico on October 8, 2020.  See Joint Notice of Removal at 1, filed October 8, 2020 (Doc. 1)("Removal Notice").  The Defendants filed their MTD on November 13, 2020, see MTD at 1, which the Court denied on September 30, 2021, see Order at 1.  Thornton filed her PI Motion on November 10, 2021.  See PI Motion at 1.

### 1.    The Complaint.

Thornton filed her Class Action Complaint in this case on September 3, 2020, in the Second Judicial District Court, State of New Mexico.  See Complaint at 19.  In the Complaint, Thornton

brings a proposed class action complaint pursuant to NMRA 1-023 against Defendants the Kroger Company and Albertsons Companies, alleging that the Defendants are deceptively marketing and advertising beef products.  See Complaint ¶ 1, at 19.  Thornton alleges that, "[s]ince 2015, Defendants have breached consumer trust by advertising that some of their beef products are a 'Product of the U.S.' when in fact, the products are not derived from domestically originating cattle."  Complaint ¶ 5, at 20-21.  Thornton alleges that the Defendants' advertisement of these products by mail or by other means as "Product of the U.S." and "in such a way to cause the consumer to believe[] that the beef is a product of the U.S. prompts consumers to buy beef products with more confidence than they might otherwise have, and to pay more for them than they otherwise would."  Complaint ¶ 8, at 21-22.  Thornton alleges that, "like other reasonable consumers who see Defendants' representations in advertisements outside of the store about beef that is a 'Product of the U.S.' [she] did not expect the Products to be derived from non-domestic cattle."  Complaint ¶ 9, at 22 (no citation for quotation).  Thornton alleges that she and others "purchased the Products believing that they were supporting American beef industry," Complaint ¶ 9, at 22, and that the Defendants are "able to sell a greater volume of the Products" by using deceptive practices, Complaint ¶ 10, at 22.

Thornton argues that the "requirements of Federal Rule of Civil Procedure 23 are satisfied," because the "member of the Class and the New Mexico Sub-Class are so numerous that joinder of all members is impracticable," "there are questions of law and fact that are common to the Class members and that predominate over individual questions," "Plaintiff Thornton's claims are typical of the claims of the Class and New Mexico Sub-Class because Plaintiff Thornton suffered the same injury," "Plaintiff Thornton will fairly and adequately represent and protect the interests" of the class members, does not have any interests that are adverse to those class members,

and has retained "competent counsel experienced in class action litigation."  Complaint ¶ 46, at 30-32.  Finally, Thornton argues that a class action is "superior to other available methods for the fair and efficient adjudication of this controversy."  Complaint ¶ 46, at 32.  Thornton also argues that the "prerequisites for maintaining a class action for injunctive or equitable relief under NMRA 1-023 are met."  Complaint ¶ 47, at 32.

In her first Count, Thornton alleges that the Defendants have violated the NMUPA by "fraudulently advertising to consumers that the muscle cuts of beef in the Products exclusively originates from American Ranchers and Farmers," and "by omitting information about the actual origination of the beef in the Products," Complaint ¶¶ 52-53, at 33, and that these representations and omissions are material in causing consumers like Thornton to purchase the beef products, see Complaint ¶ 53, at 33-34.  Thornton accuses the Defendants of "capitaliz[ing] on the reputation of domestic beef producers to make material representations and omissions to consumers in New Mexico and across the nation," Complaint ¶ 54, at 34, and of acting "with malice, ill will, or wanton conduct," Complaint ¶ 55, at 34.  Thornton requests equitable relief, actual damages, exemplary damages, and attorneys' fees and costs.  See Complaint ¶ 58, at 35.

Thornton's Second Count alleges breach-of-express-warranty claims, because the "Defendants provided Plaintiff Thornton and members of the Class with written express warranties including, but not limited to, warranties that Products originated exclusively from domestic beef producers."  Complaint ¶ 61, at 35.  In Count Three, Thornton alleges that the Defendants are "unjustly enriched through sales of imported Products at the expense of Plaintiff Thornton and the Class members."  Complaint ¶ 68, at 36.  Thornton requests certification of the class action,

declaratory relief, injunctive relief, and an award of actual and exemplary damages, plus restitution, fees and costs.  See Complaint ¶¶ A-N, at 36-37.

### 2.      The Notice of Removal.

The Defendants removed Thornton's Complaint to the United States District Court for the District of New Mexico on October 8, 2020.  See Removal Notice at 1.  The Defendants state that the Court has jurisdiction: (i) pursuant to 28 U.S.C. § 1332(d) -- CAFA, because the proposed class has at least 100 proposed class members, and asserts an aggregate amount in controversy of $5,000,000.00 or more; (ii) pursuant to 28 U.S.C. § 1332(a)(1) -- diversity jurisdiction, because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00; and (iii) pursuant to 28 U.S.C. § 1331 -- federal-question jurisdiction, because federal law preempts Thornton's claims.  See Removal Notice at 1.  In particular, the Defendants argue that the Court has federal-question jurisdiction over the Complaint, because "'[f]ederal courts may exercise federal question jurisdiction over complaints that, although not presenting federal questions on their face, nonetheless present state law claims that are *preempted* by federal law.'" Removal Notice at 11 (quoting Garley v. Sandia Corp., 236 F.3d 1200, 1207 (10th Cir. 2001))(emphasis in Removal Notice but not in Garley v. Sandia Corp.).  The Defendants also attest that the "'artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim.'"  Removal Notice at 11 (quoting Rivet v. Regions Bank, 522 U.S. 470, 475 (1998)).

### 3.      The MTD.

The Defendants filed their MTD on November 13, 2020.  See MTD at 1.  First, the Defendants argue that collateral estoppel bars Thornton's claims in this case, because Judge Riggs dismissed with prejudice her claims against the Meatpacker Defendants in Tyson Foods.  MTD at

6-9 (citing <u>Tyson Foods</u>, 482 F. Supp. 3d at 1152).  The Defendants assert that Thornton "has filed the same allegation, concerning the same advertisements of the same products with the same labeling, in support of the same claims as she did in the dismissed Tyson case," and that the only thing which has changed is the defendants.  MTD at 6.   The Defendants argue that defensive collateral estoppel "was designed to prevent precisely this kind of attempt to relitigate a lost case by switching defendants," MTD at 6-7 (citing <u>Blonder-Tongue Labs. v. Univ. of Ill. Found.</u>, 402 U.S. 313, 329 (1971) and <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 329-30 (1979)), and recite the Court's articulation of collateral estoppel's four elements from <u>Mayer v. Bernalillo Cnty.</u>, No. CIV 18-0666 JB/SCY, 2019 U.S. Dist. LEXIS 3555 (D.N.M. January 8, 2019)(Browning, J.). MTD at 7 (quoting <u>Mayer v. Bernalillo Cnty.</u>, 2019 U.S. Dist. LEXIS 3555, at *111).   The Defendants contend that collateral estoppel's first prong is met, because "the issues in this case are precisely the same as the issues in the Tyson case," and "[c]onsideration of Plaintiff's claims here requires the same analysis of the same federal statutes and regulations, and consideration of the same case law regarding federal preemption."  MTD at 8.  The Defendants argue that, in terms of collateral estoppel's second prong, the issue whether federal law preempts Thornton's claims was "'finally adjudicated on the merits' in Judge Rigg's order of dismissal."  MTD at 8 (quoting <u>Tyson Foods</u>, 2020 U.S. Dist. LEXIS 156059, at *32).  The Defendants assert that Thornton's appeal to the Tenth Circuit from Judge Riggs' decision in <u>Tyson Foods</u> does not "change the fact that it is a final judgment for purposes of invoking collateral estoppel."  MTD at 8.  The Defendants argue that the third prong is met, because "'the party against whom the doctrine is invoked,' Thornton, is the same plaintiff whose complaint was dismissed in 'the prior adjudication.'"  MTD at 8 (no citation for quotation).  On defensive collateral estoppel's fourth prong, the Defendants argue that "Thornton had a full and fair opportunity to litigate the issues in her opposition to their motion."

MTD at 8.  The Defendants assert that, because Thornton "cloned" her complaint in <u>Tyson Foods</u> and merely "switched the names of the defendants," this issue is "**<u>not a close case</u>**," but "precisely the kind of behavior defensive collateral estoppel was designed to prevent."  MTD at 9 (emphasis in MTD).

Next, the Defendants argue that federal law preempts Thornton's claims.  <u>See</u> MTD at 9-18.  Specifically, the Defendants contend that "beef labels 'are regulated under the Federal Meat Inspection Act (FMIA), codified at 21 U.S.C. § 601, et seq.,'" MTD at 9 (quoting <u>Tyson Foods</u>, 2020 U.S. Dist. LEXIS 156059, at *6), and that "the FMIA allows the USDA to ban labeling for meat products that is finds to be false or misleading," MTD at 9 (citing 21 U.S.C. § 607(e)).  The Defendants argue that FSIS approved the labels here and that Thornton conceded this fact in <u>Tyson Foods</u>.  <u>See</u> MTD at 10 (citing quoting <u>Tyson Foods</u>, 2020 U.S. Dist. LEXIS 156059, at *7).  The Defendants discuss the history of country of origin labeling requirements, and emphasize that, in 2008, "Canada and Mexico challenged the United States' country-of-origin labeling requirements in the World Trade Organization," claiming that it "disincentivized purchasers from buying foreign products."  MTD at 10-11 (citing Panel Report, <u>United States -- Country of Origin Labelling (COOL) Requirements</u>, ¶¶ 2.1-2.3, WTO Doc. WT/DS384/R (Nov. 18, 2011)).  The Defendants contend that, under threat of "$1.01 billion in retaliatory tariffs against the United States," MTD at 11, "'Congress made country o[f] origin labeling optional for beef products' starting in 2016," MTD at 12 (quoting <u>Tyson Foods</u>, 2020 U.S. Dist. LEXIS 156059, at *6).  The Defendants assert that "'[t]he USDA continues to approve beef labels'" and "'if a producer wants to label its beef with a country of origin, it must comply with FSIS'[] approved standard before doing so.'"  MTD at 12 (quoting <u>Tyson Foods</u>, 2020 U.S. Dist. LEXIS 156059, at *6 (citing 21 U.S.C. § 607(d) and FSIS' <u>Food Standards and Labeling Policy Book</u>)).  The Defendants quote FSIS' Labeling Book:

"'Labeling may bear the phrase "Product of U.S.A." under one of the following conditions:  (1) If the country to which the product is exported requires this phrase, and the product is processed in the U.S., or (2) The product is processed in the U.S. (i.e. is of domestic origin).'"    MTD at 12 (quoting FSIS, Food Standards and Labeling Policy Book at 147).  The Defendants also assert that

> "Product of the U.S.A." has been applied to products, that, at a minimum, have been prepared in the United States.
>
> Product Labeling: Defining United States Cattle and United States Fresh Beef Products, 66

Fed. Reg. 41,160, 41,160 (proposed August 7, 2001)(no citation for quotation).  See MTD at 12.

The Defendants assert that, "[b]ecause Thornton seeks an order changing the federally-approved labeling of such products . . . , her claims are . .  . preempted by the FMIA's preemption clause."  MTD at 14 (citing 21 U.S.C. § 678).  The Defendants argue that, "[i]f Thornton's claims were to succeed, they would upend the federal regulatory scheme enacted by Congress."  MTD at 15.    The Defendants argue that Kuenzig v. Hormel Foods Corp., 505 F. App'x 937 (11th Cir. 2013), is persuasive, contending that, in that case, the United States Court of Appeal for the Eleventh Circuit "upheld the dismissal of state law claims pertaining to advertising that featured FSIS-approved beef labels," and rejected the plaintiff's argument that it was "challenging advertising featuring the labels and not just the labels themselves; the court explained that 'the label could not become unfair or deceptive simply by virtue of being pictured in an advertisement.'"  MTD at 15-16 (quoting Kuenzig v. Hormel Foods Corp., 505 F. App'x at 938-39).  The Defendants contend that the "labels depicted in the advertising at issue in this case were approved by the USDA for the purpose of keeping consumers informed about the products they purchase."  MTD at 17 (citing 9 C.F.R. § 317.8(a)).  Regarding the USDA grade shields at issue in the PI Motion, the Defendants argue that Thornton, in her original Complaint, "does not include

any examples of any Albertsons advertising of beef," but argues that Albertsons Companies' use of the USDA CHOICE grade shield implies that its beef is a United States product.  MTD at 17. The Defendants assert that "[i]t cannot be misleading to use the USDA's approved label for USDA Choice beef, and any claim otherwise would be preempted . . . ."  MTD at 18 (citing Figure 6, infra).



Figure 6: USDA CHOICE grade shield.  MTD at 18.  See AMS, Beef Grading Shields.

 The Defendants argue that "the use of red, white, and blue colors does not represent that a product was made in the USA."  MTD at 17 (citing Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 256 (1916); Milso Indus. Corp. v. Nazzaro, No. CIV 08-1026 AWT, 2012 U.S. Dist. LEXIS 123999 at *59 (D. Conn. August 30, 2012)(Alvin, J)).  The Defendants assert that "[i]t cannot be misleading to use the USDA's approved label for USDA Choice beef, and any claim otherwise would be preempted for all the reasons described above."  MTD at 18.  The Defendants argue that Thornton "has not pled any facts to suggest that this unidentified beef is not a Product of the USA, as defined by the USDA," and that "Thornton may not use this lawsuit as an end-run to invalidate the USDA's grading and labeling programs."  MTD at 18.

Next, the Defendants contend that Thornton has not stated a plausible claim for relief under

Bell Atl. Corp. v. Twombly and Ashcroft v. Iqbal's standard for pleading, because Thornton does

not include a copy of Albertsons Companies' advertisements, and does not assert where she saw

the Kroger Company's advertisement, what beef product she purchased, or when she purchased it.

See MTD at 19 (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550

U.S. 544 (2007)).   The Defendants emphasize that, "more importantly, she does not allege any

factual basis for her claim that those unidentified products contained beef that was imported in

whole or in part."  MTD at 19.  The Defendants accuse Thornton of making "'**naked assertions**,'"

MTD at 19 (quoting Justice v. Ocwen Loan Servicing, LLC, No. CIV 13-0165, 2014 U.S. Dist.

LEXIS 15800, at *9 (S.D. Ohio February 7, 2014)(Sargus, J.)(emphasis in MTD, but not in Justice

v. Ocwen) and "**conclusory allegations**" with no factual basis,  MTD at 19-20 (quoting Eidson v.

Tenn. Dep't of Children's Servs., 510 F.3d 631, 634 (6th Cir. 2007)(emphasis in MTD, but not in

Eidson v. Tenn. Dep't).  The Defendants state that Thornton "was obligated to plead some factual

basis for the assertion that Defendants' beef products contained beef that was 'imported.'"  MTD

at 20 (no citation for quotation).  The Defendants criticize Thornton for her allegation that "these

unidentified products '**may not**' have been domestic."  MTD at 20 (quoting Complaint ¶ 23, at

27)(emphasis in MTD, but not in Complaint).    The Defendants assert that the "'mere possibility

of misconduct' is not enough to state a claim under *Twombly* and *Iqbal*," MTD at 20 (quoting

Ashcroft v. Iqbal, 556 U.S. at 679), and that a "'complaint that speculates about what **may** have

happened, rather than alleging what did happen, fails to state a plausible claim,'" MTD at 20

(quoting Gierum v. Glick (In re Glick), 568 B.R. 634, 674 n. 36 (Bankr. N.D. Ill. 2017))(emphasis

in MTD, but not in Gierum v. Glick).

The Defendants next contend that Thornton does not have standing to bring her claim, because "she was not a 'competitor under NMSA 57-12-7.'"  MTD at 20 (quoting Tyson Foods, 482 F. Supp. 3d at 1160).[6]  The Defendants assert that the NMUPA's safe harbor provision bars Thornton's claims, because "the labeling depicted in the advertisements at issue here was expressly permitted by the USDA," and therefore, "cannot be deceptive under the UPA."  MTD at 20-21 (citing Tyson Foods, 482 F. Supp. 3d at 1161; N.M.S.A. § 57-12-7). The Defendants also cite Phelps v. Hormel Foods Corp., 244 F. Supp. 3d 1312 (S.D. Fla. 2017)(Dimitrouleas, J.), in support of this statement, asserting that the case held that "claims of deceptive labeling of USDA-regulated meat were not covered by . . . Florida's version of the UPA."[7]  MTD at 21 (citing Phelps v. Hormel Foods Corp., 244 F. Supp. 3d at 1319).

The Defendants turn to Thornton's other State law claims, stating that her "breach of warranty claim fails because she did not provide Defendants with reasonable notice of any alleged breach of an express warranty prior to bring[ing] suit, as required by N.M. Stat. Ann. § 55-2-607(3)(a)."  MTD at 21 (citing Badilla v. Wal-Mart Stores E. Inc., 2017-NMCA-021, ¶ 10, 389 P.3d 1050, 1054).  The Defendants assert that Thornton's unjust enrichment claim fails, because the "'Defendants are complying with USDA regulations and their approved labels are presumptively lawful and not false or misleading,' and '[t]here is nothing unjust about using approved USDA labels.'"  MTD at 21 (quoting Tyson Foods, 482 F. Supp. 3d at 1161).

---

[6]Judge Rigg's opinion incorrectly cites the NMUPA's safe harbor provision here.  Also, this section of Tyson Foods discusses the plaintiff in Tyson Foods' other consolidated case, Michael Lucero, and not Thornton.

[7]Florida's UPA's safe harbor provision states: "This part does not apply to . . . [a]n act or practice required or specifically permitted by federal or state law."  Fla. Stat. Ann. § 501.212.

Finally, the Defendants urge the Court to dismiss Thornton's complaint under the Dormant Commerce Clause.  MTD at 22 (citing U.S. Const. art. I § 8, cl. 3; <u>Board of Trustees of Univ. of Ill. v. United States</u>, 289 U.S. 48, 57 (1933); <u>Japan Line, Ltd. v. Los Angeles Cnty.</u>, 441 U.S. 434, 448 (1979); <u>United States v. Durham</u>, 902 F.3d 1180, 1204 (10th Cir. 2018)).  The Defendants assert that Thornton's claims, "if successful, would undo the work of federal trade negotiators and Congressional Representatives," and would risk subjecting the United States to "a third WTO adverse action."  MTD at 22.  The Defendants warn that, if Thornton succeeds, "countries disadvantaged by New Mexico's disparate treatment of its products might retaliate against our nation so 'the Nation as a whole would suffer.'"  MTD at 23 (quoting <u>Japan Line, Ltd. v. Los Angeles Cnty.</u>, 441 U.S. at 451).

### 4. **The MTD Response.**

Thornton responded to the Defendants' MTD on December 31, 2020.  <u>See</u> Plaintiff's Response and Memorandum in Opposition to Defendants' Motion to Dismiss, filed December 31, 2020 (Doc. 16)("MTD Response").  Thornton first draws a distinction between the labels at issue in <u>Tyson Foods</u>, and the "promotional stickers" that the Defendants use to advertise their products. MTD Response at 9-10.  Thornton contrasts what she terms a "promotional sticker," with what she understands to be a product's label:



Figure 7: Comparison of sticker and label, MTD Response at 13 (depicting the promotional sticker on the top left of the product, and the label at the bottom right). Thornton argues that plainer, text-based labels are labels, and not the graphics to which she objects. See MTD Response at 4-5, Figure 8, infra.



<u>Figure 8</u>: Thornton's Label Example, MTD Response at 11. Thornton notes that the "U.S.D.A.

CHOICE/Produced in the USA" is used by the Defendants in the form of a "promotional sticker,"

which is attached directly to the package "in an effort to entice the consumer to purchase the

product in the store."  MTD Response at 13.  Thornton argues that the promotional sticker is

"clearly not the label for the product," and states that the Defendants are asking "the Court to

overlook the distinction between false advertising and false labeling."  MTD Response at 14.  Thornton contends that the Court should not apply collateral estoppel to bar her claims, because Judge Riggs' determination that the "Plaintiffs pled that third-parties and not the Defendants themselves produced the false advertisements" should have led to a finding that the Defendants are indispensable third parties.  MTD Response at 14-15 (quoting Tyson Foods, 482 F. Supp. at 1158).  Thornton argues that the issues in Tyson Foods are different than the issues in this case, and, so, she did not have a full and fair opportunity to litigate this case's issues in Tyson Foods.  See MTD Response at 15-16.

Thornton next argues that FMIA does not preempt Thornton's claims, citing to a Supreme Court case which held that the Federal Cigarette Advertising and Labeling Act, 15 U.S.C. §§ 1331-1340, does not preempt fraudulent misrepresentation or advertising claims.  See MTD Response at 16-17 (citing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 528 (1992)).  Thornton argues that FMIA's preemption provision "expressly preserves a state's ability to 'exercise concurrent jurisdiction' to prevent adulteration or misbranding."  MTD Response at 17 (quoting 21 U.S.C. § 678).  Thornton argues that her advertising claims are not the same as her labeling claims in Tyson Foods, and, because they are about the Defendants' advertising -- not labeling -- of their products, her claims are not preempted.  See MTD Response at 17-18.  Thornton argues:

> It is facile to contend (as Defendants do) that Defendants may place an ad in the mail with a promotional sticker on a piece of cooked beef that completely misdescribes (i.e. misbrands) the contents within the packaging, yet escape liability by pointing to the fact that the label (not the advertisement or the promotional sticker) was federal approved.  The applicable federal agency may have approved the label, but that label must describe truthfully what is contained within the package and does not apply to a promotional sticker on a cooked product not even inspected by USDA.  If the promotional sticker were slapped on a picture of cooked dog meat, would a preemption argument for UPA violations be preempted because the label was one that met federal approval for beef? The notion seems preposterous, yet Defendants are making that exact argument, with the distinction

being only one of degree, not substance. If the advertisement does not contain what it says it contains, then there is a false advertising problem which is not addressed by the FMIA and as stated in the Complaint, a violation of the UPA that is actionable.

MTD Response at 18 (citing Figures 9-12, infra).



Figure 9: "USDA CHOICE/Produced in the USA" graphic on advertisement depicting cooked beef.  MTD Response at 9.



Figure 10: "USDA CHOICE/Produced in the USA" graphic on advertisement depicting cooked beef, MTD Response at 9.



Figure 11: "USDA CHOICE/Produced in the USA" graphic on advertisements depicting cooked beef.  MTD Response at 9.



Figure 12: "USDA CHOICE/Produced in the USA" graphic on advertisements depicting cooked beef.  MTD Response at 10.

Thornton responds to the Defendants' express preemption argument, stating that, "[w]hen the text of a preemption clause is susceptible to more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'"  MTD Response at 18-19 (quoting Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005)).  Thornton asserts that "the only legally plausible reading of the statute is that it applies to the items contained on the label, not promotional stickers affixed to circulars distributed outside of the store of pictures of cooked beef."  MTD Response at 19.  Thornton argues that "the promotional stickers at issue here are not labels," nor "are they even alleged by Defendants to be required to be affixed to the packaging of raw beef sold to the consumers."  MTD Response at 19.  Thornton asserts that the promotional stickers that the Defendants use in their advertising "are not pictures of the labels because they are not labels."  MTD Response at 19.  Undermining the Defendants' arguments that their advertisements are

simply pictures of the labels, Thornton notes that Albertson's advertisements feature a USDA grade shield graphic absent from the beef's actual packaging.  See MTD Response at 19-20. Thornton distinguishes cases upon which the Defendants rely -- Phelps v. Hormel Foods Corp, 244 F. Supp. 3d 1312 (S.D. Fla. 2017), and Animal Legal Def. Fund v. Hormel Foods Corp., No. 2016 CA 004744 B, 2019 D.C. Super. LEXIS 7, *32-34 (D.C. Sup. April 8, 2019) -- by stating that neither case involves "promotional stickers on advertisements outside of the label."  MTD Response at 22.  Thornton argues that Supreme Court precedent "ascribes preemptive intent to Congress only in the most compelling circumstances," and that, because "consumer protection is a field traditionally regulated by the states," compelling evidence of an intent to preempt is necessary.  MTD Response at 23 (citing English v. General Electric Co., 496 U.S. 72, 87-90 (1990); Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251 (1984); New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers' Ins. Co., 514 U.S. 645. 654 (1995); Envtl. Encapsulating Corp. v. City of New York, 855 F.2d 48, 58 (2d Cir. 1988)).  Thornton asserts that "claims against fraudulent advertisements about meat are not preempted because they require exactly the same thing as is required by federal law -- veracity."  MTD at 24 (citing 21 U.S.C. § 610(d)).

Thornton compares the Defendants' preemption arguments with those that the Supreme Court rejected in Bates v. Dow Agrosciences LLC, 544 U.S. 431 (2005), where the preemption provision in the Federal Insecticide, Fungicide & Rodenticide Act ("FIFRA"), like FMIA's, preempts state law requirements "'in addition to or different from'" FIFRA's requirements.  MTD Response at 25 (citing Bates v. Dow Agrosciences LLC, 544 U.S. at 431).  Thornton emphasizes that the Supreme Court held in that case that FIFRA does not preempt State law labeling requirements which are "'equivalent to, and fully consistent with, FIFRA,'" because a contrary result would lead to reading FIFRA as preempting any State law requirements for labeling or

packaging.  MTD Response at 25 (quoting <u>Bates v. Dow Agrosciences LLC</u>, 544 U.S. at 447).

Thornton argues that, even if her fraudulent advertising claims fail on preemption grounds, her

claims based on the promotional stickers will stand, because they are similar to those which

prevailed in a Ninth Circuit case, <u>National Broiler Council v. Voss</u>, 44 F.3d 740, 747 (9th Cir.

1994).  <u>See</u> MTD Response at 26 (citing <u>Nat'l Broiler Council v. Voss</u>, 44 F.3d at 749 ("California

stores can still be required by state law to tell the truth in advertising and to display frozen chickens

for what they are -- 'frozen' -- even though the labels on the chickens themselves are required by

federal law to say 'fresh.'" (no citation for quotation)).

Next, Thornton asserts that the Dormant Commerce Clause does not bar her claims,

because those arguments rest on the Defendants' preemption arguments.  <u>See</u> MTD Response at

27.  Thornton argues that, "rather than economic protectionism, the state-law causes of action

Plaintiff asserts are legitimate, generally applicable and non-discriminatory consumer protection

measures."  MTD Response at 27.  Thornton states that the "'primary focus of a dormant

Commerce Clause challenge is whether a state law improperly interferes with interstate

commerce'" and that the "'primary concern is economic protectionism.'"  MTD Response at 27

(quoting <u>Direct Mktg. Ass'n v. Brohl,</u> 814 F.3d 1129, 1135 (10th Cir. 2016)).  Thornton argues

that the Supreme Court differentiates between "state regulation that discriminates against interstate

commerce," which require the "'strictest scrutiny,'" and "non-discriminatory regulation that,

nevertheless, burdens interstate commerce,"  MTD Response at 28 (citing <u>Or. Waste Sys., Inc. v.</u>

<u>Dep't of Envtl. Quality</u>, 511 U.S. 93, 101 (1994)(quoting <u>Hughes v. Oklahoma</u>, 441 U.S. 322, 337

(1979)), which "'will be upheld unless the burden imposed on such commerce is clearly excessive

in relation to the putative local benefits,'" MTD Response at 28 (quoting <u>Pike v. Bruce Church,</u>

<u>Inc.</u>, 397 U.S. 137, 142 (1970)).  Thornton argues that her claims are rooted in laws which do not

"attempt to discriminate against interstate commerce" and that they do not place "an undue burden on interstate commerce."  MTD Response at 28-29.

Next, Thornton argues that her Complaint is sufficient to survive a rule 12(b)(6) motion to dismiss.  See MTD Response at 30 (citing Fed. R. Civ. P. 12(b)(6)).  Thornton cites Tenth Circuit law for the standard that "motions to dismiss for lack of subject-matter jurisdiction 'generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based.'"  MTD Response at 30 (quoting Newton v. Dep't of Veterans Affairs, No. CIV 12-0163 JB/LAM, 2014 WL 1285494, at *5 (D.N.M. March 26, 2014)(Browning, J.)).    Thornton characterizes the Defendants' MTD as a "facial attack" which "enjoys Rule 12(b)(6) safeguards," such as "accept[ing] as true all well-pled factual allegations," "view[ing] those allegations in the light most favorable to the nonmoving party, and draw[ing] all reasonable inferences in the plaintiff's favor."  MTD Response at 30 (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Ruiz v. McDonnell, 299 F .3d 1173, 1180 (10th Cir. 2002)).  Thornton argues that her Complaint need only contain "sufficient" factual allegations which "'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'"  MTD Response at 31 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).  Thornton asserts that she "need only give the court reason to believe that the particular plaintiff has a reasonable likelihood of mustering factual support for [her] claims."  MTD at 31 (citing Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)).  Thornton cites Tenth Circuit precedent for the proposition that "'plausibility' refers to the scope of allegations in a complaint," which  "must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief," and "must have 'nudged their claims across the line from conceivable to

plausible.'"  MTD Response at 31-32 (quoting <u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1247 (10th Cir. 2008)).

In particular, Thornton alleges that she plausibly has stated a claim that beef she purchased from the Defendants was "in [s]ome percentage" not a "Product of the U.S."  MTD Response at 32.  Thornton characterizes Tenth Circuit law as "'embrac[ing] a liberal construction of this pleading requirement'"  and allowing that "'a complaint containing only conclusory allegations could withstand a motion to dismiss unless its factual impossibility was apparent from the face of the pleadings.'"  MTD Response at 32 (quoting <u>Mackley v. TW Telecom Holdings, Inc.</u>, 296 F.R.D. 655, 663 (D. Kan. 2014)(Sibelius, J.)).  Thornton asserts that the "Defendants seek to have this Court pass judgment on the underlying, ultimate factual questions" which she raises, "and find that no set of facts or law would support Plaintiff's claims," but argues that "[s]uch determination at this juncture" would require an impermissible ruling on ultimate factual questions.  MTD Response at 33 (citing <u>Guedry v. Ford</u>, 431 F.2d 660 (5th Cir. 1970); <u>Hilliard v. Williams</u>, 465 F.2d 1212 (6th Cir. 1972); <u>Ames v. Vavreck</u>, 356 F. Supp. 931, 936–37 (D. Minn. 1973)(Neville, J.)).

Next, Thornton addresses the Defendants' arguments that her breach-of-express-warranty claim should fail for "lack of privity and lack of pre-suit notice," contending that their arguments are based upon "inapposite" authority.  MTD Response at 33.  Thornton cites the Court's analysis of New Mexico precedent in <u>In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Products Liab. Litig.</u>, 288 F. Supp. 3d 1087, 1271-72 (D.N.M. 2017)(Browning, J.), in which the Court predicted that the Supreme Court of New Mexico would "follow the Supreme Court of California and would not require notice beyond the Amended Complaint" in a consumer protection case. MTD Response at 35 (quoting <u>In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Products</u>

Liab. Litig., 288 F. Supp. 3d 1087, 1271-72 (D.N.M. 2017)(citing State ex Rel Concrete Sales & Equip. Rental Co., Inc. v. Kent Nowlin Const., Inc., 1987-NMSC-114, ¶ 17, 106 N.M. 539, 746 P.2d 645, 648-49)). Thornton quotes the Court's conclusion that "'notice via the Amended Complaint serves the purposes that the Supreme Court of New Mexico has identified, namely, that notice must "open[ ] the way for normal settlement through negotiation"'" and that "'[f]iling a complaint often triggers settlement negotiations.'" MTD Response at 35 (quoting In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Products Liab. Litig., 288 F. Supp. 3d at 1271-72 (quoting State ex Rel Concrete Sales & Equip. Rental Co., Inc. v. Kent Nowlin Const., Inc., 1987-NMSC-114, ¶ 17, 106 N.M. 539, 746 P.2d at 648-49)).

Next, Thornton argues that her unjust enrichment claim is appropriate if she "does not have a remedy under the New Mexico UPA" and quotes the Court's statement of unjust enrichment's elements in Abraham v. WPX Energy Prod., LLC, 20 F. Supp. 3d 1244, 1266 (D.N.M. 2014)(Browning, J.). MTD Response at 36. Thornton argues that her unjust enrichment claim is "'premised on the same factual predicates'" as her other claims, and stems from the Defendants' "improper and deceitful conduct,'" which she argues "is an important distinction in the Tenth Circuit." MTD Response at 36 (quoting In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Products Liab. Litig., 288 F. Supp. 3d at 1257, and citing Phelps Oil & Gas, LLC v. Noble Energy, Inc., 2016 WL 9735739, at *4 (D. Colo. Aug. 1, 2016)(Shaffer, J.)). Thornton alleges that the Defendants' misrepresentation of beef products as being "of domestic origin under the consumers['] understanding of those terms" is plausibly deceptive and constitutes false advertising. MTD Response at 37.

Finally, Thornton contends that the Defendants' argument that she does not have standing under the NMUPA is based upon a drafting error in Tyson Foods. See MTD Response at 37 (citing

MTD at 20; <u>Tyson Foods</u>, 482 F. Supp. 3d at 1160).  Thornton clarifies that nothing in N.M.S.A. § 57-12-7 "requires that the person injured must be a competitor to have standing."  MTD Response at 38.  Thornton contends that "[n]othing in either the FMIA or FSIS Guidance even mentions advertisements much less *expressly permits* advertisements containing statements of material fact about the origins of beef."  MTD Response at 38 (emphasis in MTD Response).

     **5.**     **The MTD Reply.**

     The Defendants filed their MTD Reply on January 28, 2021.  <u>See</u> MTD Reply at 1.  The Defendants criticize Thornton for arguing that the issues here are different from the issues in <u>Tyson Foods</u>, but then "cloning her dismissed complaint for use in this case" and incorporating "all of her legal arguments from the Tyson case."  MTD Reply at 1.  The Defendants argue first that the Court should dismiss Thornton's Complaint pursuant to the doctrine of collateral estoppel, and that her remedy is in her Tenth Circuit appeal of that case and not in litigation of this case.  <u>See</u> MTD Reply at 2.  The Defendants cite several Courts of Appeals and federal district court cases for the proposition that collateral estoppel is designed to prevent plaintiffs like Thornton from relitigating an outcome with which they disagree.  <u>See</u> MTD Reply at 2 (citing, <u>e.g.</u> <u>Firishchak v. Holder</u>, 636 F.3d 305 (7th Cir. 2011)).  The Defendants argue that Thornton proves their point -- that the issues in <u>Tyson Foods</u> are identical to those in this case -- by "attach[ing] and incorporate[ing] her brief from her Tenth Circuit appeal in the Tyson case," and by "attach[ing] and incorporate[ing] an amicus brief" from that same appeal.  MTD Reply at 3.  The Defendants frame the manner of Thornton's briefing as a concession that "the issues in the Tyson case are the same as those in this case" and cite cases where the incorporation of a previous case's briefing supported the court's finding that collateral estoppel barred those claims.  MTD Reply at 4 (citing

Matthews v. Macanas, 990 F.2d 467, 468 (9th Cir. 1993); People v. Henderson, 225 Cal. App. 3d 1129, 1149-50, 275 Cal. Rptr. 837, 848 (1990)).

The Defendants emphasize that Judge Riggs "made no finding that there was an indispensable third party absent from the Tyson case" and did not dismiss Thornton's claims for failure to join an indispensable party; rather, "Judge Riggs dismissed the Tyson case because Thornton's claims were preempted by federal law." MTD Reply at 4-5. The Defendants also highlight Judge Riggs' conclusion that the "Plaintiff's claims based on advertising depicting USDA-approved labels . . . were preempted because the advertisements were merely pictures of USDA-approved labeling, which the USDA had determined 'were not misleading or false[.]'" MTD Reply at 5 (quoting Tyson Foods, 482 F. Supp. 3d at 1153). The Defendants argue that Thornton's assertion that "the Tyson case only concerned the allegedly false labels on the meat packages and not the use of the same labels in advertising" is not true, because "she featured the very same advertisements at issue here in her complaint in the Tyson case," and because she argued both false labeling and false advertising claims in Tyson Foods. MTD Reply at 5-6. The Defendants characterize Thornton's assertion that "she did not have a full and fair opportunity to litigate these issues in the Tyson case" as "disingenuous," because "she made the same arguments about the same legal issues concerning the same advertisements in that case, and she lost on them." MTD Reply at 6.

Next, the Defendants reassert their arguments that FMIA preempts Thornton's labeling claims, and argue that Thornton's reliance on Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1991), and other case law concerning FCLAA's preemption provision is misplaced, because FMIA's preemption clause is "fundamentally different from FCLAA's preemption clause," which "applies only to tobacco advertising specifically about 'smoking and health' but not to other types

of advertising." MTD Reply at 7 (quoting 15 U.S.C. § 1334(b)). The Defendants cite Judge Riggs'

statement that FMIA's preemption clause "sweeps widely" and is broader than FCLAA's. MTD

Reply at 8 (quoting Tyson Foods, 482 F. Supp. 3d at 1158 (citing Nat'l Meat Ass'n v. Harris, 565

U.S. 452, 459 (2012)). The Defendants fault Thornton for her "overbroad and incorrect" reading

of National Broiler Council v. Voss, 44 F.3d 740 (9th Cir. 1994), which the Defendants criticize

for not addressing "whether or under what circumstances the [Poultry Products Inspection Act, 21

U.S.C. §§ 451-473 ("PPIA")] barred state advertising restrictions under principles of conflict

preemption." MTD Reply at 8 (citing Nat'l Broiler Council v. Voss, 44 F.3d at 748-49). The

Defendants argue that none of the cases that Thornton cites support "the contention that states can

prohibit advertising of beef products in a manner that is consistent with USDA-approved labeling."

MTD Reply at 8-9. The Defendants contend that Kuenzig v. Hormel Foods Corp., 505 F. App'x

937, 938 (11th Cir. 2013), and Phelps v. Hormel Foods Corp., 244 F. Supp. 3d at 1317 n.2, support

their argument that FMIA preempts Thornton's claims. See MTD Reply at 9. The Defendants

argue that "Thornton's attempt to save her claims by arguing they concern promotional stickers

and not labels fails," because Thornton draws a "manufactured distinction without a difference,"

and Thornton makes "no allegations that Defendants' beef products were inconsistent with the

USDA shields that labeled them a product of the United States." MTD Reply at 10. The

Defendants argue that FMIA preempts Thornton's attempt to "impose requirements that are

different from the USDA's requirements." MTD Reply at 10.

Next, the Defendants assert that Thornton's claims fail to state a plausible claim for relief,

because her Complaint "'must contain sufficient factual matter'" and must make a "'showing'

rather than a blanket assertion, of entitlement to relief." MTD Reply (quoting Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 n.3 (2007)). The

- 55 -

Defendants emphasize that Thornton's complaint "does not identify **a single** beef product she purchased from an Albertsons or Kroger store," and "does not identify a single fact to support her allegation that the beef products were imported in whole or in part," asserting that this allegation "is not enough as a matter of law." MTD Reply at 11 (citing Gierum v. Glick (In re Glick), 568 B.R. 634, 674 n.36 (Bankr. N.D. Ill. 2017)("[A] complaint that speculates about what **may** have happened, rather than alleging what *did* happen, fails to state a plausible claim.")(emphasis in MTD Reply but not in Gierum v. Glick)). The Defendants allege that Thornton's claims are even weaker against Albertsons Companies, because she "does not excerpt any advertisements for beef products by Albertsons; instead, she suggests that the Albertsons' advertisements included a 'USDA Choice' shield but made no representation regarding the country of origin of the product." MTD Reply at 11. The Defendants argue that Thornton does not explain how Albertsons Companies' use of the USDA-approved official grade shield for choice beef is misleading as to the origin of that beef. See MTD Reply at 12.

Next, the Defendants argue that Thornton's claims fail, because they fall under NMUPA's safe harbor clause, and, because "the labeling depicted in the advertisements at issue here was expressly permitted by the USDA," "it cannot be deceptive under the UPA." MTD Reply at 13 (citing N.M.S.A. § 57-12-7). The Defendants also argue that Thornton "failed to give the required pre-suit notice to Defendants for a breach of warranty claim," and that the Supreme Court of New Mexico rejected her argument that "the only notice she was required to give was the filing of a complaint" in Badilla v. Wal-Mart Stores East, Inc., 2017-NMCA-021, 389 P.3d 1050. MTD Reply at 13 (citing Badilla v. Wal-Mart Stores East, Inc., 2017-NMCA-021, ¶ 26, 389 P.3d at 1058). The Defendants assert that the Court of Appeals of New Mexico "concluded that failure to plead pre-suit notice was 'a fatal defect in a complaint alleging breach of warranty,'" and

> found that plaintiff's failure to give pre-suit notice was unreasonable because the plaintiff had the benefit of legal advice prior to filing suit; knew the identity of the retailer from whom she purchased the product; and the delay compromised the defendant's ability to respond to the alleged defect and develop its defense.

MTD Reply at 13 (quoting Badilla v. Wal-Mart Stores East, Inc., 2017-NMCA-021, ¶ 26, 389 P.3d 1050 at 1057-58). The Defendants argue that, like the plaintiff in Badilla v. Wal-Mart Stores East, Inc, "Thornton ha[d] legal counsel in this case prior to filing her complaint, . . . knew the identities of the retailers of the beef products at issue, [and] Judge Riggs had expressly told her in the Tyson case that pre-suit notice was required." MTD Reply at 13. Additionally, the Defendants countered Thornton's unjust enrichment arguments, asserting that "Thornton does not attempt to articulate any theory upon which it could be unjust to advertise using USDA-approved labels." MTD Reply at 14.

Finally, the Defendants respond to Thornton's Dormant Commerce Clause arguments, stating that, although Thornton addresses "how her case would not burden **interstate** commerce," she does not address her case's "attempted assault on **foreign** commerce." MTD Reply at 14 (emphasis in MTD Reply). The Defendants characterize her case as an attempt to "upend World Trade Organization rulings and the delicate balance of federal law and regulation the United States has put in place to deal with them," which, the Defendants argue, "is prohibited," because it would prevent the federal government from "'speaking with one voice' in regulating foreign commerce." MTD Reply at 14 (quoting Japan Line, Ltd. v. Los Angeles Cnty., 441 U.S. 434, 451 (1979)).

### 6.    The Status Conference.

The Court held a status conference on August 24, 2021. See Clerk's Minutes at 1, filed August 24, 2021 (Doc. 25). The Court called upon Thornton to argue her Stay Motion. See Status Conf. Tr. at 3:4-7 (Court). Thornton stated that the Court set the MTD Hearing with only six days'

- 57 -

notice, and that her counsel had other commitments.  See Status Conf. Tr. at 3:4-7 (Dunn).   The

Court denied the Stay Motion, because Thornton's counsel's commitments were likely to be

finished by the time the MTD hearing started.  See Status Conf. Tr. at 9:17-10:6 (Court).

7.     **The MTD Hearing**.

The Court held a hearing on the MTD on August 25, 2021.  See Clerk's Minutes at 1, filed

August 25, 2021 (Doc. 26).  The Court first called upon the Defendants to argue their MTD.  See

Transcript of Hearing at 3:1-9 (taken August 25, 2021)(Court)("MTD Tr.").[8]    The Defendants

gave the Court and Thornton a copy of their PowerPoint presentation.  See MTD Tr. at 3:21-4:1

(Lampley).  The Court first asked the Defendants to explain why it has jurisdiction over the case,

because Thornton raises only State law claims in her Complaint.  See MTD Tr. at 5:14-19 (Court).

The Defendants asserted that raising federal preemption as a defense gives the Court subject-matter

jurisdiction, see MTD Tr. at 5:24-25 (Lampley), but did not cite any legal authority for this

proposition other than Judge Riggs' decision in Tyson Foods, see MTD Tr. at 6:6-7 (Lampley).

The Court asked the Defendants to explain why federal and not New Mexico collateral estoppel

law should apply, see MTD Tr. at 7:14-18 (Court), and the Defendants responded that the same

result would be reached either way, see MTD Tr. at 8:8-12 (Lampley), but that they had not briefed

the issue because Thornton did not raise it, see MTD Tr. at 8:20-22 (Lampley).

The Defendants first gave some background information about the history of beef labeling

laws and regulations:

> [B]efore 2008, the USDA allowed "Product of the USA" to be used if beef was
> processed in the United States.  It's the same rule that is applicable now.  In a 2002
> farm bill, Congress laid the groundwork to expand or make more restrictive the

---

[8]The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

country of origin labeling.  That bill included far more detailed disclosures on labels.  But the implementation of that bill was delayed for several years, until September of 2008, through a series of appropriations acts. . . .  But during those years, suffice it to say that Congress refined the country of origin designation to include four categories, and these requirements took effect in September of 2008.  And then in January of 2009, the USDA issued a final final rule implementing those requirements.  Canada and Mexico opposed the standards and filed an action with the World Trade Organization, claiming that they violated the U.S. obligations under World Trade Organization agreements on technical barriers to trade.  The World Trade Panel agreed.  An appellate panel agreed.  And the World Trade Organization ordered the United States to amend those regulations.  In response, the USDA issued a revised country of origin [labeling] . . . rule [which] required more detailed information.  Canada and Mexico challenged the revised rules again.  And in 2015, the World Trade Organization rejected the USDA's 2013 revised requirements and authorized a little over a billion dollars in tariffs against the [United States].  Congress responded by including in a consolidated appropriations act a provision repealing those requirements, and consistent with Congress' direction, the USDA reapplied its prior rule that beef may be described as a . . . "Product of the USA," as long as it is processed in the United States, even if the cattle is raised elsewhere.

MTD Tr. at 9:7-10:22 (Lampley).  The Defendants then explained their argument that collateral estoppel bars Thornton's claims here, because Judge Riggs dismissed those same claims in Tyson Foods.  See MTD Tr. at 11:2-12:7.  The Defendants stated that "Judge Riggs denied plaintiff leave to amend the advertising claim because she failed to explain how she could possibly state a plausible claim," and that "[o]ne week after Judge Riggs dismissed the plaintiffs' Tyson case, plaintiff took the dismissed complaint, changed the defendants and a few minor allegations, and refiled the complaint against Kroger and Albertson's."  MTD Tr. at 12:8-15 (Lampley).  The Defendants argued that collateral estoppel law bars Thornton's claims.  See MTD Tr. at 13:3-5 (Lampley).  First, the Defendants argued that the issues are identical to those in Tyson Foods, because Thornton "asserts that the same advertisements for the same beef products, using the same USDA-approved labeling, mislead customers in the same way, giving rise to the same alleged claims for relief," which involves "the same analysis of the same statutes and the same regulations

and the same case law." MTD Tr. at 13:20-14:3 (Lampley). Second, the Defendants argued that

Thornton's claims were adjudicated fully on the merits in <u>Tyson Foods</u>, despite her appeal to the

Tenth Circuit. <u>See</u> MTD Tr. at 14:6-11 (Lampley). Third, the Defendants argued that Thornton

is the same plaintiff as in Tyson Foods, and fourth, that she had a full and fair opportunity to litigate

her claims. <u>See</u> MTD Tr. at 14:12-17 (Lampley). The Defendants stated that most of Thornton's

brief in opposition to their MTD "attack[s] Judge Riggs' decision in the Tyson case" and "claims

that Judge Riggs failed to apply the law correctly or that she abused her discretion; that her opinion

is unpersuasive; and that it was unsupported by authority." MTD Tr. at 14:24-15:4 (Lampley).

The Defendants argued that Thornton's remedy is through appeal and not with this case. <u>See</u> MTD

Tr. at 15:6-8 (Lampley). The Defendants asserted that, even if the plaintiff was different in this

case, collateral estoppel would still apply, because "there is an argument that there is some privity."

MTD Tr. at 15:15-17 (Lampley). The Court asked the Defendants whether, if there were a "whole

bunch of class actions against various defendants," which "raise the same issues," other district

court decisions would collaterally estop the Court, or whether those decisions merely would be

persuasive. MTD Tr. at 16:3-15 (Court). The Defendants agreed that those decisions would be

merely persuasive, at least if the plaintiffs were different. <u>See</u> MTD Tr. at 16:14-16 (Lampley).

The Court once again questioned whether the Defendants were taking collateral estoppel's

elements from federal or New Mexico law, because this case is based on diversity. <u>See</u> MTD Tr.

at 17:5-7 (Court). The Defendants responded that they looked only at the elements of federal

collateral estoppel law, and, because Thornton did not raise New Mexico collateral estoppel law

in her MTD Response, they did not brief it and do not know whether the elements are significantly

different from New Mexico collateral estoppel law. <u>See</u> MTD Tr. at 17:13-22 (Lampley). The

Defendants reiterated their point in their MTD Reply that the fact that Thornton incorporates her

"Tyson appellate brief . . . to reduce the amount of briefing" "demonstrates that this is an attempt to relitigate the same issues."  MTD Tr. at 18:1-7 (Lampley).

The Defendants emphasized that Thornton's "claims based on advertising depicting USDA-approved labels" also are preempted, "because the advertisements were merely pictures of USDA-approved labeling, which the USDA has already determined were not false or misleading." MTD Tr. at 19:5-10 (Lampley).  The Defendants asserted that, "even though she concedes she featured the same advertisements at issue here, in her complaint in the Tyson case, she argues the Tyson case only concerned alleged false labels on the meat packages and not use of the same labels in advertising," which "is untrue."  MTD Tr. at 19:11-18 (Lampley).   In contrast, the Defendants assert that Thornton's appellate brief to the Tenth Circuit "stated plainly that she was pursuing claims for both false labeling and false advertising."  MTD Tr. at 19:20-22 (Lampley).

The Court then called on Thornton to argue in response to the Defendants' collateral estoppel arguments.  See MTD Tr. at 20:10-12 (Court).  The Court asked Thornton on what basis it has jurisdiction over the case and whether the Complete Preemption Doctrine applies.  See MTD Tr. at 21:9-17 (Court).  Thornton explained that complete preemption is an exception to the well-pleaded complaint rule, "where some fields have been so thoroughly taken up that all state law causes of action are essentially a federal cause of action."  MTD Tr. at 22:3-7 (Ray).  Thornton gave as examples when the Complete Preemption Doctrine is applied as "the Metropolitan Life case"[9] regarding "ERISA contexts . . . that are really about employee benefit plans," MTD Tr. at

---

[9]Metro. Life Ins. Co. v. Taylor, 481 U.S. 58 (1987).

22:23-25 (Ray), "the <u>Franchise Tax Board</u> case,"[10] and "the <u>Caterpillar</u> case,"[11] and stated that the Tenth Circuit summarizes that law in <u>Schmeling v. Nordam</u>, 97 F. 3d 1336 (10th Cir. 1996), MTD Tr. at 22:10-18 (Ray).   Thornton argued that "the Supreme Court doesn't really like to do this complete preemption, and allow . . . purely state law claims to be brought into federal court."   MTD Tr. at 22:18-21 (Ray).   Thornton agreed with the Court that, under <u>Schmeling v. Nordam</u>, "there actually isn't a federal question here."   MTD Tr. at 23:6-8 (Ray).   Thornton asserted that the <u>Schmeling v. Nordam</u> test for complete preemption is, first, "has Congress created a cause of action that essentially takes over what would be state causes of action[?]"   MTD Tr. at 23:14-16 (Ray). Thornton stated that, "[u]nder <u>Schmeling</u>, it's very important that there be some kind of federal cause of action that's analogous to what's being raised in this complaint, as to whether you can use this complete preemption for removal," and that there is no analogous federal cause of action to pursue the advertising claims Thornton raises in this case.   MTD Tr. at 23:24-24:3 (Ray). Thornton stated that the Court may have CAFA jurisdiction over the case, but that the Court does not have federal-question jurisdiction under complete preemption.   <u>See</u> MTD Tr. at 25:11-22 (Ray).   Thornton assured the Court that it does not have to decide whether the claims are preempted first under <u>Schmeling v. Nordam</u>, but "can instead talk about whether there is a federal cause of action that displaces state causes of action, and we can look at congressional intent as to whether there is any area left to traditional state law."   MTD Tr. at 27:8-13 (Ray)(citing <u>Schmeling v. Nordam</u>, 97 F. 3d at 1343-44).   Thornton asserted: "I don't know that there is enough of a record

---

[10]<u>Franchise Tax Bd. v. Constr. Laborers Vacation Tr.</u>, 463 U.S. 1 (1983).

[11]<u>Caterpillar, Inc. v. Williams</u>, 482 U.S. 386 (1987).

before the Court to decide whether CAFA would make this a diversity case."  MTD Tr. at 27:15-18 (Ray).

Thornton next argued that state collateral estoppel law should apply.  See MTD Tr. at 28:10-11 (Dunn).   Thornton asserted that the Defendants, in their Notice of Removal, stated that "the Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. 1332," and pled minimal diversity as well as complete diversity under diversity jurisdiction.  MTD Tr. at 29:2-7 (Dunn).  Thornton stated that she was "operating under the premise that" the Court has CAFA jurisdiction and does not think that CAFA jurisdiction "is that much at issue."  MTD Tr. at 29:11-13 (Dunn).  Thornton turned to her collateral estoppel arguments, stating that "the meat of the question -- to steal a bad pun -- is whether or not Judge Riggs' decision gets to advertising, or it's just labeling."  MTD Tr. at 30:4-7 (Dunn).  Thornton argued that,

> when you look at 21 USC 602, which is congressional intent,  nowhere in there is there any sort of . . . discussion of advertisements made outside of grocery stores. . . . [W]hat I've handed to Mr. Lampley [and] . . . to Your Honor are advertisements that are mailed either through insertion into a newspaper or through direct mail through the Postal Service, advertisements that go out to consumers. They're not just pictures of the labels.  In fact what they are, and the reason we included them in the other lawsuit[,] is they are promotional stickers that are attached to the packaging in the stores, but also attached to this.  Those aren't labels.

MTD Tr. at 30:9-25 (Dunn).   Thornton argued that changing the lawsuit from labeling to advertising is "actually a pretty major change between the cases."  MTD Tr. at 31:2-5 (Dunn). Thornton described the difference as arguing in Tyson Foods that labeling is misleading, "whether or not the guidance from FSIS excuses the fraudulent labeling by the packers," while in this case,

> we have these advertisements with promotional stickers stuck, not on a picture of the product, but on a picture of the cooked product, and sent out to entice people in.   And we believe, and we've pled sufficiently, that it is a knowing misrepresentation in an advertisement, which is different than a knowing misrepresentation in a label.

MTD Tr. at 31:6-6 (Dunn).  Thornton stated that there is a distinction between circulars that are distributed in a store and what she is arguing about here, which are circulars that come in the mail or that are in newspapers.  See MTD Tr. at 31:19-33:4 (Dunn, Court).  Thornton asserted that, in Tyson Foods, "we did mention these advertisements.  But it was along the line of some sort of vicarious liability for the packers giving this information to the grocers, and the grocers then relying on that."  MTD Tr. at 33:19-23 (Dunn).  Thornton stated:

> [I]t could very well be that the grocers in this instance have some sort of third party claim against the packers.  But that doesn't excuse the fact that they have awareness of, as we pled it, that these advertisements are not an accurate representation of where the product is from actually derived from.  And it is an advertisement.  And that's a big distinction.

MTD Tr. at 34:1-8 (Dunn).  Thornton presented demonstratives -- some of which "are included in the other case, some of those pictures are holdovers from the other case, but there are others that are not."  MTD Tr. at 36:9-12 (Dunn).  Thornton asserts that Judge Riggs' opinion dismissed her Complaint in Tyson Foods because it wasn't "plausible," but that decision "didn't go to this idea that no advertising claim could be brought under the preemption, but rather that you couldn't plausibly state that these defendants -- or those defendants rather in Tyson -- were responsible for those advertisements."  MTD Tr. at 36:19-37:2 (Dunn).  Thornton characterizes Judge Riggs' opinion as saying that "[y]ou've got the wrong defendants for advertising claims," and that, in response, Thornton "went and got the right defendants.  So it's not in conflict with her decision; it's actually in concert . . . with her decision."  MTD Tr. at 37:4-8 (Dunn).

The Court then called upon the Defendants to have the last word on their collateral estoppel arguments.  See MTD Tr. at 38:18-19 (Court).  The Court sought and received confirmation from the parties that it had jurisdiction under CAFA.  See MTD Tr. at 38:21-39:23 (Court, Ray, Lampley).  The Defendants responded to Thornton's argument that her claims in this case are

different from those in <u>Tyson Foods</u> by pointing to Thornton's appellate brief, and also to Judge Riggs' opinion, stating that the "'Plaintiffs argue that even if the claims based on the labels are preempted, they may proceed on the basis that the defendants' advertising is misleading customers. Plaintiffs' advertisement [claim] fails because plaintiffs pled th[at] third parties, not defendants themselves, produced the false advertisements.'" MTD Tr. at 40:17-23 (Lampley)(quoting <u>Tyson Foods</u>, 482 F. Supp. 3d at 1158). The Defendants argued that Judge Riggs did not dismiss <u>Tyson Foods</u> based on Thornton's failure to join an indispensable party, but "solely on the basis of preemption." MTD Tr. at 40:23-41:1 (Lampley). The Defendants also cited part of Judge Riggs' opinion which concluded that, because "'the advertisements appear to be merely pictures of USDA-approved labeling reflecting 'Product of the USA' or 'USDA Approved,'" allowing Thornton's claim "would undermine Congress' intent to create uniform standards for describing meat products under conflict preemption." MTD Tr. at 41:2-8 (Lampley). The Court stated that this case "doesn't feel like a collateral estoppel" case, where "factual determination[s] . . . cannot be relitigated," but rather, "a legal issue," where "you tend to treat people's opinions as persuasive authority rather than collateral estoppel." MTD Tr. at 41:20-42:2 (Court).

The Court next invited the Defendants to make their preemption arguments. <u>See</u> MTD Tr. at 42:23 (Court). The Defendants argued that Congress expressly preempted Thornton's claims "[b]y way of the USDA." MTD Tr. at 43:8-9 (Lampley). <u>See id</u>. at 43:4-6 (Court, Lampley). The Court asked the Defendants whether FMIA had "classic preemption language" such as "in the ERISA context," MTD Tr. at 43:16-21 (Court), to which the Defendants responded, "I don't believe that we do," MTD Tr. at 43:22 (Lampley), and affirmed that their preemption argument came from regulations, <u>see</u> MTD Tr. at 43:23-25 (Court, Lampley). The Court asked for a case that supports the proposition that express preemption can come from agency regulations, and the

Defendants were not able to name one.  See MTD Tr. at 44:1-13 (Court, Lampley).  The Defendants confirmed that they are not arguing implied preemption, see MTD Tr. at 44:20-22 (Court, Lampley), and then stated that they are arguing that the FMIA preempts Thornton's claims, see MTD Tr. at 45:9-12 (Court, Lampley).  The Defendants argued that "FSIS has provided by regulation that no final label may be used on any meat unless the label has been approved by the FSIS labeling and delivery staff," and that Thornton's Complaint "contains no allegation that the labeling depicted, the advertising, was not approved by the FSIS."  MTD Tr. at 46:19-24 (Lampley).  The Defendants explained that, after "Congress repealed earlier legislation that redefined what it meant for beef to be a product of the USA," the USDA was left "to continue to approve beef labels such that, if a producer wants to label its beef with a country of origin, it only had to comply with the FSIS' approval standards."  MTD Tr. at 47:2-7 (Lampley).  The Defendants asserted that, "if the meat is processed in the United States, then it can carry . . . that 'Product of the USA' label."  MTD Tr. at 47:4-11 (Lampley).  The Defendants state that the "FSIS approval process is required by federal law," and accused Thornton of "us[ing] the state court claims to get around the federal law and overturn USDA approval and rewrite FSIS guidelines."  MTD Tr. at 47:18-25 (Lampley).  The Defendants asserted that FMIA preempts her claim, "because Thornton seeks an order changing federally approved labeling."  MTD Tr. at 48:10-12 (Lampley).

The Defendants argued that Thornton's claims against Albertsons Companies are only that their advertising uses red, white and blue colors, which "suggest that a product was manufactured in the USA."  MTD Tr. at 49:1-5 (Lampley).  The Defendants contended that "[i]t simply cannot be misleading . . . to use the USDA's approved label for USDA choice beef."  See MTD Tr. at 49: 12-13 (Lampley).  The Defendants argue that Thornton's attempt to differentiate between labels does not matter, because "they're the same shield on the same products from the same packers,

pictured in the same advertisements, so it doesn't change the nature of the claim."  MTD Tr. at 50:
21-25 (Lampley).  The Defendants pointed the Court towards Webb v. Trader Joe's, 418 F. Supp.
3d 524 (S.D. Cal. 2019), where the district court "dismissed a case that was brought against Trader
Joe's," which advertised chicken as "having up to 5 percent retained water," although analysis
revealed that "there was more water."  MTD Tr. at 51:2-9 (Lampley).  The Defendants compared
Thornton's to those the district court held preempted, "because the retained water data supporting
the claims made on the product labels were validated by federal regulators, according to federally
prescribed methods, the claims of misbranding were preempted."  MTD Tr. at 51:9-17 (Lampley).

Thornton responded to the Defendants' preemption arguments by arguing that all express
preemption cases of she knows involve statutes and not regulations.  See MTD Tr. at 52:14-16
(Ray).  Thornton discussed Wyeth v. Levine, 555 U.S. 555 (2009), where "the Supreme Court[]
has recognized that an agency regulation, with the force of law, can preempt conflicting state
requirements."  MTD Tr. at 52:19-53:3 (Ray).  Thornton also mentioned that, in Geier v. American
Honda Motor Company, 529 U.S. 861 (2000), and Hillsborough County v. Automated Medical
Laboratories, Inc., 471 U.S. 707 (1985), "the [c]ourt . . . performed its own conflict determination
relying on the substance of state and federal law, and not on agency proclamations of preemption."
MTD Tr. at 53:4-9 (Ray).  Thornton asserted that these cases stand for the proposition, that "when
you're trying to say a regulation is the source of preemption, you're really arguing a conflict
preemption situation," MTD Tr. at 53:13-16 (Ray), and the Court agreed, see MTD Tr. at 53:17-
19 (Court).  Thornton contended that "Wyeth v. Levine essentially dispels the notion that this case
is an express preemption case," MTD Tr. at 53:23-24 (Ray), and argued that FMIA's preemption
provision, 21 U.S.C. § 678, "expressly created concurrent jurisdiction with the Secretary," who
"promulgates regulations," MTD Tr. at 55:6-9 (Ray).  See id. at 54:3-55:5 (Ray).  Thornton argued

that the Defendants are asking "the Court extend the preemption doctrine of this statute to something [-- advertising materials that are sent out in the mail by grocers --] that's never mentioned in the statute, and isn't as far as I can tell, discussed in any legislative history that's cited by anybody." MTD Tr. at 55:22-56:3 (Ray). Thornton contended that "we're actually lacking in textual authority in the statute, and what Congress did, for this notion that Congress also reached out and said the Secretary . . . has . . . jurisdiction over how this stuff is advertised." MTD Tr. at 56:10-15 (Ray). Thornton clarified that she is not "sitting here trying to have a jury in New Mexico invalidate the Secretary of Agriculture's . . . discussion of what should be a label on food," and "we don't have to do that in this case to get past this motion to dismiss." MTD Tr. at 56:19-24 (Ray). Thornton argued that

> the area of consumer protection, and what you call generic policy power, is still supposed to be within the state, unless Congress expressly came out and preempted it, or this is such a conflict . . . that a grocer couldn't comply with the FDA regulation and also comply with its obligations to not make false advertisements.

MTD Tr. at 57:4-11 (Ray). Thornton reaffirmed that there is a meaningful difference between food labels and the promotional stickers that are used in advertising, and that Congress did not contemplate preempting advertising materials. See MTD Tr. at 57:12-21 (Ray). Thornton explained that her use of the "cigarette statute" caselaw is to show that the "duty not to mislead, duty to be truthful about what you're selling, doesn't get supplanted by a federal regulation." MTD Tr. at 57:24-58:5 (Ray).

The Defendants responded to Thornton's preemption arguments by countering that "[t]his is express preemption" and cited to Judge Riggs' opinion, "where she specifically found that the Federal Meat Inspection Act preempts this state law claim." MTD Tr. at 58:23-59:3 (Lampley). The Defendants referred the Court to a string cite in Judge Rigg's opinion supporting this assertion.

See MTD Tr. at 59:22-60:5 (Lampley)(citing <u>Tyson Foods,</u> 482 F. Supp. 3d at 1157 (citing <u>Barnes</u> <u>v. Campbell Soup Co.,</u> No. CIV 12-5185 JSW, 2013 U.S. Dist. LEXIS 118225 (N.D. Cal. 2013)(White, J.); <u>Webb v. Trader Joe's</u>, 418 F. Supp. 3d 524 (S.D. Cal. 2019)(Bencivengo, J.); <u>Craten v. Foster Poultry Farms, Inc.</u>, 305 F. Supp. 3d 1051 (D. Ariz. 2018)(Rayes, J.), and <u>La</u> <u>Vigne v. Costco</u>, 284 F. Supp. 3d 496 (S.D.N.Y 2018)(Román, J.))).   The Court stated to the Defendants that "[i]t sounds also like you may be arguing field preemption, the third kind of preemption, along with conflict and express."   MTD Tr. at 60:21-25 (Court).   The Defendants responded that there may be an "overlap between express, field, and conflict" preemption, and explained that "conflict preemption . . . occurs when either compliance with both federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress," and "field preemption . . . occurs when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a state to supplement it."   MTD Tr. at 61:7-18 (Lampley).

The Defendants next argued that the Dormant Commerce Clause bars Thornton's claims, because Thornton is attempting to "use this litigation to run afoul of the World Trade Organization's decision and the federal government's attempt to comply with them," based on the federal government's "exclusive . . . power over foreign commerce."   MTD at 63:10-21 (Lampley).   The Defendants then asserted that the NMUPA's "safe harbor clause" precludes Thornton's NMUPA claims, because the Defendants' conduct is "expressly permitted under laws administered by a regulatory body of the United States."   MTD Tr. at 64:16-22 (Lampley).

The Court called upon Thornton to respond and asked when the last time the Supreme Court recognized a Dormant Commerce Clause claim, to which Thornton responded, "I don't even know[,] but . . . there is no WTO ruling being pointed out . . . that overrides state law's duties to

be truthful in your advertising about the products that you sell as a retailer," MTD Tr. at 65:16-25 (Ray), and knows of no "case by the Supreme Court that endorses the idea that any type of . . . treaty . . . about products moving in and out of the United States . . . overrides a state's ability to make sure that products are advertised truthfully." MTD Tr. at 66:1-10 (Ray).

**8.    The Order.**

The Court filed its Order on September 30, 2021. See Order at 1. In the Order, the Court denied the Defendants' MTD, and concluded that: (i) collateral estoppel does not bar Thornton's claims in this case, because the issues are not identical and because purely legal issues are not subject to collateral estoppel under New Mexico law; (ii) federal law does not preempt Thornton's state law claims, because FIMA does not expressly preempt the UPA, conflict preemption does not bar this case, and field preemption was not briefed or argued by the parties; (iii) Thornton's State law claims do not fail, because (a) the UPA's "safe harbor" provision only prohibits its application to actions or transactions "expressly permitted under laws administered by a regulatory body," and the FMIA does not expressly permit misleading advertising, (b) the notice requirement for a breach of express warranty claim would likely be waived by the New Mexico Supreme Court; (iv) the Dormant Commerce Clause does not bar this claim because the UPA is non-discriminatory and the benefit of prohibiting misleading advertising outweigh any potential burden on interstate commerce; and (v) Thornton states a plausible claim for relief under Iqbal and Twombly, but must amend her complaint to cure its defects. See Order at 1-2.

**9.    The PI Motion.**

Thornton filed the PI Motion on November 10, 2021. See PI Motion at 1. By way of background, Thornton states that "imports of beef (not counting a substantial increase in imported live feeder cattle) nearly tied an all-time high with 3.343 billion pounds" during 2020. PI Motion

at 1 (citing <u>Total U.S. beef and veal imports and exports from 2006 to 2021 (in million pounds)</u>, Statista (Feb. 24, 2021), https://www.statista.com/statistics/194702/us-total-beef-and-veal-imports-and-exports-since-2001/).  Thornton asserts that "Kroger and Albertsons, who were the two largest supermarket chains in the United States in 2020, and in 2017 were the 2nd and 3rd largest grocery retailers respectively, have beyond any colorable doubt sold some of that foreign originating beef to their consumers over the last 5 years."  PI Motion at 3.  Thornton argues that "[t]hose sales must have occurred under a sticker that misrepresented to the consumer that the beef actually originated in this country . . . ."  PI Motion at 3.  Thornton asserts that sixteen percent of beef consumed in the United States in 2020 did not originate in the United States.  <u>See</u> PI Motion at 3.

Thornton reproduces two photographs which depict advertisements for beef products available at Smith's grocery store, which both show the "U.S.D.A. CHOICE/Produced in the USA" shield with the American flag, and which Thornton asserts was issued "during the week leading up to Halloween."  PI Motion at 4-5; <u>Figure 3</u>, <u>supra</u>.  Thornton does not state whether she received these advertisements in the mail, whether they were inserted into a newspaper. or distributed to consumers at Smith's grocery stores.

Thornton states that "Albertson's halted its use of the red, white and blue label alleged by Plaintiff to give the false impression that the beef is of domestic origin," PI Motion at 5, but notes that "both Defendants resumed advertising under the unrequired[] and misleading red, white[,] and blue promotional sticker," and reproduces photographs showing advertisements displaying the words "USDA CHOICE" in a red, white and blue shield, PI Motion at 6-7 (footnote omitted).  <u>See</u> Figure 13, <u>infra</u>.



Figure 13: Close-up of Kroger Company advertisement using "USDA CHOICE" grade shield, as reproduced in the PI Motion.  PI Motion at 6.  Thornton states that "counsel for Defendants conceded this week via email that just this week Kroger had voluntarily ceased the use of the phrase 'Produced in the USA' in response to this lawsuit, but replaced that promotional sticker with just the red, white and blue USDA promotional sticker."  PI Motion at 8 (no citation for quotation).  Thornton reaffirms that this sticker misled her "into believing that the beef she was purchasing based upon those advertisements was a product originated in this Country."  PI Motion at 8.  Thornton asserts that the trier of fact should determine whether the Defendants "knowingly and intentionally placed those promotional stickers on the beef in order to achieve a belief in the consumer that it was from this Country and whether it did in fact mislead the consumers as alleged by Plaintiff."  PI Motion at 8.  Thornton alleges that the "Defendants have demonstrated that they will continue to use these promotional stickers absent an order enjoining them from this Court."  PI Motion at 8.  Thornton argues that the Defendants' advertisements put

> consumers at risk of the irreparable harm of unknowingly contracting fatal food borne illnesses from other countries with lesser or different food safety practices, contributing to the grotesquely inhuman slaughter practices of countries like Mexico with poor enforcement, environmental degradation of the Brazilian

rainforests or potentially supporting with their misinformed purchase decisions to
slave-like labor practices.

PI Motion at 8-9.

Thornton cites Keirnan v. Utah Transit Auth., 339 F.3d 1217 (10th Cir. 2003), for the
standards a plaintiff must meet for a court to grant a PI.  See PI Motion at 9 (citing Keirnan v. Utah
Transit Auth.,339 F.3d at 1220).  First, Thornton contends that she likely is to succeed on her
claims' merits, because the "Defendants cannot deny that this is not an honest statement about
where a significant portion of the beef products they sell originate" and reproduces a picture of the
"U.S.D.A. CHOICE/Produced in the USA" shield with the American flag.  PI Motion at 9.  See
Figure 3, supra.  Thornton argues also that the Defendants cannot deny that consumers have
"purchased foreign beef products that had been purposefully intermingled with American beef in
order to obscure its origin . . . ."  PI Motion at 9-10.  Thornton argues that, "absent reliance on the
false advertising of Defendants," she and other proposed class members would not have purchased
beef products which "exposed their health to increased risk of contracting fatal diseases" "such as
Bovine Spongiform Encephalopathy or Creutzfeldt-Jakob Disease," "from countries like Brazil or
Argentina that have utterly failed to stop the aforementioned environmental destruction and
humanitarian violations . . . ."  PI Motion at 10.  Thornton argues that she likely will succeed on
her NMUPA claims' merits, because "she can easily establish for the record before the Court that
Defendants have engaged in an unfair or deceptive trade practice" as the NMUPA defines those
phrases.  PI Motion at 10 (citing N.M.S.A. § 57-12-2).  Thornton asserts that the "UPA does not
require that Plaintiff satisfy the unusual high bar for an injunction," because the NMUPA states
that "'[p]roof of monetary damage, loss of profits or intent to deceive or take unfair advantage of
any person is not required.'"  PI Motion at 11 (quoting N.M.S.A. § 57-12-10).

Second, Thornton argues that she and other proposed class members will suffer additional irreparable damage if the Court denies injunctive relief.  See PI Motion at 11.  Thornton argues that misrepresenting a product's origin to a consumer is irreparable harm, particularly where the purchase "support[s] the production of beef in countries that will not stop severe environmental degradation or slave-like labor practices."  PI Motion at 11.  Similarly, Thornton argues that putting her health at risk, "even a negligible risk of contracting a debilitating and fatal disease from eating beef from one of the countries that is unable or unwilling to curb unsafe practices," creates irreparable harm.  PI Motion at 11-12.

Third, Thornton argues that "the balance of harms tips decidedly in favor of Plaintiff," because "the inclusion of a red, white and blue promotional sticker is neither regulatorily required, nor necessary for them to market their products as they commonly omit advertisements of beef products."  PI Motion at 12.  Thornton contends that it is "not required by USDA to appear on a label" and that the Defendants "will not be harmed by denying them the ability to deceive the consumers on the beef of foreign origin that they sell co-mingled with American beef . . . ."  PI Motion at 12.  Finally, Thornton argues that an injunction would be in the public interest, because it would "prevent harm to consumer[s] from unfair or deceptive practices."  PI Motion at 12 (citing Nadler v. Allegheny Airlines, Inc., 426 U.S. 290, 302 (1976)).  Thornton requests, specifically, that the Court enjoin the Defendants

> from using any sort of promotional sticker in advertisements or on packages of beef that tends to lead to the consumer to believe that they are purchasing a product that originated in this Country as cattle born and raised in the United States unless they can certify with certainty that such is a true and accurate statement.

PI Motion at 12-13.

10.     **The PI Response.**

The Defendants docketed a Joint Memorandum of Defendants the Kroger Company and Albertsons in Opposition to Plaintiff Thornton's Motion for Preliminary Injunction at 1, filed December 8, 2021 (Doc. 64)("PI Response").  The Defendants assert, as a preliminary matter, that they "include images of the USDA grading shield in their beef advertisements, informing consumers that the beef is graded by the USDA as 'Choice' or 'Prime,' for example."  PI Response at 1 (no citation for quotation).  The Defendants give two examples of the "USDA CHOICE" shield.  Figure 5, supra; Figure 14, infra.  See PI Response at 1-2.



Figure 14: Close-up of "USDA CHOICE" grade shield on an advertisement reproduced by the Defendants.  PI Response at 1.  The Defendants note that Thornton, in her PI Motion, "does not contest that the shield accurately displays the USDA grading of the beef for sale," PI Response at 2, nor does she "present any evidence to support her assertion that Defendants sell foreign beef, much less that it comes from Argentina or Brazil," PI Response at 2.  The Defendants contend that Thornton does not present any evidence "to support her claims regarding slavery, or deforestation, or any risk of [Bovine Spongiform Encephalopathy ("BSE")] in beef imported to the United States."  PI Response at 2-3.  Further, the Defendants assert that Thornton "does not present any evidence that any reasonable consumer would erroneously assume the USDA's grading shield is a representation about the country of origin of the beef."  PI Response at 3.  The Defendants also

assert that Thornton did not cure the defects that the Court identified in her original complaint[12] in either her *Amended* Class Action Complaint, filed October 15, 2021 (Doc. 30)("Amended Complaint"), or in her *Second Amended* Class Action Complaint, filed November 30, 2021 (Doc. 60)("Second Amended Complaint").  See PI Response at 3-4.  The Defendants state that they will file a motion to dismiss the Second Amended Complaint by the December 21, 2021, deadline.  See PI Response at 4.

The Defendants note that "Thornton's second amended complaint concedes that Albertsons' advertisements do not state that any beef is a product of the USA," PI Response at 3, and note that, "[i]n October, Kroger decided to voluntarily cease using 'Produced in the USA' language in connection with any beef advertisements pending further developments in this action," PI Response at 4 (no citation for quotation).  Like Albertsons Companies, the Kroger Company "now uses only the same kinds of USDA grading shields that are featured in Albertsons advertisements, as pictured above."  PI Response at 4.  See Figure 5, supra.  The Defendants argue that the First Amendment protects "truthful advertising of products, absent evidence of actual consumer confusion, which Plaintiff here fails to provide."  PI Response at 4.  Additionally, the Defendants argue that, because Thornton "admits she no longer buys beef from Albertsons or Smith's, she could not possibly be injured by the advertising she seeks to enjoin and does not have standing to bring this motion."  PI Response at 4-5.

---

[12]In its Order, filed September 30, 2021 (Doc. 28)("MTD Order"), the Court denies the Defendants' Motion to Dismiss with Prejudice, filed November 13, 2020 (Doc. 14), and "orders Thornton to file an Amended Complaint that includes clear, high resolution pictures which are labeled or indexed with information identifying which Defendant circulated each advertisement, where, and when, and whether Thornton or other putative class members purchased that meat, and on what date."  MTD Order at 15.

The Defendants discuss the legal standard for a PI, arguing that "[a] preliminary injunction is an extraordinary remedy, and it should not be issued unless the movant's right to relief is clear and unequivocal."  PI Response at 5 (citing Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)).  The Defendants cite DTC Energy Grp., Inc. v. Hirschfeld, 912 F.3d 1263, 1269-70 (10th Cir. 2018) for the four elements a PI movant must meet to be successful, and argue that the plaintiff bears the burden of demonstrating each of the four prongs.  See PI Response at 5.  The Defendants argue that Thornton's PI Motion is "disfavored," because it "seeks to alter the status quo," and should therefore be "closely scrutinized" under a "heightened standard."  PI Response at 6 (citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1259 (10th Cir. 2005); Zoller Labs., Ltd Liab. Co. v. NBTY, Inc., 111 F. App'x 978 (10th Cir. 2004)(unpublished))[13].  The Defendants argue that Thornton seeks to disrupt the status quo "by enjoining Defendants' already existing and ongoing marketing that utilizes the USDA grading shield."  PI Response at 6.

---

[13]Zoller Labs., Ltd Liab. Co. v. NBTY, Inc., 111 F. App'x 978 (10th Cir. 2004), is an unpublished opinion.  The Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir.2005)(citations omitted).  The Court concludes that Zoller Labs., Ltd Liab. Co. v. NBTY, Inc., Merswin v. Williams Cos., 364 F. App'x 438 (10th Cir. 2010), How v. City of Baxter Springs, 217 F. App'x. 787 (10th Cir. 2007), Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005), Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), Parker v. WI Waterstone, LLC, 790 F. App'x 926, 929 (10th Cir. 2019), Big Elk v. Bd. Of Cnty. Comm'rs, 3 F. App'x 802 (10th Cir. 2001), and Ryan v. Donley, 511 F. App'x 687 (10th Cir. 2013), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Next, the Defendants argue that Thornton "seeks unlawful prior restraint on speech," because "the First Amendment protects commercial speech like advertising."  PI Response at 6 (citing Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. 748, 762-63 (1976); Adolph Coors Co. v. Brady, 944 F.2d 1543, 1546 (10th Cir. 1991)).  The Defendants assert that Thornton "does not argue the use of the USDA grading shield in advertisements is false on its face," but that "the use of the grade shield is potentially misleading because someone could misconstrue the red, white, and blue colors of the shield as a representation that the beef came from a cow born, raised, and slaughtered in the USA."  PI Response at 7 (citing PI Motion at 8). The Defendants argue that Thornton cannot simply "'place the statements alone before the court'" and assert that they are misleading, but must "'adduce evidence (usually in the form of market research or consumer surveys) showing how the statements are perceived by those who are exposed to them,'" PI Response at 7 (quoting McNeilab, Inc. v. Am. Home Prods. Corp., 501 F. Supp. 517, 525 (S.D.N.Y. 1980)), or "at least provide 'expert testimony or any other evidence showing that a significant number of consumers received the claimed message from the advertisement,'" PI Response at 8  (quoting United Indus. Corp. v. Cloroz Co., 140 F.3d 1175, 1180 (8th Cir. 1998)).  The Defendants assert that Thornton has not produced any evidence "that reasonable consumers misinterpret the USDA grading shields to be representations regarding the birthplace of the cows that supplied the beef."  PI Response at 8.

Next, the Defendants argue that Thornton lacks standing to seek injunctive relief, because she is not "likely to be damaged" under the NMUPA, and because she is not facing a real or immediate threat of future harm.  PI Response at 9 (quoting N.M.S.A. § 57-12-10(A), and citing City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983)).  The Defendants contend that Thornton is "aware of the allegedly deceptive practices that form the entirety of her claims," and that,

therefore, "there is no threat she will suffer immediate or future harm."  PI Response at 9 (citing PI Motion at 3).  The Defendants cite case law from the United States Courts of Appeals for the Second, Third, and Seventh Circuits for the proposition that, "[a]s a matter of law, consumers cannot be deceived by advertising they believe to be false, and thus, have no standing to enjoin such advertising."  PI Response at 10 (citing Berni v. Barilla S.P.A., 964 F.3d 141, 147 (2d Cir. 2020); Thorne v. Pep Boys Manny Moe & Jack Inc., 980 F.3d 879, 896 (3d Cir. 2020); Conrad v. Boiron, Inc., 869 F.3d 536, 542 (7th Cir. 2017)).  The Defendants assert that Thornton cannot seek injunctive relief on behalf of the uncertified class that she seeks to represent, because "[a] putative class representative can only advance claims for which the representative has standing to pursue herself."  PI Response at 10 n.1 (citing Big Elk v. Bd. Of Cnty. Comm'rs, 3 F. App'x 802, 805 (10th Cir. 2001)(unpublished)).

The Defendants argue that Thornton does not meet her burden of proving the four prongs needed to be successful on a PI motion, because the Thornton Decl. is "a litany of hearsay from unidentified sources," none of which is "based upon any personal knowledge."  PI Response at 11. See PI Response at 12.  The Defendants characterize Thornton's PI Motion and the Thornton Decl. as "a number of conclusory, unsubstantiated allegations" that "demonstrate her inability to satisfy her burden of persuasion," PI Response at 11, and argue that her "declaration ought to have little persuasive effect here," PI Response at 12.

Regarding the PI test's first prong, the Defendants argue that Thornton has not shown that she is at risk of irreparable harm should the Court not issue an injunction.  See PI Response at 13. The Defendants argue that Thornton must show that "she stands to suffer an injury that is 'certain, great, actual, and not theoretical,'" PI Response at 13 (quoting Valdez v. Grisham, No. CIV 21-0783 MV/JHR, 2021 U.S. Dist. LEXIS 173680, at *41 (D.N.M. Sep. 13, 2021)(Vázquez, J.)), and

that "'the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent the irreparable harm,'" PI Response at 13 (quoting Schrier v. Univ. of Colo., 427 F.3d at 1266).  The Defendants note that Thornton has stated in the Thornton Decl. that she has stopped buying beef products from Smith's Grocery or Albertsons Companies, and therefore "faces **no risk** of purchasing beef from Defendants originating in other countries that allegedly contributes to environmental damage or puts her health at risk."  PI Response at 14 (citing Thornton Decl. ¶ 9, at 2)(emphasis in PI Response).  The Defendants argue that, even if Thornton has standing to argue that the proposed class members are in danger of imminent, irreparable harm, the harm she alleges is not "'certain, great, actual,'" but is "undoubtedly theoretical."   PI Response at 14 (quoting Valdez v. Grisham, 2021 U.S. Dist. LEXIS 173680, at *41).  Furthermore, the Defendants fault Thornton for failing "to acknowledge the fact that all raw meat sold in interstate and foreign commerce is inspected by the United States Food Safety and Inspection Service . . . before it is sold to the public," PI Response at 14-15, and for failing to provide "evidence to suggest that beef from foreign born cattle is any less safe than domestic beef . . . ," PI Response at 15.  The Defendants note that the World Organisation for Animal Health rates Brazil as a "'negligible risk' country for BSE despite . . . two cases," which is the same rating the United States has.   PI Response at 15 (quoting World Organisation for Animal Health, OIE Members' official BSE risk status map (last updated May 2021), https://www.oie.int/en/disease/bovine-spongiform-encephalopathy/#ui-id-2).   According to the Defendants, Thornton also has not provided any evidence that the Defendants sold her Brazilian beef.  See PI Response at 15.

Regarding the test's second prong, the Defendants assert that Thornton is not likely to succeed on the merits of her NMUPA claim, because she "has not shown that Defendants' advertisements make any claim about the origin of the beef sold."  PI Response at 17.   The

Case 1:20-cv-01040-JB-LF   Document 115   Filed 02/17/22   Page 81 of 269

Defendants note that Thornton did not mention or discuss her breach-of-express-warranty or unjust enrichment claims in her PI Motion, and so they do not address those claims in the PI's context. See PI Response at 17 n.7. The Defendants state that the "USDA grading shield employed in these advertisements truthfully identifies the grade the USDA assigned the beef sold by Defendants and makes no mention or representation as to where the beef is produced," PI Response at 17, and note that the "USDA grading criteria is publicly available on the USDA's website," PI Response at 17 n.8 (citing Larry Meadows, What's Your Beef -- Prime, Choice, or Select?, USDA (Sept. 12, 2019), https://www.usda.gov/media/blog/2013/01/28/whats-your-beef-prime-choice-or-select?page=1). The Defendants argue that "the fact that the USDA grading shield is red, white, and blue does not imply anything about the origin of the beef **as a matter of law**," citing two analogous cases in support of their assertion. PI Response at 18 (citing Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 256 (1916); Milso Indus. Corp. v. Nazzaro, No. CIV 08-1026 AWT, 2012 U.S. Dist. LEXIS 123999 at *59 (D. Conn. August 30, 2012)(Alvin, J.)).

Next, the Defendants assert that, even if the USDA grade shield could be taken to mean that the beef originates in the United States, Thornton has not provided any evidence that the beef sold by the Defendants did not originate in this country, and her statement that "'16%' of the beef **sold by Defendants** is '**potentially** not a product originating in the Country'" is not enough to assert or prevail upon a claim. PI Response at 18 (quoting PI Motion at 4)(emphasis in PI Response). The Defendants counter that Thornton's assertion that the NMUPA has a lower bar for a PI by stating that N.M.S.A. § 57-12-10(A) is not intended to change a PI analysis, or reduce a movant's burden, but was drafted "'to include a remedy for small claims'" so that a party "'need not show any monetary damage to be entitled to injunction.'" PI Response at 19 (quoting Fiser v. Dell Comput. Corp., 2008-NMSC-046 ¶ 9, 144 N.M. 464, 467, 188 P.3d 1215, 1218).

On the third prong, the Defendants assert that the balance of equities favors denial of Thornton's PI Motion.   See PI Response at 20.   The Defendants characterize their First Amendment harm as one that forces the Defendants "to change their nationwide marketing plan," impose "real operational costs," and put them at a "competitive disadvantage by prohibiting them from advertising their products in the same truthful way their competitors do."  PI Response at 20. The Defendants contrast these harms with Thornton's "indisputably hypothetical" harms,   PI Response at 20, and contend that an injunction would not prevent any harm, because Thornton is no longer purchasing beef from the Defendants, while it would cause great harm to the Defendants, see PI Response at 22.

On the fourth prong, the Defendants argue that a PI would harm the public interest, because consumers "would be given less information about the beef products they purchase," and "hinder the objectives of the USDA itself, which designed the 'USDA shields [to] assure consumers that the products they buy have gone through a rigorous review process . . . .'"  PI Response at 22-23 (quoting USDA, Agricultural Marketing Service, Grades and Standards, https://www.ams.usda.gov/grades-standards (last visited February 17, 2022)).  The Defendants also argue that it is in the public interest for the "'numerous private economic decisions'" which drive a free market economy to be "'intelligent and well informed.'"  See PI Response at 23 (quoting Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. at 765).

**11.    The PI Reply.**

On December 14, 2021, Thornton filed her Reply in Support of Plaintiff's Motion for Preliminary Injunction (Doc. 67)("PI Reply").  Thornton asserts that the Defendants

> have admitted that they know that the beef they are selling is in some part not produced in this Country and that they have no intention of ascertaining the actual source of the beef by requiring accurate labeling from the packers because they

(like the packers) are making bigger profits by selling foreign produced beef that is co-mingled with American produced beef than they would if the beef they sold were accurately labeled and advertised foreign beef.

PI Reply at 1-2.  Thornton argues that the Defendants are using the "U.S.D.A. CHOICE/Produced in the USA" shield, <u>Figure 4</u>, <u>supra</u>, and the "USDA CHOICE" shield, <u>Figure 14</u>, <u>infra</u>, to convey information about USDA inspections and beef grading, <u>see</u> <u>Figures 15-17</u>, <u>infra</u>.  PI Reply at 2.



<u>Figure 15</u>: "USDA CHOICE" shield.  PI Reply at 2.



<u>Figure 16</u>: USDA Inspection Stamp Logo.  PI Reply at 2.



<u>Figure 17</u>: USDA Inspection Stamp.  PI Reply at 2.



**USDA** United States Department of Agriculture

# What's Your BEEF?

A guide to understanding USDA beef grades

MODERATELY **ABUNDANT** MARBLING

**MODERATE** MARBLING

SLIGHT MARBLING

## Marbling

is the amount of fat streaking within the cut of meat.

### USDA PRIME BEEF

is produced from young, well-fed beef cattle. It has slightly abundant to abundant marbling, and is generally sold in hotels and restaurants. Prime roasts and steaks are excellent for broiling, roasting or grilling.

### USDA CHOICE BEEF

is high quality, but has less marbling than Prime. Choice roasts and steaks from the loin and rib will be very tender, juicy, and flavorful and are suited for broiling, roasting or grilling. Less tender cuts, such as from the round, are perfect for braising, roasting or simmering on the stovetop with a small amount of liquid.

### USDA SELECT BEEF

is normally leaner than Prime or Choice. It is fairly tender, but because it has less marbling, it may not have as much juiciness or flavor. Select beef can be great on the grill, and is also good for marinating or braising.

Agricultural Marketing Service
Revised June 2017

**SOURCE** Agricultural Marketing Service's Meat Grading site -
www.ams.usda.gov/grades-standards/beef/shields-and-marbling-pictures

Figure 18: What's Your Beef?  PI Reply at 3 (reproducing graphic from Larry Meadows, What's Your Beef -- Prime, Choice, or Select?). Thornton asserts that using black and white "USDA CHOICE" stickers, instead of the red, white, and blue stickers, would not be misleading.  See PI Reply at 3; Figures 19 and 20, infra.



Figure 19: Black and White "USDA CHOICE" shield.  PI Reply at 3.



Figure 20: Black and White "USDA CHOICE" shield in circle.  PI Reply at 3.

Thornton asserts that, "if the Defendants were being honest with this Court and the American consumer about the truth of where the beef they sell comes from, they would have no problem halting the use of red, white and blue stickers in their advertisements and on their labels." PI Reply at 4.  Thornton notes that the Kroger Company went from using the "U.S.D.A.

CHOICE/Produced in the USA" shield, <u>Figure 4</u>, <u>supra</u>, to using the a "USDA CHOICE" shield with red, white, and blue colors, <u>Figure 21</u>, <u>infra</u>.  PI Reply at 4.



<u>Figure 21</u>: "USDA CHOICE" shield with red, white, yellow, and blue.  PI Reply at 4.  <u>See</u> AMS, <u>Beef Grading Shields</u>.  Instead, Thornton asserts that the Defendants should have used a black-and-white version of the "USDA CHOICE" shield.  <u>Figure 11</u>, <u>supra</u>.  <u>See</u> PI Reply at 5.  Thornton asserts that there is a "tacit acknowledgement from Defendants" that using "red, white, and blue USA Iconography sells product because consumers want American beef," while ceasing use of red, white, and blue colors would "hurt sales."  PI Reply ay 5.

Thornton asserts that the Defendants' standing argument -- that, in mitigating her future damages by avoiding purchasing beef from Albertsons Companies and the Kroger Company, Thornton no longer has standing to seek an injunction -- "muddle[s] the law," because, "for Plaintiff here to have standing to seek relief for the putative class she herself would have to betray her duty to mitigate . . . ."  PI Reply at 6.  Thornton also counters the Defendants' First Amendment argument by citing <u>Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio</u>, 471 U.S. 626, 651 (1985)("<u>Zauderer</u>"), for the proposition that "'disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech.'"  PI Reply at 6 (quoting <u>Zauderer</u>, 471 U.S. at 651).  Thornton argues that, according to the United States Court

of Appeals for the District of Columbia Circuit, "the Government's interest in correcting deception supersede[s] the meat packers['] First Amendment protections to withhold the country of origin." PI Reply at 7 (citing Am. Meat Inst. v. U.S. Dept. of Agric., 760 F.3d 18, 23 (D.C. Cir. 2014))("American Meat").   Finally, Thornton contends that the Defendants' argument that "other individuals not party to the lawsuit are also misleading consumers . . . should not work as an excuse for continuing to profit from misleading consumers."  PI Reply at 7.

## 12.     The PI Hearing.

The Court held a hearing on the PI Motion on December 17, 2021.  See Clerk's Minutes at 1, filed December 27, 2021 (Doc. 76).  The Court first called upon Thornton to argue her PI Motion.  See Transcript of Hearing at 3:23-25 (taken December 17, 2021)(Court)("Tr.").  Thornton stated that she is going to focus on the PI test's most important prong -- the likelihood of success on the merits.  See Tr. at 6:6-9 (Dunn).  Thornton addressed the Defendants' argument that the USDA shield's purpose is to "convey grade or inspection," Tr. at 6:17-18 (Dunn), by stating that the Kroger Company's shield used to have the American flag with "Produced in the USA on it," Tr. at 6:21-24 (Dunn).  Thornton's counsel presented flyers that he received in his mailbox that week as demonstratives.  See Tr. 4:9-10 (Dunn); Kroger Company Demonstrative, filed January 10, 2022 (Doc. 76-1); Albertsons Companies Demonstrative, filed January 10, 2022 (Doc. 76-2); Food King Demonstrative, filed January 10, 2022 (Doc. 76-3).  First, Thornton invited the Court to look at a mailing from Food King,[14] which advertises beef with a graphic that says, "All American Beef" on an American flag.  See Tr. at 7:5-7 (Dunn); Food King Demonstrative at 1.

---

[14]Food King products are sold at Lowe's Market, located at 4701 4th St. NW, Albuquerque, New Mexico 87107.  See Food King Demonstrative at 1.   After moving for a PI, Thornton amended her complaint to add Lowe's Supermarkets, Inc., as a defendant. See Second Amended Complaint at 1.

Thornton noted that Albertsons Companies, the Kroger Company, and Lowe's Supermarkets all use the USDA shield only for beef products "and really nothing else."  Tr. at 7:8-10 (Dunn).  Next, Thornton handed the Court a mailing from Albertsons Companies and directed the Court's attention to an advertisement for cooked beef which includes the red, white, and blue "USDA CHOICE" graphic.  See Tr. at 7:19-8:2 (Dunn); Albertsons Companies Demonstrative.  Thornton argued that she has a likelihood of success on the merits, because the colors red, white, and blue are "specifically being put on there for the intent of conveying country of origin . . . ."  Tr. at 8:12-16 (Dunn).  Thornton clarified that she is not asking for the Defendants to stop communicating meat products' grade or that it was inspected, but only that they stop misleading consumers with the use of the red, white, and blue USDA shield.  See Tr. at 9:7-11 (Dunn).  Thornton noted that the USDA website shows black and white shields which convey the same grading information as the red, white, and blue shields.  See Tr. at 9:11-16 (Dunn).

While Thornton's counsel admitted that anecdotal evidence of him stopping the security guards and United States Marshalls on his way into the federal courthouse, and asking them what impression the USDA CHOICE shield gave them about the country of origin, is not admissible evidence and is not evidence before the Court, Thornton emphasized that the Thornton Decl. is evidence and stated that the advertisements in question misled her.  See Tr. at 11:2-9 (Dunn).  Thornton asked the Court to issue an injunction stopping the Defendants from using red, white, and blue imagery to protect the other proposed class members.  See Tr. at 12:5-12 (Dunn).  Thornton argued that the D.C. Circuit in American Meat held that "companies could be required to place pursuant to USDA regulations the country of origin on beef and it didn't violate the First Amendment," and that "the Government had a compelling interest in stopping deception."  Tr. at 10:6-12 (Dunn)(citing American Meat, 760 F.3d at 23).  Thornton highlighted the year of the

American Meat decision -- 2014 -- when "we still had country of origin labeling requirements," that were removed for beef and pork "at the end of 2015." Tr. at 12:14-22 (Dunn). Thornton stated that beef and pork "are the only two agricultural or food products that do not require a country of origin . . . on them." Tr. at 12:20-22 (Dunn). Thornton directed the Court to compare the advertisements for lamb with those for beef on the Albertsons Companies mailing, noting that lamb does not have a grade or inspection shield. See Tr. at 12:25-13:2 (Dunn). Likewise, Thornton noted that the pork advertised on the same flyer does not have a grade or inspection shield. See Tr. at 13:2-3 (Dunn).

Next, Thornton clarified that she waited to file the PI Motion until the Court addressed the MTD's preemption issue, before which it would have been difficult to show a likelihood of success on the merits. See Tr. at 13:16-22 (Dunn). Thornton reiterated her arguments about irreparable harm, arguing that her information about environmental degradation and slave labor practices in Brazil comes from reliable news sources, such as Reuters. See Tr. at 14:7-13 (Dunn). Thornton also noted that, given the "sheer volume of beef imported into the United States versus volumes that the defendants are selling," it is very likely that the Defendants are selling beef that is not from the United States. Tr. at 14:13-19 (Dunn).

The Court next called upon the Defendants to argue in opposition to the PI Motion. See Tr. 14:25-15:1 (Court).[15] The Defendants began by noting that one of the advertisements that Thornton uses as a demonstrative is from Food King, which is "owned by the new defendant[] that was added in this case and they're not [the] subject of this motion." Tr. at 15:17-22 (Miller). The

---

[15]The Defendants used a PowerPoint presentation at the PI Hearing. See Defendants' Opposition to Motion for Preliminary Injunction, filed December 22, 2021 (Doc. 75)("PowerPoint Slides").

Defendants stated that Thornton does not contest that the advertisements showing the "USDA

CHOICE" shield are "accurate on their face" and that "'USDA Choice' is in fact USDA beef."

Tr. at 16:5-6 (Miller).  The Defendants argued that "[t]here is no affirmative misrepresentation in

this advertising," and that Thornton seeks an injunction based solely upon "speculation."  Tr. at

16:8-11 (Miller).  The Defendants characterized Thornton's "chain of speculation":

> [Thornton] believed that the shield indicated that beef came from a cow
> born in the U.S. because the shield is red[,] white and blue.  She thinks it's therefore
> misleading, because she heard from unidentified sources that Albertsons and
> Smith's sometimes sell beef that is not of domestic origin, which again she defines
> is from a cow born in the USA.  She said that she heard beef production in Brazil
> and Argentina results in deforestation and slave labor.  And that there were two
> cows in Brazil from that were diagnosed with BSE, which is commonly referred to
> as mad cow disease.  She said she doesn't want to contract mad cow disease or
> contribute to deforestation, so she has ceased purchasing beef products from
> Smith's or Albertsons.

Tr. at 16:14-17:5 (Miller).  The Defendants assert that Thornton presents no evidence to support

her statement that Albertsons Companies and the Kroger Company sell Brazilian or Argentinian

beef, and that neither does she present evidence to support her allegations that the Defendants'

beef "has any connection to slavery or deforestation."  Tr. at 17:9-14 (Miller).

The Defendants argued that "a preliminary injunction is an extraordinary remedy," which

"should not be issued unless the movant's right to relief is clear and unequivocal."  Tr. 18:3-6

(Miller).  The Defendants stated that a PI's purpose is "merely to preserve the relative position of

the parties until a trial on the merits can be held" and that normally "it's to preserve an asset that

might be [in] dispute."  Tr. at 18:8-12 (Miller).  The Defendants argued that a PI would change --

and not preserve -- the status quo, "by enjoining the defendants' already existing and ongoing

marketing that uses the USDA grade shields."  Tr. at 18:22-24 (Miller).  See id. at 18:16 (Miller).

The  Defendants  argued  that  "restraints  on  speech,  constitutional  or  not,  are  inherently

burdensome," and that Thornton must meet "a very high standard" to succeed in getting the PI. Tr. at 19:6-9 (Miller).

The Defendants next addressed their standing argument, stating that, "[u]nder New Mexico law, a plaintiff can proceed with a claim for injunctive relief under the UPA if they're likely to be damaged," and argued that Thornton would not be harmed if the Court does not grant the PI, because "she doesn't buy beef products from Smith's or Albertson's anymore, and because she says she doesn't rely on these shields in making her decisions."  Tr. at 19:16-20:4 (Miller).  The Defendants asserted that "[c]onsumers can't be deceived by advertising they already believe to be false" and therefore "don't have standing to enjoin such advertising."  Tr. at 20:6-8 (Miller).  Citing a Third Circuit opinion, the Defendants characterized Thornton's request for a PI as a "[s]top me before I buy again claim," which "precludes Article III standing."  Tr. at 20:9-13 (Miller)(citing Thorne v. Pep Boys Manny Moe & Jack Inc., 980 F.3d 879, 896 (3d Cir. 2020)).  The Defendants argued that Thornton does not have standing to pursue a PI "on behalf of a class that has not yet been certified," because she does not have standing to pursue a PI.  Tr. at 20:15-20 (Miller).

The Defendants countered that Thornton's argument that the likelihood of success on the merits is the PI test's most important prong is wrong, because the first prong -- irreparable harm -- is the most important.  See Tr. at 21:5-10 (Miller).  The Defendants asserted that Thornton must show "she stands to suffer an injury that is grave, certain, actual, and not theoretical," Tr. 21:14-16 (Miller), that the injury which a plaintiff must show in securing a PI must be "imminent," and that, by contrast, Thornton's injury is merely "theoretical," Tr. at 22:1-3 (Miller).  The Defendants characterized Thornton's PI Motion as "an argument that the Court should enter preliminary relief because consumers might wrongly misconstrue the USDA shield as a

misrepresentation that the beef came from a cow born in the U.S." Tr. at 22:4-8 (Miller).  The

Defendants argue that Thornton has not presented any actual evidence that any misrepresentation

> would cause them to buy the beef that they weren't going to buy already; that this
> actually influenced their buying decision; that the beef they ultimately buy might
> come from a cow born overseas but processed in America.  And it didn't just come
> from another country, but it came from Brazil or Argentina.  And not just from
> Brazil or Argentina, but from a ranch that engages in environmental degradation
> and slave-like practices, or whether there might be a negligible risk of contracting
> a debilitating and fatal disease from BSE.

Tr. at 22:8-19 (Miller).  See id. at 22:20-22 (Miller).  The Defendants argued that the Thornton

Decl. is conclusory, contains hearsay, and is not based on personal knowledge.  See Tr. at 22:22-

23 (Miller); id. at 23:4-8 (Miller).  The Defendants noted that, in Tyson Foods, Thornton argues

that she relies on the Meatpacker Defendants' labels "that are on the product itself that say,

'Product of the U.S.,'" Tr. at 23:18-23 (Miller)(no citation for quotation), while now "she claims

that she relied on these red, white, and blue USDA shields to believe that she was purchasing

American beef," Tr. at 23:15-18 (Miller).  The Defendants argue that Thornton must show that

"true statements are misleading or deceptive despite their truthfulness," for which she needs

"evidence in the form of market research and consumer surveys showing how the statements are

perceived by those who are exposed to them," and cannot merely "place the statements alone

before the court."  Tr. 25:2-7 (Miller).

The Defendants next argued that, "even if Thornton can show that people were misled by

these shields, that doesn't mean she's demonstrated harm," because Thornton does not present

evidence that "beef from foreign born cattle [is] any less safe than domestic beef," and that

imported beef is "inspected by the United States Food Safety Inspection Service."  Tr. at 26:13-20

(Miller).  The Defendants reiterated the point from their PI Response that "the World Organization

for Animal Health . . . still rates Brazil -- even after [two BSE cases] -- as a negligible risk country,"

which is "the same rating they give the United States" and "the lowest risk category they have."
Tr. at 26:24-27:6 (Miller).  The Defendants also note that, like the two BSE cases from Brazil, five
of the United States' "six reported cases of BSE," are "'atypical cases'" which arise from "old,
aging cows" and do not threaten the food supply chain.  Tr. at 27:12-18 (Miller).  The Defendants
stated that the United States was upgraded to a negligible risk category in 2013, because of the
recognition that "atypical cases don't appear to present a risk to humans."  Tr. at 28:2-3 (Miller).
The Defendants argue that Thornton has presented "no evidence that anyone has been harmed or
if there is any potential for harm," and, "because there is no irreparable injury, the motion should
be denied," because that prong is dispositive in the Tenth Circuit.  Tr. at 28:9-14 (Miller).

The Defendants next discussed the likelihood-of-success prong, see Tr. at 28:16 (Miller),
arguing that Thornton cannot succeed under the NMUPA, because Thornton admits that "the
USDA Choice beef advertised as USDA Choice beef is Choice beef, and . . . there is no . . .
affirmative representation on that shield as to where the cow was born," Tr. at 29:5-9 (Miller).
The Defendants contended that "no reasonable consumer would believe that these USDA grading
shields imply anything about the origin of beef," because the "USDA grading criteria [are] publicly
available on the USDA's website," Tr. at 29:18-23 (Miller), and also in USDA consumer guides,
"none of [which] suggest that these shields have anything to do with where the cow was born," Tr.
at 30:4-6 (Miller).  See id. at 30:1-2 (Miller).  The Defendants reiterated the argument from their
PI Response that the colors red, white, and blue, and "'the iconography of the Statue of Liberty
and the American flag," "are too general to evoke any specific geographical associations or to
support an inference that there is implied claim of domestic manufacture.'"  Tr. at 30:8-18
(Miller)(quoting Milso Indus. Corp. v. Nazzaro, 2012 U.S. Dist. LEXIS 123999, at *59).  The
Defendants listed several companies that have red, white, and blue colors in their logos whose

products consumers do not expect to originate in the United States, and asserted that "[n]o court has ever enjoined the use of red, white, and blue," or "held that these colors imply anything about the country of origin of a product."  Tr. at 31:1-10 (Miller).  The Defendants also quoted the Honorable Barry Moskowitz, United States District Judge for the United States District Court for the Southern District of California, who found that "'the mere fact that the word "Jamaica" and "Jamaican" appear on the packaging of the beer is not sufficient to support a conclusion that consumers can be confused regarding the origin and ingredients of the beer.'"  Dumas v. Diageo PLC, No. CIV 15-1681 BTM/BLM, 2016 U.S. Dist. LEXIS 46691, at *8 (S.D. Cal. April 6, 2016)(Moskowitz, J.).   Similarly, the Defendants cited a case where "[t]he word 'Hawaii' on the snack package, combined with Hawaii-related image simply could not deceive a reasonable consumer about the origin of the Hawaiian snacks, which were, in fact, manufactured in Washington."  Tr. at 31:22-32:2 (Miller)(citing Maeda v. Kennedy Endeavors, Inc., 407 F. Supp. 3d 953 (D. Haw. 2019)(Otake, J.)).

The Defendants argued that Thornton only can speculate that the beef sold by the Defendants did not originate in the United States, and that, the "mere potential that plaintiff might be guessing right about the origin of any given beef sold by defendants is not enough to assert  a plausible claim, much less . . . show that she is likely to prevail  upon such a claim."  Tr. at 32:12-17 (Miller).  The Defendants noted that the Supreme Court in Winter v. NRDC, Inc., 555 U.S. 7 (2008), "rejected the possibility standard for preliminary injunctions" and argued that a movant must show an actual likelihood of success.  Tr. at 32:18-21 (Miller)(citing Winter v. NRDC, Inc., 555 U.S. at 22).   The Defendants asserted that Thornton has not proved her "fundamental assumption" that "beef is a product of the USA only if it came from a cow born in the USA."  Tr. at 32:24-33:1 (Miller).  The Defendants highlighted that the shields which Thornton is seeking to

enjoin "don't say 'Product of the USA,'" Tr. at 33:15-17 (Miller), and that "current government

guidance contradicts her definition of Product of the USA," Tr. at 33:24-34:1 (Miller).

Next, the Defendants discussed the balance of equities, arguing that "there is no harm on

[Thornton's] side in any way," because, not only has she not provided evidence that the USDA

shields harm consumers, she "doesn't buy beef from these stores anymore."  Tr. at 34:1-11

(Miller).  On the other hand, the Defendants argued that, a PI would be an inherently burdensome

restraint on their speech, limit the truthful advertisement of their products, impose operational

costs, put them at a competitive disadvantage, and harm their First Amendment rights.  See Tr.

34:12-22 (Miller).  The Defendants contended that a PI would

> hinder the objectives of the USDA itself, which designed these shields to assure
> consumers that the products they buy have gone through a rigorous review process
> by highly skilled graders and auditors that follow the official grade standards and
> process standards developed, maintained, and interpreted by the USDA's
> Agriculture Marketing Service.

Tr. at 35:12-19 (Miller).  The Defendants explained that the "USDA funds organizations to

encourage beef sellers to use its grading in their beef marketing," presenting as an example a

University of Tennessee Extension Service publication which "give[s] examples of these

shields . . . and they're the same red, white, and blue that you see in the Albertson's ads."  Tr. at

36:13-21 (Miller)(citing Rob Holland & Dwight Loveday, Understanding Yield Grades and

Quality Grades for Value-Added Beef Producers and Marketers at 6, University of Tennessee

Extension Service (December 2013), available at https://extension.tennessee.edu/public

ations/documents/sp755.pdf.

The Defendants noted that, in her PI Reply, Thornton "doesn't address her failure to

provide evidence in support of her motion" or "address the four requirements for preliminary

injunction," but instead "argues that maybe defendants should use these inspection stamps in their

advertising instead of USDA grade shields." Tr. at 37:14-23 (Miller).  The Defendants respond to the black-and-white inspection stamps that Thornton suggests in her PI Reply "don't have anything to do with USDA grades or cuts of beefs . . . . They're just inspection stamps."  Tr. at 37:23-25 (Miller).  The Defendants argue that, while "it's true, USDA provides black and white and color versions of the shields, because sometimes people advertise in black and white and sometimes people advertise in color," "color ads do a better job of getting information to the public than black and white," which are less memorable and less appealing than color advertisements.  Tr. at 38:10-21 (Miller).

The Defendants argued that Thornton's reliance on Zauderer v. Office Of Disciplinary Counsel, 471 U.S. 626 (1985),  is misplaced, because that case "has nothing to do with forbidding commercial speech; it has to do with compelling commercial speech."   Tr. at 39:17-21 (Miller)(citing PI Reply at 6-7; Zauderer, 471 U.S. at 651).  The Defendants explained that the Supreme Court in Zauderer "was saying that it is much harder to prohibit speech than to compel it," which is the "opposite situation of what's at issue here[;] [h]ere, Thornton is trying to prohibit speech," and "overlooks the material differences between disclosure requirements and outright prohibitions on speech."   Tr. at 40:15-21 (Miller)(citing Zauderer, 471 U.S. at 651).    The Defendants argued that a "higher level of scrutiny is applied to commercial speech restrictions than to compel commercial speech" and that Thornton "doesn't come close to meeting that burden."  Tr. at 41: 1-6 (Miller).

Finally, the Court called on Thornton to give the last word on her PI Motion, see Tr. at 42:23-24 (Court), and Thornton clarified that she is requesting that the Defendants be enjoined from "using red, white, and blue imagery in their advertisements," Tr. at 43:4-6 (Dunn).  Thornton explained that she is "not trying to prohibit . . . commercial speech that conveys the grade of the

beef; that it was inspected by USDA[.]  Those are both truthful statements."  Tr. at 43:9-13 (Dunn).

Thornton contends that the Defendants "don't deny that they're selling foreign beef," "don't deny

that . . . they're using the red, white, and blue imagery to convey country of origin," and do not

deny "that it may be misleading."  Tr. at 43:19-25 (Dunn).  Thornton argues that she was misled

by these advertisements, and that "does not preclude that she was also misled by labels inside the

store."  Tr. at 44:8-11 (Dunn).  Thornton noted that

> the advertisements that came direct to her through her newspaper or through the
> mail, [are] very different than the images that opposing [counsel] has offered to the
> Court, both in their brief, and just now in their PowerPoint, from other grocery
> stores.  First of all, we don't know where those other images are from.  The citation
> that they give is just for Walmart, and that appears to be their online advertising.
> That's not a mailer that was sent to the consumers.

Tr. at 44:14-23 (Dunn).  Thornton clarified that she is asking that the Defendants "cease in their

direct mailer to the consumers this stuff that's red, white, and blue; not necessarily that they have

to stop saying anything about the grade."  Tr. at 44:25-45:3 (Dunn).  Thornton noted again that the

Defendants mark the grade of meat on some pieces of cooked meat, but not on others.  See Tr. at

45:4-5 (Dunn).  Thornton argued that she can "easily arrive at the likelihood of success that the

consumers believe that they were misled . . . by this advertising," Tr. at 45:15-19 (Dunn), and that

she has "already been irreparably injured," because "[s]he's already purchased beef in reliance

upon these advertisements," Tr. at 46:3-5 (Dunn).  Thornton asserted that her irreparable harm

argument is not just about BSE, but also about "extreme degradation practices" such as

"deforestation" and the use of slave labor.  Tr. at 46:14-17 (Dunn).

Thornton emphasized that "[t]he shield that Kroger was using . . . had in it 'Produced in

the U.S.A.,'" which "gets to the point that the use of these shields by the defendants is for

conveying a misrepresentation in order to mislead consumers."  Tr. at 47:10-16 (Dunn)(no citation

for quotation).  Thornton argued that "the combination of USDA, plus red, white, and blue . . . misleads the consumers," whereas the examples which the Defendants give of other red, white, and blue logos do not also include "USDA" on them and are not representations of food products. Tr. at 48:2-8 (Dunn).  Addressing the Defendants' standing arguments, Thornton countered that "[a]pplying the law the way that the defendants are asking the Court to apply it, would make it impossible, under this fact scenario, for me to have an adequate class rep[resentative], unless they're willing to betray their duty to mitigate their damages."  Tr. at 48:22-49:3 (Dunn).  Thornton argued that, if she brings in another class representative to seek injunctive relief, they also "have an affirmative duty to mitigate their damages; therefore, they can never seek this injunction."  Tr. at 49:7-11 (Dunn).  Thornton stated that "the defendants are asking . . . to read the law to make it an impossibility for me to add a class rep[resentative] and get an injunction on this case."  Tr. at 49:11-14 (Dunn).

The Defendants "contest and reject the notion that [they] are using the USDA shield to try to imply anything about the origin of beef," Tr. at 49:24- 50:2 (Miller), and stated that, "[t]o the extent that Kroger previously put 'Produced in the USA' in its shields, Kroger removed that voluntarily," Tr. at 50:3-5 (Miller).  The Defendants argued that "[w]e're talking about just the colors themselves" and asserted that "no court has ever enjoined the use of red, white, and blue in any logos or advertising before [ -- ] not at the end of the merits and certainly not before we get to the merits at a preliminary injunction stage."  Tr. at 50:6-12 (Miller).  Finally, the Defendants noted that it is news to them that they are selling Brazilian beef, and that they would be "very surprised if there was evidence to support that understanding, given how far away Brazil is, and the cost of transporting beef."  Tr. at 50:13-19 (Miller).  Following a discussion between Thornton

and the Court, the Court indicated that it would get out an opinion on the PI Motion "around February 17." Tr. at 56:19-20 (Court).

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[16] If the Court finds only an

_____

[16]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state"))).[17]   The Court may also rely on

---

question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[17]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
>         . . . .

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[18]  Ultimately, "the Court's task is to predict what the

---

> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions." (emphasis and title case omitted)).

[18]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless

whether it accurately reflects state law --at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess. A district court considering a state law issue after the

publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." <u>Moore's Federal Practice</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This formulation may not be the most precise one if the goal is to ensure identical outcomes in federal and state court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, <u>see</u> <u>Abbott Labs. v. Granite State Ins.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. <u>See</u> <u>Allstate Ins. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior

- 104 -

case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley

v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d

1174, 1188-89 (D.N.M. 2008)(Browning, J.).

## LAW REGARDING FEDERAL-QUESTION JURISDICTION

A federal district court has "original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Federal-question

jurisdiction exists when "a federal question is presented on the face of the plaintiff's properly

pleaded complaint." Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First

Nat'l Bank, 299 U.S. 109, 112-13 (1936)).  As "the master of the claim," the plaintiff may choose

---

In the absence of intervening Utah authority indicating that a plaintiff is not
required to prove a safer, feasible alternative design, we are bound to follow the
rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case
interpreting an issue of Utah law], as was the district court. "Following the doctrine
of stare decisis, one panel of this court must follow a prior panel's interpretation of
state law, absent a supervening declaration to the contrary by that state's courts or
an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at
1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.
    Whether the decision to limit the intervening authority a district court can consider was
intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc.,
the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion
from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit
interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir.
2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific,
Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's highest
court.'"  (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).
    The Tenth Circuit has set forth a stringent restriction on its district courts' ability to
independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at
tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State
Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court
is bound to abide by the Tenth Circuit's interpretation of Erie.

to sue in state court rather than in federal court "by exclusive reliance on state law." Caterpillar,
Inc. v. Williams, 482 U.S. at 392.

The defendant may not try to sneak a federal question through the back door by raising a
federal defense, for "it is now settled law that a case may not be removed to federal court on the
basis of a federal defense . . . even if the defense is anticipated in the plaintiff's complaint, and
even if both parties concede that the federal defense is the only question truly at issue." Caterpillar,
Inc. v. Williams, 482 U.S. at 393 (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust,
463 U.S. 1, 12 (1983)). See Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1236 (10th Cir.
2003)("It is well settled that '[a] defense that raises a federal question is inadequate to confer
federal jurisdiction.'" (quoting Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804,
808 (1986))). While a plaintiff is free to plead a federal question in his complaint, "a defendant
cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law
claim, transform the action into one arising under federal law, thereby selecting the forum in which
the claim shall be litigated." Caterpillar, Inc. v. Williams, 482 U.S. at 399. Even the plaintiff can
go only so far in attempting to invoke federal-question jurisdiction, because "[a]ny statements in
the complaint which go beyond a statement of the plaintiff's claim and anticipate or reply to a
probable defense are to be disregarded" in deciding whether federal-question jurisdiction exists.
Mescalero Apache Tribe v. Martinez, 519 F.2d 479, 481 (10th Cir. 1975).

In addition to the requirement that the federal question appear on the complaint's face, a
"plaintiff's cause of action must either be: (i) created by federal law; or (ii) if it is a state-created
cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'"
Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Merrell Dow
Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 808). As for the second method, beyond the

requirement of a "substantial" federal-law question at the case's heart, the federal question must also be "actually disputed," and its resolution must be necessary to the case's resolution.  Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005).  Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."  Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. at 313.  In particular, the court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state law claim that will overwhelm the judiciary with cases traditionally heard in state courts.  Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. at 318-19 (explaining that "there must always be an assessment of any disruptive portent in exercising federal jurisdiction" in accepting "garden variety" state law claims).  See also David L. Hanselman, Supreme Court Federal Removal Jurisdiction, For the Defense at 25, 65, September 2005 ("The most important consideration is whether removal would federalize a garden-variety tort, contract, or fraud claim, or whether there is some uniquely federal aspect of the case that, if removed, could be adjudicated in federal court without subjecting the federal courts to a flood of original filings or removals.").

The Supreme Court has underscored that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction."  Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 813.  Indeed, the Supreme Court has "forcefully reiterated" that district courts must exercise "prudence and restraint" when determining whether a state cause of action presents a federal question, because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system," Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 810.  See Morris v. City of Hobart, 39 F.3d 1105, 1111 (10th Cir. 1994).

Under the well-pleaded complaint rule, the federal question giving rise to jurisdiction must appear on the complaint's face.  See Karnes v. Boeing Co., 335 F.3d 1189, 1192 (10th Cir. 2003).  This rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law."  Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987).  See Schmeling v. NORDAM, 97 F.3d 1336, 1339 (10th Cir. 1996).  Where a federal question appears on the well-pleaded complaint's face, federal jurisdiction is not automatic.  Federal jurisdiction requires not only a contested federal issue, but a substantial one, indicating a serious federal interest in seeking the advantages thought to be inherent in a federal forum.  See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005).  The federal issue will qualify for a federal forum if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331.  See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 313-14.

In Bar J Sand & Gravel, Inc. v. W. Mobil N.M. Inc., 2005 WL 3663689 (D.N.M. 2005)(Browning, J.), the plaintiff's complaint stated causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and unfair trade practices.  See 2005 WL 3663689, at *7.  The defendants argued that a federal question was apparent on the complaint's face

> because, as a necessary first step in proving a breach of contract, Bar J must show that a valid contract actually exists between Bar J and the Defendants. To establish that the parties entered into a valid contract, Bar J must show that all conditions precedent were met, including Bar J's possession of a valid [Sand and Gravel] Permit [that the Pueblo of San Felipe issued to Bar J Trucking, Inc.]. In turn, whether Bar J acquired a valid Permit requires reference to the federal regulations governing the issuance of those permits. Reaching the last link in their chain of argument, the Defendants assert that the federal question is whether the creation of the Permit complied with those regulations.

2005 WL 3663689, at *8 (internal citations omitted).  The Court determined that the defendants' argument confused "a condition precedent to contract performance with a condition precedent to

contract <u>formation</u>," and that the argument was raising an issue of federal law as a potential defense, rather than as an element of the plaintiff's case; accordingly, the issue did not appear on the face of the plaintiff's complaint.  2005 WL 3663689, at *8-9 (emphasis in original).  The defendants also argued that a decision whether the plaintiffs validly assigned the Permit to the defendants would raise an issue of federal law, because, "[u]nder federal regulations, an assignment of the Permit would be invalid without approval by the Secretary of the Interior"; the Court rejected this argument, because the plaintiff did not request "vindication of any assignment" in the complaint, and the Court determined the plaintiff was justified in that choice.  2005 WL 3663689, at *9.  The Court further determined that the Supreme Court's decision in <u>Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.</u> did not change the result, because,

> [u]nlike <u>Grable</u>, Bar J does not premise its breach of contract claim on any point of federal law.  Bar J does not assert that it has a right to recover from the Defendants because of the existence of some federal law. Bar J argues neither that the Defendants violated a federal statute nor that the [contract's] validity requires the interpretation or application of any provision of the United States Code.

<u>Bar J Sand & Gravel, Inc. v. W. Mobil N.M. Inc.</u>, 2005 WL 3663689, at *12 (internal citations omitted).  The Court concluded that, because the plaintiff grounded its right to relief in "basic contract law," without "referencing any federal law," the well-pleaded complaint did not raise an issue of federal law and, thus, the Court did not have federal-question jurisdiction.  2005 WL 3663689, at *13.

In <u>Olsen v. Quality Continuum Hospice, Inc.</u>, 380 F. Supp. 2d 1225 (D.N.M. 2004)(Browning, J.), the Court determined that the plaintiff's claims did not present any federal questions; although the plaintiff asserted that the defendants violated the "United States Social

Security Act of 1968 [and] . . . the Medicare program,"[19] the Court concluded that those provisions do not create a private right of action and, thus, did not create the plaintiff's causes of action. 380 F. Supp. 2d at 1229. The Court also determined that, because the plaintiff's causes of action were essentially medical malpractice claims and arose under New Mexico common law or New Mexico statutes, they would not depend on resolution of a question of federal law. See 380 F. Supp. 2d at 1230-31.

To reiterate, a plaintiff may not, however, circumvent federal jurisdiction by omitting federal issues that are essential to his or her claim. See Schmeling v. NORDAM, 97 F.3d at 1345 n.2. "A case arises under federal law if its 'well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" Morris v. City of Hobart, 39 F.3d 1105, 1111 (10th Cir. 1994)(quoting Franchise Tax Board v. Constr. Laborers Vacation Trust, 463 U.S. 1, 27-28 (1983)). Thus, even though a plaintiff asserts claims only under state law, federal-question jurisdiction may be appropriate if the state-law claims implicate significant federal issues. See Nicodemus v. Union Pacific Corp., 440 F.3d at 1232. As well, jurisdiction requires more than just a federal question: "It is by now axiomatic that 'federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" Nicodemus v. Union Pac. Corp., 440 F.3d at 1232 (quoting Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 313). See Lucero v. Ortiz, 163 F. Supp. 3d 920, 922 (D.N.M. 2015)(Browning, J.)(remanding case to state court where federal question jurisdiction did not exist, because grounds for removal were based on a cross claim);

_____

[19]Social Security Act of 1965, Pub. L. 89-97, 79 Stat. 286, and Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066.

Williams v. Board of Regents of University of New Mexico, 990 F. Supp. 2d 1121, 1145-47 (D.N.M. 2014)(Browning, J.)(concluding that a plaintiff's state law claims formed the same case or controversy as a federal claim, warranting jurisdiction over the federal claim and supplemental jurisdiction over the state clams); Shay v. RWC Consulting Group, 2014 WL 3421068, at *1 (D.N.M. 2014)(Browning, J.)(dismissing federal-question claims, and remanding state claims that were all which remained).

## LAW REGARDING THE PRECLUSIVE EFFECT OF FEDERAL COURT DIVERSITY JUDGMENTS

While it is true that "a court does not usually 'get to dictate to other courts the preclusion consequences of its own judgment,'" Smith v. Bayer Corp., 564 U.S. 299, 307 (2011)(quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4405, p. 82 (2d ed. 2002)), the law of the State in which the federal diversity court sits determines the claim-preclusive effect of a judgment of a federal court sitting in diversity, see Semtek International, Inc. v. Lockheed Martin Corp., 531 U.S. 497, 506-08 (2001)("Semtek").  The Tenth Circuit summarizes Semtek's procedural posture and conclusion:

> The Supreme Court has recently confirmed that the preclusive effect given to federal court judgments is a question of federal law. . . . In Semtek, the plaintiff's original suit against the defendant in California federal district court was dismissed because it failed to comply with California's two-year statute of limitations. . . . Plaintiff then filed suit in Maryland state court. . . . The Maryland state court dismissed plaintiff's suit under res judicata. . . . The Maryland Court of Special Appeals affirmed the dismissal, explaining that the res judicata effect given to federal diversity judgments is prescribed by federal law. . . .
>
> On appeal from the Maryland Court of Special Appeals, the Supreme Court confirmed that not only is the claim-preclusive effect of a federal diversity judgment a question of federal law, but further stated that the claim-preclusive effect of all federal judgements is a question of federal law ultimately decided by the Supreme Court. . . .  The Supreme Court continued, however, by stating that *the best federal rule for the claim-preclusive effect of a federal diversity judgment is to adopt "the law that would be applied by state courts in the State in which the federal*

*diversity court sits."* . . .  Thus, on remand in Semtek, the Maryland Court of Special Appeals was to apply California claim preclusion law to determine the res judicata effect of the California federal district court decision.

Matosantos Commer. Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1207-08 (10th Cir. 2001)("Matosantos")(citing Semtek, 531 U.S. at 506-08)(internal citations removed)(emphasis added).  Recognizing that Semtek deals with res judicata -- claim preclusion -- and not collateral estoppel -- issue preclusion -- the Tenth Circuit states that "[n]evertheless, an argument can be made that Semtek requires this court to apply Puerto Rico [ -- the rendering court's forum's -- ] collateral estoppel law to Matosantos' claim."  Matosantos, 245 F.3d at 1208.  Instead of deciding that question, however, the Tenth Circuit concludes that it "need not decide which law to apply," because "the result is the same regardless of whether Puerto Rico or Tenth Circuit collateral estoppel law applies."  Matosantos, 245 F.3d at 1208.  The Tenth Circuit decided that question -- whether Semtek requires a federal court to apply the rendering court's forum's collateral estoppel law where the rendering court sits in diversity -- in Knight v. Mooring Capital Fund, LLC, 749 F.3d 1180 (10th Cir. 2014)("Knight"), but without reference to Matosantos.  See Knight, 749 F.3d at 1186.  The Tenth Circuit explains:

> Because *Mooring I* is a federal judgment in a diversity action applying Oklahoma law, Oklahoma's preclusion law applies.  *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 . . . (2001).  In this case the appropriate preclusion doctrine is issue preclusion.  We recognize that the district court relied on claim preclusion rather than issue preclusion, but we may affirm on any ground supported by the record.  *See Bixler v. Foster*, 596 F.3d 751, 760 (10th Cir. 2010).  And the defendants raised both claim preclusion and issue preclusion in the district court, so Ms. Knight had an opportunity to address both doctrines. *See id*.

Knight v. Mooring Capital Fund, LLC, 749 F.3d at 1186.

In Taylor v. Sturgell, 553 U.S. 880 (2008)("Taylor"), the Supreme Court signals that Semtek's holding applies to both issue preclusion and claim preclusion: the Supreme Court

summarizes the first part of Semtek's holding as "the preclusive effect of a federal-court judgment is determined by federal common law," and then explains that "the preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" Taylor, 553 U.S. at 891 (citing Semtek, 531 U.S. at 507-08). The Supreme Court, therefore, suggests that Semtek's rule applies not only to the federal judgments' "*claim-preclusive* effect," Semtek, 531 U.S. at 507, 509 (emphasis added), but also to the broader "*preclusive* effect" of federal judgments, Taylor, 553 U.S. at 891 (emphasis added). The application of Semtek's rule to issue preclusion in addition to claim preclusion makes sense, because "[t]he doctrines of collateral estoppel and res judicata are insufficiently distinct to warrant different treatment under the rationale of Semtek." CSX Transp., Inc. v. Gen. Mills, Inc., 846 F.3d 1333, 1338 (11th Cir. 2017).

The United States Courts of Appeals for the Fourth, Ninth, and Eleventh Circuits have joined the Tenth Circuit in concluding that Semtek requires applying the forum state's collateral estoppel law where the rendering federal court sits in diversity. See Hately v. Watts, 917 F.3d 770, 778 (4th Cir. 2019)(applying Semtek's holding to issue preclusion and supplemental jurisdiction); Taco Bell Corp. v. TBWA Chiat/Day Inc., 552 F.3d 1137, 1144 (9th Cir. 2009)(applying Semtek to issue preclusion in holding that "any preclusive effect" of the prior federal court sitting in diversity is governed by the law of the state where it sits); CSX Transp., Inc. v. Gen. Mills, Inc., 846 F.3d at 1340 (resolving conflicting precedent in holding that "federal common law borrows the state rule of collateral estoppel to determine the preclusive effect of a federal judgment where the court exercised diversity jurisdiction"). Other Courts of Appeals have implied that collateral estoppel is included within Semtek's holding by adopting Taylor's broad language of "preclusive effect," or by adopting a definition of res judicata that includes collateral

estoppel.  See, e.g., Medina-Padilla v. United States Aviation Underwriters, Inc., 815 F.3d 83, 86 (1st Cir. 2016)(applying Puerto Rico res judicata law under Semtek, and stating that the Puerto Rico's definition of res judicata "encompasses both issue and claim preclusion");[20] Stinnett v. Delta Air Lines, Inc., 803 F. App'x 505, 508 (2d Cir. 2020)(holding that the district court was correct to apply federal common-law collateral estoppel rules and not New York collateral estoppel law, because the original case was a federal question and not diversity jurisdiction case); Toll Bros. v. Century Sur. Co., 318 F. App'x 107, 109 (3d Cir. 2009)("In general, '[f]or judgments in diversity cases, federal law incorporates the rules of preclusion applied by the State in which the rendering court sits.'")(quoting Taylor, 553 U.S. at 891).

Additionally, various State courts of appeals have applied Semtek to issue preclusion.  See Garcia v. Prudential Ins. Co. of Am., 129 Nev. 15, 17, 293 P.3d 869, 870 (2013)("When the federal court decides a case under its diversity jurisdiction, we recognize that the United States Supreme Court's decision in Semtek International Inc. v. Lockheed Martin Corp., 531 U.S. 497, 508 . . . (2001), governs the treatment of claim and issue preclusion."); Cal. State Teachers' Ret. Sys. v. Alvarez, 179 A.3d 824, 841 (Del. 2018)(recognizing that, if the original complaint was brought under a district court's diversity jurisdiction, the preclusion law of the State in which the diversity court sits would apply); Marshall v. Inn on Madeline Island, 631 N.W.2d 113, 120-21 (Minn. Ct. App. 2001)(applying Semtek to issue preclusion, "[b]ecause the Semtek holding rests on the constitutional obligation of state courts to respect federal judgments . . . federalism principles apply equally to claim preclusion and issue preclusion").

---

[20]New Mexico also considers the term "res judicata . . . [to] encompass both claim and issue preclusion."  Pielhau v. State Farm Mut. Auto. Ins. Co., 2013-NMCA-112, ¶ 7 n.1, 314 P.3d 608, 700.

## RELEVANT NEW MEXICO LAW REGARDING ISSUE PRECLUSION
## ("COLLATERAL ESTOPPEL")

Under New Mexico law, "collateral estoppel, also called issue preclusion, prevents a party from re-litigating 'ultimate facts or issues actually and necessarily decided in a prior suit.'" Ullrich v. Blanchard, 2007-NMCA-145, ¶ 19, 171 P.3d 774, 778 (quoting Deflon v. Sawyers, 2006-NMSC-025, ¶ 13, 137 P.3d 577, 582; Adams v. United Steelworkers of Am., AFL-CIO, 1982-NMSC-014, ¶ 16, 640 P.2d 475, 479). Accord Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d 1278, 1286 (D.N.M. 2011)(Browning, J.). For collateral estoppel to apply, four elements must be met: "(1) the parties in the current action were the same or in privity with the parties in the prior action, (2) the subject matter of the two actions is different, (3) the ultimate fact or issue was actually litigated, and (4) the issue was necessarily determined." Ullrich v. Blanchard, 2007-NMCA-145, ¶ 19, 171 P.3d at 778 (quoting City of Sunland Park, Santa Teresa Servs. Co. v. Macias, 2003-NMCA-098, ¶ 10, 75 P.3d 816, 820).[21] Accord Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1286. Additionally, "[t]o give rise to estoppel, the finding of ultimate facts in the prior action must have been final." Silva v. State, 1987-NMSC-107, ¶ 7, 745

---

[21]The Court is confident that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statement of collateral estoppel's elements under New Mexico law, in Ulrich v. Blanchard and City of Sunland Park, Santa Teresa Servs. Co. v. Macias. The Court bases its prediction on Silva v. State, 1987-NMSC-107, 745 P.2d 380, in which the Supreme Court of New Mexico identified the following elements of collateral estoppel under New Mexico law: "the parties in the second suit must be the same or in privity with the parties in the first suit," 1987-NMSC-107, ¶ 6, 745 P.2d at 382, and, where the causes of action in two cases are different, "the parties are precluded from relitigating only those ultimate issues and facts shown to have been actually and necessarily determined in the previous litigation," 1987-NMSC-107, ¶ 5, 745 P.2d at 382 (quotation marks omitted)(quoting City of Santa Fe v. Velarde, 1977-NMSC-040, ¶ 5, 564 P.2d 1326, 1328). The Supreme Court of New Mexico identified the same collateral estoppel elements as the Court of Appeals of New Mexico and, therefore, the Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals' listing of those elements.

P.2d 380, 382 (citing C & H Constr. & Paving Co. v. Citizens Bank, 1979-NMCA-077, ¶ 27, 597

P.2d 1190, 1200 ("It is well established that the doctrines of res judicata and collateral estoppel

apply only to final judgments."). See also City of Santa Fe v. Velarde, 1977-NMSC-040, ¶ 9, 564

P.2d 1326, 1328 (asserting that application of the doctrines of res judicata or collateral estoppel

requires a prior final decision). If the party invoking the doctrine establishes a prima facie case,

then the burden shifts to the party opposing collateral estoppel to show that he or she was not

afforded a fair opportunity to litigate the issue in the prior proceeding. See Padilla v. Intel Corp.,

1998-NMCA-125, ¶ 4, 964 P.2d 862, 865; State v. Bishop, 1992-NMCA-034, ¶ 8, 832 P.2d 793,

795.[22] Accord Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1286.

Whether the doctrine of collateral estoppel should be applied is within the trial court's

discretion, and the exercise of discretion is reviewed for an abuse of discretion on appeal. See

Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1286; Shovelin, 1993-NMSC-015,

¶ 14, 850 P.2d at 1002. Even when all the elements of collateral estoppel are present, the trial

court may consider whether countervailing equities militate against application of the doctrine.

See Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1286; Hyden v. Law Firm of

McCormick, Forbes, Caraway & Tabor, 1993-NMCA-008, ¶ 14, 848 P.2d 1086, 1091. Collateral

estoppel should be applied only where the judge determines that its application would not be

---

[22]The Court is confident that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statement regarding collateral estoppel burden-shifting, in Padilla v. Intel Corp. and State v. Bishop. The Court bases its prediction on Silva v. State, 1987-NMSC-107, 745 P.2d 380, in which the Supreme Court of New Mexico stated: "This satisfied movant's burden of showing a prima facie case for summary judgment. . . . It was then respondent's burden to show there was a factual issue as to a full and fair opportunity to litigate." 1987-NMSC-107, ¶ 8, 745 P.2d at 383. The Tenth Circuit utilized the same quote from Padilla v. Intel Corp. to state the law regarding collateral estoppel burden-shifting in New Mexico. See Salguero v. City of Clovis, 366 F.3d 1168, 1173 (10th Cir. 2004).

fundamentally unfair.  See Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1286;

Reeves v. Wimberly, 1988-NMCA-038, ¶ 14, 755 P.2d 75, 78;[23].

## RELEVANT FEDERAL LAW REGARDING ISSUE PRECLUSION

"[I]ssue preclusion . . . refers 'to the effect of a judgment in foreclosing relitigation of a

matter that has been litigated and decided.'"  Murdock v. Ute Indian Tribe of Uintah & Ouray

Reservation, 975 F.2d 683, 687 (10th Cir. 1992))(citing Marrese v. Am. Acad. of Orthopaedic

Surgeons, 470 U.S. 373, 376 n.1 (1985)).  The Tenth Circuit has stated that "a federal court

examining a question of federal law upon which another federal court . . . has previously

ruled . . . must rely on the federal law of [issue preclusion]."  Murdock v. Ute Indian Tribe of

Uintah & Ouray Reservation, 975 F.2d at 687 (citing Blonder-Tongue Lab., Inc. v. Univ. of Ill.

Found., 402 U.S. 313, 324 n.12 (1971); Meza v. Gen. Battery Corp., 908 F.2d 1262, 1265 (5th Cir.

1990); Fireman's Fund Ins. v. Int'l Mar. Place, 773 F.2d 1068, 1069 (9th Cir. 1985); Restatement

(Second) of Judgments § 87, at 314 (1982)("Federal law determines the effects under the rules of

[preclusion] of a judgment of a federal court"); 18 C. Wright & A. Miller, Federal Practice &

Procedure: Jurisdiction § 4466 (1981 & Supp. 1992)).  In the Tenth Circuit, four elements must be

---

[23]The Court is confident that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statements in Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor and Reeves v. Wimberly that a court should apply collateral estoppel only where the judge determines that its application would not be fundamentally unfair, and where equities do not militate against it.  See Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor, 1993-NMCA-008, ¶ 14, 848 P.2d 1091; Reeves v. Wimberly, 1988-NMCA-038, ¶ 14, 755 P.2d at 78.  The Court bases its prediction on the Supreme Court of New Mexico's assertion in Silva v. State that, "[i]t is clear from the cited New Mexico authorities that, in deciding whether to apply the doctrine of collateral estoppel, the trial judge may determine that its application would be fundamentally unfair and would not further the aim of the doctrine," and therefore may decide not to apply the doctrine.  1987-NMSC-107, ¶ 7, 745 P.2d at 382.  The Supreme Court of New Mexico also stated: "A growing number of jurisdictions hold that, absent fundamental unfairness in a given case, the doctrine of collateral estoppel may be applied . . . ."  1987-NMSC-107, ¶ 7, 745 P.2d at 382.

met for issue preclusion to apply: (i) "the issue previously decided is identical with the one presented in the action in question;" (ii) "the prior action has been finally adjudicated on the merits;" (iii) "the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication;" and (iv) "the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation, 975 F.2d at 687.

The Tenth Circuit has not addressed whether a summary judgment order dismissing fewer than all the claims or adjudicating the rights and liabilities of fewer than all the parties may serve as the basis for issue preclusion in subsequent litigation. The Court therefore considers what other federal courts have stated regarding the finality requirement for issue preclusion. Various federal courts have discussed the finality requirement for issue preclusion. See John Morrell & Co. v. Local Union 304A of United Food Commercial Workers, AFL-CIO, 913 F.2d 544, 563 (8th Cir. 1990); Avondale Shipyards, Inc. v. Insured Lloyd's, 786 F.2d 1265, 1269 (5th Cir. 1986). Recently, several federal courts have stated that, for purposes of issue preclusion, finality in the sense of 28 U.S.C. § 1291 is not required. See Miller Brewing Co. v. Joseph Schlitz Brewing Co., 605 F.2d 990, 996 (7th Cir. 1979)("To be 'final' for purposes of [issue preclusion] the decision need only be immune, as a practical matter, to reversal or amendment."); Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir. 1961)("'[F]inal' also is 'a word of many meanings[;]' the law of judgments does not use it in relation to conclusiveness, as 28 U.S.C. § 1291 does, to mean only a judgment 'which ends the litigation and leaves nothing for the court to do but execute the judgment[.]'" (internal citations omitted)(quoting Sw. Bell Tel. Co. v. Pub. Serv. Comm'n, 262 U.S. 276, 310 (1923); Catlin v. United States, 324 U.S. 229, 233 (1945)); 18A C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure Jurisdiction § 4434 (2d. ed

1984)("Recent decisions have relaxed traditional views of the finality requirement by applying issue preclusion to matters resolved by preliminary rulings or to determinations of liability that have not yet been completed by an award of damages or other relief."). But see Avondale Shipyards, Inc. v. Insured Lloyd's, 786 F.2d at 1269 (declining to "depart from [its] previously stated rule that an order granting partial summary judgment 'has no res judicata [(claim preclusion)] or collateral estoppel [(issue preclusion)] effect.'" (quoting Golman v. Tesoro Drilling Corp., 700 F.2d 249, 253 (5th Cir. 1983))).

The Restatement (Second) of Judgments reflects the trend that, for purposes of issue preclusion, finality in the sense of 28 U.S.C. § 1291 is not required. The Restatement (Second) of Judgments states: "The rules of [preclusion] are applicable only when a final judgment is rendered. However, for purposes of issue preclusion . . . , 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) of Judgments § 13 (1982). It further states that a "more pliant view of finality . . . is appropriate with respect to issue preclusion." Restatement (Second) of Judgments § 13 cmt. b. Under § 13 comment g, labeled criteria for determining finality in the application of issue preclusion, the Restatement (Second) of Judgments states:

> Usually there is no occasion to interpret finality less strictly when the question is one of issue preclusion, that is, when the question is whether decision of a given issue in an action may be carried over to a second action in which it is again being litigated. . . . But to hold invariably that that kind of carry-over is not to be permitted until a final judgment in the strict sense has been reached in the first action can involve hardship -- either needless duplication of effort and expense in the second action to decide the same issue, or, alternatively, postponement of decision of the issue in the second action for a possibly lengthy period of time until the first action has gone to a complete finish. In particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment. Before doing so, the court should determine that the decision to be carried over was adequately deliberated and firm, even if not final in the sense of forming a basis for a judgment already entered.

Thus preclusion should be refused if the decision was avowedly tentative. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for the purpose of preclusion. The test of finality, however, is whether the conclusion in question is procedurally definite and not whether the court might have had doubts in reaching the decision.

Restatement (Second) of Judgments § 13 cmt. g.

Based on the cases that the Court has found, federal courts are split regarding whether a summary judgment order resolving fewer than all the claims is final for purposes of issue preclusion. In Avondale Shipyards, Inc. v. Insured Lloyd's, the United States Court of Appeals for the Fifth Circuit "declined to depart from [its] previously stated rule that an order granting partial summary judgment [on certain issues] 'has no [claim preclusion] or [issue preclusion] effect.'" Avondale Shipyards, Inc. v. Insured Lloyd's, 786 F.2d at 1269 (citation omitted). In analyzing whether it should depart from its previously stated rule, the Fifth Circuit stated:

We are aware of respected authority to the effect that for the purpose of issue preclusion . . . the degree of finality required respecting the prior adjudication may in many instances be less than is appropriate for claim preclusion . . . . However, "[t]he most prominent [of these] decisions have involved issues that were resolved by appeal prior to final judgment in the first action." Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4434 at 321. See, e.g., Lummus Co. v. Commonwealth Oil Ref. Co., 297 F.2d 80, 87-90 (2d Cir. 1961), cert. denied, 368 U.S. 986 . . . (1962); Zdanok v. Glidden Co., 327 F.2d 944, 955 (2d Cir.), cert. denied, 377 U.S. 934 . . . (1964); Miller Brewing Co. v. Jos. Schlitz Brewing Co., 605 F.2d 990, 995-96 (7th Cir. 1979), cert. denied, 444 U.S. 1102 . . . (1980); Dyndul v. Dyndul, 620 F.2d 409, 411-12 (3d Cir. 1980)(appeal available but foregone). Lummus, generally viewed as the leading case in this area, expressly recognizes the importance of "the opportunity of review" of the prior decision. 297 F.2d at 89.

We are not aware of any federal appellate decision which has applied preclusion to a prior nonfinal ruling as to which appellate review was unavailable, nor any which contradicts our above-cited opinions stating that partial summary judgment orders under Rule 56(d) are not preclusive. Hence, even were we to follow Lummus, we would not extend it to such a situation. We recognize that there is highly respected authority suggesting a contrary approach. See

Restatement (Second) Judgments § 13, illustration 2.  The principal case relied on for this view is Sherman v. Jacobson, 247 F. Supp. 261, 268-69 (S.D.N.Y. 1965).

We respectfully disagree with Sherman.  A recognized text states that "[t]here are some serious problems with" the broad Restatement formulation that the prior determination is issue preclusive if "sufficiently firm to be accorded conclusive effect," gives Sherman as an example, and observes that such an approach "seems calculated to create more problems than it would solve."  1B Moore's Federal Practice, ¶ 0.441[4] at 747.  While the Restatement and another respected text assert that the availability of appellate review is a significant consideration in determining whether an otherwise nonfinal prior order should be issue preclusive, the practical effect of Sherman seems to render appealability almost irrelevant.  It appears to us that under a Sherman-type approach, the result is either that nearly every interlocutory ruling will be issue preclusive, or that it will be almost impossible to determine in advance which will be preclusive and which not.  The former alternative renders the availability of appellate review virtually irrelevant; the latter undermines predictability and efficiency.  Further, issue preclusion is normally denied where the issue determined is not essential to the judgment (this is based both on a diminished confidence due to the lack of essentiality and on the unavailability of appellate review, see Restatement (Second) Judgments § 27, comments h & i; § 28, comment a).  Such denial is difficult to reconcile with the allowance of issue preclusion to rulings in a partial summary judgment order, as to which not only is appeal presently unavailable but it is also impossible to know whether appeal will ever be available and whether any issue thus ruled on will be essential to the judgment in the case.  Moreover, Sherman rests in part on the premise that availability of relief under Rule 60(b) with respect to judgments which are final in the usual sense renders them just as subject to revocation or modification by the court which rendered them as are orders under Rule 56(d). 247 F. Supp. at 269.  We have rejected this premise.  Zimzores v. Veterans Administration, supra.  See also Acha v. Beame, 570 F.2d 57, 63 (2nd Cir. 1978).

Avondale Shipyards, Inc. v. Insured Lloyd's, 786 F.2d at 1270-71 (footnotes omitted).[24]

---

[24]In Sherman v. Jacobson, the District Court for the Southern District of New York stated:

Although there is no question that a prerequisite for application of the doctrine of [issue preclusion] is a final judgment, Restatement, Judgments § 41 (1942), the concept of finality is not easily defined.  It is true that 'finality' has sometimes been equated with 'appealability' in the context of a particular case, e.g., United States v. Physic, 175 F.2d 338 (2d Cir. 1949); United States v. One 1946 Plymouth Sedan Automobile, 167 F.2d 3 (7th Cir. 1948); Restatement, Judgments § 41, comment a (1942).  However, 'final' in the [claim preclusion] or [issue preclusion] sense is not identical to 'final' in the rule governing the jurisdiction of appellate courts.  Lummus Co. v. Commonwealth Oil Ref. Co., 297 F.2d 80, 89 (2d

Several federal district courts have similarly found that a summary judgment order resolving fewer than all the claims in the case is not a final judgment and thus cannot serve a basis for issue preclusion.  See In re Loughery, No. 09-69033-PWB, 2010 WL 4642131, at *6, 8 (Bankr. N.D. Ga. Oct. 12, 2010)(concluding that the district court's order granting in part and denying in part summary judgment, which found the defendant liable under one of the plaintiff's claims, but not the plaintiffs' other claims, did not satisfy the finality requirement of issue preclusion, because, using the guidance in the Restatement(Second) of Judgments § 13 comment g, although the parties were heard and the district court supported its decision with a reasoned opinion, the order was not subject to appeal and was not reviewed on appeal -- it was interlocutory in nature, did not end the action and was subject to revision under rule 54(b) at any time before the entry of judgment); Am.

---

Cir. 1961), cert. denied, Dawson v. Lummus Co., 368 U.S. 986 . . . (1962).  An examination of the policies underlying [claim preclusion] and [issue preclusion] and the requirement that judgments be 'final' to be appealable shows why this is so.

    . . . .

Bearing this in mind, there must still be determined exactly what the requirement of finality entails in the [issue preclusion] context.  A judgment may be final, despite the fact that an appeal from it has not been decided, whether because the appeal is pending, United States v. Nysco Labs., Inc., 318 F.2d 817 (2d Cir. 1963) (per curiam), or the party has lost its right to appeal because of the circumstances of the case, United States v. Munsingwear, Inc., supra (case became moot), or the law does not provide for review, Johnson Co. v. Wharton, 152 U.S. 252 . . . (1894) (jurisdictional amount required for appeal not satisfied).  The form of the adjudication is not decisive, 2 Freeman, Judgments § 666 (5th ed. 1925), nor is the label, such as 'interlocutory,' given the decision.  Bee Mach. Co. v. Freeman, 131 F.2d 190 (1st Cir. 1942), aff'd, 319 U.S. 448 . . . (1943).  The judgment may be final as to some matters, even though the litigation continues as to others, Restatement, Judgments § 41, comment c (1942), and the decision may have adjudicated liability only, leaving the assessment of damages in abeyance.  Zdanok v. Glidden Co., 327 F.2d 944, 955 (2d Cir.), cert. denied, 377 U.S. 934 . . . (1964).

Sherman v. Jacobson, 247 F. Supp. at 268.

- 123 -

Cas. Co. of Reading v. Sentry Fed. Sav. Bank, 867 F. Supp. 50, 56 (D. Mass. 1994)(Young, J.)(noting that the trend seems to be toward expanding the notion of finality for purposes of issue preclusion, but that most of the courts that have expanded the notion of finality have done so when there has been opportunity for appellate review, and declining to treat a partial summary judgment, resolving only one issue in the case, as final when "no final judgment [has been] entered and there has been no opportunity for appeal").

Other federal district courts, however, have found that a summary judgment order resolving fewer than all the claims in the case is a final decision for purpose of issue preclusion. See Shakman v. Democratic Party Org. of Cook Cnty., No. 03-C-4819, 2004 WL 407015, at *8 (N.D. Ill. Jan. 28, 2004)("[T]he partial summary judgment grant [on one of the plaintiffs' claims] is a final decision for purposes of issue preclusion." (citing Amcast Indus. Corp. v. Detrex Corp., 45 F.3d 155, 158 (7th Cir. 1995)("[A] good deal more latitude is allowed [regarding finality] when [issue preclusion] is invoked rather than [claim preclusion]."))); Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n, 804 F.2d 390, 393 (7th Cir. 1979)); Siemens Med. Sys., Inc. v. Nuclear Cardiology Sys., Inc., 945 F. Supp. 1421, 1433 (D. Colo. 1996)(Babcock, J.).  In Siemens Medical Systems, Inc. v. Nuclear Cardiology Systems, Inc., the Honorable Lewis Babcock, United States District Judge for the District of Colorado, declined to follow Avondale Shipyards, Inc. v. Insured Lloyd's, in determining whether a prior summary judgment order granting summary judgment on one of the plaintiff's claims against the defendant, stating:

> I am not persuaded by the Fifth Circuit's reasoning, at least as it applies here.  Although Rule 54(b) provides that an order that is not explicitly made final is subject to later revision, it would be pedantic to contend that all interlocutory orders are therefore "tentative" in any real sense.  It presupposes that a party will move for reconsideration of the order and that the court would grant it.  Significantly, where, as here, a party has settled and dismissed the case with

prejudice, Fed. R. Civ. P. 54(b) no longer applies, and whatever orders have been entered into the case are frozen, not subject to reconsideration.

In addition, the Fifth Circuit has recently recognized an inconsistency in its own decisions. Jury verdicts, like partial summary judgment orders, are subject to revision under Fed. R. Civ. P. 54(b) until they are entered as final. The Fifth Circuit, however, gives preclusive effect to such nonfinal jury verdicts. RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1295 (5th Cir. 1995). The court has recognized this incongruity but has not yet addressed it. Marine Shale Processors, Inc. v. United States Environmental Protection Agency, 81 F.3d 1371, 1380 n.2 (5th Cir. 1996).

Further, the Fifth Circuit's rationale ignores other policy concerns. If a partial summary judgment is never to have preclusive effect, a party involved in a series of suits against different litigants will have the option to avoid preclusive effects in future suits simply by settling the current suit whenever an unfavorable summary judgment order is issued. This would be directly contrary to the goal of judicial economy that [issue preclusion] is designed to promote. Parklane [Hosiery Co. v. Shore], 439 U.S. [322,] 326, . . . . So long as it would not be inequitable to do so, it makes inimitable sense to preserve and use whatever firm judicial decisions have been made previously on a particular issue. To accomplish that, however, the power to determine the preclusive effect of judgments must not be left in the hands of parties who are interested in avoiding such effects.

Siemens Med. Sys., Inc. v. Nuclear Cardiology Sys., Inc., 945 F. Supp. at 1435.

Collateral estoppel is an affirmative defense on which the party raising the defense bears the burden of proof. See Fed. R. Civ. P. 8(c); Nwosun v. Gen. Mills Rests., Inc., 124 F.3d 1255, 1256 (10th Cir. 1997), cert. denied, 523 U.S. 1064 (1998). A defendant may properly raise the defense in a rule 12(b)(6) motion when the facts necessary to support the defense are apparent on the pleadings' face. See Prospero Assocs. v. Burroughs Corp., 714 F.2d 1022, 1024 (10th Cir. 1983)("The motion is also procedurally defective," because "[t]he affirmative defense of res judicata does not appear on the face of the Complaint."); Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(reversing court's decision to grant a MTD based on defense of res judicata, where the facts that would support the defense were not in the complaint). See also Andrews v. Daw, 201 F.3d 521, 524 n.1 (4th Cir. 2000)(acknowledging that a rule 12(b)(6) MTD may raise

the res judicata affirmative defense, but only if the defense clearly appears on the complaint's

face).  Furthermore, "it must be remembered that disputes over material issues of fact cannot be

resolved on a motion to dismiss . . . but must be reserved for resolution at trial by the appropriate

trier," and thus the affirmative defense of collateral estoppel can raise no disputed issues of fact.

C. Wright & A. Miller, Federal Practice & Procedure § 1277, at 328-30, 332 (3d ed. 1998).

> When there is no disputed issue of fact raised by an affirmative defense, or the facts
> are completely disclosed on the face of the pleadings, and realistically nothing
> further can be developed by pretrial discovery or a trial on the issue raised by the
> defense, the recent cases seem to agree that the matter may be disposed of by a
> motion to dismiss under Rule 12(b).

Wright & Miller, supra.   See Scott v. Kuhlmann, 746 F.2d 1377, 1378 (9th Cir.

1984)("Ordinarily affirmative defenses such as collateral estoppel may not be raised by motion to

dismiss, but this is not true when, as here, the defense raises no disputed issues of fact").

Alternatively, the party asserting collateral estoppel through a motion to dismiss may request the

court to take judicial notice of additional documents filed of record in the prior case.  See Merswin

v. Williams Cos., 364 F. App'x 438 (10th Cir. 2010)(unpublished)(citations omitted).  See also

Andrews v. Daw, 201 F.3d at 524 n.1 (stating that, "when entertaining a motion to dismiss on the

ground of res judicata, a court may take judicial notice of facts from a prior judicial proceeding

when the res judicata defense raises no disputed issue of fact.")(citations omitted).

## LAW REGARDING CAFA

CAFA jurisdiction exists when a proposed class contains at least one-hundred persons, the

amount in controversy exceeds $5,000,000.00, and the parties are minimally diverse.  See Valdez

v. Metro. Prop. & Cas. Ins. Co., 867 F. Supp. 2d 1143, 1163 (D.N.M. 2012)(Browning, J.)(citing

28 U.S.C. § 1332(d)(2) and (5)). "CAFA was enacted to respond to perceived abusive practices by

plaintiffs and their attorneys in litigating major class actions with interstate features in state

courts." Coffey v. Freeport McMoran Copper & Gold, 581 F.3d 1240, 1243 (10th Cir. 2009).

### 1.      Diversity.

For diversity jurisdiction purposes, citizenship is determined by a person's domicile. See Crowley v. Glaze, 710 F.2d 676, 678 (10th Cir. 1983).  "A person's domicile is defined as the place in which the party has a residence in fact and an intent to remain indefinitely, as of the time of the filing of the lawsuit." McEntire v. Kmart Corp., No. 09-0567, 2010 U.S. Dist. LEXIS 13373, 2010 WL 553443, at *3 (D.N.M. Feb. 9, 2010)(Browning, J.)(citing Crowley v. Glaze, 710 F.2d at 678).  See Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 428 (1991)(holding that diversity jurisdiction is assessed as of the time at which the suit is filed).  If neither a person's residence nor the location where the person has an intent to remain can be established, the person's domicile is that of his or her parents at the time of the person's birth.  See Gates v. C.I.R., 199 F.2d 291, 294 (10th Cir. 1952)("[T]he law assigns to every child at its birth a domicile of origin. The domicile of origin which the law attributes to an individual is the domicile of his parents. It continues until another domicile is lawfully acquired.").  Additionally, "while residence and citizenship are not the same, a person's place of residence is prima facie evidence of his or her citizenship."  McEntire v. Kmart Corp., 2010 U.S. Dist. LEXIS 13373, 2010 WL 553443, at *3 (citing State Farm Mut. Auto. Ins. Co. v. Dyer, 19 F.3d 514, 520 (10th Cir. 1994)).

In determining a corporation's citizenship for diversity purposes, Congress has stated that "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."  28 U.S.C. § 1332(c)(1). While determining where a corporation is incorporated may be accomplished by looking to the corporation's incorporating documents, a corporation's "principal place of business" is a more amorphous criteria, and, until recently, the United States' Courts of Appeals

had adopted "divergent and increasingly complex interpretations" of the term.  Hertz Corp. v. Friend, 559 U.S. 77 (2010). In Hertz Corp. v. Friend, the Supreme Court clarified the test for determining the location of a corporation's principal place of business, holding that, "'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities."  130 S. Ct. at 1192. The Supreme Court related that this location "is the place that Courts of Appeals have called the corporation's 'nerve center.'" 130 S. Ct. at 1192.  The Supreme Court clarified that, "in practice," this location "should normally be the place where the corporation maintains its headquarters -- provided that the headquarters is the actual center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its board meetings." 130 S. Ct. at 1192. The Supreme Court stated that "[a] corporation's 'nerve center,' usually its main headquarters, is a single place."  130 S. Ct. at 1193.  The Supreme Court adopted this rule over a different approach that some courts had followed which focused on "the total amount of business activities that the corporation conducts" in a state, because: (i) focusing on the total amount of business activities in a state "invites greater litigation and can lead to strange results"; and (ii) "administrative simplicity is a major virtue in a jurisdictional statute."  130 S. Ct. at 1193.

     **2.**      **Amount in Controversy.**

The amount-in-controversy requirement is "an estimate of the amount that will be put at issue in the course of the litigation." McPhail v. Deere & Co., 529 F.3d 947, 956 (10th Cir. 2008). "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."  Hunt v. Wash. State Apple

<u>Adver. Comm'n</u>, 432 U.S. 333, 347 (1977).  The Tenth Circuit recognizes "several basic

principles" about establishing the amount in controversy:

> First, the amount in controversy is not "'the amount the plaintiff will
> recover,' but rather 'an estimate of the amount that will be put at issue in the course
> of the litigation.'"  <u>Frederick v. Hartford Underwriters Ins. Co.</u>, 683 F.3d 1242,
> 1245 (10th Cir. 2012)(quoting <u>McPhail v. Deere & Co.</u>, 529 F.3d 947, 956 (10th
> Cir. 2008)).  Second, the Court must accept plaintiff's allegation that the amount in
> controversy is satisfied if plaintiff alleges in good faith that it is.  Third, the Court
> looks to the amount in controversy alleged in the original Complaint and does not
> consider any reductions in the amount in controversy that may occur after the
> lawsuit is commenced.  Fourth, the Court assesses all of the damages alleged, as
> well as the value of any injunctive relief and statutorily permitted attorneys' fees.
> And last, in the class action setting, the Court considers whether the amount in
> controversy exceeds the jurisdictional threshold by aggregating the claims of the
> individual class members.

<u>Nieberding v. Barrette Outdoor Living, Inc.</u>, 129 F. Supp. 3d 1236, 1242 (D. Kan. 2015)(Crabtree,

J.)(citations omitted).  CAFA also allows for aggregating attorneys' fees when determining the

amount in controversy when a statute authorizing the cause of action allows for attorneys' fees.

<u>See</u> 14A C. Wright & A. Miller, Federal Practice and Procedure § 3704.2, at 648 (4th ed. 2011).

### <u>LAW REGARDING STANDING</u>

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has

two components.  First, standing has a constitutional component arising from Article III's

requirement that federal courts hear only genuine cases or controversies.  Second, standing has a

prudential component.  <u>See</u> <u>Habecker v. Town of Estes Park, Colo.</u>, 518 F.3d 1217, 1224 n.7 (10th

Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even

where constitutional standing exists).  The burden of establishing standing rests on the plaintiff.

<u>See</u>, <u>e.g.</u>, <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 104 (1998).  The plaintiff must

"allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they

have no standing."  <u>FW/PBS v. City of Dallas</u>, 493 U.S. 215, 231 (1990)(internal citations and

quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

### 1.     Article III Standing.

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cnty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).  See U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  Wyoming ex rel. Crank v. United States, 539 F.3d at 1241 (quoting Massachusetts v. EPA, 549 U.S. at 539 (internal quotation marks omitted).  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan Cnty., Utah v. United States, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."  Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought."  Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 U.S. 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v.

Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)).   In <u>Smith v. U.S. Court of Appeals, for the Tenth</u>

<u>Circuit</u>, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts'

practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted

allowed courts to affirm incorrect decisions without interfering with official, "published" law.   484

F.3d at 1285.   The Tenth Circuit noted that the plaintiff had recently taken his state appeal and,

therefore,

> was in no position to challenge the adequacy of state appellate review in cases
> culminating in unpublished opinions unless he could show that he would in fact
> receive such review from the state court of appeals (and from the state supreme
> court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in <u>Nova Health Systems v. Gandy</u>, the Tenth Circuit found that abortion

providers had standing to challenge an Oklahoma parental-notification law on the grounds that

they were in imminent danger of losing patients because of the new law.   <u>See</u> 416 F.3d at 1154.

Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June

2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would

lose some minor patients seeking abortions.   416 F.3d at 1155.   Moreover, while focusing on the

time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective

patients lost because of the notification law after the lawsuit began -- to demonstrate that the

plaintiff faced an imminent threat as of the time of filing.   <u>See</u> 416 F.3d at 1155.

The mere presence on the books of an unconstitutional statute, in the absence of

enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege

an inhibiting effect on constitutionally protected conduct that the statute prohibits.   <u>See</u> <u>Winsness</u>

<u>v. Yocom</u>, 433 F.3d 727, 732 (10th Cir. 2006).   "This does not necessarily mean that a statute must

be enforced against the plaintiff before he can sue." Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d 1263, 1267 (10th Cir. 2003)).  Where a plaintiff can show a "credible threat of prosecution," they can sue for prospective relief against enforcement.  Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d at 1267).  Thus, to satisfy Article III, the "plaintiff's expressive activities must be inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement."  Winsness v. Yocom, 433 F.3d at 732 (internal quotations omitted).  See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)(holding that the plaintiff has standing where he suffers "an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights").

### 2.     **Prudential Standing.**

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).  Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers."  Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted).  Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory

provision or constitutional guarantee invoked in the suit." Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing. The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l v. Static Control Components, 572 U.S. 118, 127 (2014). Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Lexmark Int'l v. Static Control Components, 572 U.S. at 127. Notably, the Supreme Court stated that it "often 'conspicuously included the word "arguably" in the test to indicate that the benefit of any doubt goes to the plaintiff.'" Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)). Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (internal quotation marks and citations omitted). This "lenient approach" preserves the APA's flexible judicial-review provisions. Lexmark Int'l v. Static Control Components, 527 U.S. at 130.

## LAW REGARDING PRELMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted). To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal

court must invariably show that it does not have an adequate remedy at law." N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984). Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits."[25] Resolution Trust Corp.

---

[25]The requirement that the movant show a mere "substantial likelihood" of prevailing on the merits is the only prong of the preliminary-injunction analysis that is easier to satisfy than its analogous prong in the permanent-injunction analysis; permanent injunctions, obviously, require full success on the merits. 43A C.J.S. Injunctions § 55 ("In general, the standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that, for a preliminary injunction, the plaintiff must show a likelihood of success on the merits rather than actual success."). It is not entirely clear what a preliminary-injunction movant's burden of proof is vis-à-vis the case's merits, as "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success -- the most common being that plaintiff must demonstrate a reasonable probability of success." 11A Charles Alan Wright, Arthur R. Miller, et. al., FEDERAL PRACTICE & PROCEDURE § 2948.3 (3d. ed. 2015)(footnotes omitted). The Tenth Circuit, however, has provided more guidance than most Courts of Appeals have, stating on three occasions -- albeit in old cases -- that the movant must make "a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought." Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972); Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir. 1969); Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781 (10th Cir. 1964).

At a trial on the merits, a plaintiff bears two burdens of proof. The first burden is the burden of production, which is sometimes called the burden of going forward. If the plaintiff fails to carry the burden of production during his or her case-in-chief, then the court will decide the case in the defendant's favor, and the case will not go to the jury. The second burden is the burden of persuasion, which refers to convincing the factfinder -- typically a jury -- that he or she has satisfied the ultimate standard of proof -- usually the preponderance-of-the-evidence standard. There is also a third, even higher quantum of evidence, sometimes called the "third burden of proof," which a plaintiff carries when he or she presents evidence of such great extent and one-sidedness that he or she is entitled to a verdict as a matter of law. Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1236 n.27 (D.N.M. 2014)(Browning, J.). The third burden and the beginning burden of production are also the relevant standards applicable to summary-judgment motions by the plaintiff and by the defendant, respectively.

v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992).  See Winter v. NRDC, Inc., 555 U.S. at 19 ("A

plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,

that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest."  (citing Munaf v. Geren,

553 U.S. 674, 688-89 (2008))).  The movant bears the burden of demonstrating all four prongs'

satisfaction.  See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).

"[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from

the standard test is impermissible."  Diné, 839 F.3d at 1282.  "A plaintiff suffers irreparable harm

'when the court would be unable to grant an effective remedy after a full trial because such

---

Moreover, satisfying the initial burden of production is known as presenting a "prima facie case."  Black's Law Dictionary 1310 (9th ed. 2009)(defining "prima facie case" as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor").  The best way to interpret the Tenth Circuit's dictate that the movant must make "a prima facie case showing a reasonable probability that he will ultimately [prevail]" is by requiring that the movant put forth enough evidence to both: (i) satisfy the burden of production -- meaning that if the same evidence were presented at trial, it would be sufficient for a reasonable factfinder to find in the movant's favor; and (ii) make it reasonably likely -- beyond just being "not unreasonable" -- that the factfinder would in fact find for the movant, i.e., that the movant would satisfy the burden of persuasion.  See 11A Wright & Miller, supra § 2948.3 ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning."  (footnotes omitted)).  The movant need not show a greater-than-fifty-percent probability of satisfying the burden of persuasion, as to require such a showing would be to convert the substantial-likelihood-of-success standard into the ultimate trial standard, which the case law makes clear is not the intended result.  See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)("The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits.").

The Court will require preliminary-injunction movants to carry the burden of production at the preliminary-injunction stage in all cases, and it will never require the movant to carry the full burden of persuasion at that stage.  As for where in between those two quanta of proof the Court will set the standard, it will vary in different cases, depending upon the strength of the movant's showing on the other three prongs: the irreparability of the movant's harm, the balance of harms as between the movant and the nonmovant, and the public interest.  Cf. Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d at 843 ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors.").

damages would be inadequate and difficult to ascertain.'"  Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura v. Hurley, 242 F.3d at 963) ).  "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm."  Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005)).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'"  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).  In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal quotation marks omitted)(quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006)("O Centro")).  Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009).   Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to

provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro [II] . . . , 389 F.3d at 979). The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

Salazar v. San Juan Cnty. Det. Ctr., 2016 WL 335447, at *40. When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro, 389 F.3d at 975). "The meaning of this category is self-evident." Salazar v. San Juan Cnty. Det. Ctr., 2016 WL 335447, at *41. With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT & T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]" United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)). See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy.

See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING THE FIRST AMENDMENT

"Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I. This clause -- the Free Speech Clause -- may act as a shield to liability in instances where otherwise illegal or unlawful conduct implicates a party's freedom of speech.  See Marsh v. Alabama, 326 U.S. 501, 509 (1946)(ruling that the Free Speech clause shielded a Jehovah's witness who distributed religious material on a company town's sidewalk from criminal trespass charges).  "It is, of course, commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state."  Hudgens v. N.L.R.B, 424 U.S. 507, 513 (1976).   State action, thus, is typically a prerequisite for First Amendment protections.  See Hudgens v. N.L.R.B, 424 U.S. at 520-21.

1.     **The First Amendment and State Action.**

For most of American history, enforcing the common law was not thought to implicate state action.  See Daniel J. Solove & Neil M. Richards, Rethinking Free Speech and Civil Liability, 109 Colum. L. Rev. 1650, 1656 (2009).  In Coppage v. Kansas, 236 U.S. 1, 17 (1915), the Supreme Court ruminated:

> [I]t is self evident that, unless all things are held in common, some persons must have more property than others, it is from the nature of things impossible to uphold freedom of contract and the right of private property without at the same time recognizing as legitimate those inequalities of fortune that are the necessary result of the exercise of those rights.

Coppage v. Kansas, 236 U.S. at 17 overruled in part Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 187 (1941).  After the New Deal, the state action doctrine underwent a radical transformation, and the Supreme Court ruled that various judicial actions amounted to state action where,

previously, those actions likely would not have.  See Shelley v. Kraemer, 334 U.S. 1, 18-19 (1948)(ruling that judicial enforcement of racially restrictive covenants is state action);  New York Times Co. v. Sullivan, 376 U.S. 254, 265 (1964)(holding that state adjudication of a libel lawsuit is state action); Cohen v. Cowles Media Co., 501 U.S. 663, 668 (1991)("Our cases teach that the application of state rules of law in state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action'").  In Shelley v. Kraemer, the Supreme Court explained:

> The short of the matter is . . . the action of the States to which the [Fourteenth] Amendment has reference, includes action of state courts and state judicial officials. Although, in construing the terms of the Fourteenth Amendment, differences have from time to time been expressed as to whether particular types of state action may be said to offend the Amendment's prohibitory provisions, it has never been suggested that state court action is immunized from the operation of those provisions simply because the act is that of the judicial branch of the state government.

334 U.S. at 18.  Thus, as the Supreme Court has recently reaffirmed, the Free Speech Clause "can serve as a defense in state tort suits."  Snyder v. Phelps, 562 U.S. 443, 451 (2011).  See N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886 n.51 (1982)("Although this is a civil lawsuit between private parties, the application of state rules of law by the Mississippi state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action' under the Fourteenth Amendment.")

The state action doctrine as applied to judicial enforcement of statutory and common-law claims has limits.  See Solove & Richards, Rethinking Free Speech and Civil Liability, 109 Colum. L. Rev. at 1664.  For example, the Supreme Court has limited the same state action rationale in the property-law context.  See Hudgens v. N.L.R.B., 424 U.S. at 513; Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 570 (1972).  In Hudgens v. N.L.R.B., the Supreme Court considered whether the First Amendment protected union members picketing in a privately owned shopping center from

a threat of criminal trespass charges.  See Hudgens v. N.L.R.B., 424 U.S. at 508.  In considering

that issue, the Supreme Court explained:

> It is, of course, a commonplace that the constitutional guarantee of free speech is a
> guarantee only against abridgement by government, federal or state.  Thus, while
> statutory or common law may in some situations extend protection or provide
> redress against a private corporation or person who seeks to abridge the free
> expression of others, no such protection or redress is provided by the Constitution
> itself.

Hudgens v. N.L.R.B., 424 U.S. at 513 (citation omitted).  In ruling that the First Amendment did

not apply, the Supreme Court emphasized that: "In addressing this issue, it must be remembered

that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by

limitations on State action, not on action by the owner of private property used nondiscriminatorily

for private purposes only."  Hudgens v. N.L.R.B., 424 U.S. at 519 (quoting Lloyd Corp., Ltd. v.

Tanner, 407 U.S. at 567).  See Central Hardware Co. v. N.L.R.B., 407 U.S. 539, 547 (1972)("The

First and Fourteenth Amendments are limitations on state action, not action by the owner of private

property used only for private purposes.").  The Supreme Court concluded, thus, that the First

Amendment offered no protection to the picketers, because the shopping center was a private entity

and not "the functional equivalent of a municipality."  Hudgens v. N.L.R.B., 424 U.S. at 520.

The Supreme Court has also stated that private party conduct may be deemed state action

when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to

the State."  Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982).  Whether the conduct

may in fact be "fairly attributed" to the state requires a two-part inquiry.  "First, the deprivation

must be caused by the exercise of some right or privilege created by the State or by a rule of

conduct imposed by the state or by a person for whom the State is responsible."  Lugar v.

Edmondson Oil Co., Inc., 457 U.S. at 937.  "Second, the party charged with the deprivation must

be a person who may fairly be said to be a state actor." <u>Lugar v. Edmondson Oil Co., Inc.</u>, 457 U.S. at 937.  <u>See</u> <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988)(explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

In <u>Lugar v. Edmondson Oil Co., Inc.</u>, the Supreme Court explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing the private parties' conduct.  457 U.S. at 937.  The <u>Lugar v. Edmondson Oil Co., Inc.</u> test's first prong -- that the deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the] Defendant's private decision."  457 U.S. at 940.  The Supreme Court, in <u>Lugar v. Edmondson Oil Co., Inc.</u>, further instructed that the second prong, identification of a defendant as a state actor, may arise, "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state."  457 U.S. at 937.

In <u>Lugar v. Edmondson Oil Co., Inc.</u>, the Supreme Court determined that the plaintiff's allegation that the defendants unlawfully deprived the plaintiff of his property without due process under state law failed to state a claim under 42 U.S.C. § 1983.  <u>See</u> 457 U.S. at 940.  The Supreme Court also held that the plaintiff's claim alleging that the private parties had invoked a state statute maliciously or without valid grounds did not give rise to state action.  <u>See</u> 457 U.S. at 940.  Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute.  <u>See</u> 457 U.S. at 940-41.

For a private individual to be acting under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule

of conduct imposed by the state or by a person for whom the State is responsible," and "the party

charged with the deprivation must be a person who may fairly be said to be a state actor . . . because

he is a state official, because he has acted together with or has obtained significant aid from state

officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil

Co., 457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to subject
> private citizens, acting as private citizens, to a federal lawsuit whenever they seek
> to initiate a prosecution or seek a remedy involving the judicial system.  To hold
> otherwise would significantly disregard one purpose of the state action
> requirement, which is to "preserve[ ] an area of individual freedom by limiting the
> reach of federal law and federal judicial power."  Lugar, 457 U.S. at 936. . . .
> Instead, in enacting § 1983, Congress intended to provide a federal cause of action
> primarily when the actions of private individuals are undertaken with state
> authority.  See id. . . .   Thus, absent more, causing the state, or an arm of the state,
> to initiate a prosecution or serve process is insufficient to give rise to state action.

How v. City of Baxter Springs, 217 F. App'x. 787, 793 (10th Cir. 2007)(unpublished).

The Tenth Circuit has described the determination of state action as "particularly fact-

sensitive, so the circumstances must be examined in their totality."  Marcus v. McCollum, 394

F.3d 813, 819 (10th Cir. 2004).  According to the Tenth Circuit, "[t]he Supreme Court has

counseled us that the state action inquiry, although a legal determination to be made by the court,

[see Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974),] requires the 'sifting [of] facts

and weighing [of] evidence.'"  Phelps v. Wichita Eagle–Beacon, 886 F.2d 1262, 1271 (10th

Cir.1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722(1961)).  In Gilmore v.

City of Montgomery, the Supreme Court ruled that, although it was the Court's role to determine

whether the use of zoos, museums, parks, and other recreational facilities by private school groups

and private non-school organizations "involved government so directly in the actions of those users

as to warrant court intervention on constitutional grounds," the factual record before the Supreme

Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind." 417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised.  The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private bodies."  Adams v. Vandemark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir.1986)(unpublished). In Adams v. Vandemark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction from the United States District Court for the Eastern District of Michigan, instructing the jury on when to find state action.  1986 WL 16606, at *1.  The Sixth Circuit concluded that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief."  1986 WL 16606, at *2.  The Sixth Circuit noted that the application of the state action test is a "very difficult and complex question[]," and, "[t]o the extent a jury is to decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined."  1986 WL 16606, at *2.  The Sixth Circuit found that the defendants were entitled to a new trial, because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action.  See 1986 WL 16606, at *2-3.

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test.  See Johnson v. Rodrigues (Orozco), 293 F.3d 1196, 1202-03 (10th Cir. 2002)(reviewing the various tests);

Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir.1995)(noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation")(internal quotation marks omitted)).  Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State."  Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974).  The public-function test is difficult to satisfy, because while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires.  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456.  The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running a nursing facility.  See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  Blum v. Yaretsky, 457 U.S. 991, 993 (1982).  A court determines, under the nexus test, whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself."  Jackson v. Metro. Edison Co., 419 U.S. at 351.  "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . .  But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found."  Tulsa Professional Collection Servs., Inc. v. Pope, 485 U.S. 478, 486 (1988)(internal citations omitted).

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity."  Burton v. Wilmington Parking Authority, 365

U.S. 715, 725, (1961). "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity. Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1452.

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453. "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1454 (internal quotation marks and citations omitted). Joint participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiff must show that the public and private actors shared a common, unconstitutional goal. See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000). Even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions. See Soldal v. Cook Cnty., 506 U.S. 56, 60 n.6 (1992). The Tenth Circuit has previously dismissed constitutional claims against a private individual where the plaintiff did not give specific facts showing a conspiracy evidencing state action. See Martinez v. Winner, 771 F.2d 424, 445 (10th

Cir.1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything.").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit surveyed several instances in which courts have found action "under color of state law" where governmental and private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests.  In both *Carey v. Continental Airlines Inc.,* 823 F.2d 1402 (10th Cir. 1987), and *Lee v. Town of Estes Park,* 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors.  We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power."  *Carey,* 823 F.2d at 1404.  In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest.  In contrast, in *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1429 (10th Cir. 1984), *cert. denied,* 474 U.S. 818, 106 S. Ct. 65, 88 L.Ed.2d 53 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor.  We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard.  In *Coleman v. Turpen,* 697 F.2d 1341 (10th Cir. 1982) (per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out.  There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it.  We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation."  *Id.* at 1345.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453-56.  The Tenth Circuit noted that, "just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient."  49 F.3d at 1453.  The Tenth Circuit ruled that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the

police have substantially assisted in the allegedly wrongful conduct." 49 F.3d at 1455. Joint participation typically arises when the authorities agree to facilitate private parties' acts that, if a state conducted, would be unconstitutional, through affirmative action. See Soldal v. Cook Cnty., 506 U.S. at 60 n.4.

### 2.    **Commercial Speech**.

The Supreme Court's First Amendment decisions create a rough hierarchy in the constitutional protection of speech. See Snyder v. Phelps, 562 U.S. at 452; R.A.V. v. St. Paul, 505 U.S. 377, 422 (1992)(Stevens, J. dissenting). "Core political speech occupies the highest, most protected position; commercial speech and nonobscene, sexually explicit speech are regarded as a sort of second-class expression; obscenity and fighting words receive the least protection of all." R.A.V. v. St. Paul, 505 U.S. at 422 (Stevens, J. dissenting). Commercial speech is "speech that does no more than propose a commercial transaction." Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976). See Central Hudson, 447 U.S. at 561 ("The Commission's order restricts only commercial speech, that is, expression related solely to the economic interests of the speaker and its audience."). The following characteristics indicate that speech is commercial speech: (i) if the speech is contained in an advertisement; (ii) if it is made with an economic motive; or (iii) if it refers to a specific product. See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1274 (10th Cir. 2000). A representation, however, is not automatically commercial speech because it contains one or more of the preceding characteristics. See Proctor & Gamble Co. v. Haugen, 222 F.3d at 1274.

The Supreme Court, in Central Hudson, provided the analytical framework to determine what kind of commercial speech is entitled to First Amendment protection. See Central Hudson, 447 U.S. at 564. It explained:

> The First Amendment's concern for commercial speech is based on the informational function of advertising.  Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity.  The government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity.

Central Hudson, 447 U.S. at 563.  The government has, accordingly, the power to regulate deceptive or commercial speech related to an illegal activity, but less power to regulate lawful and non-misleading commercial speech.  See Central Hudson, 447 U.S. at 564.  Before proceeding to the Central Hudson balancing test, a court must perform a threshold inquiry to determine whether the speech is non-misleading and concerns lawful activity.  See Central Hudson, 447 U.S. at 566.  "At the outset, we must determine whether the expression is protected by the First Amendment.  For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading."  Central Hudson, 447 U.S. at 566.  See Revo v. Disciplinary Bd. of the Supreme Court for the State of N.M., 106 F.3d 929, 932 (10th Cir. 1997)("Revo").

If a court determines that the speech is commercial, lawful, and not deceptive, the Court proceeds to a three-part balancing test.  See Central Hudson, 447 U.S. at 564-66.  "If the communication is neither misleading nor related to unlawful activity . . . we ask whether the asserted governmental interest is substantial. . . .  [W]e must [next] determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."  Central Hudson, 447 U.S. at 564, 566.  See Revo, 106 F.3d at 932.  The Tenth Circuit has expressed the Central Hudson test in following manner:

> As a threshold inquiry under *Central Hudson,* we must determine whether the particular advertisement is protected speech -- *i.e.,* whether it concerns lawful activity and is not misleading.  If not, the speech may be freely regulated.  Protected commercial speech may also be regulated, but only if the government can show that

(1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest.

Revo, 106 F.3d at 932 (citations omitted).   "[T]he regulation may not be sustained if it provides only ineffective or remote support for the government's purpose."  Central Hudson, 447 U.S. at 565.

In considering the threshold inquiry -- whether the speech concerns lawful activity and is not misleading -- Supreme Court jurisprudence has drawn distinctions between misleading commercial speech, potentially misleading commercial speech, and truthful commercial speech. See e.g., In re R.M.J., 455 U.S. 191, 203 (1982).[26]  Misleading commercial speech may be prohibited entirely without a Central Hudson analysis.  See In re R.M.J., 455 U.S. at 203.[27]  The Central Hudson balancing test, however, applies when the speech is potentially misleading or when it is truthful.  See In re R.M.J., 455 U.S. at 203. See also Revo, 106 F.3d at 933.  Potentially misleading speech occurs when "the information also may be presented in a way that is not deceptive."  In re R.M.J., 455 U.S. at 203.  Commercial speech is not "potentially misleading" simply with the "rote invocation of the words"; the party asserting that the speech is potentially

---

[26]Although In re R.M.J., considered commercial speech "in the context of advertising for professional services," In re. R.M.J., 455 U.S. at 203, Courts of Appeals have applied the case to other commercial speech contexts, see e.g., Discount Tobacco City & Lottery Inc., v. United States, 674 F.3d 509, 524 (6th Cir. 2012)(citing In re R.M.J., 455 U.S. at 203).

[27]Justice Marshall subsequently suggested, more broadly, that "[s]tates may prohibit actually or inherently misleading commercial speech entirely."  Peel v. Attorney Registration and Disciplinary Com'n of Ill., 496 U.S. 91, 111 (1990)(Marshall, J. concurring).  Whether speech is "actually misleading" requires a separate, factual inquiry from the inherently misleading analysis, and, if the record reveals that someone has been misled, the state can prohibit the speech entirely. See Peel v. Attorney Registration and Disciplinary Com'n of Ill., 496 U.S. at 111.  See also Revo, 106 F.3d at 933 ("In addition, the Board offers no evidence that anyone was actually deceived by Mr. Revo's letters.").

misleading must "point to . . . harm that is potentially real, not purely hypothetical." <u>Ibanez v.</u>

<u>Florida Dept. of Business and Professional Regulation, Bd. of Accountancy</u>, 512 U.S. 136, 146

(1994).  In contrast, inherently misleading speech is "incapable of being presented in a way that is

not deceptive."  <u>Revo</u>, 106 F.3d at 929.  In <u>Revo</u>, for example, the Tenth Circuit considered

whether direct mailing advertisements from a personal injury attorney "inevitably convey a false

message that soliciting lawyers are more experienced, tougher, more skillful, and better qualified

than non-soliciting lawyers, notwithstanding the fact that the letters themselves make no reference

to those attributes."  <u>Revo</u>, 106 F.3d at 933.  The Tenth Circuit concluded that the mailings could

not be inherently misleading, because the defendants "offer[ed] no proof that some other qualified

lawyer who could superbly represent personal injury victims would nevertheless be misleading

potential clients simply by sending a direct mail solicitation." 106 F.3d at 933.  Thus, to determine

whether speech is inherently misleading, the proper inquiry is to consider whether there are any

circumstances under which the speech could be truthful; if it could possibly be truthful, the speech

is not inherently misleading.  <u>See</u> 106 F.3d at 933.

When applying the <u>Central Hudson</u> test, the Supreme Court and the Tenth Circuit have

identified several substantial governmental interests in regulating speech.  <u>See</u> <u>Central Hudson</u>,

447 U.S. at 568 (ruling that the government has a substantial governmental interest in energy

conservation); <u>Florida Bar v. Went For It, Inc.</u>, 515 U.S. 618, 625-26 (1995)(holding that

"protecting the privacy and tranquility of personal injury victims and their loved ones against

intrusive, unsolicited contact by lawyers" is a substantial interest); <u>Posadas de Puerto Rico</u>

<u>Associates v. Tourism Co. of Puerto Rico</u>, 478 U.S. 328, 341 ("We have no difficulty in concluding

that the Puerto Rico Legislature's interest in the health, safety, and welfare of its citizens

constitutes a 'substantial' governmental interest."); <u>Utah Licensed Beverage Ass'n v. Leavitt</u>, 256

F.3d 1061, 1070 (10th Cir. 2001)(holding that promoting temperance and supplying revenue are substantial governmental interests).  The Supreme Court has concluded, however, that "the Government's interest in preserving state authority is not sufficiently substantial to meet the requirements of *Central Hudson*."  <u>Rubin v. Coors Brewing, Co.</u>, 514 U.S. 476, 486 (1995).  <u>See</u> <u>Matal v. Tam</u>, 137 S. Ct. 1744, 1764 (2017)(ruling that "preventing speech expressing ideas that offend" is not a substantial governmental interest); <u>Bolger v. Youngs Drug Products Corp.</u>, 463 U.S. 60, 70 (1983)(ruling that shielding citizens from offensive speech is not a substantial governmental interest); <u>Utah Licensed Beverage Ass'n v. Leavitt</u>, 256 F.3d at 1070 (holding that protecting nondrinkers from alcohol-related speech is not a substantial state interest); <u>U.S. West, Inc. v. F.C.C.</u>, 182 F.3d 1224, 1235 (10th Cir. 1999)(ruling that protecting dissemination of private information "does not necessarily rise to the level of a substantial state interest under *Central Hudson*").  In the tobacco context, the Supreme Court has recognized that there is a substantial governmental interest in preventing minors from using tobacco.  <u>See</u> <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 555 (2001).  "Unlike rational basis review, the <u>Central Hudson</u> standard does not permit [a court] to supplant the precise interests put forward by the State with other suppositions."  <u>Florida Bar v. Went For It, Inc.</u>, 515 U.S. 618, 624 (1995)(quoting <u>Edenfield v. Fane</u>, 507 U.S. 761, 768 (1993)).

<u>Central Hudson</u>'s third step -- determining whether the speech restriction directly and materially advances the asserted government interest -- requires more than just "mere speculation or conjecture" that the speech restriction will advance the interest.  <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. at 555.  "[R]ather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate

them to a material degree." Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Greater New

Orleans, 527 U.S. 173, 188 (1999)).  To satisfy the third step,

> [w]e do not, however, require that "empirical data come . . . accompanied by a
> surfeit of background information. . . .  [W]e have permitted litigants to justify
> speech restrictions by reference to studies and anecdotes pertaining to different
> locales altogether, or even, in a case applying strict scrutiny, to justify restrictions
> based solely on history, consensus, and "simple common sense."

Lorillard Tobacco Co. v. Reilly, 533 U.S. at 555 (quoting Florida Bar v. Went For It, Inc., 515

U.S. at 628).  In Lorillard Tobacco Co. v. Reilly, for example, the Supreme Court considered

whether a regulation prohibiting smokeless tobacco or cigar advertising within a 1,000-foot radius

of a school or playground directly advances the governmental interest in preventing minors from

using tobacco.  See 533 U.S. at 556-57.  The tobacco company argued, in part, that there is no link

between the regulation and the substantial governmental interest in preventing minor tobacco use,

because the government had only identified a problem with underage cigarette smoking and not a

problem with smokeless tobacco use.  See Lorillard Tobacco Co. v. Reilly, 533 U.S. at 556-57.

The company further averred that the government could not prove that there is a causal link

between advertising and tobacco use.  See 533 U.S. at 557.  After considering those arguments,

the Supreme Court concluded that the regulation banning the advertising advances the

governmental interest identified, because many studies support the claim that minors' smokeless

tobacco use has increased, and other studies demonstrate a link between advertising and a demand

for smokeless tobacco products. See 533 U.S. at 557-61.

In considering the final factor -- that the regulation is no more extensive than necessary to

serve the governmental interest -- the Supreme Court has cautioned that it is not a "least-

restrictive-means requirement."  Board of Trustees of the State University of New York v. Fox,

492 U.S. 469, 478 (1989).  Rather, as "commercial speech [enjoys] a limited measure of protection,

commensurate with its subordinate position in the scale of First Amendment values," the "ample scope of regulatory authority suggested . . . would be illusory if it were subject to a least-restrictive-means requirement, which imposes a heavy burden on the State." Board of Trustees of the State University of New York v. Fox, 492 U.S. at 477 (alteration in original).

> What our decisions require is a "'fit' between the legislature's ends and the means chosen to accomplish those ends," a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served," that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective.

Board of Trustees of State University of the New York v. Fox, 492 U.S. at 480 (citations omitted). "It is far different, of course, from the 'rational basis' test used for Fourteenth Amendment equal protection analysis." Board of Trustees of the State University of New York v. Fox, 492 U.S. at 480.

> There it suffices if the law could be thought to further a legitimate governmental goal, without reference to whether it does so at inordinate cost. Here we require the government goal to be substantial, and the cost to be carefully calculated. Moreover, since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require.

Board of Trustees of the State University of New York v. Fox, 492 U.S. at 480. See Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1066 (10th Cir. 2001)("Under Central Hudson, laws restricting commercial speech are subject to an 'intermediate' level of scrutiny.").

In Lorillard Tobacco Co. v. Reilly, for example, the Supreme Court determined that a tobacco advertising ban within 1,000 feet of schools or playgrounds in Massachusetts was not reasonably fitted to the legislature's goal -- preventing minors' tobacco use. See Lorillard Tobacco Co. v. Reilly, 533 U.S. at 561. The Lorillard Tobacco Co v. Reilly Court determined that the ban was unreasonable, because, in effect, the ban would "prevent advertising in 87% to 91% of Boston,

Worcester, and Springfield Massachusetts." Lorillard Tobacco Co. v. Reilly, 533 U.S. at 562. The

Supreme Court reasoned:

> In some geographical areas, these regulations would constitute nearly a complete
> ban on the communication of truthful information about smokeless tobacco and
> cigars to adult consumers. The breadth and scope of the regulations, and the process
> by which the Attorney General adopted the regulations, do not demonstrate a
> careful calculation of the speech interests involved.

533 U.S. at 562. It concluded, therefore, that the government "has failed to show that the

outdoor advertising regulations . . . are not more extensive than necessary to advance the State's

substantial interest in preventing underage tobacco use." Lorillard Tobacco Co. v. Reilly, 533

U.S. at 565.

## LAW REGARDING FEDERAL PREEMPTION

Article VI, clause 2, of the Constitution of the United States of America provides that the

United States of America's laws "shall be the Supreme Law of the Land; . . . any Thing in the

Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

Consistent with the Supremacy Clause, the Supreme Court has "long recognized that state laws

that conflict with federal law are 'without effect.'" Altria Group, Inc. v. Good, 555 U.S. 70, 75

(2008)("Altria II")(quoting Maryland v. Louisiana, 451 U.S. 725, 746 (1981)). The Supreme

Court has summarized the following situations in which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether
> Congress' command is explicitly stated in the statute's language or implicitly
> contained in its structure and purpose. Absent explicit pre-emptive language, we
> have recognized at least two types of implied pre-emption: field pre-emption, where
> the scheme of federal regulation is so pervasive as to make reasonable the inference
> that Congress left no room for the States to supplement it, and conflict pre-emption,
> where compliance with both federal and state regulations is a physical
> impossibility, or where state law stands as an obstacle to the accomplishment and
> execution of the full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992).

1.      **Express Preemption.**

As noted, preemption may be express or implied.  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  When faced with express preemption -- where a statute expressly states that it preempts certain areas of state law -- a court must determine the scope of the preemption that Congress intended.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)("[T]he purpose of Congress is the ultimate touch-stone in every pre-emption case").  "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose."  Altria II, 555 U.S. at 77.  When the preemption clause's text is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005).  Preemption arguments are analyzed under rule 12(b)(6), 12(c), or 56.  See Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013); Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012).[28]

---

[28]There is a conflict among the United States Courts of Appeals regarding which rule governs a district court's review of preemption arguments.  The United States Court of Appeals for the Fifth Circuit has noted that preemption is not a jurisdictional question, so rule 12(b)(1) is inappropriate.  See Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012).  Instead, it has held:

> Federal preemption is an affirmative defense that a defendant must plead and prove. Unless the complaint itself establishes the applicability of a federal-preemption defense -- in which case the issue may properly be the subject of a Rule 12(b)(6) motion -- a defendant should ordinarily raise preemption in a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment.

Fisher v. Haliburton, 667 F.3d at 609.  See Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013)("[T]he appropriate procedural device for reviewing the § 2680(j) preemption argument is not a motion pursuant to Rule 12(b)(1), but rather a motion under either Rule 12(b)(6) or for summary judgment.").  The United States Court of Appeals for the Sixth Circuit has explained that preemption "does not normally concern the subject-matter jurisdiction of a court to hear a claim, which is what is relevant to the resolution of a Rule 12(b)(1) motion." Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 608 (6th Cir. 2004).  See Boler v. Earley, 865 F.3d 391, 400 n.3 (6th Cir. 2017)("We have not found other comparable cases using a Rule 12(b)(1) motion to address statutory preemption of § 1983 claims; it appears that the district court

Determining express preemption's scope entails scrutinizing the statutory text in light of

two presumptions.  First,

> [i]n all pre-emption cases, and particularly in those in which Congress has
> legislated . . . in a field which the States have traditionally occupied, we start with
> the assumption that the historic police powers of the States were not to be
> superseded by the Federal Act unless that was the clear and manifest purpose of
> Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485.  Second, "[t]he purpose of Congress is the ultimate

touchstone in every pre-emption case."  Medtronic, Inc. v. Lohr, 518 U.S. at 485.

> Congress' intent, of course, primarily is discerned from the language of the pre-
> emption statute and the statutory framework surrounding it.  Also relevant,
> however, is the structure and purpose of the statute as a whole, as revealed not only
> in the text, but through the reviewing court's reasoned understanding of the way in
> which Congress intended the statute and its surrounding regulatory scheme to affect
> business, consumers, and the law.

---

incorrectly addressed this issue as jurisdictional.").  "Rather, the doctrine generally concerns the merits of the claim itself."  Trollinger v. Tyson Foods, Inc., 370 F.3d at 608.  See Metro. Edison Co. v. Pa. Pub. Utility Com'n, 767 F.3d 335, 362 (3d Cir. 2014)(noting that "pre-emption arguments do not ordinarily raise issues of subject matter jurisdiction," but that "'[d]octrines of federal pre-emption . . . may in some contexts be controlling' over 'the general rule of finality of jurisdictional determinations'" (quoting Durfee v. Duke, 375 U.S. 106, 114 (1963))).

The United States Court of Appeals for the Ninth Circuit, however, has affirmed a case's dismissal on preemption grounds under rule 12(b)(1) without comment as to the appropriateness of that rule to preemption arguments.  See Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S., 497 F.3d 972, 975 (9th Cir. 2007).  The United States Court of Appeals for the Seventh Circuit also has dismissed a claim under rule 12(b)(1) on preemption grounds, but only where the federal law preempted the state law claim, and the federal law did not provide a private right of action.  See Slaney v. Int'l Amateur Athletic Fed'n, 244 F.3d 580, 594-96 (7th Cir. 2001).  The Tenth Circuit does not appear to have taken a definitive position on the issue.  In Ryan v. Donley, 511 F. App'x 687 (10th Cir. 2013), the Tenth Circuit affirmed a district court's dismissal of a Whistleblower Protection Act, 5 U.S.C. §§ 1201-09, claim pursuant to rule 12(b)(1), noting that "there can be no such claim, due to preemption by the Civil Service Reform Act, [5 U.S.C. § 2302]."  Ryan v. Donley, 511 F. App'x at 690.  Dismissal for lack of subject matter under rule 12(b)(1) in that case is proper, however, because the Civil Service Reform Act's "preemption" means that the Whistleblower Protection Act does not provide a private right of action, so there is no federal-question jurisdiction.

Medtronic, Inc. v. Lohr, 518 U.S. at 486.  More recently, the Supreme Court vacated a stay of a district court's injunction of a nationwide eviction moratorium, because the Director of the Centers for Disease Control and Prevention ("CDC") lacked the statutory authority to renew the moratorium.  See Ala. Ass'n of Realtors v. HHS, 141 S. Ct. 2485, 2489 (2021).  In March, 2020, "Congress passed the Coronavirus Aid, Relief, and Economic Security Act [Pub. L. 116-136, 134 Stat. 281, ("CARES Act")] to alleviate burdens caused by the burgeoning COVID-19 pandemic." 141 S. Ct. at 2486.  Part of the CARES Act "imposed a 120-day eviction moratorium for properties that participated in federal assistance programs or were subject to federally backed loans."  Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2486.  The moratorium expired in July, 2020, and, although Congress did not renew it, the CDC extended the moratorium three times until its expiration on July 31, 2021.  See Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2486-87 (citing Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 8020 (February 3, 2021); 86 Fed. Reg. 16,731 (March 31, 2021); 86 Fed. Reg. 34,010 (June 28, 2021)).  The CDC "relied on § 361(a) of the Public Health Service Act[,] [42 U.S.C. §§ 201-300aaa-13,] for authority to promulgate and extend the eviction moratorium."  Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2487.  The Supreme Court concluded that "[r]egulations under this authority have generally been limited to quarantining infected individuals and prohibiting the import or sale of animals known to transmit disease," Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2487, and that the "downstream connection between eviction and the interstate spread of disease is markedly different from the direct targeting of disease that characterizes the measures identified in the statute," Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2488.  The Supreme Court concluded that "the sheer scope of the CDC's claimed authority under § 361(a) would counsel against the Government's interpretation," and held that "[w]e expect Congress to speak clearly when authorizing an agency to exercise

powers of 'vast "economic and political significance."'" Ala. Ass'n of Realtors v. HHS, 141 S.

Ct. at 2489 (quoting Utility Air Regulatory Group v. EPA, 573 U.S. 302, 324 (2014)(quoting FDA

v. Brown & Williamson Tobacco Corp., 529 U. S. 120, 160 (2000))).   Furthermore, the Supreme

Court explained that the moratorium "intrudes into an area that is the particular domain of state

law: the landlord-tenant relationship,"  Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2489 (citing

Lindsey v. Normet, 405 U. S. 56, 68-69 (1972)), and that "'[o]ur precedents require Congress to

enact exceedingly clear language if it wishes to significantly alter the balance between federal and

state power and the power of the Government over private property,'" Ala. Ass'n of Realtors v.

HHS, 141 S. Ct. at 2489 (quoting United States Forest Service v. Cowpasture River Preservation

Assn., 140 S. Ct. 1837, 1849-50 (2020)).

### 2.     **Implied Conflict Preemption: Impossibility and Obstacle Preemption.**

Implied conflict preemption is found when it is impossible for a private party to comply

with both state and federal requirements, see English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990),

or where state law "stands as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  Obstacle preemption

is one form of implied preemption.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373

(2000)(holding that preemption is appropriate where the challenged state law "stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress");

Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J.,

concurring)("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated

by the effect of the state law.").  The Supreme Court instructed that, in obstacle preemption cases,

"there is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert

it." P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988).  See Gade

v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute."  Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990).  In 2000, the Supreme Court decided Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000), which held, in a five-to-four decision, that a federal regulation which permitted, but did not require, airbags to be installed in passenger vehicles preempted claims that a car was defective because it lacked an airbag.  See 529 U.S. at 874.  The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective.  And the statute foresees the application of ordinary principles of pre-emption in cases of actual conflict.  Hence, the tort action is pre-empted."  529 U.S. at 886.  The Honorable John Paul Stevens, former Associate Justice of the Supreme Court of the United States, in dissent, expressed a desire to eliminate obstacle preemption.  See 529 U.S. at 907-08 (Stevens, J., dissenting).  He argued that the presumption against preemption

> [s]erves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court has begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations.  In 2003, the Supreme Court issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2002), rejecting implied conflict preemption of state law claims that a boat engine was defective, because it lacked a propeller guard.  See 537 U.S. at 70.  The Supreme Court considered and rejected an argument that the Coast Guard's decision not to adopt a regulation requiring propeller guards impliedly

preempted state-law claims, which inflicted liability for lack of a propeller guard.  See Sprietsma

v. Mercury Marine, 537 U.S. at 65.  It explained:

> The decision in 1990 to accept the subcommittee's recommendation to take no
> regulatory action left the law applicable to propeller guards exactly the same as it
> had been before the subcommittee began its investigation.  Of course, if a state
> common-law claim directly conflicted with a federal regulation promulgated under
> the Act, or if it were impossible to comply with any such regulation without
> incurring liability under state common law, pre-emption would occur.  This,
> however, is not such a case.

Sprietsma v. Mercury Marine, 537 U.S. at 65.

In Altria II, the Supreme Court again considered the implied preemption doctrine and

rejected the defendants' obstacle-preemption argument that the Federal Cigarette Labeling and

Advertising Act [15 U.S.C. § 1331-1341,]("FCLAA") preempted a similar state act, Maine's

Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207 (2008).  See Altria II, 555 U.S. at 90-91.

In Altria II, the plaintiffs filed suit against defendant cigarette manufacturers for deceptively

marketing their Marlboro and Cambridge Light cigarettes as containing lower tar and nicotine to

convey that their light cigarettes were less harmful than regular cigarettes.  See Altria II, 555 U.S.

at 73.  The Supreme Court concluded that the FCLAA, which forbids state law from requiring or

prohibiting language with respect to cigarette advertising and promotion, presented no obstacle to

the plaintiffs' lawsuit, because the federal law ultimately regulated warning labels, and did not

regulate false or misleading statements.  See Altria II, 555 U.S. at 82-83.  The Supreme Court also

considered whether a Federal Trade Commission ("FTC") guidance statement, which noted that

"a factual statement of the tar and nicotine content . . . would not violate the FTC Act," impliedly

preempted the Plaintiffs' claims.  Altria II, 555 U.S. at 87.  The Supreme Court contemplated and

rejected the cigarette manufacturers' argument that the FTC's statement "authorized them to use

descriptors" such as "light or low tar," because the FTC statements did not require that cigarette

manufacturers disclose their tar and nicotine yields, and the United States "Government itself disavows any policy authorizing the use of light and low tar descriptors." Altria II, 555 U.S. at 88. Moreover, the Supreme Court determined that an FTC consent order that prevents the cigarette manufacturers from using "light" and "low tar" descriptors, unless they are accompanied "by a clear and conspicuous disclosure of the cigarettes' tar and nicotine content," does not preempt the plaintiffs' claims, because "the decree only enjoined conduct," and "a consent order is in any event only binding on the parties to the agreement." Altria II, 555 U.S. at 589 n.13. The Supreme Court concluded, thus, that federal law and regulations did not preempt the plaintiffs' state law claims. See Altria II, 555 U.S. at 90.

In Wyeth v. Levine, 555 U.S. 555 (2009), six Justices of the Supreme Court, including the Honorable Stephen Breyer and the Honorable Anthony Kennedy, who joined in the majority decision in Geier v. Am. Honda Motor Co., rejected the plaintiff's two implied preemption arguments -- impossibility preemption and obstacle preemption. See Wyeth v. Levine, 555 U.S. at 581. The Supreme Court held that

> it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301, 321, 331-337, 341-350, 361-364, and 381-399; 21 C.F.R. § 201.80(e)("FDCA")].

Wyeth v. Levine, 555 U.S. at 581. In so ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. Am. Honda Motor Co. to its facts, noting that the decision in that case is based on the substantive regulation's "complex and extensive" history at issue. Wyeth v. Levine, 555 U.S. at 566. The Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption

provision at some point during the FDCA's 70-year history." Wyeth v. Levine, 555 U.S. at 609. Justice Stevens quoted the explanation of the Honorable Sandra Day O'Connor, former Associate Justice of the Supreme Court of the United States, in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 (1989): "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." Wyeth v. Levine, 555 U.S. at 575 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166-67).

Of particular import for the current status of implied obstacle preemption is the concurring opinion of the Honorable Clarence Thomas, Associate Justice of the Supreme Court of the United States, in Wyeth v. Levine:

> I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

Wyeth v. Levine, 555 U.S. at 583 (Thomas, J., concurring in the judgment). Justice Thomas continued:

> Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law . . . . Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

Wyeth v. Levine, 555 U.S. at 587.  Justice Thomas emphasized that, when analyzing the federal statutes' or regulations' preemptive effect, "[e]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue" to comply with the Constitution.  Wyeth v. Levine, 555 U.S. at 588 (citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).[29]  See also Kansas v. Garcia, 140 S. Ct. 791, 807-08 (2020)(Thomas, J., concurring)("I write separately to reiterate my view that we should explicitly abandon our 'purposes and objective' pre-emption jurisprudence," which "impermissibly rests of on judicial guesswork about 'broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law.'" (quoting Wyeth v. Levine, 555 U.S. at 590 (Thomas, J., concurring))).

Moreover, the Supreme Court has put renewed emphasis on the presumption against preemption.  See Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005).  "In areas of traditional state regulation, [the Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest."  Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.  If confronted with two plausible statutory interpretations, the court has "a duty to accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.  See Wyeth v. Levine, 555 U.S. at 565; Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518 (1992)(plurality opinion).  In Arizona v. United States, 567 U.S. 387

---

[29]Justice Thomas, writing for the five-to-four majority in PLIVA, Inc. v. Mensing, 564 U.S. 604 (2011), concluded, however, that federal law preempted inconsistent state laws on generic drug labeling, because it was impossible to comply with both federal law and the states' law.  See PLIVA, Inc. v. Mensing, 564 U.S. at 617-18.  The Supreme Court sought to reconcile Wyeth v. Levine, however, recognizing that the respective statutory schemes in each case are distinguishable.  See PLIVA, Inc. v. Mensing, 564 U.S. at 626 ("It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.").

(2012), the Supreme Court once again emphasized the importance of clear Congressional intent when applying obstacle preemption.  See 567 U.S. at 398-99.  The Supreme Court invalidated provisions of an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment, because it "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens."  Arizona v. United States, 567 U.S. at 406. With the Honorable Elena Kagan, Associate Justice of the Supreme Court, taking no part in the consideration or decision of the case, writing for a five-to-three majority, which included the Honorable John G. Roberts, Chief Justice of the Supreme Court, the Honorable Ruth Bader Ginsburg, Associate Justice of the Supreme Court, the Honorable Sonia Sotomayor, Associate Justice of the Supreme Court, and Justice Breyer, Justice Kennedy wrote: "The correct instruction to draw from the text, structure, and history of [the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101 ('IRCA')] is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment."  Arizona v. United States, 567 U.S. at 406.  The Supreme Court ruled that Congressional intent is clear; Congress considered and rejected penalizing aliens who sought unauthorized employment.  See Arizona v. United States, 567 U.S. at 405.  Federal immigration law therefore preempted the Arizona law that would have penalized aliens seeking unauthorized employment, because it would have created a penalty that Congress clearly and intentionally omitted.  See Arizona v. United States, 567 U.S. at 407.

In Kansas v. Garcia, 140 S. Ct. 791 (2020), the Supreme Court held that IRCA does not preempt Kansas identity theft statutes under which three undocumented aliens were convicted for fraudulently using another person's Social Security number.  See Kansas v. Garcia, 140 S. Ct. at 797.  Justice Alito, writing for the majority, distinguishes the Supreme Court's holding in Arizona v. United States that IRCA preempts state laws which make it a crime for "an alien to work without

authorization."  Kansas v. Garcia, 140 S. Ct. at 798 (citing Arizona v. United States, 567 U.S. at

403-407).   The Supreme Court reasons that IRCA's preemption provision "applies only to the

imposition of criminal or civil liability on *employers* and those who receive a fee for recruiting or

referring prospective employees," but "does not mention state or local laws that impose criminal

or civil sanctions on employees or applicants for employment."  Kansas v. Garcia, 140 S. Ct. at

802 (italics in original).   After finding no express or field preemption, the Supreme Court

concluded that the Kansas statutes did not conflict with federal law, because "[i]t is certainly

possible to comply with both IRCA and the Kansas statutes."  Kansas v. Garcia, 140 S. Ct. at 806.

It distinguishes its decision from Arizona v. United States:

> In *Arizona*, the Court inferred that Congress had made a considered decision that it
> was inadvisable to criminalize the conduct in question.   In effect, the Court
> concluded that IRCA implicitly conferred a right to be free of criminal (as opposed
> to civil) penalties for working illegally, and thus a state law making it a crime to
> engage in that conduct conflicted with this federal right.
>
> Nothing similar is involved here.   In enacting IRCA, Congress did not
> decide that an unauthorized alien who uses a false identity on tax-withholding
> forms should not face criminal prosecution. On the contrary, federal law makes it a
> crime to use fraudulent information on a W-4.

Kansas v. Garcia, 140 S. Ct. at 806 (citing Arizona v. United States, 567 U.S. at 404-07; 26 U.S.C.

§ 7205).  The Supreme Court explained that the overlap of state and federal criminal laws do not

constitute conflict preemption:

> The mere fact that state laws like the Kansas provisions at issue overlap to some
> degree with federal criminal provisions does not even begin to make a case for
> conflict preemption.  From the beginning of our country, criminal law enforcement
> has been primarily a responsibility of the States, and that remains true today.  In
> recent times, the reach of federal criminal law has expanded, and there are now
> many instances in which a prosecution for a particular course of conduct could be
> brought by either federal or state prosecutors.  Our federal system would be turned
> upside down if we were to hold that federal criminal law preempts state law
> whenever they overlap, and there is no basis for inferring that federal criminal
> statutes preempt state laws whenever they overlap.  Indeed, in the vast majority of

cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests.

Kansas v. Garcia, 140 S. Ct. at 806 (2020).

The Tenth Circuit has recognized federal preemption of state law in three categories: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) where Congress intends to occupy a field ("field preemption"); and (iii) to the extent that a state law conflicts with a federal law ("conflict preemption").  Colo. Dep't of Pub. Health & Env't, Hazardous Materials & Waste Mgmt. Div. v. United States, 693 F.3d 1214, 1222 (10th Cir. 2012)("Colorado Department").  See Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d 1021, 1099 (D.N.M. 2017)(Browning, J.), aff'd 863 F.3d 1226 (10th Cir. 2017).   As the defendant in Colorado Department, the United States invoked only conflict preemption to dismiss Colorado's claims against it.  See Colorado Department, 693 F.3d at 1222.  "To avoid conflict preemption, '"it is not enough to say that the ultimate goal of both federal and state law is the same. . . . A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal."'"  Colorado Department, 693 F.3d at 1224 (quoting Chamber of Commerce v. Edmondson, 594 F.3d 742, 769 (10th Cir. 2010)(quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987)(alterations, citation omitted))).  In Colorado Department, the State of Colorado created a schedule for the United States to follow in the destruction of hazardous waste stored in the State in an attempt to prohibit the storage of hazardous waste within the State.  See Colorado Department, 693 F.3d at 1223.  The Tenth Circuit held that the State statute creating this schedule conflicted with a federal statute, which mandated a deadline for the destruction of the materials.  See Colorado Department, 693 F.3d at 1224.  The Tenth Circuit reasoned that allowing the State of Colorado to set a deadline for the destruction of the materials would impede the flexibility with

which Congress had intended in its deadline.   See Colorado Department, 693 F.3d at 1224. Because the Colorado deadline would interfere with the method that Congress had intended for the waste's disposal, the Tenth Circuit concluded that the state law is in conflict with the federal law and, therefore, that the federal law preempts Colorado's schedule.  See Colorado Department, 693 F.3d at 1224.

In Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d at 1118, the Court concluded that Congress clearly intended the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701-2721 ("IGRA"), to "'expressly preempt the field in the governance of gaming activities on Indian lands.'"  233 F. Supp. 3d at 1118 (quoting S. Rep. No. 100-446, at 6-7 (1988)).  Because "even express commands of preemption should be narrowly interpreted in light of the 'presumption against the pre-emption of state police power regulations,'" Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d at 1119 (quoting Medtronic, Inc. v. Lohr, 518 U.S. at 485), however, "the context of IGRA's enactment suggests that Congress did not intend to preempt state regulation of off-reservation gaming activities," and therefore, New Mexico retained its police power to regulate non-Indian third parties outside Indian lands, Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d at 1119-21.  Turning to implied preemption, the Court concluded that Congress did not intend to "completely preempt the field" of gaming regulation, because it did not "abrogate[] states' ability to promulgate their own gaming laws and regulations," but rather, "left them intact."  Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d at 1127.  The Court similarly concluded that conflict preemption was not at issue, because it is not impossible for "third-party state licensee to comply with both IGRA and New Mexico law," and New Mexico's gaming regulations do not "pose an obstacle to the accomplishment of IGRA's objectives."  Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d at 1127-28.

3.    **Implied Preemption: Field Preemption.**

All three "types of preemption -- 'conflict,' 'express,' and 'field,' . . . work in the same way: Congress enacts a law that imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." Murphy v. NCAA, 138 S. Ct. 1461, 1480 (2018)(citing English v. Gen. Elec. Co., 496 U.S. at 78-79)(no citation for quotations).  "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

> Field preemption occurs when federal law occupies a "field" of regulation "so comprehensively that it has left no room for supplementary state legislation." *R. J. Reynolds Tobacco Co.* v. *Durham County*, 479 U. S. 130, 140, 107 S. Ct. 499, 93 L. Ed. 2d 449 (1986).  In describing field preemption, we have sometimes used the same sort of shorthand employed by Congress in express preemption provisions. *See*, *e.g.*, *Oneok, Inc.* v. *Learjet, Inc.,* 575 U. S. ___, ___, 135 S. Ct. 1591, 191 L. Ed. 2d 511, 517 (2015)("Congress has forbidden the State to take action in the *field* that the federal statute pre-empts").  But in substance, field preemption does not involve congressional commands to the States. Instead, like all other forms of preemption, it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law.  *See Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372, n. 6, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000).
>
> The Court's decision in *Arizona* v. *United States*, 567 U. S. 387, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012), shows how this works. Noting that federal statutes "provide a full set of standards governing alien registration," we concluded that these laws "reflect[ ] a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.*, at 401, 132 S. Ct. 2492, 183 L. Ed. 2d 351. What this means is that the federal registration provisions not only impose federal registration obligations on aliens but also confer a federal right to be free from any other registration requirements.

Murphy v. NCAA, 138 S. Ct. 1461, 1480-81 (2018).

## LAW REGARDING THE NMUPA

The NMUPA provides private -- individual and class action -- remedies and civil penalties "for unfair, deceptive, or unconscionable trade practices." Valdez v. Metro. Prop. & Cas. Ins., No. CIV 11-0507 JB/KBM, 2012 WL 1132414, at *19 (D.N.M. March 31, 2012)(Browning, J.)(citing Ouynh Truong v. Allstate Ins, 2010-NMSC-009, ¶ 22, 227 P.3d 73, 80)). See N.M.S.A. § 57-12-3 ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."); N.M. Stat. Ann. § 57-12-10 (authorizing private suits); N.M. Stat. Ann. § 57-12-11 (authorizing the Attorney General of New Mexico to seek civil penalties). In construing the NMUPA, "courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts." N.M. Stat. Ann. § 57-12-4.

> The term "'unfair or deceptive trade practice'" covers

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person.

N.M. Stat. Ann. § 57-12-2(D)(quotation for emphasis). To succeed on an NMUPA claim of an unfair or deceptive trade practice, the plaintiff most show four elements:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. *Ashlock* [v. Sunwest Bank of Roswell, N.A.], [1988-NMSC-026, ¶ 4,] . . . 753 P.2d [346,] 347. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." *Id*. Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. *Id*. Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person." *Id*.

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 112 N.M. 97, 100, 811 P.2d 1308,

1311.  "Generally speaking, [this NMUPA provision] is designed to provide a remedy against

misleading identification and false or deceptive advertising."  Lohman v. Daimler-Chrysler Corp.,

2007-NMCA-100, ¶ 22, 166 P.3d 1091, 1096.[30]  "The gravamen of an unfair trade practice is a

misleading, false, or deceptive statement made knowingly in connection with the sale of goods or

services."  Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 965 P.2d 332, 338.

"The 'knowingly made' requirement is met if a party was actually aware that the statement was

false or misleading when made, or in the exercise of reasonable diligence should have been aware

that the statement was false or misleading."  Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051,

¶ 17, 811 P.2d at 1311-12.  The Court has noted that, "in the right circumstances, it could grant

judgment as a matter of law on whether a statement is deceptive or misleading," although

"generally the question is a matter of fact."  Guidance Endodontics, LLC v. Dentsply Int'l, Inc.,

---

[30]Here, the Court must look to how the Supreme Court of New Mexico, rather than the
Court of Appeals of New Mexico, would resolve the case.  Federal courts sitting in diversity must
apply the substantive law of the state that would otherwise have jurisdiction over the claims at
issue.  See Erie, 304 U.S. at 78.  In the absence of an authoritative pronouncement from the highest
court, a federal court's task under the Erie doctrine is to predict how the state's highest court would
rule if presented with the same case.  See Wade v. EMCASCO Ins., 483 F.3d at 666.  When making
an Erie guess, a federal court should follow intermediate state-court decisions "unless other
authority convinces us that the state supreme court would decide otherwise."  Koch v. Koch Indus.,
Inc., 203 F.3d at 1230 (quoting Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir.
1984)).  The Court predicts that the Supreme Court of New Mexico would agree with Lohman v.
Daimler-Chrysler Corp. and Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, 965 P.2d
332, see infra, that the NMUPA provides a remedy against misleading, false, or deceptive
statements associated with advertising and the sale of goods, based on the Court's read of the
Supreme Court of New Mexico's opinion in Stevenson v. Louis Dreyfus Corp., stating that the
NMUPA is modeled after the Uniform Deceptive Trade Practices Act, which "provides a private
remedy to persons likely to suffer pecuniary harm for conduct involving either misleading
identification of business or goods or false or deceptive advertising."  Stevenson v. Louis Dreyfus
Corp., 1991-NMSC-051, ¶ 12, 811 P.2d at 1310-11 (citing N.M. Stat. Ann. § 57-12-1).  The Court
will, accordingly, apply New Mexico law as the Court of Appeals of New Mexico articulated that
law in Lohman v. Daimler-Chrysler Corp. and Diversey Corp. v. Chem-Source Corp.

728 F. Supp. 2d at 1192-93 (reasoning that the Supreme Court of New Mexico would reach this conclusion).  The Court has also concluded that a communication can mislead even if the representation is not false.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1193-95 (concluding that the Supreme Court of New Mexico would reach this conclusion).

> Unconscionable trade practices include:
>
> act[s] or practice[s] in connection with . . . the extension of credit in the collection of debts that to a person's detriment:
>
>> (1)     take[] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or
>>
>> (2)     result[] in a gross disparity between the value received by a person and the price paid.

N.M. Stat. Ann. § 57-12-2(E).  An unconscionable trade practice, accordingly, can be procedurally unconscionable, per § 57-12-2(E)(1), or substantively unconscionable, per § 57-12-2(E)(2).  See Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 21, 308 P.3d 901, 907 ("The doctrine of contractual unconscionability can be analyzed from both procedural and substantive perspectives.").  The NMUPA's provisions regarding unconscionability "evince[] a legislative recognition that, under certain conditions, the market is truly not free, leaving it for courts to determine when the market is not free, and empowering courts to stop and preclude those who prey on the desperation of others from being rewarded with windfall profits."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 34, 329 P.3d 658, 671.   "Procedural unconscionability . . . examines the particular factual circumstances surrounding the formation of [a] contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other."  Cordova v.

World Fin. Corp., 2009-NMSC-021, ¶ 23, 308 P.3d at 907-08.  Substantive unconscionability, on

the other hand, "concerns the legality and fairness of the contract terms themselves," and "focuses

on such issues as whether the contract terms are commercially reasonable and fair, the purpose

and effect of the terms, the one-sidedness of the terms, and other similar policy concerns."

Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 22, 308 P.3d at 907.  Substantive

unconscionability arises where a contract is illegal, or where it "is grossly unreasonable and against

our public policy under the circumstances," Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 31,

308 P.3d at 909, even if "there is not a statute that specifically limits [such] contract terms,"

because "[r]uling on substantive unconscionability is an inherent equitable power of the court, and

does not require prior legislative action," State ex rel. King v. B&B Inv. Grp., Inc., 2014-NMSC-

024, ¶ 33, 329 P.3d at 670.

Under the NMUPA, the Attorney General of New Mexico is entitled to bring an action in

New Mexico's name for NMUPA violations.  See N.M. Stat. Ann. § 57-12-8(A).  In such an action,

the Attorney General may "petition the district court for temporary or permanent injunctive relief

and restitution."  N.M. Stat. Ann. § 57-12-8(B).  Special penalties are available against persons

who act willfully:

> In any action brought under Section 57-12-8 NMSA 1978, if the court finds
> that a person is willfully using or has willfully used a method, act or practice
> declared unlawful by the Unfair Practices Act, the attorney general, upon petition
> to the court, may recover, on behalf of the state of New Mexico, a civil penalty of
> not exceeding five thousand dollars ($5,000) per violation.

N.M. Stat. Ann. § 57-12-11.  "Willful conduct is the intentional doing of an act with knowledge

that harm may result."  N.M. Civ. UJI 13-1827.[31]

----

[31]The Court expects the Supreme Court of New Mexico to define the NMUPA's "willful"
according to the New Mexico Civil Uniform Jury Instructions.  As discussed supra note 69, the

### NEW MEXICO LAW REGARDING EXPRESS WARRANTIES

The Supreme Court of New Mexico states that, "[u]nder the Uniform Commercial Code,"

"an express warranty can be created in one of three ways":

> (1) "any affirmation of fact or promise made by the seller to the buyer which relates
> to the goods and becomes part of the basis of the bargain," (2) "any description of
> the goods which is made part of the basis of the bargain," or (3) "any sample or
> model which is made part of the basis of the bargain."  Section 55-2-313(1)(a)-(c).

Salazar v. D.W.B.H., Inc., 2008-NMSC-054, ¶ 8, 144 N.M. 828, 830-31, 192 P.3d 1205, 1207-08

(quoting N.M.S.A. § 55-2-313(1)(a)-(c)).  While "an express warranty must be made as part of the

basis of the bargain," "[t]his does not mean, however, that an express warranty must be specifically

bargained for or even included as part of a written contract."  Salazar v. D.W.B.H., Inc., 2008-

NMSC-054, ¶ 8, 144 N.M. at 831, 192 P.3d at 1208 (citing 18 Richard A. Lord, Williston on

Contracts § 52:45, at 260-61 (4th ed. 2001)).  Furthermore, the "use of formal words such as

'warrant' or 'guarantee' are not necessary for the creation of an express warranty," "[n]or is it

---

Court predicts that the Supreme Court of New Mexico would conclude that the New Mexico Civil
Uniform Jury Instructions best defines New Mexico's understanding of "willful" in the punitive
damages context.  The Court of Appeals of New Mexico has concluded that the NMUPA's civil
penalties are punitive.  See Atherton v. Gopin, 2015-NMCA-003, ¶ 53, 340 P.3d at 641 (citing
McLelland v. United Wis. Life Ins., 1999-NMCA-055, ¶ 10, 127 N.M. 303, 980 P.2d 86, 90).  The
Court predicts that the Supreme Court of New Mexico would agree with Atherton v. Gopin.  In
Hale v. Basin Motor Co., the Supreme Court of New Mexico concluded that multiplying civil
penalties based on scienter creates punitive damages.  See 1990-NMSC-068, ¶ 20, 110 N.M. at
320.  The NMUPA does not multiply the otherwise applicable civil penalties for culpable
defendants, but it increases the maximum penalty according to scienter.  Multiplying civil penalties
differs from increasing maximum civil penalties only in the means of calculating penalties; both
provision categories enhance penalties for culpable mental states and are likewise punitive.  The
Court concludes, accordingly, that the Supreme Court of New Mexico would look to the New
Mexico Civil Uniform Jury Instructions to understand "willful" in the NMUPA provision for
enhanced civil penalties.  Cf. Atherton v. Gopin, 2015-NMCA-003, ¶¶ 53-54, 340 P.3d at 641
(reaching the same conclusion as the Court and using the N.M. Civ. UJI 13-1827 definition to
define "willful" in the NMUPA).

necessary for the seller to have the specific intention to make an express warranty." Salazar v.

D.W.B.H., Inc., 2008-NMSC-054, ¶ 8, 144 N.M. at 831, 192 P.3d at 1208 (quoting N.M.S.A. §

55-2-313(2)).  See Robey v. Parnell, 2017-NMCA-038, ¶ 17, 392 P.3d 642, 649 (holding that

express warranties need not be in writing).  The Supreme Court of New Mexico has held that the

buyer and seller need not be in privity for there to be a breach of express warranty:

> The New Mexico Legislature has effectively eliminated the need for analysis of
> privity in the context of express or implied warranties under the UCC.  See § 55-2-
> 318 ("A seller's warranty whether express or implied extends to any natural person
> who is in the family or household of his [or her] buyer or who is a guest in his [or
> her] home if it is reasonable to expect that such person may use, consume or be
> affected by the goods and who is injured in person by breach of the warranty."); id.
> cmt. 2 ("The purpose of this section is to give certain beneficiaries the benefit of
> the same warranty which the buyer received in the contract of sale, thereby freeing
> any such beneficiaries from any technical rules as to 'privity.'").  The Legislature
> has indicated its intent not to rely on privity to determine the persons entitled to
> bring an action asserting those warranties.  Therefore we find it unnecessary to
> consider this approach.

Badilla v. Wal-Mart Stores East Inc., 2015-NMSC-029, ¶ 18, 357 P.3d 936, 940 n.2

"If the goods provided are not as warranted, the goods are in breach of warranty."  Badilla

v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 21, 357 P.3d at 941.  "A breach of warranty

presents an objective claim that the goods do not conform to a promise, affirmation, or

description."  Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 23, 357 P.3d at 941 (internal

quotation marks omitted)(quoting Jaramillo v. Gonzales, 2002-NMCA-072, ¶ 13, 50 P.3d 554.).

"A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of

knowledge of the breach."  Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 21, 357 P.3d

at 941.

In Bellman v. NXP Semiconductors USA, Inc., for example, the Court considered whether,

under New Mexico's express warranty standard, the defendants had made any express affirmations

or representations to the plaintiffs concerning chemical supplies purchased.  See 248 F. Supp. 3d at 1153.  The Court noted that, "aside from perfunctorily alleging in the Complaint that Rinchem Co. 'expressly' warranted the chemicals that it supplied," the plaintiffs did not explain the warranty or even identify "the warranty's precise terms."  248 F. Supp. 3d at 1153.  The Court, accordingly, dismissed the plaintiffs' breach-of-express-warranty claim, because the Court could not conclude from the plaintiffs' conclusory allegations that the defendant had "made any express warranty."  248 F. Supp. 3d at 1153.  See Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1210-11 (D.N.M. 2011)(Browning, J.)(ruling that the plaintiffs had plausibly alleged an express warranty where the plaintiffs contended that the defendants had promised that two restored Volkswagen buses purchased would be "ready to go whether for daily driver or for cross-country trips," and "guaranteed . . . 100% satisfaction with the buses").

**NEW MEXICO LAW REGARDING UNJUST ENRICHMENT**

"New Mexico has long recognized actions for unjust enrichment . . . ." Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d 695, 698, 129 N.M. 200 (citing Tom Growney Equip., Inc. v. Ansley, 1994-NMCA-159, ¶ 6, 888 P.2d 992, 994, 119 N.M. 110).  "To prevail on an unjust enrichment claim, 'one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'"  City of Rio Rancho v. Amrep Sw. Inc., 2011-NMSC-037, ¶ 54, 150 N.M. 428, 260 P.3d 414, 428-29 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 203, 3 P.3d 695, 698).  "The theory has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity." Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M. at 203, 3 P.3d at 698.  See Credit Inst. v. Veterinary Nutrition Corp., 2003-NMCA-010, ¶ 21, 133 N.M. 248, 253, 62 P.3d 339, 344;

Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 9, 110 N.M. 173, 175-76, 793 P.2d 855, 857. The Supreme Court of New Mexico has stated that "[t]he general equity jurisdiction of the trial court is not available, although properly pleaded, because appellee in fact had an adequate remedy at law." Gen. Tel. Co. of the Sw. v. State Tax Comm'n, 1962-NMSC-005, ¶ 18, 69 N.M. 403, 367 P.2d 711, 715. See Sims v. Sims, 1996-NMSC-078, ¶ 28, 930 P.2d 153, 159, 122 N.M. 618 (stating that "equity will not act if there is a complete and adequate remedy at law"). Cf. Lopez v. Kase, 1999-NMSC-011, ¶ 6, 975 P.2d 346, 348, 126 N.M. 733 (stating that the Supreme Court of New Mexico "generally will not grant equitable relief by way of an extraordinary writ when there is an adequate remedy available to the petitioner at law, absent unusual and compelling circumstances").

Additionally, the "'hornbook rule [is] that quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.'" Elliott Indus. Ltd. P'ship v. BP America Production Co., 407 F.3d 1091, 1117 (10th Cir. 2005)("Elliott Indus.")(quoting Member Servs. Life Ins. v. Am. Nat'l Bank & Tr. Co. of Sapulpa, 130 F.3d 950, 957 (10th Cir. 1997)).[32]  In Elliott Indus., for example, the Tenth Circuit held that the plaintiffs' leases with ConocoPhillips that defined ConocoPhillips' royalty obligations precluded the plaintiffs' claims that ConocoPhillips' royalty payment practices unjustly enriched it at the plaintiffs' expense. See 407 F.3d at 1117. The plaintiffs contended that

---

[32]As the Tenth Circuit has explained, "when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue." Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003).  The Court has critiqued the Elliott Indus. decision in the past, though on a different legal issue, and concluded that the Supreme Court of New Mexico would follow a different path. See Anderson Living Tr. v. WPX Energy Prod., LLC, 312 F.R.D. 620, 625-630 (D.N.M. 2015)(Browning, J.) The Court reiterates that interpretation here, though not on the issue quoted above.

the leases did not preclude their unjust-enrichment claim, because they did not contain an express

contractual provision covering ConocoPhillips' deduction of a thirty-nine percent processing fee

from the plaintiffs' royalty payments.  See 407 F.3d at 1117.  The Tenth Circuit reasoned, however,

that, although "the contracts may not delineate any specific deductions," the leases "control how

royalties are to be paid."  407 F.3d at 1117.  The Tenth Circuit concluded, therefore, that the district

court properly granted ConocoPhillips summary judgment on the plaintiffs' unjust-enrichment

claim, because "the claim for underpayment of royalties is grounded in the parties' contractual

relationships."  407 F.3d at 1117.  See Anderson Living Tr. v. ConocoPhillips Co., LLC, 952

F. Supp. at 1033.

## LAW REGARDING THE DORMANT COMMERCE CLAUSE

While the Commerce Clause of the Constitution of the United States has had its interstate

qualifier diluted to near meaninglessness since the New Deal,[33] the Dormant Commerce Clause

---

[33]For over fifty years, between 1942 and 1995, the Commerce Clause was thought to be a dead letter, i.e., it was thought to effectively be a federal police power, and the now-familiar concept of a federal government limited by discrete, enumerated powers was all but forgotten.  In 1942, the Supreme Court upheld the application of wheat production quotas in the Agricultural Adjustment Act of 1938, Pub. L. No. 75-430, 52 Stat. 31, to private farmers who grew wheat in quantities above the law's mandated maximum for the sole purpose of personal consumption.  See Wickard v. Filburn, 317 U.S. 111 (1942).  The Supreme Court held that Congress could regulate the farmers' crop production as interstate commerce, even if it was purely for personal consumption, under the theory -- seemingly without limiting principle -- that the farmers' overproduction reduced the amount of wheat that they would need to buy, which in turn, in the aggregate, reduced the nationwide demand for wheat.  See 317 U.S. at 127-29.

After that case, the Supreme Court did not strike down a statute on the ground that it fell outside of Congress' power to regulate interstate commerce -- leading many to assume that Congress could justify any law under the Commerce Clause -- until 1995.  In that year, the Supreme Court revitalized Commerce Clause jurisprudence, striking down the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q), as regulating "truly local" activity.  United States v. Lopez, 514 U.S. 549, 568 (1995)(Rehnquist, C.J.).  Since United States v. Lopez, the Supreme Court has issued a number of major decisions defining the Commerce Clause's contours, including United States v. Morrison, 529 U.S. 598 (2000)(striking down provisions of the Violence Against Women Act, 42 U.S.C. § 13981(c)), Gonzales v. Raich, 545 U.S. 1 (2005)(upholding federal laws

remains focused on commerce that is truly interstate, rather than intrastate, in nature.  See C&A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383, 390 (1994)(Kennedy, J.)("The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent."  (citing The Federalist No. 22 (Alexander Hamilton))). "The focus of a dormant Commerce Clause challenge is whether a state law improperly interferes with interstate commerce. The primary concern is economic protectionism."  Direct Mktg. Ass'n v. Brohl, 814 F.3d 1129, 1135 (10th Cir. 2016)(citing W. Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 192 (1994)).

There are two ways that State legislation or regulation can violate the Dormant Commerce Clause: (i) by discriminating against interstate commerce, i.e., imposing burdens on interstate commerce that the state does not impose on intrastate commerce, see City of Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978); and (ii) by imposing a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits," Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).  See N.M. ex rel. Balderas v. Valley Meat Co., LLC, No. CIV 14-1100 JB/KBM, 2015 U.S. Dist. LEXIS 72874, at *79 (D.N.M. May 20, 2015)(Browning, J.); C&A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. at 390.  "To evaluate a dormant Commerce Clause challenge, this court must first determine whether the act in question 'regulates evenhandedly'

---

criminalizing home-grown cannabis for personal use, on the grounds that the laws were part of a valid "larger regulatory scheme," 545 U.S. at 27), and, most recently, National Federal of Independent Business v. Sebelius, 132 S. Ct. 2566 (2012)(Roberts, C.J.)(holding that the individual-mandate provision of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 ("ObamaCare"), exceeded Congress' power under the Commerce Clause, but upholding ObamaCare under the Spending Clause, U.S. Const. art. I, § 8, cl. 1).

among economic interests or instead 'discriminates against interstate commerce' either on its face or in practical effect." Am. Target Advert., Inc. v. Giani, 199 F.3d 1241, 1254 (10th Cir. 2000)(quoting Oregon Waste Sys., 511 U.S. at 99). "Discrimination in this context 'simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" Am. Target Advert., Inc. v. Giani, 199 F.3d 1241, 1254 (10th Cir. 2000)(quoting Oregon Waste Sys., 511 U.S. at 99). Where State regulation is discriminatory, "[o]ur cases require that justifications for discriminatory restrictions on commerce pass the 'strictest scrutiny,'" Or. Waste Sys. v. Dep't of Envtl. Quality, 511 U.S. 93, 101 (1994)(quoting Hughes v. Oklahoma, 441 U.S. 322, 337 (1979)), whereas non-discriminatory regulation will be "upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits," Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). "State laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2091 (2018)(quoting Pike v. Bruce Church, 397 U.S. 137, 142 (1970)).

> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, *Southern Pacific Co*. v. *Arizona*, 325 U.S. 761, but more frequently it has spoken in terms of "direct" and "indirect" effects and burdens. *See*, *e. g., Shafer* v. *Farmers Grain Co., supra*.

Pike v. Bruce Church, 397 U.S. 137, 142 (1970).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(citing Williams v. Meese, 926 F.2d 994, 997 (10th Cir. 1991)).  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor.  See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.  "'At the motion-to-dismiss stage, the court does not weigh the evidence,' and 'is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'"  Rivero v. Bd. of Regents of Univ. of New Mexico, No. CIV 16-0318

JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atlantic Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. at 556). This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., 372 F.Supp.3d 1166, 1245 (D.N.M. 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). "A court will not construe a plaintiff's pleadings 'so liberally that it becomes his advocate.'" Rivero v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *48 (quoting Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.)). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

 "When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Okla., 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice,"  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103-04 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

 In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion."  627 F.3d at 1186.  The United States Court of Appeals for the Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing

the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court also previously has ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v.

Crabtree, No. CIV 11-112 9 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which the plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

### RELEVANT LAW REGARDING TAKING JUDICIAL NOTICE OF DOCUMENTS WHEN RULING ON A MOTION TO DISMISS

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court"; and (ii) facts that are "capable of

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f).  "Adjudicative facts are simply the facts of the particular case."  United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201).  A court has discretion to take judicial notice of such facts, regardless whether requested.  See Fed. R. Evid. 201(c).  On the other hand, if a party requests that the court take judicial notice of certain facts and supplies the necessary information to the court, judicial notice is mandatory.  See Fed. R. Evid. 201(d).  Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed."  Fed. R. Evid. 201(e).

Judicial notice may be taken during any stage of the judicial proceeding, including on a motion to dismiss.  See 21B Charles Alan Wright & Kenneth W. Graham, Fed. Practice & Procedure § 5110, at 294 & n.17 (2d ed. 2005).  While, ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the complaint, see Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect, see Duprey v. Twelfth Judicial Dist. Court, No. 08-0756, 2009 WL 2482171, at *7 (D.N.M. July 27, 2009)(Browning, J.)(citing Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)).  Also, when considering a motion to dismiss, "[t]he court may take judicial notice of its own files and records, matters of public record, as well as the passage of time."  Logan v. United States, 272 F. Supp. 2d 1182, 1184 n.1 (10th Cir. 2003).  The documents judicially noticed, however, should not be considered for the truth of the matters asserted therein:

> Exhibits attached to a complaint are properly treated as part of the pleadings for purposes of ruling on a motion to dismiss.  Ordinarily, consideration of material attached to a defendant's answer or motion to dismiss requires the court to convert the motion into one for summary judgment and afford the parties notice and an opportunity to present relevant evidence.  However, facts subject to judicial notice

> may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.  This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record.  However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein.

Tal v. Hogan, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006)(alterations omitted)(citations omitted)(internal quotation marks omitted).

Applying these principles, in Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, in the context of a securities class action, the Court took judicial notice of news publications regarding the mortgage-back-security crisis, the background for plaintiffs' allegations.  See 825 F. Supp. 2d at 1166.  Additionally, In re Thornburg Mortg., Inc. Sec. Litig., another securities class action, the Court took judicial notice of documents that disclosed the securities held by a person in a particular entity, and/or any changes in those holdings.  See 2009 WL 5851089, at **3-4.  The Court took notice of the existence of the documents and the statements contained therein, but did not assume the truth of the documents' contents.  The Court found that rule 201(d) compelled it to take judicial notice of the documents, because the documents, which were on file with the United States Securities and Exchange Commission, were "'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,'" and the defendants intended to use the documents to prove that they did not engage in insider trading, contrary to the plaintiffs' allegations.  2009 WL 5851089, at *3 (quoting Fed. R. Evid. 201(b)).

## ANALYSIS

First, the Court will grant the Defendants' MTD as to Thornton's claims regarding the Defendants' use of the official USDA grade shields, because Thornton does not state a claim upon which relief may be granted on the basis of the Defendants' use of the official USDA grade shields. See Analysis § I(F), infra.  The Court, therefore, dismisses Thornton's claims against Albertsons

Companies.  The Court also dismisses any claims Thornton brings against the Kroger Company on the basis of its use of the official USDA grade shields.  Second, the Court will deny Thornton's PI Motion, because she does not demonstrate a substantial likelihood of success on the merits or that she will suffer irreparable injury in the absence of a PI.  Because Thornton's narrow request for injunctive relief targets only the Defendants' use of the official USDA grade shields, and the Court dismisses those claims here, Thornton does not have a substantial likelihood of succeeding on the merits of those claims, even though she may succeed on her other claims.

I.     **THE COURT GRANTS THE DEFENDANTS' MTD TO DISMISS ALBERTSONS COMPANIES, BUT DENIES THE DEFENDANTS' MTD TO DISMISS THE <u>KROGER COMPANY</u>.**

The Court grants the Defendants' MTD as to Albertsons Companies, but denies the Defendants' MTD Thornton's claims as to the Kroger Company, because: (i) collateral estoppel does not bar Thornton's claims; (ii) federal law does not preempt Thornton's claims insofar as she is not seeking to reinstate country-of-origin labeling requirements for beef; (iii) NMUPA's safe harbor clause does not exempt the Defendants' conduct; (iv) Thornton's lack of pre-suit notice does not preclude her breach of express warrant claims; (v) Thornton's claims do not fail under the Dormant Commerce Clause; but, (vi) Thornton does not state a claim upon which relief may be granted against Albertsons Companies, or against the Kroger Company regarding their use of the official USDA grade shields.

A.     **COLLATERAL ESTOPPEL DOES NOT BAR THORNTON'S CLAIMS IN THIS CASE, BECAUSE THE ISSUES ARE NOT IDENTICAL.**

A federal court's jurisdiction in a prior judgment determines the applicable preclusion law -- and thus the preclusive effect -- of that federal court's judgments.  See <u>Semtek</u>, 531 U.S. at 506-08.  The law of the State in which a federal court sitting in diversity resides determines

preclusive effect of a judgment of a federal court sitting in diversity.  See Taylor, 553 U.S. at 891;

Semtek, 531 U.S. at 506-08; Knight v. Mooring Capital Fund, LLC, 749 F.3d at 1186; Law

Regarding the Preclusive Effect of Federal Diversity Judgements, supra.  In contrast, federal

common-law determines the preclusive effect of a federal court exercising federal question

jurisdiction: "[A] federal court examining a question of federal law upon which another federal

court . . . has previously ruled . . . must rely on the federal law of [issue preclusion]."  Murdock v.

Ute Indian Tribe of Uintah & Ouray Reservation, 975 F.2d at 687 (citing Blonder-Tongue Lab.,

Inc. v. Univ. of Ill. Found., 402 U.S. 313, 324 n.12 (1971); Meza v. Gen. Battery Corp., 908 F.2d

1262, 1265 (5th Cir. 1990); Fireman's Fund Ins. v. Int'l Mar. Place, 773 F.2d 1068, 1069 (9th Cir.

1985); Restatement (Second) of Judgments § 87, at 314 (1982)("Federal law determines the effects

under the rules of [preclusion] of a judgment of a federal court"); 18 C. Wright & A. Miller, Federal

Practice & Procedure: Jurisdiction § 4466 (1981 & Supp. 1992)).

　　　Because the prior court's jurisdiction determines which preclusion law to apply, the Court

must first determine whether Judge Riggs decided Tyson Foods pursuant to federal question or

diversity jurisdiction.  The Tyson Foods court did not decide its jurisdiction in the Tyson Foods

MOO or anywhere else on the record.  See Tyson Foods, 482 F. Supp. 3d at 1152-56.  The Court,

therefore, must determine the Tyson Foods court's jurisdiction here.  Federal-question jurisdiction

exists when "a federal question is presented on the face of the plaintiff's properly pleaded

complaint."  Caterpillar, Inc. v. Williams, 482 U.S. at 392 (citing Gully v. First Nat'l Bank, 299

U.S. at 112-13).  "[I]t is now settled law that a case may not be removed to federal court on the

basis of a federal defense . . . even if the defense is anticipated in the plaintiff's complaint, and

even if both parties concede that the federal defense is the only question truly at issue."  Caterpillar,

Inc. v. Williams, 482 U.S. at 393.

Both plaintiffs in Tyson Foods brought State law claims in their original actions: claims under the NMUPA, breach of express warranty, and unjust enrichment.  See Thornton-Tyson Complaint ¶¶ 50-71, at 21-25; Lucero Complaint ¶¶ 53-67, at 24-27.  Neither plaintiff raised federal law claims nor stated federal law issues in their complaints.  See Thornton-Tyson Complaint ¶¶ 1-48, at 3-19; Lucero Complaint ¶¶ 1-67, at 4-26.  The plaintiffs in Tyson Foods, therefore, do not satisfy the well-pleaded complaint rule.  See Parker v. WI Waterstone, LLC, 790 F. App'x 926, 929 (10th Cir. 2019)(unpublished)(noting that federal question jurisdiction exists only when the federal question is present on the face of a plaintiff's properly pleaded complaint).

Tyson Foods is not a federal question case under the Complete Preemption Doctrine. Although the Meatpacker Defendants do not raise the Complete Preemption Doctrine in the Thornton-Tyson Removal Notice or in the Lucero-Tyson Removal Notice, the Defendants in this case raise it in their Removal Notice, and so the Court will analyze it here.  See Thornton-Tyson Removal Notice; Lucero-Tyson Removal Notice; MTD Tr. at 5:21-6:11 (Court, Lampley); Removal Notice at 11.  The Defendants argue that the Court has federal question jurisdiction over the Complaint, because "'[f]ederal courts may exercise federal question jurisdiction over complaints that, although not presenting federal questions on their face, nonetheless present state law claims that are *preempted* by federal law.'"  Removal Notice at 11 (quoting Garley v. Sandia Corp., 236 F.3d 1200, 1207 (10th Cir. 2001))(emphasis in Removal Notice but not in Garley v. Sandia Corp.).  The Defendants quote the Supreme Court for the rule that the "'artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim.'"  Removal Notice at 11 (quoting Rivet v. Regions Bank, 522 U.S. 470, 475 (1998)).  The Tenth Circuit explains that "removal based on preemption is permissible only if federal law provides a replacement cause of action," but "the federal cause of action need not provide the same remedy

as the state cause of action." Schmeling v. NORDAM, 97 F.3d 1336, 1343 (10th Cir. 1996).   The Tenth Circuit announced a two-part test for determining whether a State law claim is removable to federal court based on the Complete Preemption Doctrine.   See Schmeling v. NORDAM, 97 F.3d at 1343.   First, a court decides "whether . . . [federal] regulations preempt the state laws relied on by [the plaintiff]," and second, it determines "whether Congress intended to allow removal in such cases, as manifested by the provision of a federal cause of action to enforce the [federal] regulations." Schmeling v. NORDAM, 97 F.3d at 1343.   The Tenth Circuit undertakes the second part of the inquiry first, "[f]or reasons of comity and prudence," even though it may "potentially ha[ve] less relevance to the merits of the case than does the first inquiry," because the "analysis under the complete preemption doctrine is jurisdictional and therefore preliminary to any consideration of the merits." Schmeling v. NORDAM, 97 F.3d at 1343.   The Fifth Circuit states:

> The complete preemption doctrine provides that the preemptive force of some federal statutes is so strong that "it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule," such that removal is possible. *GlobeRanger Corp. v. Software AG* ("*GlobeRanger I*"), 691 F.3d 702, 705 (5th Cir. 2012) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987)).   The Copyright Act is one such federal statute that completely preempts the substantive field. *Id.* at 706.

Spear Mktg. v. BancorpSouth Bank, 844 F.3d 464, 473 n.3 (5th Cir. 2016).   The Fifth Circuit explains the difference between "[c]omplete preemption for the purpose of establishing federal subject matter jurisdiction," which is "a purely jurisdictional doctrine that is distinct from ordinary preemption," and "ordinary preemption," which is also called "defensive preemption." Spear Mktg. v. BancorpSouth Bank, 844 F.3d at 473 n.3 (citing Elam v. Kan. City S. Ry. Co., 635 F.3d 796, 803 (5th Cir. 2011)).

> Complete preemption and ordinary preemption . . . may not perfectly overlap; a state law claim may be completely preempted (meaning there is federal jurisdiction over it) but ultimately not entirely preempted on the merits (meaning that

preemption provides a defense against only some portion of the state law claim, leaving a viable state law claim to be litigated on the merits). *See GlobeRanger I*, 691 F.3d at 709 (recognizing that "at least part of the factual basis for GlobeRanger's claims may fall outside the scope of copyright" and "[i]f none of the claims were preempted . . . there would not be federal jurisdiction under the complete preemption doctrine"). For instance, a [Texas Theft Liability Act] claim based on multiple wrongful acts may not be entirely preempted on the merits if only some of those acts violate rights that are equivalent to copyright. SMI conceded this distinction at oral argument.

Spear Mktg. v. BancorpSouth Bank, 844 F.3d at 473 n.3.

Even though Judge Riggs in Tyson Foods concludes that federal law preempts ordinarily Thornton's claims against the Meatpacker Defendants, Judge Riggs nonetheless exercised jurisdiction over that case, and so implicitly did not find complete preemption. See Tyson Foods, 2020 U.S. Dist. LEXIS 156059, at **11-22; Schmeling v. NORDAM, 97 F.3d at 1343. Judge Riggs, therefore, did not conclude that Thornton's claims were preempted completely under the Complete Preemption Doctrine. Thornton brought a class action complaint in state court: without aggregating class damages, it is doubtful that Thornton alone can assert damages exceeding $75,000.00 to satisfy 28 U.S.C. § 1332(a)'s amount in controversy requirement for diversity jurisdiction. See 28 U.S.C. § 1332(a). Accordingly, the Court determines that Tyson Foods was removed to federal court under CAFA, a form of diversity jurisdiction,[34] because the parties have

---

[34]In 2005, Congress passed CAFA, listing one of its purposes as "providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction." Pub. L. No. 109-2, § 2(b)(2), 119 Stat. 4, 5 (2005). CAFA is placed within 28 U.S.C. § 1332 as a subsection of the diversity jurisdiction statute. See 28 U.S.C. § 1332(d). The Supreme Court characterizes CAFA as a form of diversity jurisdiction. See Miss. ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 165 (2014)("For class and mass actions, CAFA expanded diversity jurisdiction in two key ways."). The Tenth Circuit also describes CAFA as a form of diversity jurisdiction: "CAFA's stated purposes are to 'assure fair and prompt recoveries for class members with legitimate claims;' to 'restore the intent of the framers . . . by providing for Federal court consideration of interstate cases of national importance *under diversity jurisdiction*;' and to 'benefit society by encouraging innovation and lowering consumer prices.'" Parson v. Johnson & Johnson, 749 F.3d 879, 889 (10th Cir. 2014)(quoting CAFA, § 2, Pub. L. No. 109-2, 119 Stat. at

minimal diversity, and their aggregated claims exceed $5,000,000.00.  See 28 U.S.C. § 1332(d)(2);

Thornton-Tyson Removal Notice at 1; Lucero-Tyson Removal Notice at 1.  Because Tyson Foods

is a diversity jurisdiction case, therefore, New Mexico collateral estoppel law determines its

preclusive effect.

> For collateral estoppel to apply under New Mexico law,

> the following four elements [must be] met: "(1) the party to be estopped was a party
> to the prior proceeding, (2) the cause of action in the case presently before the court
> is different from the cause of action in the prior adjudication, (3) the issue was
> actually litigated in the prior adjudication, and (4) the issue was necessarily
> determined in the prior litigation."

Bank of N.Y. as Tr. for Popular Fin. Servs. Mortg./Pass Through Certificate Series #2006-D v.

Romero, 2016-NMCA-091, ¶ 23, 382 P.3d 991, 998-99 ("Bank of N.Y.")(quoting Ideal v.

Burlington Res. Oil & Gas Co. LP, 2010-NMSC-022, ¶ 9, 148 N.M. 228, 231-32, 233 P.3d 362,

365-66).  See also Mayer v. Bernalillo Cnty., No. CIV 18-0666 JB\SCY, 2019 U.S. Dist. LEXIS

---

5 (2005))(emphasis added).  The Sixth Circuit concurs: "Congress through CAFA sought to relax
the requirements of diversity jurisdiction in order to make it easier for plaintiffs to bring certain
interstate class actions and mass actions in federal court."  Nessel ex rel. Mich. v. Amerigas
Partners, L.P., 954 F.3d 831, 834 (6th Cir. 2020).  Other courts have treated CAFA as a form of
diversity jurisdiction for choice-of-law purposes.  See Rodriguez v. It's Just Lunch, Int'l, 300
F.R.D. 125, 135 (S.D.N.Y. 2014)(Stein, J.)("As a federal court sitting in diversity pursuant to the
Class Action Fairness Act of 2005, see 28 U.S.C. § 1332(d)(2)(A), this Court 'applies the choice-
of-law rules of the state in which' the Court sits, namely New York.")(no citation for quotation);
Kaufman v. Am. Express Travel Related Servs. Co., No. CIV 07-1707, 2008 U.S. Dist. LEXIS
18129, at *10 (N.D. Ill. March 7, 2008)(Gottschall, J.)("The case was removed pursuant to CAFA,
which is part of the diversity jurisdiction statute.  28 U.S.C. § 1332. A district court applies the
choice of law rules of the state in which it sits in a diversity case.").  The Court agrees that a CAFA
case is a diversity case.  The Constitution requires minimal diversity only.  See State Farm Fire &
Cas. Co. v. Tashire, 386 U.S. 523, 530 (1967).

3555, at *59-61 (D.N.M. Jan. 8, 2019)(Browning, J.).  Furthermore, under New Mexico law, there

must be "an identity of factual issue in [between] the two cases."  O'Brien v. Behles, 2020-NMCA-

032, ¶ 51, 464 P.3d 1097, 1116-17 ("Whether an issue was 'actually litigated' and 'necessarily

determined' in the prior lawsuit, such that it has preclusive effect, first requires comparison with

the present lawsuit, and whether there is an identity of factual issue in the two cases.")(citing

Paulos v. Janetakos, 1942-NMSC-057, ¶ 12, 46 N.M. 390, 393, 129 P.2d 636, 638).  The Supreme

Court of New Mexico explains the rationale behind collateral estoppel, and draws a distinction

between the preclusion of issues of law and issues of fact:

> The whole concept underlying collateral estoppel is to aid the finality of judgments by preventing *parties* from endlessly relitigating the same issues under the guise of different "causes of action."  It is not intended to tie the hands of judges nor to be a way to amend the law of New Mexico by forcing one judge to accept the conclusions of pure law made by another without benefit of an appeal to this Court.  Where a judge's ruling on a matter of law is intertwined with the facts of a particular case it is collaterally binding in a subsequent suit between the same parties or privies because the ruling on the factual issue, which is final under the doctrine of collateral estoppel, cannot be separated from the legal conclusion and thus both must be binding if the factual determination is to be. *McDonald v. Padilla*, 53 N.M. 116, 202 P.2d 970 (1948).  However, a conclusion or statement purely of law which is not dependent for its meaning or validity on the facts of a particular case is not binding on the judge in a later suit between the parties; "litigants have no vested right to an erroneous conclusion of law."  *Id.* at 125, 202 P.2d at 976.

Torres v. Vill. of Capitan, 1978-NMSC-065, ¶ 18, 92 N.M. 64, 68, 582 P.2d 1277, 1281.

The Supreme Court of new Mexico has defined an issue of fact for preclusion purposes:

> It must be a fact, the determination of which is material, relevant, and necessary to a decision of the case upon its merits . . .  It must not be a fact that comes collaterally or incidentally in question . . . or one that is not material or essential to a decision, even though put in issue by the pleadings[,] . . . or evidentiary facts from which the ultimate fact is inferred. . . .
> Our conclusion is that such fact must be an ultimate fact, such as is required in allegations of fact in good pleadings, or in findings of fact in cases tried to the court.  It is the ultimate fact, the fact without which the judgment would lack support in an essential particular.  This is the rule of the Federal Courts.

Paulos v. Janetakos, 1942-NMSC-057, ¶¶ 12-14, 46 N.M. 390, 393-94, 129 P.2d 636, 638.  See

Matsu v. Chavez, 1981-NMSC-113, ¶ 7, 96 N.M. 775, 778, 635 P.2d 584, 587 ("Collateral estoppel

applies when the facts are material, relevant and necessary to the decision of the case.").

　　　　Here, the party to be estopped is Thornton, who is a party to the prior proceeding, Thornton

v. Tyson Foods.  See Bank of N.Y., 2016-NMCA-091, ¶ 23, 382 P.3d at 998-99.  Collateral

estoppel's first prong is, therefore, met. The second prong is also met.  The second prong is that

"the cause of action in the case presently before the court is different from the cause of action in

the prior adjudication."  Bank of N.Y., 2016-NMCA-091, ¶ 23, 382 P.3d at 998-99.  The Supreme

Court of New Mexico explains that, "[u]nlike res judicata, collateral estoppel 'does not require

that both suits be based on the same cause of action,'" but, "[i]nstead, collateral estoppel, also

called issue preclusion, prevents a party from re-litigating 'ultimate facts or *issues* actually and

necessarily decided in a prior suit.'"  DeFlon v. Sawyers, 2006-NMSC-025, ¶ 13, 139 N.M. 637,

642, 137 P.3d 577, 582 (quoting Adams v. United Steelworkers of Am., 1982-NMSC-014, ¶ 16,

97 N.M. 369, 373, 640 P.2d 475, 479 (1982)(emphasis added in DeFlon v. Sawyers but not in

Adams v. United Steelworkers of Am.).  Along with the Tenth Circuit, New Mexico courts have

adopted the "transactional approach" for determining whether a cause of action is the same for res

judicata purposes.  Potter v. Pierce, 2015-NMSC-002, ¶ 11, 342 P.3d 54, 57.  "The transactional

approach considers all issues arising out of a 'common nucleus of operative facts' as a single cause

of action."  Ballard v. GEO Grp. Inc., No. A-1-CA-35451, 2018 N.M. App. Unpub. LEXIS 277,

at *13 (Ct. App. Aug. 15, 2018)(quoting Anaya v. City of Albuquerque, 1996-NMCA-092, ¶ 8,

122 N.M. 326, 329, 924 P.2d 735, 738 ("The transactional test requires us to go beyond any

similarity in desired outcome and to examine the operative facts underlying the claims made in the

two lawsuits.")).  To determine whether there is a common nucleus of operative facts, New Mexico

courts consider: "(1) how [the facts] are related in time, space, or origin, (2) whether, taken together, they form a convenient trial unit, and (3) whether their 'treatment as a single unit conforms to the parties' expectations or business understanding or usage.'" Potter v. Pierce, 2015-NMSC-002, ¶ 11, 342 P.3d 54, 57 (quoting Anaya v. City of Albuquerque, 1996-NMCA-092, ¶ 12, 122 N.M. at 330, 924 P.2d at 739).

The parties in this case did not brief the issue whether the cause of action here is different than in Tyson Foods.  See MTD at 7.  Nonetheless, comparing the operative facts in the Tyson Complaint to the Complaint in this case, the Court concludes that the causes of action are different. In Tyson Foods, Thornton brought claims against the Defendant Meatpackers, alleging that the Defendants Meatpackers' labeling of beef products is deceptive.  See Tyson Complaint ¶ 1, at 3. In the Tyson Complaint, Thornton alleges that "[s]ince 2015, [the Meatpacker] Defendants have breached consumer trust by representing that some of their beef products are a 'Product of the U.S.' when in fact, the products are not derived from domestically originating cattle."  Tyson Complaint ¶ 6, at 4 (no citation for quotation).  In the Complaint in this case, Thornton alleges that, "[s]ince 2015, Defendants have breached consumer trust by advertising that some of their beef products are a 'Product of the U.S.' when in fact, the products are not derived from domestically originating cattle."  Complaint ¶ 5, at 20-21.  Thornton alleges that the Defendants' advertisement of these products by mail or by other means as "Product of the U.S." and "in such a way to cause the consumer to believe[] that the beef is a product of the U.S. prompts consumers to buy beef products with more confidence than they might otherwise have, and to pay more for them than they otherwise would."  Complaint ¶ 8, at 21-22.  While these allegations are similar, Thornton's allegations in Tyson Foods target the Meatpacker Defendants' labeling of beef products, while her allegations against the Defendants here target the Defendants' grocery stores'

marketing and advertising of beef products.  The facts underlying Thornton's Tyson Complaint

occur at the meatpacking facilities which the Meatpacker Defendants operate, while the facts at

issue in this case occur at the Defendants' grocery stores or other premises.  Thornton's labeling

and advertising claims take aim at different defendants, for different activities occurring in

different locations, and subject to different laws and regulations.  The Court concludes, therefore,

that they are not the same cause of action for collateral estoppel's purposes.

Third, the factual and legal issues actually litigated in Tyson Foods are not identical to the

factual and legal issues Thornton presents here.  The issue to be estopped must have been "actually

litigated in the prior adjudication," Bank of N.Y., 2016-NMCA-091, ¶ 23, 382 P.3d at 998-99,

and there must be "an identity of factual issue in the two cases," O'Brien v. Behles, 2020-NMCA-

032, ¶ 51, 464 P.3d 1097, 1116-17.[35]  The Defendants contend that "the issues in this case are

precisely the same as the issues in the Tyson case."  MTD at 8.  The Court disagrees.  For the same

reasons that Thornton's cause of action is different here than in Tyson Foods, as discussed above,

the factual issues between the two cases are also different.  The facts governing a claim against the

Meatpacker Defendants about the manner in which they label wholesale beef products are different

than those governing a claim against grocery stores for the way they advertise and market those

beef products in retail.  Because Judge Riggs dismissed Tyson Foods primarily on federal

preemption grounds and on a motion to dismiss, very few factual issues were actually litigated in

that case.  See Tyson Foods, 2020 U.S. Dist. LEXIS 156059,  at **11-20.  The parties did not

---

[35]This requirement is the same under Tenth Circuit collateral estoppel law: "the issue previously decided is identical with the one presented in the action in question."  Mayer v. Bernalillo Cnty., No. CIV 18-0666 JB/SCY, 2019 U.S. Dist. LEXIS 3555, at *111 (quoting United States v. Rogers, 960 F.2d 1501, 1508 (10th Cir. 1992)).

litigate, for example, the factual issue whether labels, stickers or advertisements bearing "U.S.D.A. CHOICE/Produced in the USA" or the official USDA grading shields are misleading to reasonable consumers about the origin of those beef products, or whether consumers rely on those representations in their purchases.

Judge Riggs made several conclusions about factual issues that the "Defendants argued, and Plaintiffs do not dispute." Tyson Foods, 482 F. Supp. 3d at 1156. Most pertinently, Judge Riggs concludes that the "FSIS necessarily approved the product labels . . . because [t]he FSIS approval process is required by federal law and the products could not be sold unless the seller complied with the process." Tyson Foods, 482 F. Supp. 3d at 1156. Collateral estoppel's "actually litigated" prong requires more in a prior case than a conclusion based upon one party arguing a point that the other does not dispute. 18 Moore's Federal Practice § 132.03 (2021).

> As a general rule, when a question of fact is put in issue by the pleadings, is submitted to the trier of fact for its determination, and is determined, that question of fact has been "actually litigated." By contrast, an issue that was not litigated or contested in the prior litigation is not subject to the doctrine of issue preclusion.

> If the court in the former action assumed to adjudicate an issue or question not submitted by the parties in their pleadings nor drawn into controversy by them in the course of the evidence, and bases its judgment on that adjudication, the judgment is not conclusive in a subsequent proceeding under the doctrine of issue preclusion.

18 Moore's Federal Practice § 132.03 (2021). Similarly, "[f]or issue preclusion purposes, an issue is not deemed to be 'actually litigated' if it is the subject of a stipulation between the parties." 18 Moore's Federal Practice § 132.03 (2021). Because Thornton did not contest whether FSIS approved the labels in question, that issue was not actually litigated for collateral estoppel's purposes.

Furthermore, the legal issues in this case are not identical to those in Tyson Foods.  The Defendants assert that "[c]onsideration of Plaintiff's claims here requires the same analysis of the same federal statutes and regulations, and consideration of the same case law regarding federal preemption."  MTD at 8.  As the Court concludes in Analysis § I(B), infra, FMIA's preemption provision treats "establishment[s] under inspection," 21 U.S.C. § 678 -- such as those operated by the Meatpacker Defendants, see 9 C.F.R. § 302.1(a)(2) -- differently than establishments that are not subject to FSIS inspection, such as "retail-type establishment[s]" operated by the Defendants, 9 C.F.R. § 303.1(d)(2).  See 9 C.F.R. § 303.1(d)(1).    The Defendants argue that "Thornton's claims (and specifically, whether they were preempted by federal law) were 'finally adjudicated on the merits' in Judge Riggs' order of dismissal."  MTD at 8 (no citation for quotation).  "Because issue preclusion requires identity of issues," however, "it follows that issue preclusion does not apply with respect to the determination of a legal issue if the issue presented in the first proceeding differs from that presented in the subsequent proceeding."  18 Moore's Federal Practice § 132.02 (2021).  Under New Mexico collateral estoppel law, "a conclusion or statement purely of law which is not dependent for its meaning or validity on the facts of a particular case is not binding on the judge in a later suit between the parties."  Torres v. Vill. of Capitan, 1978-NMSC-065, ¶ 18, 92 N.M. 64, 68, 582 P.2d 1277, 1281.

Judge Riggs addresses briefly and dismisses Thornton's argument that "even if the claims based on the labels are preempted, [Thornton] may proceed on the basis that Defendants' advertising is misleading consumers."  Tyson Foods, 482 F. Supp. 3d at 1158.  Nevertheless, Thornton's advertising claims against the Meatpacker Defendants are still factually and legally distinct from Thornton's advertising claims against the Defendants here.  Judge Riggs reasons that Thornton's advertising claims fail, because:

> (1) Plaintiffs pled that third-parties and not the [Meatpacker] Defendants themselves produced the false advertisements; (2) the advertisements appear to merely be a picture of the USDA approved label reflecting "Product of the USA" or "USDA approved"; (3) the USDA concluded those labels are not misleading or false; and (4) allowing this claim would undermine Congress's intent to create uniform standards for describing meat products under conflict preemption.

Tyson Foods, 482 F. Supp. 3d at 1158.  Judge Riggs' first reason for dismissing Thornton's request to amend her complaint and add her advertising claims highlights the factual difference between Thornton's labeling claims against the Meatpacker Defendants and the advertising claims Thornton brings here: if Thornton selected the wrong defendants in Tyson Foods, as Judge Riggs implies, Thornton rectified that mistake here.  Judge Riggs' assertion that the Meatpacker Defendants' labels "'could not become unfair or deceptive simply by virtue of being depicted in an advertisement,'" Tyson Foods, 482 F. Supp. 3d at 1158 (quoting Kuenzig v. Hormel Foods Corp., 505 F. App'x at 939), assumes that the labels are not misleading, which, in turn, is based upon Judge Riggs' determination that FSIS approved the labels.  As discussed above, Judge Riggs' conclusion that FSIS approved the labels was not actually litigated for collateral estoppel's purposes, and, so, neither can assumptions based upon that conclusion be actually litigated.  Judge Riggs' statement that "allowing this claim would undermine Congress's intent to create uniform standards for describing meat products under conflict preemption" is a conclusion of law, based upon Judge Riggs' reading of FMIA's preemption provision.  Tyson Foods, 482 F. Supp. 3d at 1158.  See 21 U.S.C. § 678.  The Court disagrees with Judge Riggs' conclusion that FMIA preempts Thornton's advertising claims against the Defendants.  Judge Riggs' interpretation of FMIA's preemption provision, 21 U.S.C. § 678, is a legal issue, the determination of which collateral estoppel does not bar.  See Torres v. Vill. of Capitan, 1978-NMSC-065, ¶ 18, 92 N.M. at 68, 582 P.2d at 1281.  Furthermore, Judge Riggs concludes that FMIA precludes Thornton's

official USDA grade shield claims, but does not discuss the Agricultural Marketing Act, or AMS regulations promulgated under the Agricultural Marketing Act, which govern the USDA's official grading service and the Meatpacker Defendants' use of official USDA grade shields.  The Court concludes, therefore, that the factual and legal issues actually litigated in Tyson Foods are not identical to the factual and legal issues Thornton presents here.

Finally, collateral estoppel's fourth prong -- whether "the issue was necessarily determined in the prior litigation," Bank of N.Y., 2016-NMCA-091, ¶ 23, does not favor the Defendants, because it hinges on the identity of issues between the prior and current cases.  While the Court agrees with the Defendants that the issue whether federal law preempts Thornton's *labeling* claims against the Meatpacker Defendants was actually litigated and necessarily determined in Tyson Foods, see MTD at 8-9, for the reasons discussed above, the Court disagrees that the issue whether federal law preempts Thornton's *advertising* claims against the Defendants in this case was actually litigated and necessarily determined in Tyson Foods.  Collateral estoppel, therefore, does not bar Thornton's claims in this case.

### B.   FEDERAL LAW DOES NOT PREEMPT THORNTON'S CLAIMS TO THE EXTENT THAT THORNTON DOES NOT SEEK TO REINSTATE COUNTRY-OF-ORIGIN LABELING REQUIREMENTS FOR BEEF.

Federal law does not preempt Thornton's claims, to the extent that Thornton does not seek to reinstate country-of-origin labeling requirements for beef.  The Defendants argue that federal law preempts both Thornton's labeling claims in Tyson Foods and her advertising claims in this case.  See MTD at 13-17.  In Tyson Foods, Thornton brought various State law claims -- including NMUPA claims -- against the Meatpacker Defendants, premised on the Meatpacker Defendants' alleged false or misleading labeling of their beef products.  See Tyson Foods, 482 F. Supp. 3d at 1152-53.  The Defendants also argue that federal law, particularly FMIA, preempts Thornton's

claims regarding use of the "U.S.D.A. CHOICE/Produced in the USA" graphic, as well as her claims regarding use of the official USDA grade shields.  See MTD at 13-17.  Although Thornton does not raise false labeling claims explicitly in this case, the Court addresses them again here, because the Defendants argue that Thornton's advertising claims are indistinguishable from her labeling claims, and are, therefore, also preempted.  See MTD at 15-16.  The Defendants' logic is that, if federal law preempts Thornton's labeling claims, it also must preempt her advertising claims, because the Defendants' advertisements are replicas of the labels in question.[36]  MTD at 15-16.   The Court will first address whether federal law -- specifically, FMIA -- preempts Thornton's claims regarding the "U.S.D.A. CHOICE/Produced in the USA" label and advertising. Second, the Court will address whether federal law -- either FMIA, or the Agricultural Marketing Act -- preempts Thornton's official USDA grade shield claims.

**1.    Federal Law Does Not Preempt Thornton's "U.S.D.A. CHOICE/Produced in the USA" Labeling or Advertising Claims Against the Defendants.**

The Court concluded in its September 30, 2021, Order that federal law does not preempt expressly Thornton's claims.  See Order at 1, 5-9.  To the extent that Thornton is not seeking to reinstate country-of-origin labeling requirements, federal law does not preempt Thornton's

---

[36]The Defendants' advertisements in their circulars are not photographs of the products' labels or packaging.  The Defendants have superimposed a computer graphic bearing the official USDA grading shield or, in earlier advertisements, the "U.S.D.A. CHOICE/Produced in the USA" shield on photographs of beef products (which are sometimes cooked and sometimes raw, but usually are not packaged).  It is possible, therefore, that the Defendants' products are labeled one way, but advertised or promoted another.  In fact, the Kroger Company has already started to do this, in response to the lawsuit: the Kroger Company is no longer including the "U.S.D.A. CHOICE/Produced in the USA" graphic in its mailed advertisements and circulars, Zimmerman Decl. at ¶ 2, at 1, but it still puts that graphic on a sticker which is affixed to the products' immediate container.

claims.[37]  For preemption to be express, a federal statute must demonstrate an "'express congressional intent to preempt state law.'"  Cerveny v. Aventis, Inc., 855 F.3d 1091, 1097-98 (10th Cir. 2017)(quoting Mount Olivet Cemetery Ass'n v. Salt Lake City, 164 F.3d 480, 486 (10th Cir. 1998)).  FMIA's preemption clause provides:

> Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this Act may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared *at any establishment under inspection* in accordance with the requirements under title I of this Act, but any State or Territory may, consistent with the requirements under this Act, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said title, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are *outside of such an establishment* . . .

21 U.S.C. § 678 (2018)(emphasis added).  FMIA's preemption provision does not preempt Thornton's labeling claims against the Defendants in this case, because 21 U.S.C. § 678 allows for the Secretary of Agriculture's concurrent jurisdiction with the States when it comes to regulating false and misleading labeling occurring outside establishments where beef is inspected, such as at retail stores the Defendants operate.  See 21 U.S.C. § 678.  Importantly, this preemption provision draws a distinction between additional or different labeling requirements imposed *at* establishments under inspection pursuant to FMIA, which federal law preempts, and additional or different labeling requirements that are imposed *outside* such establishments, which federal law does not, because the States have concurrent jurisdiction.  See 21 U.S.C. § 678.  USDA inspection is required at slaughterhouses and meatpacking plants:

---

[37]Thornton does not explicitly request this relief, but some of her Complaint's language suggests it.  See Complaint ¶ 20 at 24 ("The 'product of the U.S.' packaging or similar advertising omitting the truth of where the Product actually originated from leads consumers to believe that the beef they are purchasing was born and raised on an American ranch or farm."); Complaint ¶ D at 36-37 (requesting an "injunction . . . requiring proper, complete, and accurate advertising of the Products").

> Inspection under the regulations in this subchapter is required at . . . [e]very establishment, except as provided in § 303.1(a) and (b), or (d) of this subchapter, within any State or organized Territory which is designated pursuant to paragraph 301(c) of the Act, at which any livestock are slaughtered or any products of any livestock are prepared, for use as human food solely for distribution within such jurisdiction.

9 C.F.R. § 302.1(a)(2).  FSIS regulations exempt from this inspection requirement "operations of types traditionally and usually conducted at retail stores and restaurants, when conducted at any retail store or restaurant or similar retail-type establishment for sale in normal retail quantities or service of such articles to consumers at such establishments."  9 C.F.R. § 303.1(d)(1).  Such operations "typically and usually conducted at retail stores" are "[c]utting up, slicing, and trimming carcasses, halves, quarters, or wholesale cuts into retail cuts such as steaks, chops, and roasts, and freezing such cuts."  9 C.F.R. § 303.1(d)(2).

Consequently, statutory language establishes that, while States may not have concurrent jurisdiction over labeling that occurs at meatpacking plants, they have concurrent jurisdiction over labeling conducted at retail stores such as those the Defendants operate, because retail stores do not fall under FMIA's definition of an "establishment under inspection."  21 U.S.C. § 678.  See 9 C.F.R. § 303.1(d)(1).  FMIA's preemption clause gives States concurrent jurisdiction over products that are "misbranded," 21 U.S.C. § 678,  and both FMIA and FSIS regulations apply the term "misbranded" "to any carcass, part thereof, meat or meat food product under one or more of the following circumstances: (1) If its labeling is false or misleading in any particular."  21 U.S.C. § 601(n); 9 C.F.R. § 301.2.  Furthermore, FMIA provides that:

> No article subject to this title shall be sold or offered for sale by any person, firm, or corporation, in commerce, under any name or other marking or labeling which is false or misleading, . . . but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.

- 203 -

21 U.S.C. § 607(d).  As a result, New Mexico shares jurisdiction with the Secretary of Agriculture to ensure that beef products do not carry "false or misleading" labels outside an establishment where the meat is inspected, whether or not those labels are approved by the Secretary of Agriculture.  21 U.S.C. § 607(d); 21 U.S.C. § 601(n).  Moreover, the Court cannot find any statutory basis for the Defendants' assertion that the FMIA -- or any other federal statute -- preempts expressly Thornton's advertising claims.  Two United States Courts of Appeals that have considered this question have reached the same conclusion.  See United States v. Stanko, 491 F.3d 408, 418 (8th Cir. 2007)("[N]othing in the text of FMIA indicates intent to preempt state unfair-trade-practices laws in general."); Animal Legal Def. Fund v. Hormel Foods Corp., 258 A.3d 174, 192 (D.C. 2021)("We see nothing in the FMIA or PPIA suggesting Congress meant to limit states' (or the District's) traditional powers to regulate advertising.").  In their MTD, the Defendants cite Kuenzig v. Hormel Foods Corp., 505 F. App'x 937, 939 (11th Cir.), for the proposition that a "label could not become unfair or deceptive simply by virtue of being pictured in an advertisement."  MTD at 16.  Because the FMIA does not preempt Thornton's labeling claims against the Defendants in this case, the Court concludes that the FMIA does not preempt advertising claims based upon those same labels.

Federal law does not preempt impliedly Thornton's claims under the doctrine of impossibility preemption.  Implied conflict preemption exists when it is impossible for a private party to comply with both State and federal requirements, see English v. Gen. Elec. Co., 496 U.S. at 78-79, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. at 67.  Obstacle preemption is one form of implied preemption.  See Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. at 679 (Thomas, J., concurring)("Obstacle pre-emption turns on whether the goals of the federal

statute are frustrated by the effect of the state law."); Crosby v. Nat'l Foreign Trade Council, 530 U.S. at 373 (holding that preemption is appropriate where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") The Supreme Court instructs that, in obstacle preemption cases, "there is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it."  P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S.at 503.  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990).

In 2016, Congress removed the requirement that beef and pork products be labeled with their country of origin.  See 7 U.S.C. §§ 1638, 1638a; Pub. L. No. 114-113, 759, 129 Stat. 2242, 2284-85 (2016).  See also Removal of Mandatory Country of Origin Labeling Requirements for Beef and Pork Muscle Cuts, Ground Beef, and Ground Pork, 81 F.R. 10,755, 10,755 (March 2, 2016)(removing 7 C.F.R. § 65.155).  To the extent that Thornton seeks to reinstate country-of-origin labeling requirements, federal law preempts those claims, because such a requirement would create a clear conflict with Congressional intent, as expressed in Pub. L. No. 114-113, 759, 129 Stat. 2242, 2284-85 (2016).  On the other hand, as a result of that legislation, beef need not be labeled with country-of-origin information at all, and so labeling beef with a sticker that reads, "Produced in the U.S.A.," or "Product of the U.S.A.," is optional and not mandatory.  Removing labels which denote geographic origin, therefore, is not preempted.

The Defendants argue that federal regulations permit labeling beef "Produced in the USA." See MTD at 13-14.  The 2001 proposed rule that the Defendants cite in their MTD states:

> For many years, "Product of the U.S.A." has been applied to product that is exported to other countries to meet those countries' country-of-origin labelling requirements (9 CFR 327.14; FSIS Policy Memo 080 (April 16, 1985)).  Products

that meet all FSIS requirements for domestic products also *may* be distributed in U.S. commerce with such labeling.  No further documentation is required.  "Product of the U.S.A." has been applied to products, that, at a minimum, have been prepared in the United States.

Product Labeling: Defining United States Cattle and United States Fresh Beef Products, 66 Fed. Reg. 41,160, 41,160 (proposed August 7, 2001)(emphasis added).  See MTD at 12.  That proposed rule subsequently was withdrawn in 2003.  See Product Labeling: Defining United States Cattle and United States Fresh Beef Products, 68 Fed. Reg. 11,008, 11,008 (withdrawn March 7, 2003). The Defendants also cite a 2005 FSIS guidance manual, which states:

> Labeling *may* bear the phrase "Product of U.S.A." under one of the following conditions:
>
> 1.    If the country to which the product is exported requires this phrase, and the product is processed in the U.S., or
>
> 2.    The product is processed in the U.S. (i.e. is of domestic origin).

Food Safety Inspection Service, Food Standards and Labeling Policy Book at 147 (August 2005)(emphasis added), https://www.fsis.usda.gov/guidelines/2005-0003.  See MTD at 12.  Both the proposed rule and the policy book, however, use permissive language and not mandatory language.  As a result, there is no implied conflict or impossibility preemption, because it is possible for the Defendants to comply both with federal rules and regulations, and with a State's UPA.

Field preemption does not preclude Thornton's claims.  "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law."  Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. at 287 (1995)).  "Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it

has left no room for supplementary state legislation.'" Murphy v. NCAA, 138 S. Ct. 1461, 1480-81 (2018)(quoting R. J. Reynolds Tobacco Co. v. Durham County, 479 U. S. 130, 140 (1986)). "[I]n substance, field preemption does not involve congressional commands to the States.  Instead, like all other forms of preemption, it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law." Murphy v. NCAA, 138 S. Ct. at 1480-81 (2018)(citing Crosby v. National Foreign Trade Council, 530 U. S. 363, 372, n. 6 (2000)).

FMIA and FSIS regulations do not occupy the field of State consumer and false advertising laws.  The Defendants argue that Thornton's claims are preempted, because FSIS operates a labeling approval process. See MTD at 13-14.  While it is true that FSIS operates a label approval program under 9 C.F.R. § 412.1, "generically approved labels" are exempt from this approval process under 9 C.F.R. § 412.2(b), and "[l]abels that bear claims and statements that are defined in FSIS's regulations or the Food Standards and Labeling Policy Book . . . are also deemed to be generically approved by the Agency without being submitted for evaluation and approval,"  9 C.F.R. § 412.2.   Because the Food Standards and Labeling Policy Book approves the label "Product of U.S.A." for food processed in the United States, this label is a generic one that does not need individual FSIS approval.

In 2013, FSIS "amended its prior label approval regulations to expand the circumstances in which certain types of labels are generically approved."  FSIS Compliance Guideline for Label Approval at 2 (July 2020)("Compliance Guideline"), available at https://www.fsis.usda.gov/sites/default/files/media_file/2020-10/Label-Approval-Guide.pdf  (last visited January 13, 2022)("2013 Compliance Guideline")(citing Prior Label Approval System: Generic Label Approval, 78 Fed. Reg. 66,826, 66,827).  The Compliance Guideline summarizes the key changes, which are that:

FSIS only needs to evaluate four types of labels 9 CFR 412.1 ((c)):

1)      Labels for religious exempt products 9 CFR 412.1 (c)(1)[;]

2)      Labels for export with deviations from domestic requirements 9 CFR 412.1 (c)(2)[;]

3)      Labels with special statements and claims 9 CFR 412.1 (c)(3)[; and]

4)      Labels for temporary approval 9 CFR 412.1 (c)(4).

Compliance Guideline at 2.  In the Compliance Guideline, FSIS also updates its list of "Factual Statements and Claims that are Generically Approved," and for which no evaluation or approval is required.  Compliance Guideline at 17, Appendix 2.  The following statement prefaces the list:

> The following statements and claims do not require FSIS approval prior to use in commerce. Labels with these factual statements and claims may be generically approved *if the label* complies with all regulatory requirements and *the statement or claim is truthful and not misleading*. Supporting documentation for the statement or claim must be part of the labeling record.

Compliance Guideline at 17 (emphasis added).  This guidance reflects 21 U.S.C. § 607(d)'s requirement that a product's label cannot be false or misleading, whether or not its label is approved by the Secretary of Agriculture:

> No article subject to this title shall be sold . . . by any person . . . in commerce, under any name or other marking or labeling which is false or misleading, . . . but established trade names and other marking and labeling . . . which *are not false or misleading and which are approved by the Secretary are permitted*.

21 U.S.C. § 607(d)(emphasis added).    The statute's conjunctive phrasing means that approval by the Secretary of Agriculture alone, therefore, is not enough to make a label permitted; a label must also not be false or misleading.  This requirement extends beyond establishments subject to FSIS inspection, to establishments such as retail stores.  See 21 U.S.C. § 607(d).  The Compliance Guideline's list of generic labels contains the following statements and claims:

- 208 -

- Country of origin statements (COOL) per 9 CFR 317.8 (b)[38]

- Geographic claims that comply with 9 CFR 317.8 (b)(1)

- Geographic flag (e.g., Foreign Country Flag) with corresponding statement, accompanied by statement Made in USA) *

- Product of USA*

Compliance Guideline at 17-19. The asterisk denotes a term that is a "new and updated entry to the appendix." Compliance Guideline at 17. Even generically-approved labels, therefore, include a caveat that they also are not false or misleading. The list of generically approved labels, notably, does not include the phrase, "Produced in the USA." See Compliance Guideline; Food Labeling Policy Book. FSIS gives no express permission, therefore, for the Defendants' use of graphics or labels which bear the words "Produced in the USA." The Defendants' "U.S.D.A. CHOICE/Produced in the USA" label is similar to the phrase, "Product of the USA," but changing a noun to a verb is not an insignificant difference, and this difference is sufficient to foreclose the Defendants' argument that federal guidelines expressly permit such labels. However, even if the "U.S.D.A. CHOICE/Produced in the USA" label was listed in the Compliance Guideline, the labels would still not be deemed generically approved if they are false or misleading. In

---

[38]In pertinent part, 9 C.F.R. 317.8(b) provides:

> Terms having geographical significance with reference to a locality other than that in which the product is prepared may appear on the label only when qualified by the word "style," "type," or "brand," as the case may be, in the same size and style of lettering as in the geographical term, and accompanied with a prominent qualifying statement identifying the country, State, Territory, or locality in which the product is prepared, using terms appropriate to effect the qualification.

9 C.F.R. § 317.8(b)(1).

conclusion, FMIA's preemption provision does not preempt labeling claims against the Defendants in this case, while neither proposed rules nor policy guidance rise to the level of federal law for the purpose of express preemption.  Finally, because the labeling of beef products with a country of origin is not mandatory, and all FSIS guidance surrounding labeling beef products with a country of origin is permissive and not mandatory, there are no grounds for implied conflict preemption.

### 2.   Federal Law Does Not Preempt Thornton's Claims Regarding the Official USDA Grade Shields.

AMS created the official USDA grade shields as part of a program AMS administers under the Agricultural Marketing Act.  See 7 U.C.S. §§ 1621-1627.  The Defendants have not alerted the Court to, and neither can the Court find, a relevant preemption provision in the Agricultural Marketing Act.  See 7 U.C.S. §§ 1621-1627.  In the Agricultural Marketing Act, Congress declares that "a sound, efficient, and privately operated system for distributing and marketing agricultural products is essential to a prosperous agriculture and is indispensable to the maintenance of full employment and to the welfare, prosperity, and health of the Nation," and states that it is the

> policy of Congress to promote through research, study, experimentation, and through *cooperation among Federal and State agencies*, farm organizations, and private industry a scientific approach to the problems of marketing . . . of agricultural products . . . so that such products capable of being produced in abundance may be marketed in an orderly manner and efficiently distributed.

7 U.S.C. § 1621 (emphasis added).  Rather than preempting expressly State laws, the Agricultural Marketing Act seeks cooperation between the State governments and the federal government.  See 7 U.S.C. § 1621.  Unlike FMIA regulations, which create mandatory inspection requirements for the purpose of ensuring food safety, AMS administers voluntary "programs that create domestic and international marketing opportunities for U.S. producers of food, fiber, and specialty crops,"

and "provides the agriculture industry with valuable services to ensure the quality and availability of wholesome food for consumers across the country."   AMS, Our Mission, available at https://www.ams.usda.gov/about-ams (last visited December 30, 2021).  AMS regulations provide that "[a]ny person may apply for [the official USDA grading] service with respect to products in which he or she has a financial interest by completing the required application for service," but, "[i]n any case in which the service is intended to be furnished at an establishment not operated by the applicant, the application must be approved by the operator of such establishment."  7 C.F.R. § 54.6.  Presumably, then, it is usually meatpackers and meat producers who take advantage of the AMS' grading service, because it increases the value of their products.  AMS regulations explain the manner in which graded meat is marked:

> All products examined for class and grade under the official standards, or the immediate containers and the shipping containers, shall be stamped, branded, or otherwise marked with an appropriate official identification.   Except as otherwise directed by the Director, such markings will not be required when an applicant desires only an official memorandum.  The marking of products, or their containers, as required by this section shall be done by official graders or under their immediate supervision.

7 C.F.R. § 54.16. The Defendants in this case do not assert that they applied for AMS' grading service.  Rather, the Court assumes that, in general, the Defendants receive products from entities for whom the grading service has been performed, and either the carcass or its immediate container is "stamped, branded or otherwise marked with" an official USDA grade shield.  7 C.F.R. § 54.16. Although it may be prevalent and customary for a retail store to use the official USDA grade shields on its packaging or in advertisements, the Court could not find, and the Defendants do not provide, a statute or regulation which expressly permits a retail store's use of the official USDA grade shields on a retail store's packaging or in their advertisements.  The Court concludes,

therefore, that retail stores such as those the Defendants operate fall outside AMS' express provisions.

Finding no support for express preemption, the Court turns next to implied conflict preemption, whether impossibility or obstacle.  Similar to the Defendants' use of the "U.S.D.A. CHOICE/Produced in the USA" label, labeling beef with an official USDA grade shield is not required, but is indicative of beef that has been graded in accordance with AMS' voluntary grading service.  See 84 Fed. Reg. 48551, 48552 (stating that AMS' grading and certification "services are voluntary, with users paying for the cost of the requested service").  Because there is nothing mandatory about the USDA grade shields, it is possible for the Defendants to comply both with State and federal law.  See English v. Gen. Elec. Co., 496 U.S. at 78-79.  Accordingly, there is no implied conflict -- or impossibility -- preemption arising from the Agricultural Marketing Act.

Nevertheless, the question remains whether State law -- as Thornton seeks to use it -- presents an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Crosby v. Nat'l Foreign Trade Council, 530 U.S. at 373.  The Court must also examine whether "the goals of the federal statute are frustrated by the effect of the state law." Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. at 679 (Thomas, J., concurring).  Congress declares that, to attain the objectives of the Agricultural Marketing Act,

> it is the intent of Congress to provide for (1) continuous research to improve the marketing, handling, storage, processing, transportation, and distribution of agricultural products; (2) cooperation among Federal and State agencies, producers, industry organizations, and others in the development and effectuation of research and marketing programs to improve the distribution processes; (3) an integrated administration of all laws enacted by Congress to aid the distribution of agricultural products through research, market aids and services, and regulatory activities, to the end that marketing methods and facilities may be improved, that distribution costs may be reduced and the price spread between the producer and consumer may be narrowed, that dietary and nutritional standards may be improved, that *new and wider markets for American agricultural products may be developed*, both in the

> United States and in other countries, *with a view to making it possible for the full production of American farms to be disposed of usefully, economically, profitably, and in an orderly manner.*

7 U.S.C. § 1621 (emphasis added).  Notably, Congress envisions that the Agricultural Marketing Act will develop markets for "American agricultural products" and aid "American farms," but says nothing about the development of domestic markets for foreign beef, nor does it envision helping dispose of foreign farms' products.  7 U.S.C. § 1621.  The obstacle preemption analysis must proceed, therefore, in light of the Agricultural Marketing Act's original purpose to develop markets for "American agricultural products," and to aid disposal of "the full production of American farms." 7 U.S.C. § 1621.

To accomplish the goal of developing markets for American products, the Agricultural Marketing Act promotes cooperation between State and federal agencies, and seeks "an integrated administration of all laws enacted by Congress to aid the distribution of agricultural products through research, market aids and services, and regulatory activities." 7 U.S.C. § 1621. Furthermore, "[t]o the maximum extent practicable . . . market information, inspection, regulatory work and other marketing service done hereunder in cooperation with the State agencies shall be done in cooperation with the State departments of agriculture, and State bureaus and departments of markets." 7 U.S.C. § 1621.  See 7 U.S.C. § 1633 ("[T]he Secretary of Agriculture is hereby authorized . . . to enter into cooperative arrangements with State departments of agriculture and other State agencies charged with the administration and enforcement of such State laws and regulations . . . .").

The Court cannot see how a lawsuit brought under State law seeking to enjoin the use of labels and advertising for beef products that allegedly mislead consumers into thinking that beef products are from American farms creates an obstacle to congressional intent as the Agricultural

Marketing Act expresses that purpose.  See 7 U.S.C. § 1621; Hines v. Davidowitz, 312 U.S. at 67; Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. at 679.  On the contrary, such a lawsuit furthers Congressional intent to develop markets for American agricultural products, because it challenges transactions that compete unfairly with American products.  The Court concludes, therefore, that State law does not create an obstacle to implementation of Congress' purposes in the Agricultural Marketing Act.

Finally, the Defendants contend that FMIA's labeling and preemption provisions govern their use of the official USDA grade shields in labeling and advertising.  See MTD at 14-15; 21 U.S.C. §§ 607(d), 678.  Because, however, AMS' grading service -- whether procured by meatpackers, by producers, or by retail stores -- is permissive, and not a requirement, it cannot be the kind of  "[m]arking, labeling, [or] packaging . . . *requirement[]*" which FMIA's preemption provision protects from conflicting State laws.  21 U.S.C. § 678 (emphasis added)("Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this Act may not be imposed by any State . . . .").  Accordingly, if AMS' grading service is not a requirement, then FMIA's preemption provision does not apply.  See 21 U.S.C. § 678.  In the same way that FMIA does not preempt Thornton's advertising claims, because FMIA does not preempt her labeling claims, see Section I(B)(1), infra, neither does the Agricultural Marketing Act preempt Thornton's advertising claims, because the Agricultural Marketing Act does not preempt Thornton's labeling claims.

### C.   NMUPA'S SAFE HARBOR PROVISION DOES NOT EXEMPT THE DEFENDANTS' CONDUCT.

The Court concludes that NMUPA's safe harbor provision does not preclude Thornton's

NMUPA claims.  NMUPA's safe harbor provision provides:

> Nothing in the Unfair Practices Act shall apply to actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico or the United States, but all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the Unfair Practices Act.

N.M.S.A. § 57-12-7.   New Mexico courts have been reluctant to apply this provision and

consistently have read it narrowly.  See Quynh Truong v. Allstate Ins. Co., 2010-NMSC-009,

¶¶ 43, 46-51, 147 N.M. 583, 592, 595-96, 227 P.3d 73, 82, 84-85 ("Quynh Truong").  In Quynh

Truong, the Supreme Court of New Mexico explained that, in 1999, the New Mexico Legislature

"significantly narrowed" NMUPA's safe harbor provision "by inserting the limiting term

'expressly' before the term 'permitted' and by adding the new phrase, 'but all actions or

transactions forbidden by the regulatory body, and about which the regulatory body remains silent,

are subject to the Unfair Practices Act.'" 2010-NMSC-009, ¶ 36, 147 N.M. 583, 592-93, 227 P.3d

73, 82-83 (quoting 1999 N.M. Laws, ch. 171, § 2).  Even before 1999, in one of the first cases to

discuss the NMUPA's safe harbor provision, the Court of Appeals of New Mexico discussed what

would be required for the safe harbor provision to apply:

> We construe[s] the language "permitted under laws administered by a regulatory body" in Section 57-12-7 to require more than the mere existence of a regulatory body in order for the exemption to apply.  At a minimum, the regulatory body must actually administer the regulatory laws with respect to the party claiming the exemption, thereby exercising at least the modicum of oversight that the exempting language indicates is required.  In effect, this means the regulatory body must render permission to engage in the business of the transaction through licensing, registration or some similar manifestation of "permitting" the business activity.  Until the party complies with the requisite licensing or registration procedure, the

regulatory body cannot be deemed to have authorized, or implicitly permitted, any transactions in the area subject to regulation.

State ex rel. Stratton v. Gurley Motor Co., 1987-NMCA-063, ¶ 21, 105 N.M. 803, 807, 737 P.2d 1180, 1184.[39]   See Quynh Truong, 2010-NMSC-009, ¶ 43, 147 N.M. at 592, 227 P.3d at 82 (approving State ex rel. Stratton v. Gurley Motor Co's narrow reading of NMUPA's safe harbor provision).  The Supreme Court of New Mexico notes:

> A significant thread running through all New Mexico precedents applying Section 57-12-7, both before and after the 1999 amendment, is that only express pre-conduct permission, such as existed in Valdez [v. State, 2002-NMSC-028, 132 N.M. 667, 54 P.3d 71], has been deemed sufficient to create a UPA exemption. Neither inferential pre-conduct agency permission nor post-conduct agency review has even been held to satisfy the requirement of the statute.

Quynh Truong, 2010-NMSC-009, ¶ 51, 147 N.M. at 595, 227 P.3d at 85.  In Valdez v. State, the Supreme Court of New Mexico affirmed the district court's decision to dismiss the plaintiffs' claims under the primary-jurisdiction doctrine, because the New Mexico Public Regulation Commission ("NMPRC") fixed the defendant telephone service provider's rates for prison inmates.  2002-NMSC-028, ¶¶ 6-8, 132 N.M. 667, 671-72, 54 P.3d 71, 75-76.  The Supreme Court of New Mexico concluded that the NMPRC expressly permitted the defendant's conduct, because, "[i]n New Mexico, the NMPRC is authorized to 'fix, determine, supervise, regulate and control all charges and rates of . . . telephone . . . companies . . . within the state,'" and, therefore, applied NMUPA's safe harbor provision.  Valdez v. State, 2002-NMSC-028, ¶ 8, 132 N.M. at 672, 54 P.3d at 76.

---

[39]The Court concludes that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's decision in State ex rel. Stratton v. Gurley Motor Co., 1987-NMCA-063, ¶ 21, 105 N.M. 803, 807, 737 P.2d 1180, 1184, because the Supreme Court of New Mexico cited that case approvingly in Quynh Truong, 2010-NMSC-009, ¶ 43, 147 N.M. at 592, 227 P.3d at 82.

The Supreme Court of New Mexico has noted the need to balance the State's interest in upholding the "general protections of the UPA" with its interest in giving deference to the "expertise of the relevant regulatory body," and not penalizing "regulated entities who have conformed their conduct to the express directives of their governing regulatory body."  Quynh Truong, 2010-NMSC-009, ¶¶ 31-32, 147 N.M. at 592, 227 P.3d at 82.  Nevertheless, the Supreme Court of New Mexico emphasizes that "'New Mexico has not taken the path of broad regulatory exemption based on the mere existence of a regulatory structure' that has been followed in a number of other states" whose statutes do not include the term, "expressly permitted," but "honor[s] the New Mexico Legislature's command by interpreting its statutory term 'expressly permitted' as meaning 'expressly permitted.'"[40]  Quynh Truong, 2010-NMSC-009, ¶¶ 52-53, 147 N.M. at 596, 227 P.3d at 86 (quoting Quynh Truong v. Allstate Ins. Co., 2008-NMCA-051, 143 N.M. 831, 182 P.3d 814).  See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig., 288 F. Supp. 3d 1087, 1249 (D.N.M. 2017)(Browning, J.)("[T]he Supreme Court of New Mexico has held that 'expressly' means 'directly and distinctly stated or expressed *rather than implied or left to inference.*'" (quoting Truong v. Allstate Ins. Co., 2010-NMSC-009, ¶ 38,

---

[40]Unlike some other jurisdictions, New Mexico's UPA's safe-harbor provision does not include rules or regulations that a regulatory body promulgates as authority for expressly permitted actions. See, e.g., Tenn. Code Ann. § 47-18-111 ("This part does not apply to . . . [a]cts or transactions required or specifically authorized under the laws administered by, *or rules and regulations promulgated by*, any regulatory bodies or officers acting under the authority of this state or of the United States[.]")(emphasis added); Wyo. Stat. Ann. § 40-12-110 ("Nothing in this act shall apply to . . . [a]cts or practices required or permitted by state or federal law, *rule or regulation* or judicial or administrative decision.")(emphasis added); Va. Code Ann. § 59.1-199 ("Nothing in this chapter shall apply to . . . "[a]ny aspect of a consumer transaction which aspect is authorized under laws or *regulations* of this Commonwealth or the United States . . . .")(emphasis added).

147 N.M. at 593, 227 P.3d at 83 (emphasis in <u>Truong v. Allstate Ins. Co.</u> and in <u>In Re Santa Fe</u>))).

Furthermore, for the safe harbor provision to apply,

> "the regulatory body must render permission to engage in the business of the transaction through licensing, registration or some similar manifestation of 'permitting' the business activity. Until the party complies with the requisite licensing or registration procedure, the regulatory body cannot be deemed to have authorized, or implicitly permitted, any transactions in the area subject to regulation."

<u>Campos v. Brooksbank</u>, 120 F. Supp. 2d 1271, 1275-76 (D.N.M. 2000)(Parker, J.)(quoting <u>State</u>

<u>ex rel. Stratton v. Gurley Motor Co.</u>, 1987-NMCA-063, ¶ 21, 105 N.M. 803, 807, 737 P.2d 1180,

1184).  Additionally, "'[t]he specific activity, *including the manner in which it was done*, must be

expressly permitted to fall within [the] exemption.'"  <u>Truong v. Allstate Ins. Co.</u>, 2010-NMSC-

009, ¶ 58, 147 N.M. at 597, 227 P.3d at 87 (quoting <u>Azar v. Prudential Ins. Co. of Am.</u>, 2003-

NMCA-062 ¶ 68, 133 N.M. 669, 689, 68 P.3d 909, 292)(emphasis added in <u>Truong v. Allstate Ins.</u>

<u>Co.</u>).  The NMUPA does not bar Thornton's claims, because: (i) the Defendants' use of the

"U.S.D.A. CHOICE/Produced in the USA" label or graphics are not "actions or transactions

expressly permitted under laws administered by a regulatory body of New Mexico or the United

States," N.M.S.A. § 57-12-7; and (ii) AMS regulations do not expressly permit the Defendants'

use of the official USDA grade shields.

### 1.  **NMUPA's Safe Harbor Provision Does Not Preclude Thornton's "U.S.D.A. CHOICE/Produced in the USA" Claims.**

At the heart of this dispute between Thornton and the Defendants is a conflict between

Thornton's understanding of Congressional intent as prohibiting false and misleading labeling,

and the Defendant's understanding of FSIS guidance as permitting labels which indicate that

products which only have been processed in the United States can be labeled as a United States

product, regardless whether these labels are false or misleading.  For the purposes of the NMUPA

safe harbor provision, "only express pre-conduct permission . . . has been deemed sufficient to create a UPA exemption."  Quynh Truong, 2010-NMSC-009, ¶ 51, 147 N.M. at 595, 227 P.3d at 85.   The Court cannot find express permission for the Defendants' use of the "U.S.D.A. CHOICE/Produced in the USA" label or graphic in FMIA's statutory provisions, FSIS decisions, or FSIS rules and regulations.

FMIA prohibits the false and misleading marking and labeling of meat products, even if the Secretary of Agriculture has approved those products' labels:

> No article subject to this title shall be sold or offered for sale by any person, firm, or corporation, in commerce, under any name or other marking or labeling which is false or misleading, . . . but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.

21 U.S.C. § 607(d).  FSIS' Compliance Guideline gives a similar message, prefacing its list of generic labels with the caveat that they are generically approved only "if the label complies with all regulatory requirements and the statement or claim is truthful and not misleading."  2020 Compliance Guideline at 17.  In general, then, FMIA does not expressly permit false or misleading labels, and neither does it permit, by extension, false or misleading advertising.   On the contrary, FMIA expressly prohibits false or misleading labeling, which Thornton seeks to enjoin.

In contrast with this broad statutory prohibition, the Defendants rely on two sources of authority for permission to use the "U.S.D.A. CHOICE/Produced in the USA" label and graphic: the FSIS' Labeling Policy Book, and an FSIS proposed rule.  MTD at 13-14.  First, the Labeling Policy Book is a generic guide to all food labelling and is not just for meat products, and states in its preface that "[t]he Policy Book is intended to be guidance to help manufacturers and prepare product labels that are truthful and not misleading.  Compliance with the requirements set forth in this publication does not, in itself, guarantee an authorization."  Labeling Policy Book at 2.  The

Labeling Policy Book, like the Compliance Guideline, reiterates FMIA's intention that manufacturers and producers prepare labels "that are truthful and not misleading." Labeling Policy Book at 2. It also includes the caveat that use of the Labeling Policy Book does not "guarantee an authorization." Labeling Policy Book at 2. The Labeling Policy Book's guidance falls short of the express permission that the NMUPA's safe harbor provision requires. According to the Court of Appeals of New Mexico, the FSIS

> must render permission to engage in the business of the transaction through licensing, registration or some similar manifestation of "permitting" the business activity. Until the party complies with the requisite licensing or registration procedure, the regulatory body cannot be deemed to have authorized, or implicitly permitted, any transactions in the area subject to regulation.

State ex rel. Stratton v. Gurley Motor Co., 1987-NMCA-063, ¶ 21, 105 N.M. at 807, 737 P.2d at 1184.[41] FSIS' statement in the Labeling Policy Book that compliance with its guidance "does not, in itself, guarantee an authorization," Labeling Policy Book at 2, chafes against New Mexico precedent requiring a regulatory body's "licensing, registration or some similar manifestation of 'permitting' the business activity," State ex rel. Stratton v. Gurley Motor Co., 1987-NMCA-063, ¶ 21, 105 N.M. at 807, 737 P.2d at 1184. Such generic guidance does not compare in any meaningful way to a business' licensing or registration process. Unlike the defendants in Valdez v. State, whose telephone rates the NMPRC "'fix[ed], determine[d], supervise[d], regulate[d] and control[led],'" the FSIS has not determined, in advance, specific permissible labels or graphics for the Defendants' use on packaging -- or in advertising. Valdez v. State, 2002-NMSC-028, ¶ 8, 132

---

[41]The Court concludes that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's decision in State ex rel. Stratton v. Gurley Motor Co., 1987-NMCA-063, ¶ 21, 105 N.M. 803, 807, 737 P.2d 1180, 1184, because the Supreme Court of New Mexico cited that case approvingly in Quynh Truong, 2010-NMSC-009, ¶ 43, 147 N.M. at 592, 227 P.3d at 82.

N.M. at 672, 54 P.3d at 76 (quoting N.M.S.A. § 63-7-1.1(A)(1)).   Additionally, "'[t]he specific

activity, *including the manner in which it was done*, must be expressly permitted to fall within

[the] exemption.'"   Truong v. Allstate Ins. Co., 2010-NMSC-009, ¶ 58, 147 N.M. at 597, 227 P.3d

at 87 (quoting Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062 ¶ 68, 133 N.M. 669, 689, 68

P.3d 909, 292)(italics added in Truong v. Allstate Ins. Co.).   Here, the specific activity that

Thornton challenges is the Defendants' use of the "U.S.D.A. CHOICE/Produced in the USA" label

and graphic in advertising: the Labeling Policy Book does not mention this exact wording, or the

combination of that wording with the American flag.   Furthermore, the Labeling Policy Book does

not cover the manner in which the label is used -- in advertising, for example.

Second, the Defendants argue that federal regulations permit labeling beef "Product of

USA."   See MTD at 12.   The full paragraph from the 2001 proposed rule that the Defendants cite

in their MTD states:

> For many years, "Product of the U.S.A." has been applied to product that is
> exported to other countries to meet those countries' country-of-origin labeling
> requirements (9 CFR 327.14; FSIS Policy Memo 080 (April 16, 1985)).  Products
> that meet all FSIS requirements for domestic products also may be distributed in
> U.S. commerce with such labelling.  No further documentation is required.
> "Product of the U.S.A." has been applied to products that, at a minimum, have been
> prepared in the United States.  It has never been construed by FSIS to mean that the
> product is derived only from animals that were born, raised, slaughtered, and
> prepared in the United States.  The only requirement for products bearing this
> labeling statement is that the product has been prepared (i.e. slaughtered, canned,
> salted, rendered, boned, etc.).  No further distinction is required.  In addition, there
> is nothing to preclude the use of this label statement in the domestic market, which
> occurs, to some degree. This term has been used on livestock products that were
> derived from cattle that originated in other countries and that were slaughtered and
> prepared in the United States. Also, the cattle could have been imported, raised in
> U.S. feed lots, and then slaughtered and prepared in the United States. The beef
> products from these cattle can be labeled as "Product of the U.S.A." for domestic
> and export purposes.

<u>Product Labeling: Defining United States Cattle and United States Fresh Beef Products</u>, 66 Fed. Reg. 41,160, 41,160-41,161 (proposed August 7, 2001).[42]  This rule does not give the Defendants express permission for the conduct Thornton challenges.  First, that rule was an advance notice of proposed rulemaking -- not a final rule -- and was withdrawn in 2003.  See <u>Product Labeling: Defining United States Cattle and United States Fresh Beef Products</u>, 68 Fed. Reg. 11,008, 11,008 (withdrawn March 7, 2003).  Second, the proposed rule, like the Labeling Policy Book, refers to the term "Product of the U.S.A." and not to the term, "Produced in the U.S.A.," and does not permit expressly the use of the American flag in conjunction with those terms.  Third, the Labeling Policy Book refers to labeling and not advertising.

The Defendants argue that "the USDA does not require -- as Thornton argues it should in her complaint -- that cattle be born, raised, and slaughtered in the United States to qualify as a 'Product of U.S.A.'"  MTD at 12.  While it is true that the USDA does not require that cattle be born in the United States to qualify as a "Product of the U.S.A.," this fact does not mean that the

---

[42]Interestingly, the advance notice of proposed rulemaking -- in the section above the paragraph the Defendants quote -- describes the labels that denote claims of geographic origin:

> FSIS regulations (9 CFR 317.8) permit fresh beef products to be labeled with terms such as "U.S. (Species)," "U.S.A. Beef," and "Fresh American Beef." Such terms are viewed by the Agency as geographic claims  associated with animal raising and production.  FSIS interprets these terms to mean that the cattle to which the terms are applied were born, raised, slaughtered, and prepared in the United States or in specific geographic locations in the United States. Producers and processors voluntarily may label products with such geographic claims and other production claims as long as those claims are substantiated.  To substantiate labeling claims, producers must provide testimonials and affidavits that include the producer's operational protocol that supports the labeling claim that the food product was derived from animals that were born, raised, slaughtered, and prepared in the United States.

<u>Product Labeling: Defining United States Cattle and United States Fresh Beef Products</u>, 66 Fed. Reg. 41,160, 41,160-41,161 (proposed August 7, 2001).

FSIS has given the Defendants express permission to use the "U.S.D.A. CHOICE/Produced in the USA" label or graphic in their labels or advertisements. Relying on Judge Riggs' analysis in <u>Tyson Foods</u>, the Defendants assert that Thornton concedes that "the labeling at issue had been approved by FSIS." MTD at 10 (citing <u>Tyson Foods</u>, 482 F. Supp. 3d at 1156-57). Just because Thornton did not dispute that FSIS approved the labels does not make it true that FSIS approved those labels. FSIS regulations state that "[l]abels that bear claims and statements that are defined in FSIS' regulations or the Food Standards and Labeling Policy Book . . . and that comply with those regulations are also deemed to be generically approved by the Agency without being submitted for evaluation and approval." 9 C.F.R. 412.2. This regulation means, therefore, that FSIS generically approves labels that bear the phrase "Product of the USA." More recent FSIS guidance includes the terms "Product of USA" and "Processed in the USA 100%" as generic terms. Compliance Guideline at 19. The phrases "U.S.D.A. CHOICE/Produced in the USA" or "Produced in the USA" are not listed as generic terms either in the Labeling Policy Book or the Compliance Guideline. As a result, they cannot be "deemed to be generically approved" by FSIS. 9 C.F.R. § 412.2. If the labels are not deemed generically approved, they must be "submitted for approval to the FSIS Labeling and Program Delivery Staff, accompanied by FSIS Form 7234-1, Application for Approval of Labels, Marking, and Devices, and approved by such staff . . . ." 9 C.F.R. § 412.1.

The Defendants do not contend that they submitted their "U.S.D.A. CHOICE/Produced in the USA" label for approval to the FSIS Labeling and Program Deliver Staff, as 9 C.F.R. § 412.1 requires. Thornton's failure to contest this point in <u>Tyson Foods</u> is not, by itself, adequate to support the Defendants' NMUPA safe harbor defense. In the absence of any direct assertion from the Defendants or any evidence, such as a copy of Defendant's application on FSIS Form 7234-1, that they submitted the label for approval to FSIS under 9 C.F.R. § 412.1, the Defendants cannot

contend soundly that FSIS expressly permitted their use of the "U.S.D.A. CHOICE/Produced in the USA" label, as New Mexico law defines the term "expressly permitted." N.M.S.A. § 57-12-7. See Quynh Truong, 2010-NMSC-009, ¶¶ 38-44, 147 N.M. at 593-94, 227 P.3d at 83.

In conclusion, neither the Labeling Policy Book, the Compliance Guideline, nor the 2001 notice of proposed rulemaking expressly permit the Defendants' use of the "U.S.D.A. CHOICE/Produced in the USA" label, and the Defendants do not demonstrate that they submitted the labels for FSIS approval. See Campos v. Brooksbank, 120 F. Supp. 2d at 1275-76 (D.N.M. 2000)("Until the party complies with the requisite . . . procedure, the regulatory body cannot be deemed to have authorized, or implicitly permitted, any transactions in the area subject to regulation." (quoting State ex rel. Stratton v. Gurley Motor Co., 1987-NMCA-063, ¶ 21, 105 N.M. at 807, 737 P.2d at 1184)). Accordingly, NMUPA's safe harbor provision does not bar Thornton's "U.S.D.A. CHOICE/Produced in the USA" claims.

### 2. NMUPA's Safe Harbor Provision Does Not Preclude Thornton's Official USDA Grade Shield Claims.

The next issue is whether the Defendants' use of official USDA grade shields in their labels and advertisements are "actions or transactions expressly permitted under laws administered by a regulatory body of . . . the United States." N.M.S.A. § 57-12-7. The Court acknowledges New Mexico's interest in giving deference to the "expertise of the relevant regulatory body" and not penalizing "regulated entities who have conformed their conduct to the express directives of their governing regulatory body." Quynh Truong, 2010-NMSC-009, ¶¶ 31-32, 147 N.M. at 592, 227 P.3d at 82. Both FSIS and AMS are regulatory bodies, and have expertise in their respective areas of food safety and labeling, and agricultural marketing. As discussed above, the Defendants have not shown that they submitted their labels for approval to FSIS or shown that FSIS regulates them

in any other respect.  See Analysis § I(B)(2), supra.  The question remains, then, whether the Defendants in this case are entities that the USDA or AMS regulate, and whether the USDA or AMS have given the Defendants express permission to use the official USDA grade shields in their labeling and advertisements of foreign-originating beef products.

For the NMUPA's safe harbor provision to apply, "the regulatory body must actually administer the regulatory laws with respect to the party claiming the exemption, thereby exercising at least the modicum of oversight that the exempting language indicates is required."  State ex rel. Stratton v. Gurley Motor Co., 1987-NMCA-063, ¶ 21, 105 N.M. at 807, 737 P.2d at 1184.  As discussed above, see Analysis § I(B)(2), the Defendants do not assert that they applied for AMS' grading service, but presumably received products from entities for whom the grading service has been performed.  The Court could not find, and the Defendants do not provide, a statute or regulation that expressly permits a retail store's use of the official USDA grade shields on a retail store's packaging or in their advertisements.

AMS makes public statements about the official USDA grade shields, but these do not give express permission for the Defendants' specific conduct, either.  AMS' website states: "The USDA grade shields, official seals and labels are reputable symbols of the quality and integrity of American agricultural products.  Large-volume buyers such as grocery stores, military institutions, restaurants, and even foreign governments use the quality grades as a common 'language,' making business transactions easier."  AMS, Grades and Standards, available at https://www.ams.usda.gov/grades-standards (last visited January 27, 2022)(no citation for quotation).  On its public website, therefore, AMS asserts that "grocery stores" use the official USDA grade shields to demonstrate that the products in question are "American agricultural products."  AMS, Grades and Standards.  The USDA and AMS convey similar messages about

the USDA grade shields' geographic connotations on other websites: "The USDA grade shields are highly regarded as symbols of safe, high-quality *American beef*. Quality grades are widely used as a 'language' within the beef industry, making business transactions easier and providing a vital link to *support rural America*." Larry Meadows, What's Your Beef -- Prime, Choice, or Select? (emphasis added). See AMS, Beef Grading Shields ("The USDA grade shields are highly regarded as symbols of high-quality *American beef*. Quality grades are widely used as a 'language' within the beef industry, making business transactions easier and providing a vital link to *support rural America*.")(emphasis added). These statements are consistent with Congress' intent, as the Agricultural Marketing Act expresses that goal, to promote markets for "American agricultural products" to "mak[e] it possible for the full production of American farms to be disposed of usefully, economically, profitably, and in an orderly manner."
7 U.S.C. § 1621.

To the extent that the USDA and AMS acknowledge grocery stores' use of the grade shields on beef which is "American beef" or an "American agricultural product," those statements could be construed as the agencies' ratification of such use. AMS, Grades and Standards; AMS, Beef Grading Shields. While these statements may acknowledge and thus ratify such use, they do not contain permissive language such as "may." Their language is merely descriptive. Without permissive language, it is difficult to see how these statements constitute express permission, even if they are used on products that are "American beef" or "American agricultural products." AMS, Grades and Standards; AMS, Beef Grading Shields.

Complicating the issue further, the USDA and AMS provide no explicit public guidance or statement about what, exactly, "American beef" or an "American agricultural product" is. The 2001 proposed notice of rulemaking the Defendants cite in their MTD indicates that the agency in

2001 viewed similar language such as "'U.S.A. Beef,' and 'Fresh American Beef,'" as a "geographic claim associated with animal raising and production." Product Labeling: Defining United States Cattle and United States Fresh Beef Products, 66 Fed. Reg. 41,160, 41,160-41,161 (proposed August 7, 2001). The proposed rule explains:

> FSIS interprets these terms to mean that the cattle to which the terms are applied were born, raised, slaughtered, and prepared in the United States or in specific geographic locations in the United States. Producers and processors voluntarily may label products with such geographic claims and other production claims as long as those claims are substantiated. To substantiate labeling claims, producers must provide testimonials and affidavits that include the producer's operational protocol that supports the labeling claim that the food product was derived from animals that were born, raised, slaughtered, and prepared in the United States.

Product Labeling: Defining United States Cattle and United States Fresh Beef Products, 66 Fed. Reg. 41,160, 41,160-41,161 (proposed August 7, 2001). As discussed above, see Analysis I(B)(1), supra, this rule was subsequently withdrawn. The Court has not found more recent, or more official, guidance about what "American beef" or an "American agricultural product" means. Nevertheless, that USDA or AMS' websites -- or the Labeling Policy Book or Compliance Guideline -- do not define those terms indicates that the agency has not supplanted a layperson's understanding of those terms with its own. The regulatory prescription how to neutralize the misleading effect of "[t]erms having geographical significance with reference to a locality other than that in which the product is prepared," 9 C.F.R. § 317.8, implies that geographic terms describing where a product is prepared are not misleading. Similarly, 9 C.F.R. 327.18 creates an inference that imported products may be labeled in the same way as domestic product: "All products, after entry into the United States, shall be deemed and treated as domestic products and shall be subject to the applicable provisions of the Act and the regulations in this subchapter . . . ."

9 C.F.R. 327.18.  Neither of these regulations define "American beef" or an "American agricultural product" as the USDA and AMS use those terms.

It takes a certain amount of mental gymnastics to reconcile the Agricultural Marketing Act's plain language -- as well as the USDA's public pronouncements -- about how the USDA grade shields promote "American beef" and "American agricultural products," with the thicket of USDA regulations that implicitly undermine those stated goals.  The question at this stage is whether any of those authorities expressly permits the Defendants' use of the USDA grade shields on imported beef, as NMUPA's safe harbor provision requires.  Although the Defendants' practice of using USDA grade shields on their labels and in advertisements may be prevalent and customary in the retail industry, and the USDA may even ratify that use to the extent that the shields are used to indicate "American agricultural products," "[n]either inferential pre-conduct agency permission nor post-conduct agency review has even been held to satisfy the requirement of the statute." Quynh Truong, 2010-NMSC-009, ¶ 51, 147 N.M. at 595, 227 P.3d at 85.  In other words, the patchwork of regulations and proposed rules which the Defendants argue give them permission to use the USDA grade shields on imported beef are not sufficient to satisfy NMUPA's safe harbor provision, because those regulations offer no express permission for that particular conduct.  Nor do the websites' statements suffice, because their language is descriptive and not permissive, and certainly not approving of the specific conduct at issue here.  The Court concludes, therefore, that NMUPA's safe harbor provision does not bar Thornton's official USDA grade shield claims.

### D.    THORNTON'S LACK OF NOTICE TO DEFENDANTS ON HER EXPRESS WARRANTY CLAIMS DOES NOT PRECLUDE HER CLAIMS.

Thornton's lack of notice to the Defendants does not preclude her breach-of-express-warranty claims.  The Defendants argue that, because Thornton did not give them notice of an

alleged breach of express warranty before her lawsuit, the Court must dismiss her breach of express warranty claims.  See MTD at 21 (citing N.M.S.A. § 55-2-607(3)(a)).  New Mexico's Uniform Commercial Code, N.M.S.A. §§ 55-1-102 to 55-12-111 ("UCC"), provides that "[w]here a tender has been accepted . . .  the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."  N.M.S.A. § 55-2-607.  The Supreme Court of New Mexico looks to the statutory definition of notice in determining that "'a person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.'"  State ex rel. Concrete Sales & Equip. Rental Co. v. Kent Nowlin Constr., Inc., 1987-NMSC-114, ¶ 17, 106 N.M. 539, 542, 746 P.2d 645, 648 ("Concrete Sales")(quoting N.M.S.A. § 55-1-201(26)).  Additionally, "'[a] person receives notice when it comes to his attention.'"  Concrete Sales, 1987-NMSC-114, ¶ 17, 106 N.M. at 542, 746 P.2d at 648 (quoting N.M.S.A. § 55-1-201(26)(a)).  The "purpose of the statutory requirement of notice to the seller of breach of warranty is to enable the seller to minimize damages in some manner, if possible to correct the defect, and also to give the seller some immunity against stale claims." O'Shea v. Hatch, 1982-NMCA-013, ¶ 29, 97 N.M. 409, 415, 640 P.2d 515, 521.[43]  Furthermore, "[t]he sufficiency of notice and what is considered a reasonable time within which to give notice of breach of warranty are ordinarily questions of fact, based upon the circumstances of each case." O'Shea v. Hatch, 1982-NMCA-013, ¶ 29, 97 N.M. at 415, 640 P.2d at 521.  "'The notification

---

[43]The Court concludes that the Supreme Court of New Mexico would agree with this statement of the law in O'Shea v. Hatch, 1982-NMCA-013, ¶ 29, 97 N.M. 409, 415, 640 P.2d 515, 521, because the Supreme Court of New Mexico cited that statement approvingly in State ex rel. Concrete Sales & Equip. Rental Co. v. Kent Nowlin Constr., Inc., 1987-NMSC-114, ¶ 18, 106 N.M. 539, 543, 746 P.2d 645, 649.

which saves the buyer's rights under this article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.'"  Concrete Sales, 1987-NMSC-114, ¶ 17, 106 N.M. at 542-43, 746 P.2d at 648-49 (quoting N.M.S.A. § 55-2-607 cmt.4).  The statute's commentary notes that

> The time of notification is to be determined by applying commercial standards to a merchant buyer. "A reasonable time" for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.

N.M.S.A. § 55-2-607 cmt. 4.  See Badilla v. Wal-Mart Stores E., Inc., 2017-NMCA-021, ¶ 16, 389 P.3d 1050, 1055 ("Badilla")(quoting § 55-2-607 cmt.4).

The Defendants assert that Badilla rejects Thornton's argument that "the only notice she was required to give was the filing of a complaint."  MTD Reply at 13 (citing Badilla, 2017-NMCA-021, ¶ 26, 389 P.3d at 1058).  In Badilla, the plaintiff "purchased work boots from Wal-Mart Stores in October 2003," whose "packaging described the boots as 'iron tough,' 'rugged leather,'" and stated that they were "'designed for light to medium industrial use.'" 2017-NMCA-021, ¶ 2, 389 P.3d at 1052 (no citation for quotation).  The plaintiff wore the boots for his work as a tree-trimmer and, in 2004, was "injured while attempting to move a log weighing about 150 pounds when the unglued sole of his boot got caught on debris, causing him to fall backwards and drop the log on top of himself."  Badilla, 2017-NMCA-021, ¶ 3, 389 P.3d at 1052.  He received worker's compensation in January, 2007, and filed a breach of express warranty claim against Wal-Mart Stores in September, 2007, "more than three years after he was injured and beyond the statute of limitations for personal injury cases."  Badilla, 2017-NMCA-021, ¶ 3, 389 P.3d at 1052.  The plaintiff  in Badilla "never provided notice of the boots' failure or of a claim under any warranty to Defendants prior to filing suit against them."  Badilla, 2017-NMCA-021, ¶ 4, 389 P.3d

at 1052.  The Court of Appeals of New Mexico remarked that "[n]o New Mexico case holds that the filing or service of a complaint constitutes sufficiently timely notice of a warranty claim, nor explains what criteria should be used to determine the reasonableness of any length of time between discovery of a breach and notice being given." Badilla, 2017-NMCA-021, ¶ 11, 389 P.3d at 1054.  Because the defendants objected to the timing of the plaintiff's notice and not to its form, the Court of Appeals of New Mexico did not decide the question whether a timely complaint gives sufficient notice for § 55-2-607's purposes:

> Defendants raise the reasonableness of the time Plaintiff took to file the complaint, but not whether the complaint itself was a proper vehicle for notice.  We accordingly do not address the suitability of a complaint as providing the required notice of breach in this case, but only the reasonableness of the passage of three years and two months between the accident and Plaintiff's providing notice to Defendants of the alleged breach of warranty. The critical issue in this case therefore is whether Plaintiff's filing suit after he discovered or should have discovered the alleged breach amounts to reasonably timely notice, thereby complying with the language of Section 55-2-607.

Badilla, 2017-NMCA-021, ¶ 12, 389 P.3d at 1054.  The Defendants' assertion that Badilla rejects Thornton's argument that her Complaint was not sufficient notice is, therefore, inaccurate.  MTD Reply at 13 (citing Badilla, 2017-NMCA-021, ¶ 26, 389 P.3d at 1058).  As explained above, the Court of Appeals of New Mexico did not decide that issue.  See Badilla, 2017-NMCA-021, ¶ 12, 389 P.3d at 1054.  The Defendants compare Thornton to the plaintiff in Badilla, stating that "Thornton ha[d] legal counsel in this case prior to filing her complaint, . . . knew the identities of the retailers of the beef products at issue, [and] Judge Riggs had expressly told her in the Tyson case that pre-suit notice was required."  MTD Reply at 13 (citing Badilla, 2017-NMCA-021, ¶¶ 24- 26, 389 P.3d at 1057-58).  However, this comparison does not take account of the untimeliness of the Badilla plaintiff's lawsuit, the main objection that the defendants in that case

raised.  See Badilla, 2017-NMCA-021, ¶ 12, 389 P.3d at 1054.  The Defendants here do not argue that Thornton's Complaint is untimely.

Thornton argues that her Complaint serves the purpose of providing notice to the Defendants for her breach of express warranty claim and that the Supreme Court of New Mexico likely would follow other jurisdictions' rules waiving the notice requirement.  See MTD Response at 27-28 (citing In Re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Products Liab. Litig., 288 F. Supp. 3d at 1271-72).  In In Re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Products Liab. Litig., the Court asked whether the Supreme Court of New Mexico would hold that an injured consumer's complaint satisfies N.M.S.A. § 55-2-607(3)(a)'s notice requirements for breach-of-warranty claims, see In Re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Products Liab. Litig., 288 F. Supp. 3d at 1271-72, and determined that

> the Supreme Court of New Mexico is likely to agree with the Supreme Court of California's reasoning that notice should not be required in these suits, because "[t]he injured consumer is seldom steeped in the business practice which justifies the rule, and at least until he has had legal advice it will not occur to him to give notice to one with whom he has had no dealings."  Greenman v. Yuba Power Products, Inc., 377 P.2d at 900.  The Court also concludes that notice via the Amended Complaint serves the purposes that the Supreme Court of New Mexico has identified, namely, that notice must "open[] the way for normal settlement through negotiation."  State ex Rel Concrete Sales & Equip. Rental Co., Inc. v. Kent Nowlin Const., Inc., 1987-NMSC-114, ¶ 17, 746 P.2d at 648-49.  Filing a complaint often triggers settlement negotiations.  The Court concludes, accordingly, that the Supreme Court of New Mexico would follow the Supreme Court of California and would not require notice beyond the Amended Complaint.

In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig., 288 F. Supp. 3d at 1272.  Although many of the cases the Court reviewed in that case featured the consumer's personal injury, the Court does not think that the Supreme Court of New Mexico would draw that distinction, because only one other court has done so:

The New York Supreme Court, Appellate Division, has eliminated the requirement in "situations involving goods sold for human consumption." Fischer v. Mead Johnson Labs., 41 A.D. 2d 737, 737, 341 N.Y.S.2d 257 (N.Y. App. Div. 1973). The decision involves, however, a plaintiff's personal injury, which at least one court has distinguished on those grounds. See In re 5-Hour ENERGY Marketing and Sales Practices Litig., No. 13-2438, 2015 U.S. Dist. LEXIS 191705, 2015 WL 12734796, at *9 (C.D. Cal. January 22, 2015)(Gutierrez, J.). The Court concludes that Fischer v. Mead Johnson Labs is not correctly cabined to only personal injury cases, as it contemplates all cases "grounded on tortious elements," Fischer v. Mead Johnson Labs., 41 A.D.2d at 737 (citing Kennedy v. Woolworth Co., 205 A.D. 648, 649, 200 N.Y.S. 121 (N.Y. App. Div. 1923)).

In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig., 288 F. Supp. 3d at 1272. Although the Court is "not convinced that the Court of Appeals of New York would write in an exception to the statute's clear language to benefit a purchaser," it "has previously concluded that the Supreme Court of New Mexico would relax UCC standards for lawsuits in light of potential consumer harm" and would do so in this case. In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig., 288 F. Supp. 3d at 1272 (citing Bhandari v. VHA Southwest Community Health Corp., No. 09-0932, 2011 U.S. Dist. LEXIS 37700, 2011 WL 4669848, at *24 (D.N.M. March 30, 2011)(Browning, J.)). In conclusion, Thornton's failure to provide the Defendants with pre-suit notice does not bar her claims.

## E.  THORNTON'S CLAIMS DO NOT FAIL UNDER THE DORMANT COMMERCE CLAUSE.

Thornton's State law claims do not fail under the Dormant Commerce Clause, because the State laws upon which Thornton bases her claims are not designed to foster economic protectionism, nor are they discriminatory. See Or. Waste Sys., 511 U.S. at 101; Direct Mktg. Ass'n v. Brohl, 814 F.3d at 1135. The Defendants argue that Thornton's case is an "attempted assault on **foreign** commerce." MTD Reply at 14 (emphasis in MTD Reply), but do not explain how using State law to target false or misleading advertising would affect foreign commerce. The

Defendants assert that Thornton is trying to "upend World Trade Organization rulings and the delicate balance of federal law and regulation the United States has put in place to deal with them," MTD Reply at 14, and warn that, if Thornton succeeds, "countries disadvantaged by New Mexico's disparate treatment of its products might retaliate against our nation so 'the Nation as a whole would suffer,'"  MTD at 23 (quoting Japan Line, Ltd. v. Los Angeles Cnty., 441 U.S. at 451).

In 2016, Congress addressed the consternation that country-of-origin labeling requirements caused other countries by withdrawing the requirement that beef products be labeled with a country of origin.  See 7 U.S.C. §§ 1638, 1638a; Pub. L. No. 114-113, 759, 129 Stat. 2242, 2284-85 (2016).  Because Congress withdrew this requirement, and because advertising beef as "U.S.D.A. CHOICE/Produced in the USA," or with the USDA official grade shield, is permissive and not mandatory, it is possible for the Defendants to comply with State law without affecting international trade agreements.  The Defendants could comply, for example, by removing from their advertisements misleading promotional stickers and graphics which contain wording or symbols suggesting a country of origin for beef products.  See Animal Legal Def. Fund v. Hormel Foods Corp., No. 19-CV-0397 at *38-39.  It is difficult to see how, if the Defendants can no longer advertise imported beef products with promotional stickers or advertising graphics indicating that those products have a geographic origin in the United States, this would upend WTO rulings.

To the extent that Thornton requests that the Defendants refrain from making false or misleading statements about those products by removing the promotional stickers and graphics from advertisements for beef whose origin they cannot confirm is domestic, her claims do not run foul of the Dormant Commerce Clause, because ensuring that advertisements are truthful and not misleading is a legitimate public interest, which will be upheld "'unless the burden imposed on

such commerce is clearly excessive in relation to the putative local benefits.'" South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2091 (2018)(quoting Pike v. Bruce Church, 397 U.S. 137, 142 (1970)).  The Defendants do not demonstrate that refraining from advertising beef products with the graphics or promotional stickers to which Thornton objects is an excessive burden in light of the local State interest in truthful advertising.

### F. THORNTON STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED AGAINST THE KROGER COMPANY, BUT NOT AGAINST ALBERTSONS COMPANIES.

Thornton pleads sufficient facts to state a plausible claim for relief against the Kroger Company, but not against Albertsons Companies, based upon the Kroger Company's use of the "U.S.D.A. CHOICE/Produced in the USA" graphic only.  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d at 340 (citing Williams v. Meese, 926 F.2d at 997.  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor.  See Smith v. United States, 561 F.3d at 1098 ("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d at 1039).  The Court concludes that Thornton: (i) states a plausible claim for relief on her NMUPA claim against the Kroger Company, but not against Albertsons Companies; (ii) states a plausible claim for relief on her breach-of-express-warranty claim against the Kroger Company, but not against Albertsons Companies; and (iii) states a plausible claim for relief on her unjust enrichment claim against the Kroger Company, but not against Albertsons Companies.

  1.  **<u>Thornton States a Plausible Claim For Relief on Her NMUPA Claims</u>**
    **<u>Against the Kroger Company, but Not Against Albertsons Companies</u>.**

Thornton states a claim upon which relief may be granted on her NMUPA claims against the Kroger Company, but not against Albertsons Companies. To succeed on her NMUPA claim of an unfair or deceptive trade practice, Thornton must show that: (i) the Defendants "made an 'oral or written statement, visual description or other representation' that was either false or misleading"; (ii) "the representation must have been 'knowingly made in connection with the sale . . . of goods'"; (iii) this representation "occurred in the regular course of the representer's trade or commerce"; and (iv) "the representation must have been of the type that 'may, tends to or does, deceive or mislead any person.'" <u>Stevenson v. Louis Dreyfus Corp.</u>, 1991-NMSC-051, ¶ 13, 112 N.M. at 100, 811 P.2d at 1311 (quoting <u>Ashlock v. Sunwest Bank of Roswell, N.A.</u>, 1988-NMSC-026, ¶ 4, 107 N.M. at 101, 753 P.2d at 347 (citing N.M.S.A. § 57-12-2(D))). Thornton has stated a plausible claim under the NMUPA that the Kroger Company's advertisements featuring the "U.S.D.A. CHOICE/Produced in the USA" promotional sticker or graphic are misleading. Although Thornton states that she is challenging advertising bearing the words "'Product of United States' or other similar representations," Complaint ¶ 22, at 24 (no citation for quotation), the only Kroger Company advertisements that Thornton includes in her Complaint are pictures of advertising featuring the words "U.S.D.A. CHOICE/Produced in the USA," printed on a shield bearing the stars and stripes of the American flag, Complaint at 25-26. Viewing Thornton's allegations in the light most favorable to her, and drawing all reasonable inferences in her favor, <u>see</u> <u>Smith v. United States</u>, 561 F.3d at 1098, the Court infers that she is challenging the advertisements depicted, even if her verbal descriptions of those advertisements are inaccurate.

Thornton has not stated a claim for relief based upon any other forms of Kroger Company's advertising.[44]

Thornton's inclusion of photographs of advertisements sent out in newspapers or in the mail demonstrate plausibly that the Kroger Company's representations occur in the regular course of its business, and are in connection with the sale of the beef products in question. See N.M.S.A. § 57-12-2(D). Thornton does not set forth detailed factual allegations, but the ones that she sets forth are "enough to raise a right to relief above the speculative level," assuming that "all the allegations in the complaint are true." Bell Atlantic Corp. v. Twombly, 550 U.S. at 555. To succeed on her NMUPA claim, Thornton need allege only that the Kroger Company's advertisements "may" or "tend[] to" deceive consumers about the origin of those beef products. N.M.S.A. § 57-12-2(D). Thornton pleads sufficient facts for the Court to find it plausible that at least some of the beef which she has purchased from the Kroger Company comes from cattle that are not born, raised, and slaughtered in the United States. See Complaint ¶¶ 2, 4-5, 7, 21, at 19-21. The Court concludes that it is plausible that consumers could view the Kroger Company's advertisements with the "U.S.D.A. CHOICE/Produced in the USA" promotional sticker or graphic, and believe that the advertised beef was from cattle born and raised in the United States when it was not. In terms of her NMUPA claims against the Kroger Company, then, Thornton has shown more than "the mere metaphysical possibility" that she could "prove some set of facts in support of the pleaded claims," and she has given the Court "reason to believe that [she] has a

---

[44]In her PI Motion, Thornton attaches advertisements from the Kroger Company which include the official USDA grade shield graphic, but the Court dismisses Thornton's official USDA grade shield claims against both Defendants in this MOO.

reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177.

Thornton does not plead sufficient facts to support her claims against Albertsons Companies, however.  In her Complaint, Thornton does not include photographs of Albertsons Companies' advertisements, see Complaint at 25-26,  but states that she received them by mail or in a newspaper, see Complaint ¶ 30, at 27, and that they feature the "'USDA Choice' red white and blue graphic,"  Complaint ¶ 24, at 27 (no citation for quotation).  As a result, the Court ordered Thornton to submit an amended complaint that included, among other things, photographs of Albertsons Companies' advertisements.  See Order at 15.[45]  Thornton attaches photographs to her Amended Complaint.  See Albertsons Advertisement at 1-2.  The Albertsons Advertisement depicts a "USDA CHOICE" official grade shield superimposed on various advertisements for beef products.  Albertsons Advertisement at 1; Figure 2, supra.  See MTD at 18; MTD Response at 20.

The Court concludes that it is not plausible that consumers would be misled about the beef products' origin based on Albertsons Companies' advertisements alone: on their face, the official USDA grade shield states merely the beef's grade and implies that it has passed USDA inspection. Thornton alleges that Albertsons Companies' advertisements are misleading, because of "the absence of the country of origin taken together, with [the] 'USDA Choice' red white and blue

---

[45]Thornton filed her Amended Class Action Complaint on November 30, 2021, which the Defendants moved to dismiss on December 21, 2021, see Defendants the Kroger Company's and Albertson's Joint Motion to (1) Dismiss the Second Amended Complaint with Prejudice, (2) Reconsider the Court's September 29, 2021 Ruling on Collateral Estoppel, and (3) in the Alternative, Stay This Case Pending Resolution of the Tyson Appeal, filed December 21, 2021 (Doc. 74)("MTR").  Because the Court has not yet heard arguments on the MTR, the Court will not consider the arguments made in that briefing, but it will consider here the additional pleading in Thornton's Amended Class Action Complaint, filed October 15, 2021 (Doc. 30)("Amended Complaint").

graphic," which, she alleges, "are intended to, and do, portray to consumers that they are purchasing a 'Product of the United States.'"   Complaint ¶ 24, at 27 (no citation for quotation)(alterations added).  Viewed in conjunction with the USDA and AMS' statements on their public websites about the meaning of those grade shields, see AMS, Grades and Standards; AMS, Beef Grading Shields; Larry Meadows, What's Your Beef -- Prime, Choice, or Select?; Analysis § I(C)(2), supra, the Court  determines that the official USDA grade shields could be construed as misleading, but Thornton does not allege that she finds the USDA grade shields misleading based upon USDA's or AMS' statements.

A "direct representation, by the defendant to the plaintiff" is not a prerequisite to a NMUPA claim, and "the conjunctive phrase 'in connection with' seems designed to encompass a broad array of commercial relationships." Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 21, 142 N.M. at 442, 166 P.3d at 1096 (quoting N.M.S.A. § 57-12-2(D)).[46]  In Lohman v. Daimler-Chrysler Corp., the Court of Appeals of New Mexico refused to limit the NMUPA's scope to communications that the commercial defendant made to the plaintiff directly, or even to the general public, but held that the NMUPA may "reach misrepresentations made by and between third parties in the course of commercial transactions, particularly when misrepresentations are designed

---

[46]The Court concludes that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's decision in Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, 142 N.M. 437, 166 P.3d 1091, because, although the Supreme Court of New Mexico distinguished Lohman v. Daimler-Chrysler Corp. in GandyDancer, LLC v. Rock House CGM, LLC, 2019-NMSC-021, 453 P.3d 434, the Supreme Court of New Mexico cited its holding approvingly.  See GandyDancer, LLC v. Rock House CGM, LLC, 2019-NMSC-021, ¶ 32, 453 P.3d at 443 ("In allowing a consumer claim to move forward, the Court of Appeals held that the UPA does not necessarily require a direct transaction between the consumer and a defendant that supplied parts incorporated in the goods purchased when the defendant's 'misrepresentations . . . bear on downstream sales.'").

to enable a manufacturer to sell a product to consumers." Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 26, 142 N.M. at 443, 166 P.3d at 1096. See id., ¶¶ 21-25, 142 N.M. at 442-43, 166 P.3d at 1093-97. Unlike the commercial defendant in Lohman v. Daimler-Chrysler Corp., which authored the misrepresentation at issue in that case, here, it is not the commercial defendant but third-party federal agencies that are the authors of what the Court considers to be the only misrepresentation made in connection with the official USDA grade shields. See Analysis § I(C)(2), supra. Thornton has not pled sufficient facts for the Court to conclude that the general public finds the official USDA grade shields misleading based on the USDA's and AMS' website statements.[47] The Court concludes, therefore, that Thornton does not state a plausible claim for relief on her NMUPA claims against Albertsons Companies or the Kroger Company based on their use of the official USDA grade shields.

### 2.    Thornton States a Plausible Claim for Breach of Express Warranty Against the Kroger Company, but Not Against Albertsons Companies.

Turning to Thornton's breach-of-express-warranty claims, the Court concludes that Thornton states a plausible a claim for relief against the Kroger Company, but not against Albertsons Companies, based on the Kroger Company's use of the "U.S.D.A. CHOICE/Produced

---

[47]The Court does not conclude here that a defendant could never be held liable under the NMUPA for misrepresentations that a third party makes about the products a defendant sells. If, for example, the USDA or AMS ran television advertisements every night stating that the USDA grade shields are symbols of high quality American beef and that their purchase supports rural America, then Thornton plausibly could allege, and the Court could conclude, that reasonable consumers could be misled by the Defendants' use of the official USDA grade shields, even though the Defendants' advertisements are not facially misleading. Here, however, Thornton does not allege a link between the Defendants' use of the official USDA grade shields in their advertisements and the USDA and AMS' websites' statements about American beef, and the Court doubts that there is one. Indeed, Thornton does not mention these statements in her Complaint or in her briefing; the Defendants first call the Court's attention to these websites in their PI Response. See PI Response at 17 n.8.

in the USA" graphic.  To succeed on a breach-of-express-warranty claim under New Mexico law, Thornton must show that the Defendants made an "affirmation of fact or promise . . . which relates to the goods and becomes part of the basis of the bargain," or "any description of the goods which is made part of the basis of the bargain," Salazar v. D.W.B.H., Inc., 2008-NMSC-054, ¶ 8, 144 N.M. at 830-31, 192 P.3d at 1207-08 (citing N.M.S.A. § 55-2-313(1)(a)-(c)), and that the "goods provided are not as warranted," Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 23, 357 P.3d at 941.  "A breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description."  Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 23, 357 P.3d at 941.  "'[T]he precise time when words of description or affirmation are made . . . is not material.  The sole question is whether the language . . . [is] fairly to be regarded as part of the contract.'"  Salazar v. D.W.B.H., Inc., 2008-NMSC-054, ¶ 12, 144 N.M. 828, 832, 192 P.3d 1205, 1209 (quoting N.M.S.A. § 55-2-313 cmt. 7).  Commentary to N.M.S.A. § 55-2-313 provides: "A description need not be by words. Technical specifications, blueprints and the like can afford more exact description than mere language and if made part of the basis of the bargain goods must conform with them."  N.M.S.A. § 55-2-313 cmt. 5.  See Robey v. Parnell, 2017-NMCA-038, ¶ 17, 392 P.3d 642, 649.  New Mexico courts have held that "the question of whether a contractual term or provision is susceptible to reasonable but conflicting meanings, i.e., whether there is ambiguity, is one of law," C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 17, 112 N.M. 504, 509, 817 P.2d 238, 243 (citing Young v. Thomas, 93 N.M. 677, 679, 604 P.2d 370, 372 (1979)), and that, "if the court finds ambiguity, the jury (or the court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding issues of breach and damages," C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 17, 112 N.M. 504, 509, 817 P.2d 238, 243 (citing Paperchase Partnership v. Bruckner, 102 N.M. 221, 223,

693 P.2d 587, 589 (1985)).  "A contract term may be ambiguous if it is 'reasonably and fairly susceptible [to] different constructions.'"  ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶ 23, 299 P.3d 844, 852 (quoting Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. 778, 781, 845 P.2d 1232, 1235).

Here, the Court concludes that the phrase "Produced in the USA" is ambiguous as applied to beef products, because it is subject to more than one interpretation.  See ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶ 23, 299 P.3d at 852.  Some consumers, like Thornton, may believe it means that the beef is derived from cattle who were born, raised, slaughtered, and processed in the United States.  See Complaint ¶ 5, at 20-21.  Others may understand it to mean that the beef derives from cattle not born in the United States, but imported before slaughter.  Still others may believe that it means that the carcasses were merely processed or prepared in the United States.  Because the phrase ambiguous, the Court concludes that the jury should determine its meaning as the ultimate factfinder, and therefore denies the Kroger Company's MTD on Thornton's breach-of-express-warranty claim.  See C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 17, 112 N.M.at 509, 817 P.2d at 243.

Thornton has not stated a plausible claim for breach-of-express warranty against Albertsons Companies for the same reason that the Court does not find it plausible that consumers would be misled about the beef products' origin based on Albertsons Companies' advertisements alone.  See Analysis § I(F)1, supra.  Albertsons Companies' advertisements featuring the official USDA grade shield state merely the beef's grade: "USDA CHOICE."  Albertsons Advertisement at 1.  Albertsons Companies' "affirmation of fact or promise . . . which relates to the goods," Salazar v. D.W.B.H., Inc., 2008-NMSC-054, ¶ 8, 144 N.M. at 830-31, 192 P.3d at 1207-08 (citing N.M.S.A. § 55-2-313(1)(a)-(c)), is that the beef in question was graded as "USDA CHOICE" beef,

and Thornton does not contend that the beef products that Albertsons Companies sell are not USDA choice grade beef.  Although Thornton contends that it is the combination of the words "USDA CHOICE" with the red, white and blue colors, and the absence of country-of-origin labeling which misleads consumers about the beef's origin, she does not explain how the colors themselves might rise to the level of an express warranty.  While it is true that an express warranty "need not be by words," commentary on New Mexico's express warranty statute gives as examples of wordless express warranties "[t]echnical specifications, blueprints and the like," because they "can afford more exact description than mere language." N.M.S.A. § 55-2-313 cmt. 5.  The colors red, white, and blue do not afford an exact description of a product's origin like the words "Product of the U.S." or "Produced in the U.S."  Consequently, the Court cannot construe Albertsons Companies' advertisements featuring the USDA grade shields as an express warranty of the beef products' origin.  Because Albertsons Companies did not warrant expressly anything about the origin of their beef products in the advertisements which Thornton provides, the Court concludes that Thornton does not state a plausible claim for breach of express warranty against Albertsons Companies.

> ### 3.   Thornton States a Plausible Claim for Unjust Enrichment Against the Kroger Company, but Not Against Albertsons Companies.

Thornton states a plausible unjust enrichment claim against the Kroger Company, but not against Albertsons Companies.  To state a plausible unjust enrichment claim under New Mexico law, Thornton must show that the Defendants have been "knowingly benefitted" at her expense "'in a manner such that allowance of the other to retain the benefit would be unjust.'"  City of Rio Rancho v. Amrep Sw. Inc., 2011-NMSC-037, ¶ 54, 150 N.M. 428, 260 P.3d at 428-29 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M. at 203, 3 P.3d at 698).

Although claims for unjust enrichment have "evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity," Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M. at 203, 3 P.3d at 698, New Mexico courts "explicitly provide for alternative pleading of civil claims," Starko, Inc. v. Presbyterian Health Plan, Inc., 2012-NMCA-053, ¶ 94, 276 P.3d 252, 278 (citing N.M.R.A. 1-008(E)(2))(reversed on other grounds by Starko, Inc. v. N.M. Human Servs. Dep't, 2014-NMSC-033, 333 P.3d 947). "[W]hether a plaintiff has an 'adequate remedy at law' does not foreclose the option of pursuing a claim in equity, at least not at the motion to dismiss stage." Abraham v. WPX Energy Prod., LLC, 20 F. Supp. 3d 1244, 1281 (D.N.M. 2014)(Browning, J.).

Even though the Court denies the Defendants' MTD on Thornton's NMUPA and breach-of-express warranty claims against the Kroger Company, allowing these claims to go forward does not foreclose Thornton's option of pursuing her equitable claim of unjust enrichment.  See Abraham v. WPX Energy Prod., LLC, 20 F. Supp. 3d at 1281.  Thornton pleads sufficient facts to state a plausible claim that the Kroger Company knowingly benefitted from the sale of imported beef products as a result of advertising which suggests that those beef products originate from the United States, when it is plausible that not all of it does.  See Analysis I(F)(1), supra.  The Defendants argue that Thornton's unjust enrichment claim fails, because the "'Defendants are complying with USDA regulations and their approved labels are presumptively lawful and not false or misleading,' and '[t]here is nothing unjust about using approved USDA labels.'"  MTD at 21 (quoting Tyson Foods, 482 F. Supp. 3d at 1161).  The Court disagrees with the Defendants' argument -- at least in relation to the Kroger Company's conduct -- for the same reasons that the Court concludes that federal law does not preempt Thornton's claims, see Analysis § I(B)(1), supra, and that NMUPA's safe harbor provision does not exempt the Defendants' conduct, see

Analysis § I(C)(1), supra.  Nevertheless, just as the Court distinguishes the Kroger Company's advertisements from Albertsons Companies' advertisements in terms of their tendency to mislead consumers, see Analysis I(F)(1), supra, and the extent to which they make an express warranty about the beef's origin, see Analysis I(F)(2), supra, so too does the Court distinguish them for the purposes of Thornton's unjust enrichment claims.  Because the Court concludes that it is plausible that consumers could be misled by the Kroger Company's advertisements featuring the "U.S.D.A. CHOICE/Produced in the USA" graphic, but not by Albertsons' Companies' advertisements featuring the official USDA grade shields, see Analysis I(F)(1), supra, the Court concludes that the Kroger Company's use of the  "U.S.D.A. CHOICE/Produced in the USA" graphic is plausibly unjust, while Albertsons Companies' conduct is not.  The Court, therefore, grants the Defendants' MTD as to Thornton's unjust enrichment claims against Albertsons' Companies, but denies it as to Thornton's unjust enrichment claims against the Kroger Company.

## II.    THE COURT DENIES THORNTON'S PI, BECAUSE SHE DOES NOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS, SHE DOES NOT SHOW IRREPARABLE INJURY ABSENT A PI, THE BALANCE OF EQUITIES DO NOT WEIGH IN HER FAVOR, AND A PI WOULD NOT BE IN THE PUBLIC INTEREST.

The Court will deny Thornton's PI Motion, because Thornton does not demonstrate that she has a likelihood of success on the merits of her official USDA grade shield claims, she does not demonstrate that she will suffer irreparable injury in the absence of a PI, she does not demonstrate that the balance of equities weighs in her favor, and she does not demonstrate that a PI is in the public interest.  Before a district court may issue a PI pursuant to rule 65 of the Federal Rules of Civil Procedure, a movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the PI "outweighs whatever damage the proposed injunction

may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d at 1198.  See Winter, 555 U.S. at 19; Munaf v. Geren, 553 U.S. at 688-89.  The movant bears the burden of demonstrating all four prongs' satisfaction. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d at 1183.

Thornton seeks a PI that would alter the status quo, which is one of the three kinds of "disfavored" preliminary injunction the Tenth Circuit recognizes.  Schrier v. Univ. of Colo., 427 F.3d at 1258.  A PI that seeks to alter the status quo deviates from a PI's main purpose, which "'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'" Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395). The Tenth Circuit has held that

> "courts in this Circuit must recognize that any preliminary injunction fitting within one of the disfavored categories *must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.*  Furthermore, because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard.  Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified likelihood-of-success-on-the-merits standard."

Schrier v. Univ. of Colo., 427 F.3d at 1261 (quoting O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft, 389 F.3d 973, 975-76 (10th Cir. 2004)(emphasis in Schrier v. Univ. of Colo. but not in O Centro).  The PI Thornton that seeks here is a disfavored injunction, because it would require the Defendants to disturb their "already existing and ongoing marketing that utilizes the USDA grading shield."  PI Response at 6.  The Court requires, therefore, that Thornton make a

"strong showing" on the four prongs, which it will more closely scrutinize than other requests for

PIs.  Schrier v. Univ. of Colo., 427 F.3d at 1261.

> In her PI Motion, Thornton
>
> requests the Court grant a Preliminary Injunction that prohibits the Defendants from using any sort of promotional sticker in advertisements or on packages of beef that tends to lead to the consumer to believe that they are purchasing a product that originated in this Country as cattle born and raised in the United States unless they can certify with certainty that such is a true and accurate statement.

PI Motion at 12-13.  Thornton's written PI Motion requests an injunction enjoining the use of these

graphics "on packages of beef" inside the store, and in advertising, PI Motion at 12-13, but, when

the Court asked Thornton to clarify precisely in the PI Hearing what relief Thornton is requesting,

Thornton replied that she is requesting that the Court enjoin the Defendants from "using red, white,

and blue imagery in their advertisements" featuring the official USDA grade shields, Tr. at 43:4-

6 (Dunn), and that the Defendants "cease in their direct mailer to the consumers this stuff that's

red, white, and blue," Tr. at 44:25-45:3 (Dunn).[48]  Thornton seeks a PI to enjoin the Defendants'

use of red, white, and blue colors as part of the "USDA CHOICE" or "USDA PRIME" grade

shields, but she does not seek to enjoin black-and-white versions of the shields.  PI Motion at 12-

13.  See Tr. at 43:4-6 (Dunn).  AMS regulations list and illustrate examples of black-and-white -- as

well as color -- versions of the official USDA grading shield, see 7 C.F.R. § 54.17, although these

examples do not include the exact "USDA CHOICE," "USDA PRIME," and "USDA SELECT"

---

[48]For this MOO's purposes, the Court defines "advertising" as the Defendants' promotion of their products outside of their stores and not inside them, for the following reasons: (i) Thornton pleads only advertising claims in her Complaint, in contrast to her complaint in Tyson Foods, in which she pleads labeling claims; (ii) Thornton gives as illustrations in her Complaint and Amended Complaint photographs only of advertisements that she received from the Defendants in the mail or in newspapers, and does not depict any in-store advertising; and (iii) Thornton distinguishes "promotional stickers" on the beef's packaging from its labels, but does not define them as advertising for her Complaint's purposes.

shields which Thornton seeks to enjoin here, and which are promoted on the USDA website, see AMS, Beef Grading Shields. Thornton argues that the Defendants' use of the colors red, white, and blue in the "USDA CHOICE" graphic in their advertisements is misleading to her and to proposed class members, because it conveys the impression to consumers that those beef products originate in the United States. PI Motion at 9-10. As a result, Thornton argues that, should the Court fail to enjoin the Defendants from using these colors, she and other proposed class members will suffer irreparable injury, and the balance of equities and the public interest weigh in her favor. See PI Motion at 11-12. The Court will deny Thornton's PI Motion, because: (i) Thornton does not demonstrate a substantial likelihood of success on the merits, because the Court dismisses her claims involving the official USDA grade shields, which are the target of her PI Motion; (ii) Thornton does not show irreparable injury if the Court declines to issue a PI; (iii) Thornton does not meet her burden of showing that the balance of equities weighs in her favor; and (iv) Thornton has not met her burden of showing that a PI would be adverse to the public interest.

### A.   THORNTON DOES NOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF HER OFFICIAL USDA GRADE SHIELD CLAIMS.

Thornton does not demonstrate that she has a substantial likelihood of success on the merits of her official USDA grade shield claims. The Court analyzes Thornton's likelihood of success on the merits of her official USDA grade shield claims under the NMUPA, and not on her "U.S.D.A. CHOICE/Produced in the USA" claims, because she does not seek to enjoin the Defendants' use of that graphic in her PI Motion. To succeed on her NMUPA claim of an unfair or deceptive trade practice, Thornton must show that: (i) the Defendants "made an 'oral or written statement, visual description or other representation' that was either false or misleading"; (ii) "the representation must have been 'knowingly made in connection with the sale . . . of goods'"; (iii)

this representation "occurred in the regular course of the represerer's trade or commerce"; and (iv) "the representation must have been of the type that 'may, tends to or does, deceive or mislead any person.'"  Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 112 N.M. at 100, 811 P.2d at 1311 (quoting Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, ¶ 4, 107 N.M. at 101, 753 P.2d at 347 (citing N.M.S.A. § 57-12-2(D))).  Thornton does not demonstrate a likelihood of success on the merits of her official USDA grade shield claims, because the Court dismisses those claims here.  See Analysis § I(F)(1), supra.  Additionally, the Court concludes that Thornton does not have a substantial likelihood of success on the merits in challenging the Defendants' use of the official grade shields, because: (i) although the Defendants' use of the official USDA grade shields in advertisements could be misleading to reasonable consumers if viewed in conjunction with USDA's and AMS' websites' statements about those shields, Thornton does not demonstrate that the general public is aware of or relies upon those statements; and (ii) because the official USDA grade shields are not inherently misleading, they enjoy First Amendment protection, and Thornton does not demonstrate that a PI is the least restrictive method of vindicating the important State interest in truthful commercial speech.

### 1.  Thornton Does Not Demonstrate That the Official USDA Grade Shields Are Misleading to a Reasonable Consumer.

Thornton does not present sufficient evidence to show that the use of red, white and blue colors on the USDA grade shields is misleading to reasonable consumers regarding the origin of those beef products to succeed under the NMUPA.  Thornton's sole evidence to support her contention that the Defendants' use of red, white, and blue USDA grade shields is misleading is the Thornton Decl., which states that Thornton "relied on the red[,] white[,] and blue USDA stickers to indicate that I was purchasing American beef and when I saw advertisements in the

mail or the newspaper it caused me to purchase those products believing I was supporting American ranchers and farmers . . . ." Thornton Decl. ¶ 4, at 1-2.  At the hearing, Thornton clarified that she is "not trying to prohibit . . . commercial speech that conveys the grade of the beef; that it was inspected by USDA," because "[t]hose are both truthful statements."  Tr. at  43:9-13 (Dunn). Thornton argues, however, that "the combination of USDA, plus red, white, and blue . . . , misleads the consumers."  Tr. at 48:2-8 (Dunn).  The Defendants argue that Thornton cannot simply "'place the statements alone before the court'" and assert that they are misleading, but must "'adduce evidence (usually in the form of market research or consumer surveys) showing how the statements are perceived by those who are exposed to them,'" PI Response at 7 (quoting McNeilab, Inc. v. Am. Home Prods. Corp., 501 F. Supp. at 525), or "at least provide 'expert testimony or any other evidence showing that a significant number of consumers received the claimed message from the advertisement,'" PI Response at 8  (quoting United Indus. Corp. v. Cloroz Co., 140 F.3d at 1180).

While the Court does not require Thornton to carry the full burden of persuasion at the PI stage, it does require Thornton satisfy the burden of production, which "is known as presenting a 'prima facie case.'"  Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1039 n.6 (D.N.M. 2016)(Browning, J.)(quoting Black's Law Dictionary 1310 (9th ed. 2009)).  A prima facie case is "'[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor.'"  Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d at 1039 n.6 (quoting Black's Law Dictionary 1310 (9th ed. 2009)).  "The requirement that the movant show a mere 'substantial likelihood' of prevailing on the merits is the only prong of the preliminary-injunction analysis that is easier to satisfy than its analogous prong in the permanent-injunction analysis; permanent injunctions, obviously, require full success on the merits." Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d at 1039 n.6 (quoting 43A C.J.S. Injunctions § 55).   The Tenth Circuit has

stated that the movant must make "a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought." Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972). See Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir. 1969); Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781 (10th Cir. 1964).

> The best way to interpret the Tenth Circuit's dictate that the movant must make "a prima facie case showing a reasonable probability that he will ultimately [prevail]" is by requiring that the movant put forth enough evidence to both: (i) satisfy the burden of production -- meaning that if the same evidence were presented at trial, it would be sufficient for a reasonable factfinder to find in the movant's favor; and (ii) make it reasonably likely -- beyond just being "not unreasonable" -- that the factfinder would in fact find for the movant, i.e., that the movant would satisfy the burden of persuasion.

Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d at 1039 n.6 (quoting 11A Charles Alan Wright & Arthur R. Miller, et al., Federal Practice & Procedure § 2948.3 ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning.")). "The movant need not show a greater-than-fifty-percent probability of satisfying the burden of persuasion, as to require such a showing would be to convert the substantial-likelihood-of-success standard into the ultimate trial standard, which the case law makes clear is not the intended result." Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d at 1039 n.6 (citing Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)).

> The Court will require preliminary-injunction movants to carry the burden of production at the preliminary-injunction stage in all cases, and it will never require the movant to carry the full burden of persuasion at that stage. As for where in between those two quanta of proof the Court will set the standard, it will vary in different cases, depending upon the strength of the movant's showing on the other three prongs: the irreparability of the movant's harm, the balance of harms as between the movant and the nonmovant, and the public interest. Cf. Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d at 843 ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors.").

Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d at 1039 n.6.

Thornton does not make a prima facie case showing that there is a reasonable probability that she will prevail on her claim that using red, white, and blue colors in the USDA grade shield misleads reasonable consumers in violation of the NMUPA.  If the Thornton Decl. were to be the only evidence Thornton presents at trial, it would not be sufficient for a reasonable factfinder to find in her favor.  While it is true that the issue whether an advertisement is misleading is a factual question to which individual jurors would bring their own opinions, perceptions, and experience -- and would ultimately determine, were this case to go to trial -- the Court determines that, in the absence of consumer surveys, market research, or expert testimony to the contrary, a reasonable jury would not consider the USDA grade shields to be misleading facially.  In contrast to the "U.S.D.A./Produced in the USA" graphic, Figures 1, 4, supra -- which the Kroger Company has ceased using in its advertisements -- the USDA grade shields do not assert facially anything about the beef's origin, but assert only the meat's grade and that it passes USDA inspection standards.

The Defendants argue that "the fact that the USDA grading shield is red, white, and blue does not imply anything about the origin of the beef **as a matter of law**," citing two analogous cases in support of their assertion.  PI Response at 18 (citing Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. at 256; Milso Indus. Corp. v. Nazzaro, 2012 U.S. Dist. LEXIS 123999 at *59)(emphasis in PI Motion).  The Court does not agree with the Defendants that these cases stand for the proposition that the use of red, white and blue can never denote geographic origin.  The Supreme Court in Hamilton-Shoe Co. v. Wolf Bros. & Co., in ruling on a trademark infringement issue, determined that the use of the words "American Girl" did not denote that the shoes were made in the United States, because the words "American Girl" did not describe the shoes themselves and therefore could be a trademark.  240 U.S. at 256-57.  The Supreme Court explained that the words "American Girl" do "not signify that the shoes are manufactured in America, or

intended to be sold or used in America, nor does it indicate the quality or characteristics of the shoes.  Indeed, it does not, in its primary signification, indicate shoes at all."  Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. at 256-57.  The Supreme Court affirmed its jurisprudence that geographic names should not be trademarks, and, because "American Girl" is not a literal descriptor of the shoes' origin -- whereas "American Shoes" would be -- the Supreme Court determined that the plaintiff was entitled to use the words "American Girl" as a trademark for shoes.  Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. at 258-59.  Here, in contrast, the issue is not whether the terms "USDA CHOICE," "USDA PRIME," "USDA SELECT," or even "USDA CHOICE/Produced in the USA" denote geographic origin for trademark purposes. Moreover, unlike the words "American Girl" when applied to shoes, the terms here are literal descriptors of the products on sale, and denote the beef's quality and character.  Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. at 256-57.

Milso Indus. Corp. v. Nazzaro does not stand for the proposition that the colors red, white, and blue can never denote geographic origin.  See 2012 U.S. Dist. LEXIS 123999. The Honorable Alvin Thompson, United States District Judge for the United States District Court for the District of Connecticut, concluded that:

> Although the company name, "Liberty Casket," and the iconography of the Statue of Liberty and the American flag evoke clear associations with the United States of America, these words and symbols are too general to evoke any specific geographical associations or to support an inference that there is an implied claim of domestic manufacture.

Milso Indus. Corp. v. Nazzaro, 2012 U.S. Dist. LEXIS 123999, at *59.  In Milso Indus. Corp. v. Nazzaro, the plaintiff relied on an expert report based on a survey of 400 consumers, which found that "'the information that a Liberty casket is made in China is material to consumers and that the omission of such information is misleading to consumers.'"  Milso Indus. Corp. v. Nazzaro, 2012

U.S. Dist. LEXIS 123999, at *63.  The district court found the survey inadequate, because it "support[s] a conclusion that information that a casket is made in China is material to consumers," but not "a conclusion that the omission of such information from Liberty's advertising and promotional materials renders them impliedly false."  Milso Indus. Corp. v. Nazzaro, 2012 U.S. Dist. LEXIS 123999, at *63.  The survey was inapposite, because the plaintiff's claim was

> not that omission from a casket manufacturer's advertising and promotional materials of the fact that a casket is made in China renders them impliedly false, . . . but rather that Liberty's pervasive use of American iconography, including the name of the company and its logo, requires disclosure of the fact that its caskets are manufactured in China in order for Liberty's advertising and promotional materials not to be implicitly false.

The district court found that the consumer survey did not support the plaintiff's claim, because "[n]o part of [the] survey focused on Liberty's advertising and promotional materials and whether they suggest that Liberty's caskets are manufactured domestically."  Milso Indus. Corp. v. Nazzaro, 2012 U.S. Dist. LEXIS 123999, at *63-64.  As a result, the district court granted the defendants' motion for summary judgment on the plaintiff's false advertising claims.  See Milso Indus. Corp. v. Nazzaro, 2012 U.S. Dist. LEXIS 123999, at *67.  Accordingly, the Court does not read Milso Indus. Corp. v. Nazzaro to stand for the proposition that the use of American iconography and the American flag is not misleading as a matter of law, but rather, that pertinent and targeted consumer surveys must support adequately any such allegations, particularly at the summary judgment stage.  Thornton does not provide any evidence -- other than the Thornton Decl. -- that the colors red, white, and blue mislead consumers about the beef products' origin.  d

At the PI Hearing, and in the PI Response, the Defendants direct the Court's attention to the USDA and AMS websites, and, in particular, to a blog post explaining the meaning of the USDA grade shields.  See Tr. at 29:18-23 (Miller); PI Response at 17.  The Defendants contend

that "no reasonable consumer would believe that these USDA grading shields imply anything about the origin of beef," because the "USDA grading criteria [are] publicly available on the USDA's website," Tr. at 29:18-23 (Miller), and also in USDA consumer guides, "none of [which] suggest that these shields have anything to do with where the cow was born," Tr. at 30:4-6 (Miller). See id. at 30:1-2 (Miller). The Defendants reproduce parts of the USDA blog post in their PowerPoint presentation, with certain portions highlighted. See PowerPoint Slides at 45; Figure 20, infra.

Figure 20: Screenshot of the Defendants' PowerPoint Slides at 45. The Defendants assert that "USDA grading criteria is publicly available on the USDA's website, and it is clear that the country of origin has nothing to do with the grading criteria." PowerPoint Slides at 45.

Contrary to the Defendants' representations, however, two paragraphs above the prose the Defendants excerpt, the USDA's blog post states:

The USDA grade shields are highly regarded as symbols of safe, *high-quality American beef*. Quality grades are widely used as a "language" within the beef industry, making business transactions easier and *providing a vital link to support rural America*. Consumers, as well as those involved in the marketing of agricultural products, benefit from the greater efficiency permitted by the availability and application of grade standards.

Larry Meadows, What's Your Beef -- Prime, Choice, or Select? (emphasis added). The USDA

blog post appears to draw its content from the AMS' website, which contains a nearly identical

statement: "The USDA grade shields are highly regarded as symbols of *high-quality American*

*beef*. Quality grades are widely used as a "language" within the beef industry, making business

transactions easier and providing *a vital link to support rural America*." AMS, Beef Grading

Shields (emphasis added). In light of the statements on these websites, Thornton's assertion that

she "relied on the red[,] white[,] and blue USDA stickers to indicate that I was purchasing

*American beef* and when I saw advertisements in the mail or the newspaper it caused me to

purchase those products believing I was *supporting American ranchers and farmers* . . . " looks a

little more reasonable. Thornton Decl. ¶ 4, at 1-2 (emphasis added). Thornton's statement that

the USDA CHOICE shield indicated "American beef" that would "support[] American ranchers

and farmers," and that she "relied on the red[,] white[,] and blue USDA stickers to indicate that I

was purchasing American beef and when I saw advertisements in the mail or the newspaper it

caused me to purchase those products believing I was supporting American ranchers and farmers

. . . ." Thornton Decl. ¶ 4, at 1-2, is not unreasonable in light of the USDA and AMS' statements

that the grading shields are "symbols of high-quality American beef" and which provide a "vital

link to support rural America." AMS, Beef Grading Shields. When viewed in conjunction with

the promotional statements the USDA and AMS make on their websites, see Larry Meadows,

What's Your Beef -- Prime, Choice, or Select?; AMS, Beef Grading Shields, the USDA grade

shields could mislead reasonable consumers about the where the cattle from which the beef comes

are raised. [49]   Just as the Supreme Court determined -- at least for trademark purposes -- that the

---

[49]The Honorable Alvin W. Thompson, United States District Judge for the United States District of Connecticut, draws a distinction between the burden of production required for alleging an implied as opposed to an explicit falsehood:

> "'[P]laintiffs alleging an implied falsehood are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality' -- a claim that 'invites a comparison of the impression, rather than the statement with the truth.' . . . Therefore, whereas 'plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, . . . a district court must rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message.'" Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007)(quoting Schering Corp. v. Pfizer, Inc., 189 F. 3d 218, 229 (2d Cir. 1999)).

> "[T]he success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey." Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beechman Corp., 960 F.2d 294, 298 (2d Cir. 1992). "[W]here the plaintiff cannot demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement, the plaintiff cannot establish that it suffered any injury as a result of the advertisement's message." Id.

Milso Indus. Corp. v. Nazzaro, 2012 U.S. Dist. LEXIS 123999, at *60-61 (brackets in Time Warner Cable, Inc. v. DIRECTV, Inc.). The Second Circuit case cited by Judge Thompson explains more fully the contours of an explicit falsehood claim:

Two different theories of recovery are available to a plaintiff who brings a false advertising action under § 43(a) of the Lanham Act. First, the plaintiff can demonstrate that the challenged advertisement is literally false, i.e., false on its face. See GAC Int'l, Inc., 862 F.2d at 977. When an advertisement is shown to be literally or facially false, consumer deception is presumed and "the court may grant relief without reference to the advertisement's [actual] impact on the buying public." Coca-Cola Co., 690 F.2d at 317. "This is because plaintiffs alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe." Schering Corp. v. Pfizer Inc., 189 F.3d 218, 229 (2d Cir. 1999).

Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007). The Court is reluctant, however, to require consumer surveys for implicit falsehood claims at the PI stage. Nevertheless, the distinction is one worth considering when determining whether Thornton meets her burden of production.

term "American shoes" denotes a geographic origin for shoes, it is reasonable to think that the term "American beef" denotes a geographic origin for beef.[50] <u>Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.</u>, 240 U.S. at 256-57.

Despite the Court's conclusion here that the USDA grade shields, taken in conjunction with USDA and AMS' promotional statements, could mislead a reasonable consumer about the origin of the beef which they advertise if that beef does not originate from the United States, Thornton does not plead that either she or the general public is aware of or relies upon the USDA and AMS websites' statements about the official USDA grade shields when they purchase beef products.  As the Court noted in its MTD Analysis § I(F)(1), <u>supra</u>, Thornton does not plead sufficient facts for the Court to conclude that the general public finds the official USDA grade shields misleading based on the USDA's and AMS' website statements.  Without a showing that the general public is aware of an equivalence between the official USDA grade shields and the USDA's and AMS' statements that they symbolize "American beef," Thornton does not demonstrate that the USDA grade shields are misleading as to the beef products' origin.  AMS, <u>Beef Grading Shields</u>.  Without a misleading statement or misrepresentation, Thornton cannot succeed on her NMUPA claim.

---

[50]Although Thornton did not argue in her PI Motion or in the PI Hearing that the USDA website's statement is misleading, and although Thornton does not contend that she relied on the USDA website's assertions when purchasing the Defendants' beef products, the Court can decide a PI "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. at 395.  Furthermore, "when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits," and "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." <u>Heideman v. S. Salt Lake City</u>, 348 F.3d at 1188.  The Court, therefore, can consider these findings of fact for the PI's purposes, and these findings do not bind the Court or the parties at trial.

Additionally, to succeed on the merits of her claim that the Defendants' advertising is misleading, Thornton must demonstrate by a preponderance of the evidence that at least some of the beef the Defendants sell and advertise using the USDA grade shields does not originate from the United States.  Thornton asserts that the Defendants

> have admitted that they know that the beef they are selling is in some part not produced in this Country and that they have no intention of ascertaining the actual source of the beef by requiring accurate labeling from the packers because they (like the packers) are making bigger profits by selling foreign produced beef that is co-mingled with American produced beef than they would if the beef they sold were accurately labeled and advertised foreign beef.

PI Reply at 1-2.  Thornton asserts that "imports of beef (not counting a substantial increase in imported live feeder cattle) nearly tied an all-time high with 3.343 billion pounds" during 2020, PI Motion at 1 (citing Total U.S. beef and veal imports and exports from 2006 to 2021 (in million pounds), Statista (Feb. 24, 2021), https://www.statista.com/statistics/194702/us-total-beef-and-veal-imports-and-exports-since-2001/), and  alleges that "Kroger and Albertsons, who were the two largest supermarket chains in the United States in 2020, and in 2017 were the 2nd and 3rd largest grocery retailers respectively, have beyond any colorable doubt sold some of that foreign originating beef to their consumers over the last 5 years," PI Motion at 3.  Thornton asserts that sixteen percent of beef consumed in the United States in 2020 did not originate in the United States.  See PI Motion at 3.  The Defendants counter, however, that Thornton's statement that "'16%' of the beef **sold by Defendants** is '**potentially** not a product originating in the Country'" is not enough to assert or prevail upon a claim.  PI Response at 18 (quoting PI Motion at 4)(emphasis in PI Response but not in PI Motion).

While Thornton presents no evidence at the PI stage -- other than general statistics from online news articles -- to prove that the Defendants are selling beef which is raised outside the

United States, the regulatory scheme currently in place permits the obfuscation of beef products'

origins.  See 9 CFR 327.18(a)("All products, after entry into the United States, shall be deemed

and treated as domestic products . . . [and] may . . . be taken into official establishments and be

mixed with or added to any product in such establishments which has been inspected and passed

therein.").  FMIA states that, in terms of imported livestock, "[a]ll such imported articles shall,

upon entry into the United States, be deemed and treated as domestic articles subject to the other

provisions of this Act."  21 U.S.C. § 620.  The FSIS has indicated, albeit in 2005 policy guidance,

that "[l]abeling may bear the phrase 'Product of U.S.A.' . . .  if . . . [t]he product is processed in

the U.S. (i.e. is of domestic origin)."  FSIS, Food Standards and Labeling Policy Book at 147

(emphasis added).  Federal guidance allows imported beef to be indistinguishable from domestic

beef.  See 21 U.S.C. § 620; 9 CFR 327.18(a); Food Standards and Labeling Book at 147.  Even

the White House is troubled by the co-mingling of foreign with domestic beef:

> American farmers and ranchers are also getting squeezed by foreign
> corporations importing meat from overseas with labels that mislead customers
> about its origin.  Under current labeling rules, meat can be labeled "Product of
> USA" if it is only processed here -- including when meat is raised overseas and then
> merely processed into cuts of meat here.  For example, most grass-fed beef labeled
> "Product of USA" is actually imported. That makes it hard or impossible for
> consumers to know where their food comes from and to choose to support
> American farmers and ranchers.

The White House Briefing Room, FACT SHEET: Executive Order on Promoting Competition in

the American Economy (July 9, 2021), https://www.whitehouse.gov/briefing-room/statements-

releases/2021/07/09/fact-sheet-executive-order-on-promoting-competition-in-the-american-

economy/ (last visited January 13, 2022)("White House Briefing").  The White House Briefing

cites Bloomberg News for its statement that "most grass-fed beef labeled 'Product of USA' is

actually imported."  White House Briefing.  On July 9, 2021, President Joseph R. Biden issued an

Executive Order directing the Secretary of Agriculture

> to ensure consumers have accurate, transparent labels that enable them to choose products made in the United States, consider initiating a rulemaking to define the conditions under which the labeling of meat products can bear voluntary statements indicating that the product is of United States origin, such as "Product of USA."

EO 14036, <u>Promoting Competition in the American Economy</u>, signed July 9, 2021.  Taking into

account the news sources that Thornton and the White House cite, and the regulatory framework

permitting the intermingling of foreign with domestic beef, the Court concludes that Thornton has

a substantial likelihood of proving that some of the beef that the Defendants sell and which they

advertise using the official USDA grade shields originates, in fact, from foreign countries.

Because, however, Thornton does not demonstrate that the color versions of the official USDA

grade shields are misleading to reasonable consumers about the beef products' origin, the fact that

some of the beef the Defendants sell is not from the United States is immaterial.  In conclusion,

Thornton does not demonstrate that the USDA grade shields are misleading facially, because she

does not demonstrate how the colors red, white, and blue make the official USDA grade shields

misleading.  Furthermore, Thornton does not demonstrate that USDA's and AMS' websites'

statements are well known enough to the general public to make the color versions of the official

USDA grade shields misleading.  Accordingly, Thornton does not demonstrate a substantial

likelihood of success on the merits of her NMUPA official grade shield claim.

    **2.**    <u>**Thornton Does Not Demonstrate That Enjoining the Defendants' Use of the Official USDA Grade Shields on Beef That Does Not Originate in the United States Would Be the Least Restrictive Method of Regulating Potentially Misleading Speech**</u>**.**

Thornton does not demonstrate a substantial likelihood of success on the merits of her

official USDA grade shield claims, because the Defendants' use of the USDA grade shields for

beef products is subject to First Amendment protections for commercial speech. The Defendants' use of the official USDA grade shields is commercial speech, because the speech is contained in an advertisement, is made with an economic motive, and refers to specific products. See Proctor & Gamble Co. v. Haugen, 222 F.3d at 1274. If commercial speech is not misleading and concerns lawful activity, it garners First Amendment protection. See Central Hudson, 447 U.S. at 566. The Supreme Court has drawn distinctions between misleading commercial speech, potentially misleading commercial speech, and truthful commercial speech. See In re R.M.J., 455 U.S. at 203. The Central Hudson balancing test applies when the speech is potentially misleading or when it is truthful. See In re R.M.J., 455 U.S. at 203. Potentially misleading speech occurs when "the information also may be presented in a way that is not deceptive." In re R.M.J., 455 U.S. at 203. In contrast, inherently misleading speech is "incapable of being presented in a way that is not deceptive." Revo, 106 F.3d at 929.

Because the Court concludes, supra, that the official USDA grade shields are not inherently misleading commercial speech, they are entitled to First Amendment protection as either truthful or "potentially misleading" commercial speech. In re R.M.J., 455 U.S. at 203. See Central Hudson, 447 U.S. at 566. The Court, therefore, applies the Central Hudson three-part balancing test. See Central Hudson, 447 U.S. at 564-66. Under the Central Hudson test, "Protected commercial speech may . . . be regulated, but only if the government can show that (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest." Revo, 106 F.3d at 932. Here, Thornton's requested PI would regulate commercial speech for the Central Hudson test's purposes. See CBS v. Davis, 510 U.S. 1315 (1994)(staying a preliminary injunction on First Amendment grounds). Although the State has an interest in

regulating false or misleading commercial speech, Thornton retains the burden of proving that any restriction on the Defendants' truthful speech is justified.  See Zauderer v. Off. of Disciplinary Counsel of Supreme Court, 471 U.S. at 647.  If

> the illustration [is] . . . an accurate representation . . . and has no features that are likely to deceive, mislead, or confuse the reader, the burden is on the State to present a substantial governmental interest justifying the restriction as applied to appellant and to demonstrate that the restriction vindicates that interest through the least restrictive available means.

Zauderer v. Off. of Disciplinary Counsel of Supreme Court, 471 U.S. at 647.  Thornton does not demonstrate that enjoining the Defendants' use of the official USDA grade shields is the least restrictive means of ensuring that consumers are not misled about the beef products' origin. Accordingly, the Court declines to issue a PI enjoining the Defendants' protected commercial speech.

### B.   THORNTON DOES NOT SHOW THAT SHE WILL SUFFER IRREPARABLE INJURY SHOULD THE COURT NOT ISSUE A PI.

Thornton does not demonstrate that she will suffer irreparable injury should the Court not issue a PI, and, because the Court determines that Thornton does not have a substantial likelihood of success on the merits of her official USDA grade shield claims, see Analysis § II(A), supra, she is not entitled to any presumption of irreparable harm.  See Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d at 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005))("Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm.").

> To obtain an injunction, the moving party must show it "will suffer irreparable injury if the injunction is denied." First W. Cap. Mgmt. Co., 874 F.3d at 1141 . . . "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." Schrier, 427 F.3d at 1267. . . . The burden of showing

irreparable harm is not "an easy burden to fulfill." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004)(internal quotation marks omitted).

Keybank Nat'l Ass'n v. Williams, No. 20-1384, 2022 U.S. App. LEXIS 3701, at *8-9 (10th Cir. Feb. 10, 2022).   Furthermore, "[a] plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'"   Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d at 1190 (quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1156 (10th Cir. 2001)).

Thornton does not show that she will suffer an injury that is "certain, great, actual, and not theoretical," Valdez v. Grisham, 2021 U.S. Dist. LEXIS 173680, at *41), or that her "injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent the irreparable harm," Schrier v. Univ. of Colo., 427 F.3d at 1266.  Thornton states in the Thornton Decl. that she has stopped buying beef products from Smith's Grocery or Albertsons Companies:

> I have completely ceased purchasing any beef products from Smith's or Albertsons given that they [are] using advertising out of the store and on the packaging of beef as falsely stat[ing]or giv[ing] the impression that all of the beef they are selling originated in the United States when in fact a significant portion of the beef they sell came [from] countries like Brazil.

Thornton Decl. ¶ 9, at 2.   The Defendants argue that Thornton, therefore, "faces **no risk** of purchasing beef from Defendants originating in other countries that allegedly contributes to environmental damage or puts her health at risk."   PI Response at 14 (citing Thornton Decl. ¶ 9, at 2)(emphasis in PI Response).   Assuming that Thornton's allegations that the Defendants are selling beef from Argentina and Brazil are correct, and even assuming that Thornton has purchased beef originating from those countries from the Defendants believing that she was purchasing

American-raised beef, her avowal to cease purchasing beef products from the Kroger Company or Albertsons Companies means that she is not facing any imminent injury.  See Thornton Decl. ¶ 9, at 2.  Moreover, even if Thornton were to continue purchasing beef products from the Defendants, and thereby risk purchasing foreign beef, she does not present any evidence to support her assertion that she would suffer harm to her health from consuming it over American-raised beef.  As the Defendants note, Thornton does not "acknowledge the fact that all raw meat sold in interstate and foreign commerce is inspected by the United States Food Safety and Inspection Service . . . before it is sold to the public," PI Response at 14-15, and fails to provide "evidence to suggest that beef from foreign born cattle is any less safe than domestic beef . . . ," PI Response at 15.  Indeed, the USDA grade shields to which Thornton objects as misleading indicate that those products have been inspected and graded, a fact which Thornton does not dispute.  See Tr. at  43:9-13 (Dunn).

Thornton asserts that her irreparable harm argument is not just about her health, but also about "extreme degradation practices" such as "deforestation" and the use of slave labor in countries such as Brazil and Argentina.  Tr. at 46:14-17 (Dunn).  While environmental degradation and slave labor practices are objectionable, Thornton does not show how they cause her great and actual injury.  See Schrier v. Univ. of Colo., 427 F.3d at 1267.   Furthermore, Thornton does not offer any evidence showing a connection between the deforestation and human rights abuses that she avoids supporting, and the Defendants' supply chain, much less how her proposed PI would remedy these ills.  In conclusion, the Court concludes that Thornton does not carry her burden to meet the PI test's irreparable injury prong.

### C.   THORNTON DOES NOT DEMONSTRATE THAT THE BALANCE OF EQUITIES WEIGHS IN HER FAVOR.

Thornton does not demonstrate that the balance of equities weighs in her favor.  Before a district court may issue a PI pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must demonstrate that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party."  Resolution Trust Corp. v. Cruce, 972 F.2d at 1198.  Thornton argues that "the balance of harms tips decidedly in favor of Plaintiff," because "the inclusion of a red, white and blue promotional sticker is neither regulatorily required, nor necessary for them to market their products as they commonly omit advertisements of beef products."  PI Motion at 12.  Thornton contends that use of the USDA grade shields is not mandatory and that the Defendants "will not be harmed by denying them the ability to deceive the consumers on the beef of foreign origin that they sell co-mingled with American beef . . . ."  PI Motion at 12.  In response, the Defendants assert that the balance of equities favors denying Thornton's PI Motion, because they will be forced "to change their nationwide marketing plan," which will impose "real operational costs," and put them at a "competitive disadvantage by prohibiting them from advertising their products in the same truthful way their competitors do."  PI Response at 20.  The Defendants contrast these harms with Thornton's "indisputably hypothetical" harms,  PI Response at 20, and contend that a PI would not prevent any harm, because Thornton is no longer purchasing beef from the Defendants, while it would cause great harm to the Defendants, see PI Response at 22.

Thornton's PI Motion does not satisfy the PI test's two most important prongs: a substantial likelihood of success on the merits and irreparable injury.  Asking the Defendants to change their national marketing campaign and forego the benefits of using USDA grade shields in their

marketing would levy a substantial financial burden on the Defendants.  On the other side of the equation, Thornton does not demonstrate any injury, especially irreparable injury, should the Court not grant the PI, and, so, she demonstrates no injury that outweighs a PI's burden on the Defendants.  The balance of equities, therefore, does not weigh in Thornton's favor.

D.      A PI IS NOT IN THE PUBLIC INTEREST.

Thornton has not carried her burden of demonstrating that a PI is in the public interest.  In addition to meeting the other three prongs of the PI test, a movant must show that "the injunction, if issued, would not be adverse to the public interest."  Resolution Trust Corp. v. Cruce, 972 F.2d at 1198.  Thornton argues that a PI would be in the public interest, because it would "prevent harm to consumer[s] from unfair or deceptive practices."  PI Motion at 12 (citing Nadler v. Allegheny Airlines, Inc., 426 U.S. at 302.  On the other hand, the Defendants argue that a PI would harm the public interest, because consumers "would be given less information about the beef products they purchase," and "hinder the objectives of the USDA itself, which designed the 'USDA shields [to] assure consumers that the products they buy have gone through a rigorous review process . . . .'"  PI Response at 22-23 (quoting USDA, Agricultural Marketing Service, Grades and Standards, https://www.ams.usda.gov/grades-standards).  The Defendants also argue that it is in the public interest for the "'numerous private economic decisions'" that drive a free market economy to be "'intelligent and well informed.'"  PI Response at 23 (quoting Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. at 765).

Thornton does not demonstrate that the Defendants' use of the official USDA grade shields is misleading.  The official USDA grade shields serve an important public interest: indicating the beef's grade to retailers and consumers.  Thornton does not demonstrate that the official USDA grade shields alone mislead consumers as to the beef's origin, and the Court concludes that they

are plausibly misleading only when viewed in conjunction with USDA's and AMS' public statements about the shields.  See Analysis II(D)1, infra.  Enjoining the Defendants from using these shields would not be in the public interest, therefore, because it would remove from the public the grading program's benefits, without redressing the only misrepresentation connected with their use.   The Court concludes, therefore, that enjoining the Defendants' use of the official USDA grade shields in their advertising would not be in the public interest.  Accordingly, the Court denies Thornton's PI Motion.

**IT IS ORDERED** that (i) the Defendants' Motion to Dismiss with Prejudice, filed November 13, 2020 (Doc. 14) is granted as to the Plaintiff's New Mexico Unfair Practices Act, breach-of-express-warranty, and unjust enrichment claims against Albertsons Companies and the Kroger Company regarding their use of the official USDA grade shields, but denied as to her claims based on the "U.S.D.A. CHOICE/Produced in the USA" graphic; (ii) the Plaintiff's Opposed Emergency Motion to Vacate and Stay, filed August 23, 2021 (Doc. 22) is denied; (iii) the Plaintiff's claims against Albertsons Companies are dismissed; and (iv) the Plaintiff's Motion for Preliminary Injunction, filed November 10, 2021 (Doc. 36), is denied.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Marshall J. Ray
Law Offices of Marshall J. Ray, LLC
Albuquerque, New Mexico

-- and –

A. Blair Dunn
Jared Robert Vander Dussen
Western Agriculture Resource and Business Advocates, LLP
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Monica R. Garcia
Butt Thornton & Baehr PC
Albuquerque, New Mexico

-- and --

Nathaniel Lampley, Jr.
Jessica K Baverman
Victor Allen Walton , Jr.
Jeffrey A. Miller
Vorys, Sater, Seymour and Pease LLP
Cincinnati, Ohio

    *Attorneys for Defendants Albertsons Companies and the Kroger Company*

Hugh N. Lyle
Mullin, Hoard & Brown, LLP
Lubbock, Texas

    *Attorneys for Defendant Pay and Save Inc.*