## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ROBIN G. THORNTON, on behalf of**
**Herself and others similarly situated,**
**WENDY IRBY, on behalf of**
**Herself and others similarly situated,**

    **Plaintiff,**

**v.**                              **No. 1:20-CV-1040 JB/LF**

**THE KROGER COMPANY,**
**PAY AND SAVE, INC,**

    **Defendants.**

### CLOSING BRIEF SUPPORT OF THE THORNTON MOTION TO CERTIFY CLASS; PROPOSED FINDINGS OF FACT AND CONCLUSION OF LAW

COMES NOW, Plaintiff Robin G. Thornton, by and through undersigned counsel of record Western Agriculture, Resource and Business Advocates, LLP (A. Blair Dunn, Esq. and Jared R. Vander Dussen, Esq.), Law Offices of Marshall Ray (Marshall J. Ray, Esq.) and Preston Law Offices (Ethan Preston, Esq.) on behalf of herself and all others similarly situated and provide her Closing Brief in Support of the Motion to Certify the New Mexico Class[1] against Kroger.

I.    **Closing Brief in Support of Certification of the New Mexico Class[2]**

The evidence shows that Defendants have willfully created a situation in which they use explicit misrepresentations to unjustly part a vast number of Americans from their purchasing dollars, but that Defendants' other machinations—willful spoliation of records that could identify class members achieved by industry collusion— attempts to render the Court entirely helpless to

---

[1] Plaintiff Thornton withdraws the request to certify a national class against Kroger for the reasons stated herein.
[2] This Closing Argument is Offered Here and Incorporated by Reference in Plaintiff Irby's Written Brief in Support of the Motion to Certify Class filed concurrently.

solve this problem.[3] This failure of justice, however, is entirely an artifice of Defendants' framing the parties' dispute to enable their underlying fraud and unjust enrichment.

In essence, what Plaintiffs have realized after considering the entire record before the Court, is that solving this riddle built by the Defendants (with the aid of the packers) requires implementing Albert Einstein's aphorism "[w]e cannot solve our problems with the same level of thinking that created them." Based on the full record before the Court, it is now apparent that the Court grant the motion only as to the New Mexico subclass for each of the Defendants.

This cuts the Gordian knot created by attempting to balance the blame between the packers, the USDA, and the Defendants, and the difficulties necessary to address the national or multi-state unjust enrichment claim and crunching the data of the millions of consumers misled by the Defendants' false advertising of geographic origin falls by the wayside, and the case is reduced to simply applying the New Mexico UPA to just New Mexico consumers. More importantly, as needed for analysis under either Rule 23(a) or (b) the information about how to obtain the amounts of foreign beef or beef from imported cattle from the packers as part of the traceability system required for foodborne illness, as described by Dr, Robinson in her testimony, is information that is available, and can be used at trial to help the jury determine just how much foreign beef was consumed by New Mexicans shopping at Defendants' stores.  And based upon the modeling performed by Dr. Robinson using the study of Mr. Sanderoff's company, as confirmed by the USDA study recently brought to light by USDA's proposed rule-making, *see* ECF Doc. 268 at 65-66, the jury will be guided by a doubly established average discount amount for the types of

---

[3]  But, as author Rosamund Stone Zander once said, "[e]very problem, every dilemma, every dead end we find ourselves facing in life, only appears unsolvable inside a particular frame or point of view. Enlarge the box, or create another frame around the data, and problems vanish, while new opportunities appear."

products that New Mexico consumers purchased that contained, in some percentage, beef products of foreign origin.[4] Classwide damages are certainly ascertainable for the Court based upon the information currently before the Court and the jury will certainly be able to reach a determination that comports with the laws the Court must follow in cutting the Defendants'' manufactured Gordian knot.

However, Plaintiff Thornton understands and agrees that this Court must conduct a "rigorous analysis" in order to certify class. *Payne v. Tri-State Care Flight, LLC*, 332 F.R.D. 611, 656 (D.N.M. 2019). However, what Defendant Kroger asks this Court to do is essentially re-perform much of its Rule 12 analysis, in addition to conducting a trial weighing the persuasiveness or completeness of the evidence thus far accrued by Plaintiffs in this case. In effect, Kroger is asking this Court to take Plaintiff's evidence regarding causality for a test drive under the guise of ascertainability. This is contrary to the Supreme Court's direction that:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (internal quotation marks omitted), Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. See *id.,* at ——, n. 6, 131 S.Ct., at 2552, n. 6 (a district court has no " 'authority to conduct a preliminary inquiry into the merits of a suit' " at class certification unless it is necessary "to determine the propriety of certification" (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974))); Advisory Committee's 2003 Note on subd. (c)(1) of Fed. Rule Civ. Proc. 23, 28 U.S.C.App., p. 144 ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision.").

*Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S. 455, 465–66 (2013). Importantly this Court has recognized that the uncertainty in a class certification is resolved in favor of

---

[4] This includes ground beef, because despite their arguments to the contrary, Defendants cannot and will never be able to establish that they did not market ground beef

certifying the class: the "interests of justice require that in a doubtful case, ... any error, if there is to be one, should be committed in favor of allowing the class action." *Abraham v. WPX Prod. Productions, LLC*, 317 F.R.D. 169, 218 (D.N.M. 2016). This is especially true for the Court in this case given the clear evidence that Kroger *knew* that it was selling commingled foreign beef, purposefully avoided any effort at collecting or keeping records that would allow it to trace the beef it traded to particular countries of origin, even while it knew from its own market research that the country of origin was very material to beef consumers, but still elected to affirmatively advertise that beef as "Produced in the USA."

Contrary to the assertions of Kroger, Plaintiff Thornton has presented sufficient evidence to satisfy the Court's rigorous analysis that: (1) consumers received advertisements of beef products with the logo at issue; (2) that the USDA Produced in the US logo led a significant percentage of those consumers to believe that they were purchasing beef products derived from cattle born, raised and harvested in the United States (Doc. 214-3 at 2); (3) Kroger included the "Produced in the USA" slogan in its advertising—after concluding that geographic origin was very important to a significant portion of its customers when purchasing beef(Doc. 214 – 3 at 8, Doc. 214-5 at 20-23); and (4) that (though obscured by suppliers Defendants willfully continued to use) a significant portion of the beef advertised and sold under geographic origin logo was from cattle that were not born, raised and even harvested in the United States. (Doc. 214-5 at 3-5; Ex. A to Speer Decl. ¶¶ 4.1-4.5).

Here Plaintiffs, have established proof that Plaintiff regularly and consistently reviewed the circulars that contained the promotional logo that led Plaintiff to rely on the ad to purchase a chuck roast that was likely to have been not from a bovine born and raised in the USA despite her belief based upon the advertisement that it was. The critical component that prevents Defendants from

tracing the additional beef purchases that were of foreign origin is a system that Defendants have been complicit in and purposefully benefited from that began in 2016. Here the relevant changes in the law discussed in the original and operative complaints are important and summarized as follows:

- At the end of 2015 Congress amended the Agriculture Marketing Act to remove only beef and pork from the requirements of mandatory-Country of Origin Labeling (m-COOL).

- Prior to this change in the law Kroger's suppliers were required trace and label beef and pork in a fashion that disclosed all of the geographic origins of these products from birth to processing, but following the change in the law it became voluntary guidance that FSIS inspected facilities were permitted to label beef as a Product of the United States if it was processed at some inspected facility regardless of whether or not a producer in the United States had any input into the production of that meat.

- In October of 2018, Kroger knowing both that country of production origin was important to consumers (Doc. 214-5 at 20-23) and knowing that its beef suppliers were supplying it with intermingled beef elected to begin affirmatively marketing virtually all beef it sold as "Produced in United States" while affirmatively avoiding any effort to verify the truth or falsity of those statements that it was making to consumers.

Thus, Defendants not merely asking this Court to lift the hood, check the fluid levels and kick the tires for Plaintiff's case at the certification stage, but, instead, to start the car and take out it on the test track, testing the merits of Plaintiff's claims by measuring the weight of their evidence even before discovery closes to determine causality now. Defendants seek such a demanding (not merely rigorous) analysis now because it has bet the farm on the premise that discovery was

complete and final. "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation," class certification "is inherently tentative." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (cleaned up). Moreover, Defendants have no legitimate excuse for knowingly and voluntarily using advertising which it knows misleads a significant portion of its consumers about the geographic origin of its beef products. Thus, their arguments against certification boil down to: (1) ignoring the known statistical reality that their suppliers provided it with commingled foreign beef which it elected to advertise as American produced beef contrary to the New Mexico UPA; and (2) arguing that it is impossible to ascertain which consumers relied on the ads, and actually ended up purchasing a piece of the commingled foreign beef because there is no direct traceability of either the beef or the consumers (even though this Court has recognized that reliance is not a requirement under the New Mexico UPA). *See Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 35, 142 N.M. 437, 444, 166 P.3d 1091, 1098.

In the end, Defendants ask this Court to turn a blind eye to their unlawful conduct to allow them to retain their ill-gotten profits on the basis that the classes are too broad and class members too difficult to identify.  But that is not an accurate portrayal of the proof or procedure actually needed to identify litigate the New Mexico classes' claim. The New Mexico subclasses are narrowly defined as consumers that purchased beef a percentage of which was foreign sourced from Defendants from October of 2018 to November of 2021. Just because the number of putative New Mexico class members is still large does not automatically equate to the premise that its definition is broad (let alone overbroad). Nor does the large number of class members necessarily equate to impossibility of identification or of damages or an insurmountable presumption that individual damage considerations predominate over class-wide determination. Identification of

New Mexico class members can be accomplished by giving notice via the same advertising used by Defendants in the first instance and then requiring the class members to opt out (or, alternatively, declare under penalty of perjury that they met the requirements noted above, electing to either join the class providing an estimate of the amount of each type of beef product that they have purchased on an annual basis).  Likewise, damages should not be reduced to individualized inquires. Instead, the Court should permit Plaintiffs to present evidence of the exact percentage amount of the beef sold into Defendants' New Mexico stores, allow the jury to decide what discount should be applied to those sales for the amounts of the foreign beef sold into New Mexico, and to distribute that amount pro rata according to the sums class members estimated upon the amounts that New Mexico shoppers estimate that they have purchased of each of the beef products shown to have contained foreign beef on an annual basis.

> [The] unjust enrichment of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong. The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty. Restitution remedies that pursue this object are often called "disgorgement" or "accounting."

Restatement (Third) of Restitution and Unjust Enrichment § 51(4) (2011). As explained, regarding the New Mexico subclass, the calculation is not unfathomable for the jury at trial. Defendants have conceded that the data exist to evaluate how much beef was sold in New Mexico and that it is possible to calculate how much shoppers purchased individually over that period of time to find an average. All that must then be done is to apply the discount, determined by the jury to the members of the class that self-identify, to the amounts they allege they purchase on average annual for each of the types of products arrive at class-wide damages amount. Defendants retain the opportunity to challenge any individual class members claim that is outside of the norm.  Quite

simply, the New Mexico class is a much smaller elephant that is readily manageable for the Court to digest and hold Defendants' accountable for their unlawful actions.

## II.    Findings of Fact[5]

### A.  Adoption and Incorporation of Previous Findings of Fact

This Court, in resolving Plaintiff Thornton's Motion for Preliminary Injunction (ECF Doc. 36) and Defendant Kroger's Motion to Dismiss (ECF Doc. 14) previously made factual determinations, MOO, ECF Doc. 115 at 4-31, for which no evidence determined to date calls into question with only two exceptions. One of those exceptions relates to this Court's determination that the use of the USDA Shield without any modification could not plausibly state a claim for misrepresentation of geographic origin. That determination by this Court in the MOO at 235, is not in dispute before the Court as part of class certification for either Kroger or Pay and Save, but is called into question by the survey research published by USDA. *See* ECF Doc. 268-3 at 65[6]. Additionally, though it is oft repeated by Kroger and is expected to be offered as fact by Kroger, there has been no determination by this Court that Kroger has never advertised ground beef as a product of the United States. And though the record in this matter does support that the Court could make that determination by a preponderance of the evidence here, such a determination is not necessary to certify the New Mexico class. *See* ECF Doc. 241-6 at 2-3. Therefore, with those exceptions noted, Plaintiff Thornton incorporates the Court's applicable previous factual determinations without repeating them here.

### B.  Facts Satisfying Rule 23(a)'s Requirements for NM UPA Class.

---

[5] *See Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 617, FN3 (D.N.M. 2019)

[6] "About 18% of eligible consumers mistakenly believed that USDA Choice means the meat is a product of the United States, and 11% mistakenly believed that the USDA mark of inspection means the meat is a product of the United States."

1. **Facts Demonstrating that by a Preponderance of the Evidence the Numerosity Requirement is Met.**

    a.  Well more than 1000 people in New Mexico have purchased a beef that was advertised since November of 2018 as a Product of the United States when it geographically originated, at least in some part outside of the United States. (*See* Motion at 11, ECF Doc. 214; Reply at 18-19, ECF Doc. 246; ECF Doc. 214-4 at 12; https://www.beefitswhatsfordinner.com/retail/sales-data-shopper-insights/ground-beef-at-retail-and-foodservice; https://www.statista.com/topics/1447/beef-market/#dossierKeyfigures)

2. **Facts Demonstrating that by a Preponderance of the Evidence the Commonality Requirement is Met**

    **a.**  A very significant portion of consumers are misled to believe that the beef that they were purchasing was from cattle born raised and slaughtered in the United States. (*See* Sanderoff Survey, ECF Doc. 214-3 at 2 (46%) and USDA Survey, ECF Doc. 268-3 at 65 (63%).)

    **b.**  Kroger sold foreign beef advertised as American beef to New Mexico consumers in each of the years that it was using the offending promotional logo. (*See* ECF Doc. 214-5 at 3-5, 16-17; Ex. A to Speer Decl. ¶¶ 4.1-4.5)

    **c.**  Consumers attached a lesser economic value to purchases of foreign beef (*See* ECF Doc. 214-5 at 13 and ECF Doc. 268-3 at 65-66.)

    **d.**  Kroger's conduct was willful and wanton because it knew (for at least well over a year even after the lawsuit was filed) that a significant portion of the beef it was advertising as a product of the United States was not exclusively of American origin. (*See* ECF Doc. 214 at 6-10; https://www.thekrogerco.com/wp-

content/uploads/2021/07/Kroger-2021-ESG-

Report.pdf;https://www.thekrogerco.com/wp-content/uploads/2022/08/Kroger-

Co-2022-ESG-Report.pdf

    **e.** How much foreign originating beef was sold to New Mexico consumers between November 2018 and November 2021 can be determined from Kroger's sales records and the disease traceability records maintained by the Packers that supply Kroger. (*See* Class Certification Hearing Transcript, December 5, 2022, ECF Doc. 251-2 at 57-61.)

**3. Facts Demonstrating that by a Preponderance of the Evidence the Typicality Requirement is Met**

    a. Plaintiff lives in the community of Edgewood, approximately 26 miles from Albuquerque, NM, in what she describes as a "bedroom community" to Albuquerque. Doc. 251-2, at 180:1-13.

    b. Plaintiff regularly shopped at Smith's Grocery Store. *Id*., at 180:18-181:8.

    c. Plaintiff would receive advertising materials from Smith's in the form of circulars that would show up in the mailbox and inside newspapers. *Id*. at 181:13-182:5.

    d. Plaintiff received advertising materials from Smith's once a week. *Id*. at 181:24-25.

    e. Plaintiff would view advertisements for beef products which appeared front and center and on the front page of Smith's advertising materials. *Id*., at 182:15-21.

    f. The advertising materials Plaintiff saw included "Produced in the USA" with a red, white, and blue striped color scheme evocative of the United States flag. Id. at 183:1-184:15.

    **g.** Plaintiff was misled by the advertising at issue in this case to believe that the beef she

was purchasing was from cattle born raised and slaughtered in the United States. (*See* Class Certification Hearing Transcript, December 5, 2022, ECF Doc. 251-2 at 181-190.)  Plaintiff understood the red, white and blue color scheme, combined with the words "Produced in the USA" to mean that the beef products being advertised were born, raised, and produced in the United States.  *See id*. at 184:10-15, 185.

**h.**  These circular advertising materials Plaintiff received influenced her decision to go to the Smith's store.  *See id*. at 185:13-22.

**i.**  Once in the store, Plaintiff would see the advertising materials on the beef products in-store.  *See id*. at 186:13-17.  These advertising materials would also influence Plaintiff's behavior and decisions related to the beef products bearing the advertising materials.  *See id*. at 186:18-187, 189:6-8.

**j.**  The advertisements that were viewed by Plaintiff are the same advertisements that were conveyed to putative New Mexico Class members by mail or newspaper and for which the interpretation of the logo that shared by an estimated 46% of Sanderoff Survey Respondents (ECF Doc. 214-3 at 2) and 63% of USDA Survey Respondents (ECF Doc. 268-3 at 65.) *See also* (ECF Doc. 214-2 at 34, 132:4 – 133:10).

**4.  Facts Demonstrating that by a Preponderance of the Evidence the Adequacy of Plaintiff Thornton and Proposed Class Counsel Requirement is Met**

**a.**  Plaintiff Thornton's interests are fully aligned with the putative class members and she is conflict free.  (*See* Class Certification Hearing Transcript, December 5, 2022, ECF Doc. 251-2 at 178:1 – 222:10)

**b.**  Ms. Thornton is a consumer who shopped at Smith during the time periods relevant to this lawsuit.  She saw advertising materials in circulars that arrived by mail and in Newspapers, and inside the store that stated that certain beef products were

"Produced in the USA" while bearing red, white, and blue striped color themes which she associated with the flag of the United States.  *See* Doc. 251-2, at 180-190.  She is pursuing claims on behalf of consumers that are similarly situated to her and understands well what those claims are.  She testified that she wants to avoid knowingly spending her dollars on foreign beef.  *See* Doc. 251-2, at 221:4-6.

    **c.**    Proposed Plaintiffs' Class Counsel has the experience and expertise to adequately represent the class**.** (*See* ECF Doc. 214-9, 214-10 and 214-11).

    **d.**    Proposed Plaintiffs' Class Counsel has the experience and expertise to adequately represent the class**.** (*See* ECF Doc. 214-9, 214-10 and 214-11). Ethan Preston specializes in class litigation and has participated in numerous class action suits.  ECF Doc. 214-11.  Mr. Dunn's practice has included a significant focus on agriculture and litigation related to agricultural issues for the 15 years that he has been practicing law. (ECF Doc.214-9).  Mr. Ray has been involved in civil litigation since he began practicing law in 2009.  His practice has included class action work on behalf of defendants and plaintiffs, and he has extensive litigation and trial experience in federal court. ECF Doc. 214-10.

## C.  Facts Satisfying Rule 23(b)(3)'s Requirements for the NM UPA Class

### 1.  Facts Demonstrating that by a Preponderance of the Evidence the Requirement for Common Questions of Law or Fact to Predominate are Met.

    **a.**    In addition to Facts 1(a), 2 (a)-(e), and 3 (a)-(j), Kroger's advertising of beef of foreign origins was material and relied upon by consumers to their detriment. (ECF Doc. 214-3 at 2,8 and ECF Doc. 268-3 at 65-66.)

    **b.**    Kroger has knowingly and purposefully purchased beef that is comingled with foreign sourced beef to avoid truthfully advertising the geographic origin of the beef products it advertised and labeled as "Product of the US." (*See* ECF Doc. 214

at 6-10; Ex. A to Speer Decl. ¶ 4.4 A. 3.)[7]

2. **Facts Demonstrating that by a Preponderance of the Evidence that a Class Action a Superior Method are Met.**

a. Kroger's beef products in some form or at some point bore the false advertising or benefitted by proximity to the used of the deceptive logo with regard to geographic origin in violation of the UPA. (*See* ECF Doc. 235 at 14) This includes advertising that juxtaposes ground beef near the false advertising to mislead consumers regarding the commingled foreign sourcing of that beef. (*See* ECF Doc. 214-6 at 2-3; Ex. A to Speer Decl. ¶ 4.4 A. 3.

b. Consumers are willing to pay a premium for beef of American origin or are unwilling to purchase beef of a foreign origin. (*See* ECF Doc. 214-5 at 13; ECF Doc. 268-3 at 65-66.

c. In New Mexico the potential claims that could be brought individually is estimated at over 580,000. (Assuming that New Mexico consumers represent only 1% of the average 58,296,682 households, *see* ECF Doc. 214 at 15, that purchased advertised USDA Choice muscle cuts of beef (not including ground beef) in the years 2019-2021).

III. **Conclusions of Law**

A. **Relevant Law Regarding NM UPA Claims**

---

[7] "To that end, nearly all imported beef (product) arrives in the United States as lean trimmings (90% lean) for the purpose of being blended with fed cattle trimmings (50% lean) to make ground beef and/or hamburger. This product does NOT carry any tie to USDA Quality Grades, and it is my understanding that Kroger has never advertised such product with the "USDA CHOICE: Produced in the USA" graphic at issue in this litigation."

New Mexico's UPA is designed to protect Consumers from false advertising. The basic requirements to state a UPA claim are,

> (1) [the] defendant made an oral or written statement that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale of goods or services; (3) the conduct complained of occurred in the regular course of defendant's business; and (4) the representation may, tends to, or does deceive or mislead any person.

*Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 621 (D.N.M. 2007). The New Mexico Supreme Court has identified the policy objective of the Unfair Practices Act as intending to "provide a remedy against misleading identification and false or deceptive advertising." Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 166 P.3d 1091, 1096 (N.M. App. 2007). "[T]he focus on advertising suggests that the UPA addresses representations directed at the public at large, as consumers. *Id.*, 2007-NMCA-100, ¶ 22, 142 N.M. at 442, 166 P.3d at 1096. Unfair practices involve "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made ... in the collection of debts by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person," including but not limited to "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive" and "stating that a transaction involves rights, remedies or obligations that it does not involve." NMSA 1978, § 57-12-2(D)(14) and (15).

This Court, in a previous decision, laid out a detailed explanation of the elements and operation of New Mexico's UPA as follows:

> 53. "The UPA provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices." *Valdez v. Metro. Prop. & Cas. Ins. Co.*, 2012 WL 1132414 at *19 (D.N.M. Mar. 31, 2012)(Browning, J.)(*citing Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 22, 147 N.M. 583, 227 P.3d 73, 80)). "Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising." *Lohman v. Daimler–Chrysler Corp.*, 2007-NMCA-100, ¶ 22, 142 N.M. 437, 166 P.3d 1091, 1096.[]

54. To state a claim under the UPA for an unfair or deceptive practice, a complaint must allege:

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

*Lohman v. Daimler–Chrysler Corp.*, 2007-NMCA-100, ¶ 5, 142 N.M. 437, 166 P.3d at 1093 (*citing* N.M. Stat. Ann. § 57–12–12(D); *Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051, ¶ 13, 112 N.M. 97, 811 P.2d 1308, 1311)). "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services." *Diversey Corp. v. Chem–Source Corp.*, 1998-NMCA-112, ¶ 17, 125 N.M. 748, 965 P.2d 332, 338.

55. Under the UPA, unconscionable trade practices include

> act[s] or practice[s] in connection with ... the extension of credit in the collection of debts that to a person's detriment:
> (1) take[ ] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or
> (2) result[ ] in a gross disparity between the value received by a person and the price paid.

N.M. Stat. Ann. § 57–12–2(E). Accordingly, a trade practice can be procedurally unconscionable, under § 57–12–2(E)(1), or substantively unconscionable, under § 57–12–2(E)(2). *See Cordova v. World Finance Corp.*, 2009-NMSC-021, ¶ 21, 146 N.M. 256, 208 P.3d 901 ("The doctrine of contractual unconscionability can be analyzed from both procedural and substantive perspectives.")

56. "Procedural unconscionability ... examines the particular factual circumstances surrounding the formation of [a] contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other." *Cordova v. World Finance Corp.*, 2009-NMSC-021, ¶ 23, 146 N.M. 256, 208 P.3d at 907–08.

57. Substantive unconscionability, on the other hand, "concerns the legality and fairness of the contract terms themselves," and "focuses on such issues as whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar policy concerns." *Cordova v. World Finance Corp.*, 2009-NMSC-021, ¶ 22, 146 N.M. 256, 208 P.3d at 907. A contractual term is substantively unconscionable if it is illegal, or if it "is grossly unreasonable and against our public policy under the circumstances," *Cordova v. World Finance Corp.*, 2009-NMSC-021, ¶ 31, 146 N.M. 256, 208 P.3d at 909, even if "there is not a statute that specifically limits [such] contract terms," because "[r]uling on substantive unconscionability is an inherent equitable power of the court, and does not require prior legislative action," *State ex rel. King v. B & B Investment Group, Inc.*, 2014-NMSC-024, ¶ 33, 329 P.3d 658, 670. Moreover,

the UPA's provisions regarding unconscionability "evince[ ] a legislative recognition that, under certain conditions, the market *1247 is truly not free, leaving it for courts to determine when the market is not free, and empowering courts to stop and preclude those who prey on the desperation of others from being rewarded with windfall profits." *State ex rel. King v. B & B Investment Group, Inc.*, 2014-NMSC-024, ¶ 33, 329 P.3d at 671.

58. Under the UPA, "[a]ny person who suffers any loss of money or property, real or personal, as a result of any ... method, act or practice declared unlawful by the [UPA] may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater." N.M. Stat. Ann. § 57–12–10(B). UPA plaintiffs do not need to show actual damages, or the actual loss of money or property to recover statutory damages, however. *See Lohman v. Daimler–Chrysler Corp.*, 2007-NMCA-100, ¶ 44, 142 N.M. 437, 166 P.3d at 1099–1100 ("[T]he UPA does not require proof of actual monetary or property loss.").[]

59. In a class action under the UPA, statutory damages are available only to *1248 the named plaintiff whereas class members can recover only their actual damages. See N.M. Stat. Ann. § 57–12–10(B).

60. Injunctive relief under the UPA is available to people "likely to be damaged by an unfair or deceptive trade practice ... under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive or take unfair advantage of any person is not required." N.M. Stat. Ann. § 57–12–10(A).

61. "The court shall award attorney fees and costs to the party complaining of an unfair or deceptive trade practice or unconscionable trade practice if the party prevails." N.M. Stat. Ann. § 57–12–10(C).

*Daye v. Cmty. Fin. Loan Serv. Centers, LLC*, 280 F. Supp. 3d 1222, 1245–48 (D.N.M. 2017) (paragraph numbers in original).  This approach, as explained by the Court, is a sound explanation of New Mexico's UPA.

## B.  Conclusions of Law for Rule 23(a)'s Requirements for NM UPA Class.

### 1.  Numerosity

In determining whether a proposed class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." *Neiberger v.*

*Hawkins*, 208 F.R.D. 301, 313 (D. Colo. 2002)(Babcock, J.)(*quoting Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 639 (D. Colo. 1986)(Kane, J.)). *See Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a " 'strict numerical test' "; holding, however, that where class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous" (*citing Senter v. General Motors Corp.*, 532 F.2d 511, 523 n. 24 (6th Cir. 1976))); *Robidoux v. Celani*, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 putative class members should raise a presumption that joinder is impracticable."); 1 Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels, § 3.05, at 141-42 (2d ed. 1985). Here because the commonsense assumption that the Court can make based upon the evidence is that a number far greater than 1000 individuals make up the New Mexico class the requirement for numerosity is satisfied.

## 2.  Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist." *In re Intelcom Grp. Sec. Litig.*, 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.). *See Adamson v. Bowen*, 855 F.2d at 676 ("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); *Lopez v. City of Santa Fe*, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the

application of a common policy.' " (citations omitted)(*citing In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996) and *quoting Adamson v. Bowen*, 855 F.2d at 676)) Here, the Plaintiff has demonstrated that the question of whether the misrepresentation in advertisements of the geographic origin of beef that was sold by Kroger violates the NM UPA is common and material to all class members.

### 3. Typicality

Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims. See Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest. *See Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994). "Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. at 622 (*citing Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1320 (11th Cir. 2008)).  Here, Thornton's claim that she was misled by advertisements to purchase beef that she believed was of American origin when some of it was of foreign origin that she otherwise would not have purchase or at a minimum would have expected to pay less for is typical of the class members' claims under the NM UPA. Ms. Thornton's claims arise because of advertising materials which were sent out to the public at large via newspaper circulars, mailed circulars, and in-store advertising.  Ms. Thornton was a consumer and member of that public that was exposed to, viewed, and responded to the advertising materials Ms. Thornton claims were false in a material way.  The same claims of liability would therefore apply to the rest of the putative class members.

### 4. Adequacy

a. Plaintiff Thornton "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The requirement of typicality dovetails into the requirement of adequacy of representation." *Edgington v. R.G. Dickinson & Co.*, 139 F.R.D. 183, 189 (D. Kan. 1991)(Crow, J.)(*quoting Penn v. San Juan Hospital, Inc.*, 528 F.2d at 1189). *See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d at 1219 (noting that "the commonality, typicality, and adequacy requirements of Rule 23(a) 'tend to merge' " (*quoting Wal-Mart*, 564 U.S. at 349 n.5, 131 S.Ct. 2541)). Plaintiff Thornton does not have any conflicts with other proposed class members and she has demonstrated that she will vigorously prosecute the action on the class' behalf meeting the test for the Tenth Circuit. *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002).

b. As this Court has noted "[a]lthough Tenth Circuit precedent suggests that the adequacy-of-counsel analysis is conducted as a part of the rule 23(a)(4) inquiry, *see Lopez v. City of Santa Fe*, 206 F.R.D. at 289-90, this analysis has now been moved to rule 23(g)." *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 662 (D.N.M. 2019) Proposed class counsel, based upon their disclosed experience and relevant knowledge, are adequate class counsel.

## B. Conclusions of Law for Rule 23(b)'s Requirements for NM UPA Class

### 1. Predominance

a. Thornton class' NM UPA claims (1) is comprised almost entirely of the elements of misrepresentation of foreign beef made as American beef in advertisements made in connection of the sale of that beef to unsuspecting New Mexico consumers which susceptible to generalized proof, and (2) which predominates over individual inquires over

reliance on the advertising because detrimental reliance is not at issue in a NM UPA claim[8]. *See Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 397 (D.N.M. 2015), *adhered to on reconsideration, Anderson Living Tr. v. WPX Energy Prod.*, LLC, 312 F.R.D. 620 (D.N.M. 2015); *citing CGC Holding Co. LLC v. Broad & Cassel,* 773 F.3d 1076 (10th Cir.2014).

b. Based upon the information regarding the price differentials between American beef and foreign originating beef, based upon the Sanderoff Survey and the USDA Survey, a common methodology for class member damages predominates over individual damage calculations. *See Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 668 (D.N.M. 2019) Here, the potential for hundreds of thousands of claimants seeking at most a few hundred dollars each predominates because it yields substantial economies in litigation. *See Carnegie v. Household Int'l., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)

**2. Superiority**

"Courts should not judge manageability in a vacuum, but rather—as a part of the superiority analysis—they should assess how the difficulties the class action device present stack up against the difficulties that other available procedural mechanisms present." *Bustillos v. Bd. of Cnty. Comm'rs of Hidalgo Cnty.*, 310 F.R.D. 631, 657 (D.N.M. 2015) (collecting cases). Here, the obvious alternative to a class action would be for plaintiffs to

---

[8]    To the extent that USTC's argument is premised on Plaintiff's failure to allege detrimental reliance, the argument has been rejected. "[T]he UPA does not require that the defendant's conduct actually deceive a consumer; it permits recovery even if the conduct only 'tends to deceive.' " *Smoot v. Physicians Life Ins. Co.,* 2004–NMCA–027, ¶ 21, 135 N.M. 265, 87 P.3d 545. Accordingly, a claimant need not prove reliance upon a defendant's deceptive conduct in this context. *Id.* ¶ 22.
*Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 35, 142 N.M. 437, 444, 166 P.3d 1091, 1098

bring individual suits against defendants – potentially well over 500,000 individual suits in New Mexico. This would be grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation." *In re Universal Serv. Fund Tel. Billing Pracs. Litig.*, 219 F.R.D. 661, 679 (D. Kan. 2004). Tens of thousands, if not hundreds of thousands, of individual actions are not *practical*, let alone *preferable*, here. *Garcia v. Tyson Foods, Inc.*, 890 F. Supp. 2d 1273, 1283 (D. Kan. 2012) ("individual lawsuits filed by five thousand class members [] would have been more burdensome on the class members and the court"); *Rodriguez v. Cascade Collections LLC*, 532 F. Supp. 3d 1099, 1123 (D. Utah 2021) ("the burden to the judicial system associated with adjudicating 188 individual lawsuits" supported superiority).

## CONCLUSION

Wherefore, Plaintiff respectfully requests that the Court certify the New Mexico UPA class proposed by Plaintiff Thornton under the definitions proposed in her motion with the modifications that the Court deems to be appropriate.

Respectfully submitted:

*/s/ A. Blair Dunn, Esq.*
WESTERN AGRICULTURE, RESOURCE
AND BUSINESS ADVOCATES, LLP
A. Blair Dunn, Esq.
Jared R. Vander Dussen, Esq.
400 Gold Ave SW, Suite 1000
Albuquerque, NM 87102
(505) 750-3060
abdunn@ablairdunn-esq.com
warba.llp.jared@gmail.com

and

LAW OFFICE OF MARSHALL J. RAY
Marshall J. Ray
514 Marble Ave NW

Albuquerque, NM 87102
(505) 312-7598
mray@mralaw.com

and

PRESTON LAW OFFICES
Ethan Preston
ep@eplaw.us
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340; Fax: (866) 509-1197

*Attorneys for Plaintiffs Thornton and Irby, on their own behalf, and behalf of all others similarly situated*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the foregoing via CM/ECF on this 10th day of April 2023, causing all parties to receive notice via electronic means.

*/s/ A. Blair Dunn*
A. Blair Dunn, Esq.