**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ROBIN G. THORNTON, on behalf of herself
and others similarly situated, and WENDY
IRBY, on behalf of herself and others similarly
situated,

        Plaintiffs,

vs.                             No. CIV 20-1040 JB/LF

THE KROGER COMPANY and PAY AND
SAVE, INC.,

        Defendants.

**<u>ORDER</u>[1]**

    **THIS MATTER** comes before the Court on: (i) Plaintiff Thornton's Motion for Class Certification & Supporting Memorandum as to Defendant Kroger, filed October 17, 2022 (Doc. 214)("Thornton Class Certification Motion"); (ii) Plaintiff Irby's Motion for Class Certification & Supporting Memorandum as to Defendant Pay and Save, filed October 17, 2022 (Doc. 215)("Irby Class Certification Motion"); (iii) Defendant the Kroger Company's Motion to Exclude Expert Testimony of Dr. Chadelle Robinson, filed November 18, 2022 (Doc. 232)("Motion to Exclude Dr. Robinson"); and (iv) Defendant the Kroger Company's Motion to Exclude Survey Evidence, filed November 18, 2022 (Doc. 234)("Motion to Exclude Survey").

---

    [1]This Order disposes of: (i) Plaintiff Thornton's Motion for Class Certification & Supporting Memorandum as to Defendant Kroger, filed October 17, 2022 (Doc. 214); (ii) Plaintiff Irby's Motion for Class Certification & Supporting Memorandum as to Defendant Pay and Save, filed October 17, 2022 (Doc. 215); (iii) Defendant the Kroger Company's Motion to Exclude Expert Testimony of Dr. Chadelle Robinson, filed November 18, 2022 (Doc. 232); and (iv) Defendant the Kroger Company's Motion to Exclude Survey Evidence, filed November 18, 2022 (Doc. 234). The Court will issue at a later date, however, a Memorandum Opinion more fully detailing its rationale for this decision.

The Court held an evidentiary hearing on the class certification motions on December 5, 2022.  See Clerk's Minutes at 1, filed December 5, 2022 (Doc. 253)("Class Certification Hearing").  The Court held a hearing on Defendant the Kroger Company's ("Kroger Co.") motions to exclude on January 30, 2023.  See Clerk's Minutes at 1, filed December 5, 2022 (Doc. 253)("Daubert Hearing").  The primary issues presented are: (i) whether -- pursuant to rule 23 of the Federal Rules of Civil Procedure -- the Court should certify a class of all persons from New Mexico who saw out-of-store advertisements of Kroger Co.'s New Mexico stores that advertised beef products using the "Product of the USA" shield, and, in reliance on this representation, made the decision to attend a Kroger Company-owned store and purchase beef products that these customers believed were produced exclusively in the United States, when in fact the products contained beef from cattle that were not born, raised, and harvested exclusively in the United States ("Proposed New Mexico Kroger Class");[2] (ii) whether -- pursuant to rule 23 of the Federal Rules of Civil Procedure -- the Court should certify a class of all persons from New Mexico who saw out-of-store advertisements of Pay and Save Inc.'s ("Pay and Save") New Mexico stores that advertised beef products using the "All American" logo, and, in reliance on this representation, made the decision to attend a Pay and Save, Inc.-owned store and purchase beef products that these customers believed were produced exclusively in the United States, when in fact the products contained beef from cattle that were not

---

[2]In her original class certification motion, Plaintiff Robin Thornton also sought to certify a national class that pertained to persons who saw out-of-store advertisements of the Kroger Company's New Mexico stores that advertised beef products using the "Product of the USA" shield, and, in reliance on these representations, made the decision to attend a Kroger Company-owned store and purchase beef products these customers believe were produced exclusively in the United States, when in fact the products contained beef from cattle that were not born, raised, and harvested exclusively in the United States.  See Thornton Class Certification Motion at 9.  Mr. Thornton later withdrew this request in her closing briefs in support of class certification.  See Closing Brief in Support of the Thornton Motion to Certify Class; Proposed Findings of Fact and Conclusion of Law at 1 n. 1, filed April 10 (Doc. 275).

born, raised, and harvested exclusively in the United States ("Proposed New Mexico Pay and Save Class");[3] (iii) whether the expert report of Dr. Chadelle Robinson ("Robinson Report") is admissible under rule 702 of the Federal Rules of Evidence and the test of <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993)("<u>Daubert</u>"); and (iv) whether the Plaintiffs' survey evidence -- prepared by Mr. Brian Sanderoff and relied upon by Dr. Robinson -- is inadmissible under rule 702.

For the reasons stated on the record at the hearings, and elaborated below, the Court concludes: (i) the Thornton Class Certification Motion is denied, because Thornton has not provided the Court with a proposed class that is definable on the basis of objective criteria, and questions of law or fact common to the proposed class members do not predominate over individual inquiries; (ii) the Irby Class Certification Motion is denied, because Irby has not provided the Court with a proposed class that is definable on the basis of objective criteria, and questions of law or fact common to the proposed class members do not predominate over individual inquiries; (iii) the Motion to Exclude Dr. Robinson is granted in part and denied in part, and Dr. Robinson's Report is limited to portions that the Court has identified as permissible under rule 702 of the Federal Rules of Evidence, <u>see</u> Court's Notice of Filing Dr. Robinson Report; Highlighted Material is of Sufficient Reliability Under Rule 702 to Support Dr. Robinson's Testimony, Material Not Highlighted is

---

[3]Similarly to Thornton, in her original class certification motion, Plaintiff Wendy Irby originally sought to certify a multi-state class of persons from Texas, Colorado, Kansas, and Arizona that saw out-of-store advertisements of Pay and Save Inc.'s stores that advertised beef products using the "All American" or "Truly Texas" logos, and, in reliance on these representations, made the decision to attend a Pay and Save-owned store and purchase beef products these customers believe were produced exclusively in the United States, when in fact the products contained beef from cattle that were not born, raised, and harvested exclusively in the United States.  <u>See</u> Irby Class Certification Motion at 7.  Ms. Irby also later withdrew these requests in her closing brief in support of class certification.  <u>See</u> Closing Brief in Support of the Irby Motion to Certify Class; Proposed Findings of Fact and Conclusion of Law at 1 n. 1, filed April 10 (Doc. 276).

Inadmissible, filed September 29, 2023 (Doc. 285); and (iv) the Motion to Exclude Survey is denied.

## FACTUAL BACKGROUND

The parties have submitted proposed findings of fact.  See Closing Brief Support [sic] of the Thornton Motion to Certify Class; Proposed Findings of Fact and Conclusions of Law, filed April 10, 2022 (Doc. 275)("Thornton FOF"); Closing Brief in Support of the Irby Motion to Certify Class; Proposed Findings of Fact and Conclusions of Law, filed April 10, 2022 (Doc. 276)("Irby FOF"); Defendant the Kroger Company's Proposed Findings of Fact & Conclusions of Law, filed April 10, 2022 (Doc. 272)("Kroger FOF"); Defendant Pay and Save, Inc.'s Proposed Findings of Fact and Conclusions of Law Regarding Plaintiff's Irby's Motion for Class Certification, filed April 10, 2022 (Doc. 274)("Pay and Save FOF").  The Court carefully has considered all proposed facts and accepts some of them, rejects others, and finds some facts that neither party brought to its attention.[4]  These findings are authoritative only on the question of this Order on class certification, and the parties may relitigate any of them at the merits stage. See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  The Court applied the Federal Rules of Evidence at the class certification

---

[4]The Court is not required to make formal findings of fact in ruling on a class certification motion.  See Fed. R. Civ. P. 54(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion."); Fed. R. Civ. P. 54(a)(3) Advisory Committees Notes to 2007 Amendments ("Amended Rule 52(a)(3) says that findings are unnecessary 'unless these rules provide otherwise.' This change reflects provisions in other rules that require Rule 52 findings on deciding motions. Rules 23(e), 23(h), and 54(d)(2)(C) [but not rule 23(a), (b), or (g)] are examples.").  The Court has elected to make findings of fact to show the parties as much as possible how the Court has reached its conclusions.

hearing, ruled on several evidentiary objections, and considered only admissible evidence in finding these facts.  The Court sets forth its findings of fact below.

### 1.    The Litigation and the Parties.

1.      This case addresses allegedly deceptive marketing practices that Kroger Co. and Pay and Save used in out-of-store advertisements[5] for beef products.  See *Third Amended* Class Action Complaint ¶ 1, at 1, filed January 19, 2022 (Doc. 97)("Third Amended Complaint")(emphasis in original); Pay and Save FOF ¶ 8, at 4; Kroger FOF ¶ 10, at 3.

2.      The allegedly deceptive marketing practices involve the use -- in advertising circulars delivered in the mail or in newspapers -- of certain terms, phrases, or logos related to the geographic origin of meat products sold in Defendants' grocery stores.  See Third Amended Complaint ¶ 9, at 4.

3.      With respect to Kroger Co., the allegedly deceptive phrase is "Product of the USA" within a shield logo.  Thornton Class Certification Motion ¶ 1, at 8-9.

4.      With respect Pay and Save, the allegedly deceptive phrase is "All American" along with an affiliated logo.[6]  Irby Class Certification Motion ¶ 1, at 7.

5.      Both Plaintiff Robin Thornton ("Thornton") and Plaintiff Wendy Irby ("Irby"), as representatives of two proposed classes of similarly situated individuals, seek damages under the class action mechanism that rule 23(b)(3) of the Federal Rules of Civil Procedure provides.  See

---

[5]In an earlier Memorandum Order and Opinion, the Court defined "advertising" as "the Defendants' promotion of their products outside of their stores and not inside them." Memorandum Opinion and Order at 247 n.48, filed February 17, 2022 (Doc. 115).  The Court maintains this definition as the scope of the challenged advertising in this case.

[6]Irby originally also based her claim on the basis of another phrase and logo -- the "Truly Texas" logo.  After narrowing her request for class certification solely to a proposed class of New Mexico customers, however, she dropped this part of her claim, stating "the 'Truly Texas' deceptive promotional logo is no longer at issue."  Irby FOF at 2 n.5.

Thornton Class Certification Motion at 20; Irby Class Certification Motion at 19.

6.     Thornton defines her proposed class in the following manner:

A class consisting of all persons from New Mexico that reviewed the advertisements of Kroger's New Mexico stores known as Smith's that they received in a mailer or newspaper from November 2018 to the cessation of the use of the Product of the USA Shield to make the decision to attend a Smith's store to purchase beef products that they relied upon to have been produced exclusively in the USA even though the geographic origin of the production of the beef products included foreign sources.

Thornton Class Certification Motion ¶ 1, at 8-9.

7.     Irby defines her proposed class in the following manner:

A class consisting of all persons from New Mexico that reviewed the advertisements of Pay and Save's New Mexico stores known as Lowe's, Food King, Fiesta Foods, that they received in a mailer or newspaper or viewed online from May 2018 to the cessation of the use of the All American or Truly Texas logos to make the decision to attend a Pay and Save store to purchase beef products that they relied upon to have been produced exclusively in the USA even though the geographic origin of the production of the beef products included foreign sources.

Irby Class Certification Motion ¶ 1, at 7.

8.     Both Thornton and Irby bring one cause of action against their respective Defendants: a claim under the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1 to -26 (1967, as amended through 2019)("NMUPA").[7]

9.     Thornton lives in Edgewood, New Mexico.  See Transcript of Class Certification Hearing at 180:2 (dated December 5, 2022), filed January 4, 2023 (Doc. 255)("Transcript of Class Certification Hearing").

10.     According to the Third Amended Complaint, Thornton is a "long-time purchaser of

---

[7]In their respective Class Certification Motions, both Thornton and Irby originally also include unjust enrichment claims, see Thornton Class Certification Motion at 7-8; Irby Class Certification Motion at 6, but both have since narrowed their request for certification to only the NMUPA claims, see Thornton FOF at 2 ("[T]he case is reduced to simply applying the New Mexico UPA to just New Mexico consumers"); Irby FOF at 2 n.5 ("Plaintiff Irby is self-limiting her requested certification to a class of New Mexico consumers under the UPA.").

beef products" and has "continuously purchased beef products in New Mexico from Smith's Grocery Store." *Third Amended* Class Action Complaint ¶ 12, at 4.

11.     Irby lives in Otero County, New Mexico, and is also a "long-time purchaser of beef products." *Third Amended* Class Action Complaint ¶ 13, at 5.

12.     Irby has "continuously purchased beef products in New Mexico from Pay and Save, Inc. . . . grocery stores." *Third Amended* Class Action Complaint ¶ 13, at 5.

13.     Kroger Co. is a supermarket operator headquartered in Ohio that operates nearly 2,800 grocery stores in thirty-five states operating under twenty-eight different names that fall within the Kroger umbrella.  See Declaration of Jennifer Schmitz ¶ 4, at 1 (dated November 18, 2022), filed November 18, 2022 (Doc. 235-1)("Schmitz Dec.").

14.     Smith's is the Kroger Co. banner store for Arizona, Idaho, Montana, Nevada, New Mexico, Utah, and Wyoming.  Schmitz Dec. ¶ 5, at 1.

15.     Pay and Save is a Texas corporation with its principal place of business in Littlefield, Texas.  See *Third Amended* Class Action Complaint ¶ 17, at 6.

16.     Pay and Save operates 138 stores under a variety of names, e.g., Lowe's Market, Food King, Shop-N-Save, Lowe's Mercado, in five states: New Mexico, Texas, Colorado, Kansas and Arizona.  See Irby FOF ¶ 2, at 3.

**2.      The Challenged Conduct as to Kroger Co.**

17.     Kroger Co. advertises products it sells in circulars, which are typically distributed as standalone mailers or as part of the newspaper on Wednesday, and the promotions within them run from Wednesday to Tuesday of the following week.  See Schmitz Dec. ¶ 8, at 1.

18.     Kroger Co.'s circulars vary by location depending on factors such as competition, product cost, and availability.  Schmitz Dec. ¶ 9, at 2.

19.     From October, 2018, until November, 2021, Kroger Co. used a graphic in some of its circulars that said "U.S.D.A. Choice" atop a shield logo, the bottom half of which was colored in the manner of the flag of the United States of America.  See Kroger FOF ¶ 7, at 2 (photo of logo).  The phrase "Produced in the USA" in blue lettering is in the American flag's red and white stripes on the lower part of this shield logo.  Kroger FOF ¶ 7, at 2.

20.     Kroger Co.'s circulars only advertise some beef products in a circular any given week, and sometimes no beef products are advertised.  See Schmitz Dec. ¶ 11, at 2.

21.     Neither Kroger nor any third party tracks who received circulars that advertised beef with the "USDA Choice: Produced in the USA" graphic either as a standalone mailer or in the newspaper.  See Schmitz Declaration ¶ 12, at 2.[8]

22.     Thornton and Irby allege that "[s]ince 2015, Defendants have been advertising beef that is imported into the U.S. post slaughter as 'Product of the U.S.' 'All American' or some similar label designed to give the impression that the beef that the consumer is purchasing is from an animal born, raised and slaughtered in the United States."  Third Amended Complaint ¶ 5, at 2-3.

23.     Accordingly, Thornton alleges that Kroger Co.'s "Produced in the USA" representation constitutes an "unfair or deceptive trade practice" under the NMUPA, N.M.S.A. § 57-12-2(D), because she and members of her proposed class "relied on the various mailers or promotional stickers . . . promoting domestic production which misled them into believing that all

---

[8]In her Reply in Support of the Motion to Certify Class at 6, filed December 2, 2022 (Doc. 246)("Thornton Certification Reply"), and also in her Closing Brief Support [sic] of the Thornton Motion to Certify Class; Proposed Findings of Fact and Conclusions of Law, filed April 10, 2023 (Doc. 275)("Thornton FOF"), Thornton alleges "willful spoliation of records that could identify class members achieved by industry collusion," see Thornton FOF at 1.  Thornton, however, has not specifically asked the Court in these documents to address any alleged spoliation or identify the missing records.  Accordingly, the Court finds that Thornton has not supported by a preponderance of the evidence her theory of evidence spoliation -- at least with respect to documentation pertaining to which customers received circulars.

of the beef they were purchasing was a product of the US."  Thornton Class Certification Motion at 5-6.

      **3.**       **The Challenged Conduct as to Pay and Save.**

      24.      In May 2018, Pay and Save began using the phrase "All American" to advertise some of the beef products sold in its New Mexico stores.  Defendant Pay and Save, Inc.'s Opposition to Plaintiff's Motion for Class Certification at 3, filed November 18, 2022 (Doc. 227)("Pay and Save Class Certification Opposition").

      25.      Like the circulars discussed in relation to Kroger Co., these advertisements were mailed to potential customers and also available online.  See Irby Class Certification Motion at 1-2.

      26.      Pay and Save asserts that it has no database listing the individuals who received a Pay and Save mailer or a newspaper containing a Pay and Save advertisement, and there are no records showing which individuals viewed a Pay and Save advertisement online.  Irby FOF ¶ 77, at 16-17.[9]

      27.      Irby alleges that she and others similarly situated relied on these representations to buy beef products from Pay and Save stores under the assumption that "All American" meant that the beef products were made "from cattle produced (meaning born, raised and slaughtered) in the United States."  Third Amended Complaint ¶ 14, at 5.

      28.      Accordingly, Irby alleges that Pay and Save's "All American" representation constitutes an "unfair or deceptive trade practice" under the NMUPA, N.M.S.A. § 57-12-2(D), because she and members of her proposed class relied "on the various mailers or promotional

_____

     [9]For reasons identical to those discussed above, the Court concludes that a preponderance of the evidence does not support Irby's allegations of spoliation regarding records related to which customers received circulars.

stickers . . . promoting domestic production which misled them into believing that all of the beef they were purchasing was a product of the US."  Irby Class Certification Motion at 4.

     **4.**     **<u>Facts Bearing on the Evidentiary Motions.</u>**

     29.     The Plaintiffs disclosed Dr. Chadelle Robinson and produced her report ("Robinson Report") on July 5, 2022.  Kroger FOF ¶ 26, at 9; U.S.A. Beef Research (Dated July 1, 2022), filed October 17, 2022 (Doc. 214-5).

     30.     Dr. Robinson holds a Ph.D. in Marketing and an M.S. in Agricultural Economics. <u>See</u> Response to Motion to Exclude Expert Testimony of Dr. Chadelle Robinson, filed December 21, 2022 (Doc. 251-1).

     31.     Dr. Robinson's empirical conclusions largely are based on what she describes as "descriptive statistics," Transcript of Class Certification Hearing at 105:10, and Dr. Robinson did not perform any supporting statistical analysis.[10]

     32.     Neither Thornton nor Irby retained Dr. Robinson to develop a damages model. Transcript of Class Certification Hearing at 105:205 (Abrams, Robinson).

     33.     For statistical foundation, Dr. Robinson's Report drew heavily on a survey Brian

---

     [10]Accordingly, for the reasons stated on the record at the hearing, <u>see</u> Transcript of <u>Daubert</u> Hearing at 61:22-63:5 (dated January 20, 2023), filed February 9, 2023 (Doc. 266)("Transcript of <u>Daubert</u> Hearing"), the Court concludes that certain portions of Dr. Robinson's Report are inadmissible under rule 702 of the Federal Rules of Evidence, because the Court determines that certain portions of the report are not the product of reliable principles and methods.  Dr. Robinson conceded that the methodology which she used to produce her report -- which contained no measure of statistical significance -- would not have been sufficiently reliable to be peer-reviewed, and that her own peer reviewed work "go[es] further" by measuring statistical significance, Transcript of Class Certification Hearing at 106:7-8, and that she was not "aware of any academic production in [her] field that would conclude that a variable was statistically important or influential without conducting an analysis of statistical significance," Transcript of Class Certification Hearing at 105:17-21.  The Court concludes that the portions of Dr. Robinson's Report that the Court excludes are not the product of reliable methodology for rule 702's purposes, and subsequently no reliable methodology has been applied to this case's facts.

Sanderoff conducted ("Sanderoff Survey").[11]   See Beef Shield Survey (Dated May 2022), filed October 17, 2022 (Doc. 214-3).

## RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert . . . , trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert, whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert . . . requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.[12]

---

[11]For reasons stated on the record at the hearing, see Transcript of Daubert Hearing at 60:15-61:18, the Court declines to exclude the Sanderoff Survey.

[12]One of the things that consistently amazes the Court is the unwillingness of modern lawyers to tailor their briefing to the particular judge before whom they argue. The Court still gets briefings filled with citations to other district cases, even though it has written opinions more directly on point. See, e.g., United States v. Begay, 310 F. Supp. 3d 1318, 1336 (D.N.M. 2018)(Browning, J.)(party citing Caine v. Burge, No. 11 C 8996, 2013 WL 1966381, at *1 (N.D. Ill. May 10, 2013)(Durkin, J.)) to argue for admitting expert testimony); United States v. Chapman, No. CR 14-1065 JB, 2015 WL 10401776, at *3 (D.N.M. Aug. 28, 2015)(Browning, J.)(party citing First Data Corp. v. Konya, No. CIV 04-0856, 2007 WL 2116378, at *10 (D. Colo. July 20, 2007)(Kane, J.)). There is nothing wrong -- and a lot right -- with our colleagues in other states, but it mystifies the Court why lawyers continue not to research and know the judge before whom they are practicing.

Nowhere is the need to research the presiding judge more important than in the Daubert area. Given Daubert's and rule 702's demands, trial judges often have to write detailed opinions, with findings of fact and conclusions of law. See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150 (D.N.M. 2016)(Browning, J.); United States v. Rodriguez, 125 F. Supp. 3d 1216 (D.N.M. 2015)(Browning, J.); Montoya v. Sheldon, 286 F.R.D. 602 (D.N.M. 2012). Cf. Admissibility of Scientific Evidence, SJ081 ALI-ABA 1, 21 ("Appellate courts increasingly insist that even when no Daubert hearing is held, the district court must create a sufficient record so that the basis for the admissibility decision can be reviewed."). The written opinions are a goldmine for figuring out what the trial judge is going to do with the new expert's report. Lawyers should research their judge thoroughly through Lexis and Westlaw. In the 21st century, litigants can know

1.      __Rule 702__.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)**      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)**      the testimony is based on sufficient facts or data;
>
> **(c)**      the testimony is the product of reliable principles and methods; and
>
> **(d)**      the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[13]  Rule 702 thus requires the trial court to "determine whether the expert

_____

their judge like the hand knows the glove.

When the Court was a young associate at a large law firm after its clerkships, the Court and a co-associate, and the Court's future partner, would swing by the University of New Mexico School of Law every evening after work, alternating days, to go through a box of slip opinions by the federal judges.  The lower federal judges in the early 1980s would send the opinion to the counsel of record by mail but also send a copy to the law library.  The Court and the other associate would copy almost every opinion and create binders by subject matter: rule 12(b)(1), rule 32, etc.  Some binders got so large that they got dividers to divide the opinions by specific judges.  The Court and the other associate kept up the laborious data collection even when the Court and the other associate started their own firm.  The Court and its firm would cite, quote, and discuss the opinions of the local federal judges back to them in its briefing.

If the Court went to this much travail to locate all the opinions of the judge before whom it was appearing, imagine what it thinks when it receives a brief citing, discussing, or quoting mostly other courts' opinions on topics on which the Court has written, sometimes extensively and exhaustively.  In contrast to the paper world in which the Court lived in the early and mid-1980s, all an associate has to do with Lexis and Westlaw is put in the judge's name and the subject to be researched.  With research by judge and topic so easy today, there is no excuse for a lawyer not to know the opinion of the judge before whom they are practicing.

[13]Rule 702's most prominent hurdle is the sufficiency of basis.  Yet the judiciary's uncomfortableness with analyzing an opinion's basis can be seen in the conflict in the cases.  The current conflict is whether the questions of sufficiency of basis, and of application of principles and methods, are matters of weight or admissibility.  Compare David E. Bernstein & Eric G.

Lasker, Defending Daubert: It's Time to Amend Federal Rule of Evidence 702, 57 Wm. & Mary L. Rev. 1, 32 (2015)("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." (quoting Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005)), with Bernstein & Lasker, supra, at 13 ("[T]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." (quoting Milward v. Acuity Speciality Prods. Grp. 639 F.3d 11, 22 (1st Cir. 2011)).  There should not be a conflict. Rule 702 states that these are questions of admissibility.  Yet many courts treat them as questions of weight.  See, e.g., Bernstein & Lasker, supra, at 13 (citing several Courts of Appeals that instruct district courts to consider the sufficiency of basis and/or application of the methodology as questions of weight).

    What is most interesting is what the divergence from Supreme Court precedent and rule 702 suggest.  The divergence suggests that Daubert and rule 702 are too academic.  Daubert and rule 702 write better than they work in the courtroom and in practice.  Lower courts continue -- rightfully so -- to be uncomfortable with deciding these issues with the Sixth and Seventh Amendments to the Constitution of the United States protecting the right to jury trials in civil and criminal cases.  Cf. Bernstein & Lasker, supra, at 13 (2015)("[C]ourts have held that '[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.'" (quoting Manpower, Inc. v. Ins. of Pa., 732 F.3d 796, 806 (7th Cir.)); Ronald J. Allen, Esfand Fafisi, Daubert and its Discontents, Brooklyn L.R., 131, 147 (2010)(describing an argument for Daubert's unconstitutionality under the Seventh Amendment).

    The Court is concerned that the federal courts will overact to the wayward opinions that have created a split whether sufficiency of basis and application of methods is for the court or goes to the evidence's weight.  The Court is concerned that the federal courts are going in the direction of new rules.  There is thus a built-in institutional bias towards more rules and amendments.  The Judicial Conference runs the federal judiciary through committees.  See About the Judicial Conference, U.S. Cts., https://www.uscourts.gov/about-federal-courts/governance-judicial-conference/about-judicial-conference (last visited Jan. 5, 2019)("The Conference operates through a network of committees . . . ").  The Judicial Conference has a Standing Committee on Rules. The Standing Committee has five Advisory Committees: (i) Civil Procedure; (ii) Criminal Procedure; (iii) Evidence; (iv) Bankruptcy; and (v) Appellate.  See How the Rulemaking Process Works, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works (last visited Jan. 5, 2019).  Each of these advisory committees has a reporter, almost always a prominent professor.  See Overview for the Bench, Bar, and Public, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works/overview-bench-bar-and-public (last visited Jan. 5, 2019).  The reporter position is more prestigious if the reporter can get new rules promulgated.  They have to justify their existence.  There is thus a very smart, likeable, and well-liked person putting pressure on the committee to amend the rules.  While judges are more conservative about promulgating new rules, they too often succumb to the reporter's pressure.  The result is that the federal judiciary and the bar gets a host of new rules almost every year.  The development of new rules burdens the federal judiciary and the bar -- all of which are overworked -- with mandatory changes each year, often constituting little more than stylistic changes.  Everyone has to get new rule books every year.  The

is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994).  Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").  An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."  LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).  See United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M. 2014)(Browning, J.)(deeming inadmissible testimony on a sex crime's victim's demeanor during an examination, because "demeanor is not always a reliable indicator whether someone is telling the truth, especially about sex -- then no expert testimony is needed.  That knowledge is well within the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that "testimony regarding nationally accepted police standards is irrelevant" to issues of "excessive force and" reasonableness).  The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.[14]

---

burden of new rules often does not justify the meager benefits of the changes.

[14]The Court is clipping the wings of experts all the time.  See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d at 1204 (precluding an expert from discussing class certification requirements, but allowing the expert to testify to information about royalty instruments); United States v. Rodriguez, 125 F. Supp. 3d at 1255-56 (permitting an expert to describe a cartel's structure and organization, and to explain drug running, but not admitting the expert's testimony opining that the defendant was running drugs); Montoya v. Sheldon, 286 F.R.D. at 619 (precluding a treating physician from testifying about a party's PTSD diagnosis, opinions about the causes for a party's symptoms, or a party's prognosis).  Attorneys ask experts to do too much, and experts

See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). See United States v. Rodella, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert's] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the

---

try to do too much. The experts are being paid; they are trying to be helpful to the attorney. Cf. Mark I. Bernstein, Jury Evaluation of Expert Testimony Under the Federal Rules, Drexel L. Rev. 239, 268 (2015)("Any use of expert witnesses paid by a party raises concerns of partisanship, competency, and honesty. Because experts are partisan witnesses paid by a party, there is an inevitable danger of bias."). The experts will often do anything. They toss statements into their reports to be helpful. Too many attorneys release the report as written -- without editing and without trimming. This failure to edit and to trim creates unnecessary litigation. Many expert reports contain statements that the proponent attorney does not need or even want. The reports draw Daubert motions or rule 702 challenges. The proponent is then forced to defend the statements that he or she does not even need or want.

trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)). "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." United States v. Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

## 2.    The Standard in Daubert.

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert, 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).[15]   The

---

[15]The current law -- and its trajectory -- are casting serious shadows over using expensive experts. This is particularly true in cases involving jury trials. It is probably a good time for the judiciary to rethink expert testimony rather than continuing with the current regime and making incremental changes.

Lawyers and appellate courts overemphasize the importance of experts, and distrust juries. See Sanja Kutnjak Ivkovic & Valerie P. Hans, Jurors' Evaluations of Expert Testimony: Judging the Messenger and the Message, 28 Law & Soc. Inquiry 441, 442 (2003)("One key assumption underlying the Daubert line of cases is that jurors might be duped by a persuasive but untrustworthy expert who testifies about matters that are not based on sound scientific principles or data."). Cf., Elaine E. Sutherland, Undue Deference to Experts Syndrome?, 16 Ind. Int'l & Comp. L. Rev. 375, 382 (2006)("After all, if one is coming from a position of ignorance, the person who holds the key to that certain body of knowledge is something of a savior. The danger for the legal system is that this empowerment of the expert witness will result in undue deference to his or her opinion."). Appellate judges often do not have extensive or any trial experience, particularly as Presidents want to rule from the grave, and appoint younger and younger appellate judges, who often --

Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.[16] See Daubert, 509 U.S. at 594-95.  The court is also to consider whether the witness' conclusion

---

because of their years -- have not spent a lot of time trying cases in the courtroom before juries. Academics, corporate lawyers, general counsel, and appellate judges -- without considerable courtroom experience -- think that experts will easily mislead juries.  Yet, the Court talks regularly to juries after jury trials, and the Court listens to trial lawyers talking to juries after jury trials. Juries often expressly state that they disregarded the parties' experts.  The Court often hears comments like the "expert arrogant and/or incomprehensible."

Part of the problem is that academics and, often, appellate jurists do not appreciate or understand modern American jurors.  Jurors have become very independent, and do not take direction well or easily from anyone -- the judge, lawyers, or experts.  The days of dressing up for court in coats and ties, and doing what the judge tells them to do are fading.  Jurors question everything.  If the Court tells them to go in one door, they want to use another.  Whereas jurors used to complement the Court's jury instructions as giving a roadmap to the jurors' decisions, jurors now criticize even the uniform or pattern jury instructions.  Modern American jurors do not like to think that they are being told what to do.  And they certainly do not like experts telling them what to do; modern American jurors do not like the idea of "experts" who are smarter than they are.

At the same time that modern American jurors are showing more independence, paternalistic Daubert hearings have proliferated.  This phenomenon raises many concerns.  One concern is the sheer prevalence of Daubert motions.  Cf. Cynthia Lynne Pike, The Impact of Revised MRE 702 and 703 in Response to Daubert, 52 Wayne L. Rev. 285, 301 (2006)(describing the effects of a state-specific rule resembling rule 702 and stating, "One of the more important tactical strategies in dealing with the court's role as gatekeeper under the new MRE 702 is the use of motions in limine and other pretrial evidentiary hearings.").  Motions to dismiss, class certification motions, and motions for summary judgment, sentencings, competency hearings -- in addition to testimony -- require Daubert hearings.  The costs of Daubert motions, to the court and the parties, is staggering.  The time-consuming nature of Daubert motions is overwhelming.

[16]Federal courts are obsessed with reliability problems.  This idea pops up several places and in several ways, creating multiple grounds upon which the court has the power to exclude the expert.  See Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 27 (noting that courts treat the "assist the trier of fact" requirement for expert testimony as a relevancy requirement, and stating that rule 401 already requires evidence to be relevant).

represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. at 146).  The United States Court of Appeals for the Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable."  Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . .).  This obligation involves a two-part inquiry.  Id.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  Id.  (quoting Daubert, 509 U.S. at 592 . . .).  In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."  Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted).  "The second inquiry is related to the first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . .  The evidence must have a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591.  If the expert's proffered testimony fails on the first prong, the court does not reach the second prong.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.  In Kumho Tire Co. v. Carmichael, the Supreme Court expanded the rules under Daubert to non-scientific expert testimony.  See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on

'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (quoting Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1521 (S.D. Ala. 1996)).  The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (citing Daubert, 509 U.S. at 595).  "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted)(quoting Dodge v. Cotter Corp., 328 F.3d at 1222).  The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  The Tenth Circuit noted in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of

science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206.  The United States Court of Appeals for the Ninth Circuit noted in <u>Claar v.</u>

<u>Burlington N.R.R.</u>, 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.  Certainly, scientists may form initial tentative hypotheses.  However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact.  In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

<u>Ram v. N.M. Dep't of Env't</u>, No. CIV 05-1083, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.)(citing <u>United States v. Rodriguez-Felix</u>, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

<u>See</u> <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in  Plaintiff."); <u>In re Breast Implant Litig.</u>, 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the <u>ipse dixit</u> of the expert.  The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. at

146.  See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3.     Necessity of Evaluating an Issue Under Daubert.

The restrictions in Daubert apply to both "novel" expert testimony and "well-established propositions."  509 U.S. at 593 n.11 ("Although the Frye[17] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence.").  "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."  Daubert, 509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201."  Daubert, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need

---

[17]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."  293 F. at 1014.

not take issue under <u>Daubert</u>. . . ."  <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d 769, 780

(10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a district

court may require further indications of reliability."  <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565

F.3d at 780.  Whether courts have accepted theories underlying an expert's opinion is a relevant

consideration in determining whether expert testimony is reliable.  <u>See</u> <u>Att'y Gen. of Okla. v.</u>

<u>Tyson Foods, Inc.</u>, 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with

the PCR methodology,[18] and in fact some courts have indicated their acceptance of it.").[19]

_____

[18]PCR, a "[p]olymerase chain reaction," <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d at 780, is a widely used method for copying DNA segments.  <u>Polymerase Chain Reaction</u>, Wikipedia, https://en.wikipedia.org/wiki/Polymerase_chain_reaction (last visited Nov. 28, 2018).

[19]Much of the focus of current debate about experts is on forensic evidence, which comes in many forms.  The challenge to forensic evidence comes from two areas: (i) the federal courts; and (ii) the scientific community.  The reports of the National Academies of Science ("NAS") and the President's Council of Advisors on Science and Technology ("PCAST") raise challenges to the reliability of forensic methods.  <u>See</u> Executive Office of the President President's Council of Advisors on Science and Technology, <u>Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods</u> (Sept. 2016); Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council, <u>Strengthening Forensics Science in the United States: A Path Forward</u> (July 2009).  There is increasing skepticism of the legal profession's most cherished evidence, including fingerprints, DNA, firearms, and breath tests.  <u>See</u>, <u>e.g.</u>, President's Council of Advisors on Science and Technology, <u>supra</u>, at 67-110; Committee on Identifying the Needs of the Forensic Sciences Community, <u>supra</u>, at 42-48.
      The Court is concerned that the federal judiciary is moving toward a freestanding rule on forensic evidence.  The Court is not a big fan of addressing the topic of forensic evidence through rulemaking.  No rule, procedures manual, or note is needed to tell judges that there is no certainty with forensic opinions.  There is also no reasonable degree of certainty.  These opinions are now considered overstated: in the old days -- like last week -- attorneys would routinely ask: "Doctor, in your opinion, to a reasonable degree of certainty, that the plaintiff's appendix was on the left side of the body?"
      The nation does not need another rule.  An examination of Article VII -- Opinions and Expert Testimony -- shows six rules: (i) rule 701 -- Opinion Testimony by Lay Witnesses; (ii) rule 702 -- Testimony by Expert Witnesses; (iii) rule 703 -- Bases of an Expert's Opinion Testimony; (iv) rule 704 -- Opinion on an Ultimate Issue; (v) rule 705 -- Disclosing the Facts or Data Underlying an Expert's Opinion; (vi) rule 706 -- Court-Appointed Expert Witnesses (a bad idea in about all cases).  <u>See</u> Fed. R. Evid. 701-06.  If the reporter would drop rule 706, perhaps there would be room for a rule pertaining to forensic evidence.
      The Court is concerned with what a new rule would look like.  The judiciary could make

## LAW REGARDING RULE 23 CLASS ACTIONS

Rule 23 sets forth the requirements for certifying a class action under the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 23.  All prospective classes must demonstrate: (i) the existence of a "class"; (ii) all rule 23(a) requirements; and (iii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify.  See Fed. R. Civ. P. 23(a)-(b).  The plaintiff[20] bears the burden of showing that the requirements are met.  See Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.).  In ruling on a class certification motion, the Court need not accept either party's representations, but must

---

its point in a committee note, but without a new rule, there is no need for a new note.  The PCAST report does not propose a change to the Evidence Rules.  Rather, PCAST proposes a best procedures manual.  See President's Council of Advisors on Science and Technology, supra, at 145.  It would be better if legal leaders do like Duke University School of Law has done for class actions and the Sedona Conference has done for electronic discovery.  See Class-Action Settlement Conference, Duke Law, https://law.duke.edu/judicialstudies/conferences/oct2016/ (last visited Jan. 7, 2019); The Sedona Conference Working Group Series, The Sedona Conference, https://thesedonaconference.org/wgs (last visited Jan. 7, 2019).  Rather than a new rule or note, the Court believes that a best practices manual -- prepared by professional leaders that come together to write -- and not the judiciary -- would be the better approach.

The Court expects several difficulties with a new rule.  The first difficulty with any rule on forensic evidence will be determining to whom it should apply.  A new rule would presumably apply to forensic witnesses' testimony.  Such witnesses include people testifying about evidence about through scientific means, by comparing patterns, or by "experimental or scientific analysis."  See Evidence, Black's Law Dictionary (10th ed. 2014).  After the Court and the bar have identified the universe of experts to whom the rule applies or the best practices apply, the new rules' requirements must be determined.  An expert must already satisfy all of rule 702's requirements.  Under a new rule, the expert will also need to satisfy all of the new requirements.  With more handles, the chances of exclusion or limiting are enhanced.  Rule 702's requirements, however, are enough, and the law should not require more.

[20]More precisely, the movant bears the burden of proof; defendants also may move for a denial of class certification and will bear the burden of proof for such a motion.  See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed. 2017).  As a practical matter, however, plaintiffs make almost all motions for class certification.

independently find the relevant facts by a preponderance of the evidence.[21]  See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." (quoting Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996))).  "'In determining the legality of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" Anderson v. City of Albuquerque, 690 F.2d 796, 799(10th Cir. 1982)(quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).  See Vallario v. Vandehey, 554 F.3d 1259, 1267(10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").  Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

---

[21]As the Court previously has noted, Tenth Circuit precedent suggests that the Court must show some level of deference to a complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints." In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1097, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. at 178).  Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues.  Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013).  This request is consistent with the general trend in the federal judiciary toward using an ordinary preponderance standard to find facts at the class certification stage.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); Newberg § 7.21 (5th ed. 2017)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused).  Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in General Telephone Co. of the Southwest v. Falcon [, 457 U.S. 147 (1982),] that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.    Actual, not presumed, conformance with Rule 23(a) remains indispensable."  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-52 (2011)("Wal-Mart").  In a subsequent admonition, the Supreme Court cautioned district courts not to decide the case's merits at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013).  The Court will find facts for the purposes of class certification by the preponderance of the evidence, but will allow the parties to challenge these findings during the case's subsequent merits stage.  See Menocal v. GEO Group, Inc, 882 F.3d 905, 926 n.17 (10th Cir. 2018)(considering facts relevant to the merits only to the extent necessary for class certification).  This approach is analogous to preliminary injunction practice, and many Courts of Appeals have endorsed it.  See Abbott v. Lockheed Martin Corp., 725 F.3d at 810; In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 313; Gariety v. Grant Thornton, LLP, 368 F.3d at 366.  In taking evidence on the question of class certification, the

Federal Rules of Evidence apply, albeit in a relaxed fashion.  See Anderson Living Tr. v. WPX Energy Prod. LLC, 306 F.R.D. at 378 n.39 ("The Court concludes that the Federal Rules of Evidence apply [to a class certification hearing.]. . . [R]ealistic[ally,] the judge [should] consider all but the most egregiously inadmissible pieces of evidence as they are presented, and factor any evidentiary infirmity into the weight he or she gives them.")

### 1.  Existence of a "Class".

Rule 23(a) refers to the existence of a "class," and rule 23(c)(1)(b) requires the court -- in an order certifying a class -- to "define the class."  As the Court has noted, "[b]efore the Court analyzes whether the proposed class meets rule 23's requirements, the Court must identify the class based on the evidence introduced at the class certification hearing." Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. 169, 254 (D.N.M. 2016)(Browning, J.).  See Cherry v. Dometic Corp., 986 F.3d 1296, 1302 (11th Cir. 2021)("A class is inadequately defined if it is defined through vague or subjective criteria. And without an adequate definition for a proposed class, a district court will be unable to ascertain who belongs in it.")(citing DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970)).

This threshold requirement is sometimes called "ascertainability,"[22] and there are various approaches -- outlined below -- how federal courts approach this analysis.  The Court has used two distinct standards when evaluating whether a proposed class is readily ascertainable: (i) whether the class is properly defined by using "objective criteria"; and (ii) whether identifying the

---

[22]As the Court discusses in greater detail below, the term "ascertainability" is used in somewhat imprecise ways, and thus the Court will attempt to use the term with more precision. Whenever possible, the Court will refer to the threshold "existence of a class" requirement, e.g., whether a party has defined their class according to objective criteria, and will not ask whether the party has proffered an "ascertainable" class in this initial analysis.

prospective class members can be done in a manner that is "administratively feasible."  Abraham

v. WPX Prod. Prods., LLC, 317 F.R.D. at 254-58.  The first of these requirements, that a class be

defined clearly by objective criteria, is a widely accepted principle of class action litigation under

rule 23.

> Although formulations of [the "ascertainability" or "definiteness" doctrines] vary,
> all essentially require a putative class to be ascertainable with reference to objective
> criteria.  A definable class protects absent plaintiffs in two ways -- by enabling
> notice to be provided where necessary and by defining who is entitled to relief; and
> a definable class protects defendants by enabling a final judgment that clearly
> identifies who is bound by it.

1 Newberg and Rubenstein on Class Actions § 3:1 (6th ed.)(footnotes omitted).  See Mullins v.

Direct Digital, LLC, 795 F.3d 654, 659 (7th Cir. 2015)("Rule 23 requires that a class be defined,

and experience has led courts to require that classes be defined clearly and based on objective

criteria.").  The "objective criteria" in this standard stand in opposition to subjective criteria, such

as a class composed of individuals "who 'believe' they were discriminated against."  Abraham v.

WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Chiang v. Veneman, 385 F.3d 256, 271 (3d

Cir. 2004)). See Lopez Tijerina v. Henry, 48 F.R.D. 274, 277 (D.N.M. 1969)(per curiam, three-

judge panel)(concluding that a proposed class defined as New Mexicans who are "poor" is not "an

adequate definition of a class").   As the Court discusses below, the other "ascertainability"

standard that the Court used in Abraham v. WPX Production Productions, LLC -- whether a class

can be administered in a manner that is "administratively feasible" -- is not universally accepted.

Before the Court discusses that split, however, it is useful to keep in mind the general

objectives of an "existence of a class" or "ascertainability" requirement:

> First, it eliminates "serious administrative burdens that are incongruous with the
> efficiencies expected in a class action" by insisting on the easy identification of
> class members.  Marcus v. BMW of N. Am., LLC, 687 F.3d at 593 (quoting
> Sanneman v. Chrysler Corp., 191 F.R.D. 441, 446 (E.D. Pa. 2000)
> (Van Antwerpen, J.)).  Second, it protects absent class members by facilitating the

"best notice practicable" under rule 23(c)(2) in a rule 23(b)(3) action.  See Manual for Complex Litigation, § 21.222 (4th ed. 2004).  Third, it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable.  See Xavier v. Phillip Morris USA, Inc., 787 F.Supp.2d 1075, 1089 (N.D.Cal.2011)(Alsup, J.)("Ascertainability is needed for properly enforcing the preclusive effect of final judgment.  The class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment . . . ."); 1 William B. Rubenstein et al., Newberg on Class Actions, § 3:1 (5th ed.).

Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254.  The Court notes in Abraham v. WPX Production Productions, LLC, that the proposed class "raises problematic ascertainability issues," notably that the plaintiffs could not identify which leases' gas had been delivered to certain processing plants for natural gas liquid extraction and marketing, because some gas was not processed at all, and some gas was collected and, in some cases, redirected to more than one plant. 317 F.R.D. at 254-257.  The Court concludes in Abraham v. WPX Production Productions, LLC that the Court's inability to "determine where one substantial category of gas flowed renders the class unascertainable."  317 F.R.D. at 257 & n.63 (distinguishing Anderson Living Trust v. WPX Energy Production, LLC, 306 F.R.D. 312, where "individual issues surrounding which gas was processed did not prevent class certification," because the plaintiffs in that case did not "tie their class definition to the gas being processed at certain plants").  Additionally, the Court in Abraham v. WPX Production Productions, LLC notes that determining whether gas flowed through certain gathering systems would not be "'administratively feasible,'" which the Court defined as "'mean[ing] that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.'"  317 F.R.D. at 258 (quoting Carrera v. Bayer Corp., 727 F.3d 300, 307-08 (3d Cir. 2013)).  The Court cites additionally to EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2014), noting that the Fourth Circuit did not certify the proposed class on the basis of ascertainability, because, although "some class members were easy to identify . . . others

'could be determined by reference to local land records.'"  Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 258 (quoting EQT Prod. Co. v. Adair, 764 F.3d at 359).  Further, even though the plaintiffs feasibly could have combed through the land records, "the Fourth Circuit concluded that it would 'be a complicated and individualized process,' which 'pose[s] a significant administrative barrier to ascertaining the ownership classes.'"  Abraham v. WPX Production Productions, LLC, 317 F.R.D. at 258 (quoting EQT Prod. Co. v. Adair, 764 F.3d at 359)(alteration added in Abraham v. WPX Prod. Prods., LLC).

A split has developed among the Courts of Appeals whether to apply an administrative feasibility requirement as a component of "ascertainability" for a proposed class.[23]  The United States Court of Appeals for the Third Circuit developed its ascertainability analysis first in Marcus v. BMW of N. Am., LLC, 687 F.3d 583, where it insisted on administrative feasibility and the need for "easy identification of class members."  687 F.3d at 593 (citing Sanneman v. Chrysler Corp., 131 F.R.D. at 446).  This requirement is a more stringent standard than that which other courts use to determine ascertainability.  See C. Wright & A. Miller, Federal Practice & Procedure § 1760 & n.13 (4th ed. 2023)(calling the Third Circuit's requirement "enhanced").  The Third Circuit, in remanding the case, cautioned "against approving a method that would amount to no more than ascertaining by potential class members' say so . . . .  Forcing [defendants] to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications."  Marcus v. BMW of N. Am., LLC, 687 F.3d at 594.  "'Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.'"  Carrera v. Bayer Corp.,

---

[23]The United States Court of Appeals for the D.C. Circuit and the United States Court of Appeals for the Federal Circuit have not addressed whether to include an administrative feasibility requirement in the ascertainability analysis.

727 F.3d at 307-08 (quoting Newberg on Class Actions § 3:3).  The Third Circuit in Carrera v. Bayer Corp. rejected the plaintiff's arguments that: (i) the claims' low value would mean that class members likely would not submit fraudulent affidavits; (ii) determining a fixed liability amount would prevent prejudice to the defendant and, thus, the Third Circuit should relax the ascertainability requirement; and (iii) screening methods could weed out unreliable affidavits.  See 727 F.3d at 309-12.  The United States Court of Appeals for the First Circuit cited Carrera v. Bayer Corp. positively, noting that, "[a]t the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members.  The court may proceed with certification so long as this mechanism will be 'administratively feasible' . . . ."  In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015)(quoting Carrera v. Bayer Corp., 727 F.3d at 307).  As mentioned above, the Fourth Circuit previously vacated and remanded the district court's class certification, because the certified class was not ascertainable.  See EQT Prod. Co. v. Adair, 764 F.3d at 359-60.  In explaining the ascertainability standard, the Fourth Circuit cited Wright & Miller's Federal Practice & Procedure for the proposition that "'[t]he requirement that there be a class will not be deemed satisfied unless . . . it is administratively feasible for the court to determine whether a particular individual is a member.'"  EQT Prod. Co. v. Adair, 764 F.3d at 358 (quoting Federal Practice & Procedure § 1760).  See Krakauer v. Dish Network, LLC, 925 F.3d 643, 658 (4th Cir. 2019)("The goal is not to 'identify every class member at the time of certification,' . . . but to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." (quoting EQT Prod. Co. v. Adair, 764 F.3d at 358)).

Other Courts of Appeals, on the other hand, have opted not to apply an administrative

feasibility requirement.  The Seventh Circuit, for example, has specifically rejected heightening the ascertainability requirement, stating that the administratively feasible requirement "erect[s] 'a nearly insurmountable hurdle' for class certification," and "'does not further any interest of Rule 23 that is not already adequately protected by the Rule's explicit requirements . . . .  The stringent version of ascertainability effectively bars low-value consumer class actions, at least where plaintiffs do not have documentary proof of purchases, and sometimes even when they do.'" Federal Practice & Procedure § 1760 (quoting Mullins v. Direct Digital, LLC, 795 F.3d 654, 662 (7th Cir. 2015), cert. denied 136 S. Ct. 1161).  Other Courts of Appeals also have rejected the heightened requirement.  For example, the Second Circuit notes that "creating [an administrative feasibility prerequisite] would upset the careful balance of competing interests codified in the explicit requirements of Rule 23.  In declining to adopt an administrative feasibility requirement, we join a growing consensus that now includes the Sixth, Seventh, Eighth, and Ninth Circuits." In re Petrobras Secs., 862 F.3d at 265, 268 (citing Briseno v. ConAgra Foods, Inc., 844 F.3d at 1123 (stating that "[w]e have never interpreted Rule 23 to require such a showing [of administrative feasibility], and, like the Sixth, Seventh, and Eighth Circuits, we decline to do so now," but also noting that administrative feasibility is a factor to consider in determining predominance and superiority); Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d at 995-96 ("Since Ihrke [v. N. States Power Co., 459 F.2d 566 (8th Cir.1972)], this court has not addressed ascertainability as a separate, preliminary requirement.  Rather, this court adheres to a rigorous analysis of the Rule 23 requirements, which includes that a class 'must be adequately defined and clearly ascertainable.'" (quoting Ihrke v. N. States Power Co., 459 F.2d at 573 n.3)); Rikos v. Procter & Gamble Co., 799 F.3d at 525 ("We see no reason to follow *Carrera*, particularly given the strong criticism it has attracted from other courts."), cert. denied, 136 S. Ct. 1493 (2016);

Mullins v. Direct Digital, LLC, 775 F.3d at 657-58 (stating that "[w]e decline to [apply an administrative feasibility requirement] and will stick with our settled law.  Nothing in Rule 23 mentions or implies this heightened requirement under Rule 23(b)(3), which has the effect of skewing the balance that district courts must strike when deciding whether to certify classes," and noting that rule 23's existing requirements "already address the balance of interests that Rule 23 is designed to protect"); Byrd v. Aaron's Inc., 784 F.3d at 177 (Rendell, J., concurring)(suggesting that the Third Circuit eliminate the administrative feasibility prong)).

The United States Court of Appeals for the Fifth Circuit has applied the administrative feasibility standard in some cases, but not in others.  In Seeligson v. Devon Energy Production Co., 761 F. App'x 329 (5th Cir. 2019), the Fifth Circuit concludes that the lower court "did not abuse its discretion in determining that the class . . . was ascertainable."  761 F. App'x at 334.  In reaching that conclusion, the Fifth Circuit states that it "has not adopted [the Third Circuit's] heightened standard" in Carrera v. Bayer Corp., although the standard to which the Fifth Circuit refers states that a plaintiff must show, "'by a preponderance of the evidence, that the class is 'currently and readily ascertainable based on objective criteria.'"  Seeligson v. Devon Energy Prod. Co., 761 F. App'x at 334 (quoting Carrera v. Bayer Corp., 727 F.3d at 306 (quoting Marcus v. BMW of N. Am., 687 F.3d at 593))(emphasis added in Seeligson v. Devon Energy Prod. Co.).  The Fifth Circuit also notes that it is "not convinced" by the defendant's argument "that Plaintiffs' proposed alternative -- reviewing property and title records -- is not administratively feasible and therefore fails to satisfy Rule 23's ascertainability requirements."  Seeligson v. Devon Energy Prod. Co., 761 F. App'x at 334 n.22.  More recently, however, the Fifth Circuit stated that, "[u]ltimately, 'the touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a

member.'"  <u>A.A. by and through P.A. v. Phillips</u>, No. 21-30580, 2013 WL 334010, at *2 (5th Cir.

January 20, 2023)(quoting <u>Brecher v. Republic of Argentina</u>, 806 F.3d 22, 24 (2d Cir.

2015)(quoting <u>Federal Practice & Procedure</u>, <u>supra</u> § 1760)).[24]  The Fifth Circuit in <u>A.A. by and</u>

<u>through P.A. v. Phillips</u>, however, did not determine that the proposed class was not ascertainable

on administrative feasibility grounds, but because the district court's class definition was "too

vague to identify class members."  2023 WL 334010, at *3.

Finally, the Tenth Circuit only tangentially has referred to the Third Circuit's heightened

standard.  In <u>In re Urethane Antitrust Litigation</u>, 768 F.3d 1245 (10th Cir. 2014), for example, the

defendant cited <u>Carrera v. Bayer Corp.</u> in asserting "an interest in the allocation of damages to

ensure that all class members are bound by the judgment."  <u>In re Urethane Antitrust Litig.</u>, 768

F.3d at 1269.  The Tenth Circuit states that <u>Carrera v. Bayer Corp.</u> is inapplicable in that context:

> *Carrera v. Bayer Corp.* likewise involved a class-wide judgment with an uncertain binding effect.  727 F.3d 300, 310 (3d Cir. 2013).  The class there had been decertified because there was insufficient evidence of an ascertainable class.  As a result, the class members could argue that they were not bound by the judgment.  *Id.*

> Unlike the defendants in . . . *Carrera*, Dow has not identified any reason to believe that the judgment here would fail to bind all class members.

768 F.3d at 1269.  The only other case in which the Tenth Circuit has referenced the administrative

feasibility requirement is in <u>Davoll v. Webb</u>, in which it concludes that the district court did not

abuse its discretion in determining that "the individualized consideration required to determine

whether each class member was disabled under the ADA rendered the proposed definition

'untenable.'"   194 F.3d at 1146 (quoting <u>Davoll v. Webb</u>, 160 F.R.D. 142, 146 (D. Colo.

---

[24]The Second Circuit issued its opinion in <u>Brecher v. Republic of Argentina</u> in 2015, two years before its opinion in <u>In re Petrobras Secs.</u>, where it explicitly declined to apply the administrative feasibility requirement.  <u>See</u> <u>In re Petrobras Secs.</u>, 862 F.3d at 265.

1995)(Kane, Sr. J.)).   The Tenth Circuit notes that "'[t]he district court has broad discretion to determine whether the class description is sufficiently definite,'" Davoll v. Webb, 194 F.3d at 1146 (quoting Moore's Federal Practice § 23.21[5] at 23-61), and, accordingly, "it was within the district court's discretion to decide that determining class membership under the proposed definition would be administratively infeasible," 194 F.3d at 1146.   Thus, although the Tenth Circuit has not adopted the Third Circuit's administrative feasibility requirement, it has made clear that the district courts do not err when they determine that individualized inquiries render class certification administratively infeasible.

As noted, the Court has previously considered ascertainability, in Abraham v. WPX Prods. Prod., LLC.   In that case, the Court concluded that the class was not ascertainable, because "no existing database can identify the proposed class.   Moreover, it is not feasible for the Court to identify which wells' gas was processed in each year.   Doing so is an individual and time-consuming inquiry."[25]   317 F.R.D. at 258.   Within the Tenth Circuit, several district courts -- in addition to the Court -- have addressed whether to apply the administrative feasibility requirement. In Smith v. LifeVantage Corp., 341 F.R.D. 82 (D. Utah 2022), the Honorable David B. Barlow, United States District Judge for the United States District Court for the United States District of Utah, reviewed the same Court of Appeals split that the Court has reviewed above.   See 341 F.R.D. at 91-96.   Judge Barlow states that "the court need not resolve the issue [of which ascertainability standard to apply and whether ascertainability is required] because the substance of those concerns

---

[25]On reconsideration, the plaintiffs submitted a new proposed class definition, which the Court determined was ascertainable, because "the Defendants appear to have records showing who they pay on the keep-whole methodology, [and so] there is 'a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified.'"   Abraham v. WPX Energy Prod., LLC, 322 F.R.D. 592, 642 (D.N.M. 2017)(Browning, J.)(quoting Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 187 (3d Cir. 2006)).

either are not present here or are relevant to and addressed by the predominance and superiority

requirements."  341 F.R.D. at 94.  Although he does not adopt the administrative feasibility

requirement, Judge Barlow considers any administrative feasibility question to be inherent to the

predominance and superiority analysis, stating:

> [T]he court finds that whether identifying which distributors meet the class criterion
> of financial loss at the damages stage is administratively feasible depends on
> whether it can be done without destroying the predominance of common issues or
> the superiority of the class action mechanism.  If common issues predominate and
> a class action would be superior despite the need for individualized damages
> determinations, the court would be reluctant to declare those individualized
> determinations an administratively infeasible method for ascertaining class
> membership.  On the other hand, if the individualized damages determinations
> needed to identify class members destroy the predominance of common issues and
> superiority of the class action, identifying class members would be de facto
> administratively infeasible.
>
> Therefore, whether the proposed class is ascertainable will rise or fall with
> the court's findings regarding predominance and superiority.  For that reason, the
> court declines to deny certification in this case on grounds of ascertainability alone.

341 F.R.D. at 96.  In Evans v. Brigham Young University, Case No. 1:20-CV-100-TS, 2022 WL

596862 (D. Utah February 28, 2022), however, the Honorable Ted Stewart, United States District

Judge for the United States District Court for the United States District of Utah, acknowledges the

different requirements between the Third and Seventh Circuits, but concludes that the plaintiffs in

that case did not demonstrate ascertainability under either an administrative-feasibility theory or

under an objective-criteria theory.  See 2022 WL 596862, at *3-*4.  In Lavigne v. First Community

Bancshares, Inc., No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457 (D.N.M. June 5, 2018), the

Honorable William P. Johnson, Chief United States District Judge for the United States District

Court for the United States District of New Mexico, states that, "[f]or a class definition to be

ascertainable, identifying class members must be administratively feasible," but concluded that

ascertaining the proposed class members in that case was administratively feasible.  2018 WL

2694457, at *7.  Courts within each of Oklahoma's three judicial districts also have applied the administrative feasibility requirement.  See Cline v. Sunoco, Inc., 333 F.R.D. 676, 688 (E.D. Okla. 2019)(Gibney, J.)(citing Federal Practice & Procedure, supra § 1760; Carrera v. Bayer Corp., 727 F.3d at 306-07); In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig., No. 12-ML-2048-C, 2014 WL 104964, at *2 (W.D. Okla. January 9, 2014)(Cauthron, J.)(quoting Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013)); Cole v. ASARCO Inc., 256 F.R.D. 690, 696 (N.D. Okla. 2009)(Frizzell, J.)(quoting Joseph v. Gen. Motors Corp., 109 F.R.D. 635, 639 (D. Colo. 1986)(Kane, J.); Cherokee Nation of Oklahoma v. United States, 199 F.R.D. 357, 360 (E.D. Okla. 2001)(Seay, J.)).  Finally, the Honorable Nancy D. Freudenthal, Chief United States District Judge for the United States District Court for the District of Wyoming, has cited Carrera v. Bayer Corp. for the proposition that a class must be readily ascertainable, "such that the Court can easily understand who and what is in, or our of, the class," and has offered plaintiffs seeking class certification an opportunity to revise the class definition "to be sufficiently precise and objective so that it is administratively feasible for the Court to ascertain" who are the class members.  Belmont v. BP Am. Prod. Co., No. 13-CV-0063, 2015 WL 11019026, at *5 (D. Wyo. January 8, 2015)(Freudenthal, C.J.)(citing Carrera v. Bayer Corp., 727 F.3d at 305-12).

When determining whether identifying a proposed class' members is administratively feasible, the Third Circuit has stated that "[a]ffidavits from potential class members, standing alone, without 'records to identify class members or a method to weed out unreliable affidavits,' will not constitute a reliable and administratively feasible means of determining class membership."  City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d 434, 441 (3d Cir. 2017)(quoting Byrd v. Aaron's Inc., 784 F.3d at 171).  "Some courts have held that where nothing in company databases shows or could show whether individuals should be included in the

proposed class, the class definition fails." Marcus v. BMW of N. Am., LLC, 687 F.3d at 593 (citing Clavell v. Midland Funding LLC, No. 10–3593, 2011 WL 2462046, at *4 (E.D. Pa. June 21, 2011)(Dalzell, J.); Sadler v. Midland Credit Mgmt., Inc., No. 06–C–5045, 2008 WL 2692274, at *5 (N.D. Ill. July 3, 2008)(Pallmeyer, J.); In re Wal–Mart Stores, Inc. Wage & Hour Litig., No. C 06–2069 SBA, 2008 WL 413749, at *8 (N.D. Cal. February 13, 2008)(Armstrong, J.); Deitz v. Comcast Corp., No. C 06–06352 WHA, 2007 WL 2015440, at *8 (N.D. Cal. July 11, 2007)(Alsup, J.)). In Meyer v. BMW of North America, LLC, the Third Circuit concluded that a class definition of BMW owners whose tires had gone flat and been replaced was not administratively feasible, given that BMW did not have records of all BMW owners whose tires fit that definition, because not all BMW owners went to the dealership to replace their tires. 687 F.3d at 593-94. The Third Circuit also "caution[s] . . . against approving a method that would amount to no more than ascertaining by potential class members' say so. For example, simply having potential class members submit affidavits that their Bridgestone RFTs have gone flat and been replaced may not be 'proper or just.'" Meyers v. BMW of N. Am., LLC, 687 F.3d at 594 (citing Xavier v. Philip Morris USA Inc., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011)(Alsup, J.)(concluding that the plaintiffs' proposed class definition was not ascertainable, because, "[u]nlike in many cases, there are no defendant records on point to identify class members," and because individual affidavits regarding the number of cigarettes a potential class member has smoked are unreliable)). That a defendant does not have reliable records with which plaintiffs can identify readily the proposed class members does not relieve those plaintiffs of their burden to meet the ascertainability requirement. See Hayes v. Wal-Mart Stores, Inc., 725 F.3d at 356.

As the Seventh Circuit has noted, the administrative feasibility requirement erects a high barrier for potential class actions, particularly in the low-value consumer class action context. See

Mullins v. Direct Digital, LLC, 795 F.3d at 662 ("[S]ome courts have used [the administrative feasibility] requirement to erect a nearly insurmountable hurdle at the class certification stage in situations where a class action is the only viable way to pursue valid but small individual claims."). This assertion has proven true in several consumer class actions regarding products like orange juice, see In re Tropicana Orange Juice Mktg. & Sales Practices Litig., 2018 WL 497071, at *11 (rejecting a proposed class, because several orange juice retailers did not maintain adequate records regarding who purchased their products), cooking oil, see Ault v. J.M. Smucker Co., 310 F.R.D. at 64-65 (concluding that a proposed class of consumers who purchased a certain cooking oil brand was not ascertainable where defendant did not sell its products to end users and defendant sold multiple brands with different labels at different times), and beverages, see Bello v. Beam Glob. Spirits & Wine, Inc., 2015 WL 3613723, at *9-12 (rejecting the use solely of claim forms without verifiable records or documents, and asserting that "acceptance of receipts as evidence of purchase would not necessarily prevent the submission of fraudulent claims"). The Seventh Circuit notes that, although courts "must consider 'the likely difficulties in managing a class action,' . . . in doing so [they] must balance countervailing interests to decide whether a class action 'is superior to other available methods for fairly and efficiently adjudicating the controversy.'" Mullins v. Direct Digital, LLC, 795 F.3d at 658 (quoting Fed. R. Civ. P. 23(b)(3)).

Judges within the Third Circuit have echoed the Seventh Circuit's concerns that requiring plaintiffs to meet an administrative feasibility requirement "undermines the 'very core' of cases that the class action device was designed to bring to court: cases where many consumers have been injured, but none have suffered enough to make individual actions possible." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444 (Fuentes, J., concurring); Byrd v. Aaron's Inc., 784 F.3d at 172 (Rendell, J., concurring). The Honorable Julio M. Fuentes, United States

Circuit Judge for the Third Circuit, has argued that administrative feasibility is not necessary to serve the values which the Third Circuit in Marcus v. BMW of N. Am., LLC recognized -- namely "absent plaintiffs' opt-out rights and interest in not having future claims diluted," "a defendant's due process rights," and "the efficiency of the class action mechanism" -- because rule 23's existing predominance and superiority requirements already protect those values sufficiently. City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444 (Fuentes, J., concurring). Judge Fuentes notes first that the concern that false or fraudulent claims will dilute absent class members' recovery is misaligned with class administration's reality, because: (i) the number of eligible class members who submit claims in most consumer cases is low, so fraudulent claims are unlikely to dilute class members' recovery; (ii) "'[t]he chances that someone would, under penalty of perjury, sign a false affidavit stating that he or she bought Bayer aspirin for the sake of receiving a windfall of $1.59 are far-fetched at best,'" City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444-45 (Fuentes, J., concurring)(quoting Byrd v. Aaron's Inc., 784 F.3d at 175 (Rendell, J., concurring))(alteration in City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., but not in Byrd v. Aaron's Inc.)(citing Briseno v. ConAgra Foods, Inc., 844 F.3d at 1130); (iii) courts have tools to screen fraudulent claims, such as claims administrators, audits, random sampling to detect fraud, and follow-up notices, among other techniques; and (iv) the Third Circuit accepts cy pres remedies in class actions, which allow "the distribution of unclaimed class action damages to non-class members," City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 444-45 (Fuentes, J., concurring)(quoting Briseno v. ConAgra Foods, Inc., 844 F.3d at 1129)(citing Mullins v. Direct Digital, LLC, 795 F.3d at 667; Newberg on Class Actions § 12:32; In re Baby Prod. Antitrust Litig.y Prod. Antitrust Litig., 708 F.3d 163, 172 (3d Cir. 2013); Geoffrey C. Shaw, Note, Class Ascertainability, 124 Yale L.J. 2354, 2371 (2015)).

Second, Judge Fuentes asserts that the arguments that an administrative feasibility requirement protects defendants by identifying clearly those plaintiffs whom the final judgment binds and by securing the defendant's due process right to raise individual defenses are flawed. See City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 446.  Judge Fuentes asserts that the existing objective-criteria requirement, which demands that "a class must be defined in reference to objective criteria, already allows courts to determine whether a plaintiff in a future action was a member of a prior class and thus is precluded from relitigation." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 446 (Fuentes, J., concurring)(citing Briseno v. ConAgra Foods, Inc., 844 F.3d at 1130 n.9).  Additionally, he asserts that a defendant may challenge individual class members and individual damages later in the litigation, and "does not have a due process right to the most 'cost-effective' method for challenging individual claims . . . and these challenges are more appropriately addressed after certification." City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 447 (Fuentes, J., concurring)(citing Mullins v. Direct Digital, LLC. 795 F.3d at 671 (italics added in City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.); Briseno v. ConAgra Foods, Inc., 844 F.3d at 1132; Wal-Mart Stores Inc. v. Dukes, 564 U.S. at 364-65).

Judge Fuentes asserts finally that rule 23(b)'s superiority requirement addresses already any efficiency concerns.  "Specifically, Rule 23(b)(3) requires that the class device be 'superior to other available methods for fairly and efficiently adjudicating the controversy' and considers 'the likely difficulties in managing a class action.'  Thus, imposing a separate manageability requirement within ascertainability 'renders the manageability criterion of the superiority requirement superfluous.'" City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d at 447 (Fuentes, J., concurring)(quoting Fed. R. Civ. P. 23(b); Mullins v. Direct Digital, LLC, 795

F.3d at 663 (citing Daniel Luks, Note, <u>Ascertainability in the Third Circuit: Name That Class</u> <u>Member</u>, 82 Fordham L. Rev. 2359, 2395 (2014))).  Judge Fuentes notes that courts must "weigh the costs *and* benefits of certification," and that placing the administrative feasibility requirement in the ascertainability analysis as a prerequisite "forces courts to consider the costs 'in a vacuum' without considering the realistic alternatives available to plaintiffs for bringing their claims." <u>City</u> <u>Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.</u>, 867 F.3d at 447 (Fuentes, J., concurring)(quoting <u>Mullins v. Direct Digital, LLC</u>, 795 F.3d at 663)(emphasis in original).  Judge Fuentes asserts that district courts are capable of managing their cases at the claims administration stage, and should be permitted to wait until the claims administration process has begun, "'when much more may be known about available records, response rates, and other relevant factors'" to determine whether to decertify a class, in the event that the class becomes unmanageable.  <u>City</u> <u>Select Auto Sales. v. BMW Bank of N. Am. Inc.</u>, 867 F.3d at 448 (Fuentes, J., concurring)(quoting <u>Mullins v. Direct Digital, LLC</u>, 798 F.3d at 664)(citing <u>Carrera v. Bayer</u> <u>Corp.</u>, Br. of Amici Curiae Professors of Civil Procedure & Complex Litigation at 7-8; <u>Byrd v.</u> <u>Aaron's Inc.</u>, 784 F.3d at 175).

While an administrative feasibility requirement is not an express requirement in rule 23's language, it is built into 23(b)(3)(D).  Rule 23(b)(3) states:

The matters pertinent to [the predominance and superiority] findings include

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).   Determining whether a proposed class's members will be administratively feasible is a question inherent to the Court's consideration of "the likely difficulties in managing a class action."   Fed. R. Civ. P. 23(b)(3)(D).   Further, although the ascertainability requirement threatens to block some low-value consumer classes from certification, it by no means blocks all -- just some.   The choice is really between considering the difficulties in managing a class action now and the difficulty of identifying class members now, or kicking the issue down the road to the claim administration stage -- which is after the case has been certified.   This delay gives plaintiffs a considerable advantage of trying to secure a settlement without the district court ever deciding the difficulties in managing a class action.   While plaintiffs prefer not to bother about the difficulties of managing a class action, the rule requires the district court to consider difficulties at class certification and not just postpone them.

An administrative-feasibility requirement does not endanger all low-value consumer classes.   In many low-value consumer cases, the consumer is readily ascertainable and administratively feasible to identify.   The requirement only endangers classes where the consumers are not ascertainable.   Many times, the defendant knows its customers, and the information can be ascertained from the defendant's documents.   It is only cases where the actual consumer cannot be ascertained that this requirement creates problems.   And when it does create problems, the question is why the class action -- largely manufactured by attorneys -- should go forward when the actual victims cannot be determined.

On a clean slate, as the Court did in Abraham v. WPX Production Productions, LLC, the Court would adopt the Third Circuit's administrative-feasibility requirement.[26]   Given, here, the

---

[26]The Court would adopt the Third Circuit's rule for similar reasons that the Third Circuit identified in announcing the rule.   See Marcus v. BMW of N. Am., LLC, 687 F.3d at 593.   First,

extensive debate in the Court of Appeals, the Court does not believe the Tenth Circuit will follow the Third Circuit's rule. As first discussed in the Court's recent opinion in In Re: Santa Fe Natural Tobacco Company Marketing & Sales Practices and Products Liability Litigation, No. MD 16-2695 JB/LF, 2023 WL 6121894, at *101-09 (D.N.M. Sept. 19, 2023)(Browning, J.)("Santa Fe Natural Tobacco"), the Court determines that it is more likely that the Tenth Circuit will conclude that administrative feasibility is a part of the rule 23(b)(3)(A)-(D) considerations, and, accordingly, weigh administrative feasibility in its analysis of rule 23(b)(3)'s predominance and superiority analysis, but not view administrative feasibility as an "ascertainability" prerequisite the failure of which dooms a proposed class.[27] The Court emphasizes that this conclusion bears on when -- and

---

an administrative-feasibility requirement ensures that the Court and the parties easily can identify class members. Engaging in prolonged class certification litigation only to end up with a claims administration process that struggles to identify class members without engaging in individualized inquiries is not an efficient use of time and resources. Second, an administrative feasibility requirement protects class members' rights, because such a requirement limits fraudulent claims and ensures that only valid class members obtain relief, which is important particularly where defendants are ordered to pay a lump-sum judgment of which each class member takes a share. Third, an administrative feasibility requirement protects defendants' rights, because requiring clear records and documentation avoids "mask[ing] individual issues" and enables defendants to exercise their rights under the Seventh Amendment to challenge individual claimants. Carrera v. Bayer Corp., 727 F.3d at 307.

[27]In this regard, the Court predicts that the Tenth Circuit will align with the Eleventh Circuit's formulation of this rule, and determine that ascertainability requires a class definition that relies on objective criteria, but that the 23(b)(3) predominance and superiority analyses encompass the administrative feasibility determinations. See Shook v. El Paso Cnty., 386 F.3d 963, 972 (10th Cir. 2004)(listing "identifiability" as one of rule 23(b)(3)'s elements); Cherry v. Dometic Corp., 986 F.2d 12996, 1301-05 (11th Cir. 2021). In Cherry v. Dometic Corp., the Eleventh Circuit concludes that ascertainability is a rule 23(a) prerequisite and that administrative feasibility is not relevant to ascertainability, but rather is a part of a court's consideration under rule 23(b)(3)'s manageability criteria. See 986 F.3d at 1303-05. The Eleventh Circuit notes that it previously applied an administrative feasibility requirement in Karhu v. Vital Pharms., Inc., 621 F. App'x 945, 946 (11th Cir. 2015)(citing Bussey v. Macon Cnty. Greyhound Park, Inc., 562 F. App'x 782, 787 (11th Cir. 2014)), but that this line of cases is unpublished and therefore not binding precedent. See Cherry v. Dometic Corp., 986 F.3d at 1302. In walking back from its previous analysis, the Eleventh Circuit states:

Our ascertainability precedents though do not mandate proof of administrative feasibility. A class is "clearly ascertainable" if we are certain that its membership is "capable of being" determined. *Ascertain*, *Webster's New International Dictionary* (3d ed. 1993); *Ascertainable*, *Webster's New International Dictionary* (3d ed. 1993). But membership can be capable of determination without being capable of *convenient* determination. Administrative feasibility is not an inherent aspect of ascertainability.

. . . .

Administrative feasibility does not follow from the text of Rule 23(a). Unlike traditional ascertainability, administrative feasibility does not bear on the ability of a district court to consider the enumerated elements of that subsection. A plaintiff proves administrative feasibility by explaining how the district court can locate the remainder of the class *after* certification. *See, e.g.*, *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 396-97 (3d Cir. 2015). The plaintiff satisfies this requirement if the district court concludes that the proposed process will be manageable and successful. *Byrd*, 784 F.3d at 163-64. But neither foreknowledge of a method of identification nor confirmation of its manageability says anything about the qualifications of the putative class representatives, the practicability of joinder of all members, or the existence of common questions of law or fact. Fed. R. Civ. P. 23(a). Because administrative feasibility has no connection to Rule 23(a), it is not part of the ascertainability inquiry.

Nor does a requirement of administrative feasibility follow from Rule 23(b). To be sure, administrative feasibility has relevance for Rule 23(b)(3) classes, in the light of the manageability criterion of Rule 23(b)(3)(D). *See* Rubenstein, 2 *Newberg on Class Actions* § 4:76, at 301 (5th ed. 2012). Rule 23(b)(3)(D) instructs the district court, in deciding whether "a class action [would be] superior to other available methods for fairly and efficiently adjudicating the controversy," to consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). A difficulty in identifying class members is a difficulty in managing a class action. *See Briseno*, 844 F.3d at 1126. But because Rule 23(b)(3) requires a balancing test, it does not permit district courts to make administrative feasibility a requirement. The manageability inquiry focuses on whether a class action "will create relatively more management problems than any of the alternatives," not whether it will create manageability problems in an absolute sense. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 . . . (2008). And the district court must balance its manageability finding against other considerations. Fed. R. Civ. P. 23(b)(3). So administrative difficulties -- whether in class-member identification or otherwise -- do not alone doom a motion for certification. Indeed, we have made clear that manageability problems will "rarely, if ever, be in [themselves] sufficient to prevent certification." *Klay*, 382 F.3d at 1272.

Cherry v. Dometic Corp., 986 F.3d at 1303-04 (emphasis and alterations in original).  This formulation is a variance from the Court's earlier writing on the subject in Abraham v. WPX Production Productions, LLC, in which the Court determined that administrative feasibility issues in identifying which gas was processed in which processing plants prevented the proposed class from meeting the ascertainability requirement.  See Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254-58.  In its analysis in that case, the Court references rule 23(c)'s requirement that the Court "'define the class and the class claims, issues, or defenses.'"  Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Fed. R. Civ. P. 23(c)).  The Court next asserts that "[a]nother 'essential' prerequisite to a rule 12(b)(3) class action is that the 'class must be currently and readily ascertainable based on objective criteria.'"  Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 592-93).  The objective criteria which the Court references stand in opposition to subjective criteria, such as a class composed of individuals "'who 'believe' they were discriminated against."  Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Chiang v. Veneman, 385 F.3d 256, 271 (3d Cir. 2004)).  The Court finally states that, "'[i]f class members are impossible to identify without extensive and individualized factfinding or 'mini-trials,' then a class action is inappropriate.'" Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 593).  The Court's subsequent analysis includes a reference to Carrera v. Bayer Corp.'s administrative-feasibility language alongside a consideration of the administrative difficulties in identifying which gas flowed to which wells, at the conclusion of which the Court states that "identify[ing] which wells' gas was processed in each year . . . is an individual and time-consuming inquiry."  Abraham v. WPX Prod. Prods, LLC, 317 F.R.D. at 258.  Although the Court frames its analysis in Abraham v. WPX Production Productions, LLC, as an ascertainability question, given the extensive review of the caselaw the Court has performed in the text above, the Court concludes that the Tenth Circuit would find that administrative feasibility is more appropriately a predominance and superiority analysis, investigating whether identifying which wells' gas was processed where would be an individualized and time-consuming inquiry, such that the individualized questions predominate over any common questions, and whether the class action is the superior vehicle for the plaintiffs to bring their claims.  Although the Court now believes the Tenth Circuit would consider the Court's analysis in Abraham v. WPX Production Productions, LLC, to be an analysis under rule 23(b)(3) -- predominance and superiority -- rather than 23(c) -- ascertainability -- the Court would have reached the same conclusion in that case, given the overwhelming administrative difficulties in identifying the processed gas's source wells.

While the Court still thinks that the Third Circuit's rule is the best, the Court believes the Tenth Circuit will not adopt that rule, so the Court clarifies here the basic analysis for a proposed rule 23(b)(3) class that it believes the Tenth Circuit will use.  Rule 23(c) requires the Court to "define the class" in its class certification order.  Fed. R. Civ. P. 23(c)(1)(B).  When identifying definiteness, "Courts generally treat the requirement as a precursor to Rule 23 and therefore examine the implicit requirements before proceeding to the Rule's explicit requirements." Newberg on Class Actions § 3:3.  Additionally, "[a]ll courts essentially focus on the question of whether the class can be ascertained by objective criteria.  A class definition that depends on subjective criteria, such as class members' state of mind, will fail for lack of definiteness." Newberg on Class Actions § 3:3.  After determining the proposed class' definiteness -- because the class is or is not ascertainable on the basis of objective criteria -- the Court examines the

how -- the question of administrative feasibility should be assessed in the context of class certification.  The Court does not, however, alter its approach to the threshold requirement that a class must be ascertained by objective criteria.  The "objective criteria" requirement remains a fundamental requirement under rule 23, and the Court is aware of no authority that calls into question the importance of determining whether "a class" defined by objective criteria exists as a prerequisite to class certification.

      2.    **Rule 23(a) Requirements.**

All classes must satisfy the prerequisites of rule 23(a):

> **(1)**    the class is so numerous that joinder of all members is impracticable;
>
> **(2)**    there are questions of law or fact common to the class;
>
> **(3)**    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> **(4)**    the representative parties will fairly and adequately protect the interests of the class.

---

explicit rule 23(a) requirements: numerosity, commonality, typicality, and adequacy.  See Fed. R. Civ. P. 23(a).  Once the Court has determined that the proposed class satisfies the rule 23(a) criteria, the Court turns to the rule 23(b)(3) predominance and superiority requirements, which direct the Court to consider, among other factors, "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  In analyzing the likely difficulties in managing the class action, the Court considers whether it will be administratively feasible for each proposed class member to prove that they are a class member.  Even where a proposed class relies on objective criteria for its definition -- in Abraham v. WPX Production Productions, LLC, whether gas was processed at a particular plant -- determining whether an individual proposed class member satisfies those objective criteria may be so burdensome or require significant individualized inquiry such that the individualized inquiries predominate over common questions or the class action is not superior to other adjudication methods -- the case in Abraham v. WPX Production Productions, LLC, where the Court determined that identifying where each wells' gas was processed would have been "an individual and time-consuming inquiry.  Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 258.

Fed. R. Civ. P. 23(a).  These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively.  See Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met."  Reed v. Bowen, 849 F.2d at 1309.  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. at 161, and citing Reed v. Bowen, 849 F.2d at 1309).

> ### a.      Numerosity.

Rule 23(a)(1) provides for class certification where "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  See Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).  "[R]ule 23(a)(1) is concerned with manageability, i.e., the Court's ability to handle the case as a non-class action; this purpose is obvious from the rules text, which calls for 'joinder . . . [being] impracticable.'"  Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 436 (quoting Fed. R. Civ. P. 23(a)(1)), adhered to on reconsideration, 312 F.R.D. 620 (D.N.M. 2015)(Browning, J.).  "[T]he numerosity requirement . . . is [second] concerned with protecting absent plaintiffs from the dangers that inhere in class litigation's foregoing of meaningful, face-to-face attorney-client representation."  Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 436.  "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion."  Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d at 436).

Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption." Trevizo v. Adams, 455 F.3d at 1162. "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, 2010 WL 4053947, at *7 (quoting Rex v. Owens, 585 F.2d at 436). Cf. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement"). In determining whether a proposed class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(Babcock, J.)(quoting Joseph v. Gen. Motors Corp., 109 F.R.D. 635, 639 (D. Colo. 1986)(Kane, J.)). See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a "'strict numerical test'"; holding, however, that where class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous" (citing Senter v. General Motors Corp., 532 F.2d 511, 523 n. 24 (6th Cir. 1976))); Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 putative class members should raise a presumption that joinder is impracticable."); 1 Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels, § 3.05, at 141-42 (2d ed. 1985).

"Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993). See Robidoux v. Celani, 987 F.2d at 935 ("Impracticable does not mean impossible."). The Court has previously found that

joinder of "several hundred tenants and homeowners" would be impracticable, and thus the proposed class met rule 23(a)(1)'s numerosity requirement.  Lowery v. City of Albuquerque, 273 F.R.D. 668, 682-83 (D.N.M. 2011)(Browning, J.).  At the other end of the spectrum, the Court found that a class of 6,100 members, in a securities action, was so numerous that joinder was impracticable.  See Lane v. Page, 272 F.R.D. 558, 574 (D.N.M. 2011)(Browning, J.).  See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620 (D. Kan. 2008)(Brown, J.)(finding that the numerosity requirement is met by a proposed class seeking injunctive relief that constituted "at least tens of millions of members," and by a proposed class seeking damages that constitutes at least 4,900 members).

### b.   Commonality.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist." In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.).  See Adamson v. Bowen, 855 F.2d at 676 ("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)(citing In re Am. Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir. 1996) and quoting Adamson v. Bowen, 855 F.2d at 676)).

The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer. See Wal-Mart, 564 U.S. at 348-52. In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination. See 564 U.S. at 342. Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion. See 564 U.S. at 343-45. The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice." 564 U.S. at 345. The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," [Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. at 157]. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention -- for example, the assertion

of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 564 U.S. at 349-50 (emphasis in original)(quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132 (2009)).  In EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2011)(Diaz, J., joined by Keenan and Wilkinson, JJ.), the United States Court of Appeals for the Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.

> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties.  These common practices are not irrelevant to Rule 23(b)'s predominance requirement.  But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.

> The district court identified numerous common royalty payment practices.  For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM."  With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."

> That the defendants engaged in numerous common practices may be sufficient for commonality purposes.  As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citing <u>Adair v. EQT Prod. Co.</u>, No. 1:10-CV-00037, 2013 WL 5429882, at *38-39 (W.D. Va. Sept. 5, 2013)(Sargent, M.J.)).

In <u>Wal-Mart</u>, the Honorable Antonin Scalia, then Associate Justice of the Supreme Court of the United States, stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay." 564 U.S. at 366. Scalia concluded from this observation:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

<u>Wal-Mart</u>, 564 U.S. at 367. "Thus, the common question or questions cannot be 'incidental,' nor can the plaintiff submit a long list of 'incidental' questions or issues, and say that they predominate over the real issues." <u>Anderson Living Tr. v. WPX Energy Prod. LLC,</u> 306 F.R.D. at 382.

### c.    Typicality.

Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims. <u>See</u> Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest. <u>See Baby Neal ex rel. Kanter v. Casey</u>, 43 F.3d 48, 57 (3d Cir. 1994). "Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." <u>Thompson v. Jiffy Lube Int'l, Inc.</u>, 250 F.R.D. at 622 (citing <u>Busby v. JRHBW Realty, Inc.</u>, 513 F.3d 1314, 1320 (11th Cir. 2008)).

The Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." <u>Gen. Tele. Co. of the Sw. v. Falcon</u>, 457 U.S. at 157 n.13. "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if

there are common questions of law or fact." Gianzero v. Wal-Mart Stores Inc., No. CIV 09-00656 REB/BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(Blackburn, J.)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982)("In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient.")); Adamson v. Bowen, 855 F.2d at 676). "[L]ike commonality, typicality exists where . . . all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010). Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d at 676. See DG ex rel. Stricklin v. Devaughn, 594 F.3d at 1199 (citing Adamson v. Bowen, 855 F.2d at 676 ("Provided the claims of Named Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality.")); Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").

Accordingly, differences in the amount of damages will not defeat typicality. See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.). On the other hand, "it is well-established that a proposed class representative is not 'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become a major focus of the litigation.'" In re Crocs, Inc. Sec. Litig., 306 F.R.D. 672, 687 (D. Colo. 2014)(Brimmer, J.)(quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 599 (3d Cir. 2012)).

"[A] lead plaintiff's unique defense is detrimental to the class . . . [because] the lead plaintiff 'might devote time and effort to the defense at the expense of issues that are common and controlling for the class.'"   In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006)).   See Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. 825 F. Supp. 2d 1082, 1214 (D.N.M. 2011)(Browning, J.).

### d.   Adequacy.

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).   "The requirement of typicality dovetails into the requirement of adequacy of representation." Edgington v. R.G. Dickinson & Co., 139 F.R.D. 183, 189 (D. Kan. 1991)(Crow, J.)(quoting Penn v. San Juan Hospital, Inc., 528 F.2d at 1189).   See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1219 (noting that "the commonality, typicality, and adequacy requirements of Rule 23(a) 'tend to merge'" (quoting Wal-Mart, 564 U.S. at 349 n.5)).   The adequacy requirement protects the interests of unnamed proposed class members -- who are bound by any judgment in the action.   See Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)(Vratil, J.)("Due process requires that the Court 'stringently' apply the competent representation requirement because putative class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings." (citing Albertson's, Inc. v. Amalgamated Sugar Co., 503 F.2d 459, 463-64 (10th Cir. 1974)).   "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a)." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.).   See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)(Gourley, J.)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . .").

The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002). The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the putative class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)). Intra-class conflicts "may negate adequacy under Rule 23(a)(4)." Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315-16 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts). See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees, who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees, whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(Michael, J.)(ruling that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- where some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment). On the other hand, "[t]hough a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class members, not every potential disagreement between a class representative and the putative

class members will stand in the way of a class suit."  Lowery v. City of Albuquerque, 273 F.R.D.

at 680 (quoting 1 A. Conte & H. Newberg, Newberg on Class Actions § 3:26, at 433-34 (4th ed.

2002)).  "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's

claim of representative status.  Beyond that straightforward proposition, defining the level of

antagonism or conflict that should preclude class certification is a more difficult proposition."  7A

Wright, Miller & Kane, supra § 1768, at 389-93.

Although Tenth Circuit precedent suggests that the adequacy-of-counsel analysis is

conducted as a part of the rule 23(a)(4) inquiry, see Lopez v. City of Santa Fe, 206 F.R.D. at 289-

90, this analysis has now been moved to rule 23(g).  The 2003 amendment to rule 23 created rule

23(g), entitled "class counsel."  Fed. R. Civ. P. 23(g).  This subsection contains its own adequacy-

of-counsel analysis.  See Fed. R. Civ. P. 23(g)(1)-(2).  The advisory committee notes advise that

rule 23(g) should replace the analysis of class counsel under rule 23(a)(4); these notes describe

that rule 23(g)

> responds to the reality that the selection and activity of class counsel are often
> critically important to the successful handling of a class action.  Until now, courts
> have scrutinized proposed class counsel as well as the class representative under
> Rule 23(a)(4).   This experience has recognized the importance of judicial
> evaluation of the proposed lawyer for the class, and this new subdivision builds on
> that experience rather than introducing an entirely new element into the class
> certification process.   Rule 23(a)(4) will continue to call for scrutiny of the
> proposed class representative, while this subdivision will guide the court in
> assessing proposed class counsel as part of the certification decision.   This
> subdivision recognizes the importance of class counsel, states the obligation to
> represent the interests of the class, and provides a framework for selection of class
> counsel.  The procedure and standards for appointment vary depending on whether
> there are multiple applicants to be class counsel.  The new subdivision also provides
> a method by which the court may make directions from the outset about the
> potential fee award to class counsel in the event the action is successful.

Fed. R. Civ. P. 23(g) advisory committee notes to the 2003 amendment.  See Lyall v. City of

Denver, 319 F.R.D. 558, 565 (D. Colo. 2017)(Martinez, J.)(addressing the named plaintiffs'

adequacy under rule 23(a)(4) and the counsel's adequacy under rule 23(g)); Thompson v. Jiffy

Lube Int'l, Inc., 250 F.R.D. at 628 ("Rule 23(g) now sets forth a specific set of factors relevant to

the appointment of class counsel.").  Cf. Martin v. Blessing, 571 U.S. 1040, 1040 (2013)(stating,

while denying a writ of certiorari, that rule 23(g) orders a district court to consider the adequacy

of class counsel in determining whether to grant class certification).

### 3.    Rule 23(b).

Once the court concludes that the threshold requirements have been met, "it must then

examine whether the class falls within at least one of three categories of suits set forth in Rule

23(b)."  Adamson v. Bowen, 855 F.2d at 675.  See DG ex rel. Stricken v. Devaughn, 594 F.3d

1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must

also meet the requirements of one of the types of classes described in subsection (b) of Rule 23.").

Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied,

and the case falls into one or more of three categories:

> (b)    Types of Class Actions.  A class action may be maintained if Rule 23(a) is
> satisfied and if:
>
> (1)    prosecuting separate actions by or against individual
> putative class members would create a risk of:
>
> (A)    inconsistent or varying adjudications with
> respect to individual putative class members
> that would establish incompatible standards
> of conduct for the party opposing the class; or
>
> (B)    adjudications with respect to individual
> putative class members that, as a practical
> matter, would be dispositive of the interests
> of the other members not parties to the
> individual adjudications or would
> substantially impair or impede their ability to
> protect their interests;

(2)    the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3)    the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

    (A)    the putative class members' interests in individually controlling the prosecution or defense of separate actions;

    (B)    the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

    (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).  "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements."  Gonzales v. City of Albuquerque, No. CIV 09–0520 JB/RLP, 2010 WL 4053947, at *11 (citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility.  Class actions under (b)(1) can be certified only in very particular circumstances.  Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages.  Far and away the most controversial class action category, (b)(3), can be brought

for class-wide damages, injunctive relief, declaratory relief, or any combination thereof.  Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire.  See Fed. R. Civ. P. 23(c)(2)(B), (c)(3)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 812 (1985)("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.").  The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given.  See Fed. R. Civ. P. 23(c)(2)(B), (c)(3)(A).  The Court will focus on the most important form of class action, the (b)(3) damages class action.[28]

---

[28]The Court will briefly address the other class-action types.  Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified.  See Fed. R. Civ. P. 23(b)(1).  Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication.  See Fed. R. Civ. P. 23(b)(1)(A).  "Incompatible" means more than simply inconsistent.  A situation in which, for example, a defendant was ordered to pay ten thousand dollars to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but the situation does not create "incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings.  What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing" in which, for example, one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.  Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally or logically -- incompatible judgments.  Fed. R. Civ. P. 23(b)(1)(B).  Rule 23(b)(1)(B) applies when the defendant has possession or control of a res -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the res.  For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the res.  Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian

of the *res* does not pay out the entire *res* to the first investors to file suit, but, instead, distributes the *res* fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well.  Both exist, in a sense, for the defendant's benefit -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them.  In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual.  In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open.  Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it, or pursue his or her own individual claim.  Accordingly, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances.  See Fed. R. Civ. P. 23(c)(2)(A).  Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." . . .In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 564 U.S. at 360-61 (emphasis in original).  The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today.  See Newberg § 4:26.  The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case.  Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one?  . . .Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy that she needs without going through the hurdles of certifying a class.  For example, to return to Brown v. Board of Education, [349 U.S. 294 (1955),] once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue.  Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) "the class members' interest in individually controlling the prosecution or defense of separate actions"; (ii) "the extent and nature of any litigation concerning the controversy already begun by or against members of the class"; (iii) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (iv) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." *Gonzales v. City of*

---

Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons. First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal. Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances. Second, the scope of the plaintiff's relief is likely augmented by certifying a class. It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy. Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of5 individual cases as they have limited resources, and the economies of scale may argue for a class action suit. Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms. Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

Newberg § 4:26 (footnotes omitted). Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class. See Fed. R. Civ. P. 23(c)(2)(A).

*Albuquerque*, 2010 WL 4053947, at *11 (citing *Carpenter v. Boeing, Co.*, 456 F.3d at 1187 (stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

      **a.**    **Predominance.**

Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those questions that are individualized.  <u>See</u> Fed. R. Civ. P. 23(b)(3).  A question is common when "the same evidence will suffice for each member to make a prima facie showing," <u>Blades v. Monsanto Co.</u>, 400 F.3d 562, 566 (8th Cir. 2005)(citing <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," <u>In re Nassau Cnty. Strip Search Cases</u>, 461 F.3d 219, 227 (2d Cir. 2006).  A question is individual when "the members of a proposed class will need to present evidence that varies from member to member."  <u>Blades v. Monsanto Co.</u>, 400 F.3d at 566.  Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones.  <u>See</u> <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.")(quoting <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 623-24 (1997).  As the Tenth Circuit, addressing a Title VII claim, put it:

> Although we do not rest our decision upon Rule 23(a), cases that interpret . . . the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate.

> . . . The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(footnote omitted).

The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages. In Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the Supreme Court held that it could not accept the regression model which the plaintiffs' expert had developed as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires. See 569 U.S. at 35-38. The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates. 569 U.S. at 31. The district court found, among other things, that the damages resulting "from overbuilder-deterrence impact could be calculated on a classwide basis." 569 U.S. at 31-32.

> To establish such damages, [the plaintiffs relied] solely on the testimony of Dr. James McClave. Dr. McClave designed a regression model comparing actual cable prices in the Philadelphia [Designated Market Area] with hypothetical prices that would have prevailed but for [Comcast Corp.'s] allegedly anticompetitive activities. The model calculated damages of $875,576,662.00 for the entire class. As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact. The District Court nevertheless certified the class.

569 U.S. at 31-32 (citations omitted).

The United States Court of Appeals for the Third Circuit affirmed the district court decision. The Third Circuit concluded that the plaintiffs "'provided a method to measure and quantify damages on a classwide basis,' finding it unnecessary to decide 'whether the methodology

was a just and reasonable inference or speculation.'"  569 U.S. at 32 (quoting 655 F.3d 182, 206 (3d Cir. 2011)).  The Supreme Court granted certiorari on the question "[w]hether a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis."  Comcast Corp. v. Behrend, 567 U.S. 933, 933 (2012).  Justice Scalia criticized the Third Circuit's reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination."  Comcast Corp. v. Behrend, 569 U.S. at 34.  Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis.  Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

569 U.S. at 34.  Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.  Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity."  569 U.S. at 35 (emphasis in original).

It is clear that Comcast Corp. v. Behrend applies to classwide damages.  It is less clear that Comcast Corp. v. Behrend's language applies to the determination of individual damages.  There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards.  First, the Court could decide that Comcast Corp. v. Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages.  Second, the Court could decide that everything that Justice Scalia said about classwide damages also applies to the determination of individual damages.  Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things

which apply to classwide damages.  As to the first option, while much could be said for limiting Justice Scalia's opinion to classwide damages -- even from the opinion's language and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damage awards.  Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seem relevant to whether damages are classwide or individual.  While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards.  On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to the individual determination of damages as it does to classwide damages.  The dissent stated that "[r]ecognition that individual damage calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." Comcast Corp. v. Behrend, 569 U.S. at 42 (Ginsburg, J., dissenting).  Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law.  See Menocal v. GEO Group, Inc., 882 F.3d at 927 (stating that the determination of individualized damages does not defeat class certification).  Accordingly, different amounts of damages for plaintiffs and class members, and separate calculations of damages do not defeat class certification.

What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold.  First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided.  In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation.  See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.,

725 F.3d at 1220 ("[T]he district court should consider the extent to which material differences in damages determinations will require individualized inquiries.").  A class can have individual damage calculations, but the Court has to look at the issues of individual damage calculations at the class certification stage.  Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis.  In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.  Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.  The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups.  The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.  See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1220 (describing that individualized damages issues might destroy predominance).

A defendant's desire to assert individual counterclaims[29] does not typically defeat predominance.  See Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1259-60 (11th Cir. 2003).  A defendant's desire to assert individual

---

[29]Generally speaking, counterclaims, even common ones, are not permitted against absent class members.  See Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 810 (1985).

affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d at 39 ("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."),[30] but this statement is less true after Wal-Mart.  Affirmative defenses may be considered as one factor in the class certification calculus.  See Donaca v. Dish Network, LLC., 303 F.R.D. 390, 400 (D. Colo. 2014)(Jackson, J.)(describing that affirmative defenses are relevant considerations for class certification); Miller v. Farmers Ins. Grp., No. CIV-10-466-F, 2012 WL 8017244, at *16 (W.D. Okla. March 22, 2012)(Friot, J.)(describing that affirmative defenses are relevant to the class certification inquiry and stating that Wal-Mart clarifies that the question for

----

[30]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the claim accrued; and (ii) the date on which the action was filed.  Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint.  Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a claim until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.  Even if the question is individual -- for example, if a class is defined as encompassing only preexisting filed claims, or if the discovery rule might delay the accrual of the claim for some class members but not others -- it still typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James W. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).  See Newberg, § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

class certification "is whether it can fairly and lawfully be said that plaintiff's win, if he wins *his* case, can fairly and lawfully be replicated for every member of the class")(emphasis in original); Mulford v. Altria Grp., Inc., 242 F.R.D. 615, 629-30 (D.N.M. 2007)(Vazquez, J.)("While the existence of affirmative defenses that may require individualized evidence does not compel a finding that individual issues predominate over common ones, it does weigh against class certification.").  Other recurring issues present serious challenges to predominance, such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[31]

---

[31]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes to the 1966 amendment (citing Miller v. Nat'l City Bank of N.Y., 166 F.2d 723 (2d Cir. 1948); Oppenheimer v. F. J. Young & Co., Inc., 144 F.2d 387 (2d Cir. 1944)).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg, supra, § 4:58.  Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized.  See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)(listing Courts of Appeals that "have held that oral misrepresentations are presumptively individualized"); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(Hall, J.)(certifying class where class definition was narrowed to include only those who had received written communications from defendant).  The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company --

(ii) differences in the applicable law in a multi-state, state-law-based class action,[32] see Castano v.

Am. Tobacco Co., 84 F.3d at 741; and (iii) the need to determine individual personal injury

---

are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances.  First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance.  Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public.  The public information is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[32]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), the Honorable Frank H. Easterbrook, United States Circuit Judge for the Seventh Circuit, in an opinion that predates Wal-Mart and Comcast Corp. v. Behrend, states:

> No class action is proper unless all litigants are governed by the same legal rules.  Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3).  Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015.  Judge Easterbrook then discussed how variations in tires defeat class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.  Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis.  About 20% of the Ford Explorers were shipped without Firestone tires.  The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires.  Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation.  Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat.  Other factors also affect heating; the failure rate (and hence the discount) may have been higher in

Arizona than in Alaska.  Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold.  Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000.  Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.  The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

. . . .

When courts think of efficiency, they should think of market models rather than central-planning models.

Our decision in In re Rhone-Poulenc Rorer, Inc., made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d [1293,] 1299)[(1995)] will yield the information needed for accurate evaluation of mass tort claims.

. . . .

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism.  Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. See BMW v. Gore, 517 U.S. [559, 568-73 (1996)]; Szabo[v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994).  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

288 F.3d at 1018-20.

damages, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.  There is little uniform guidance

on how to assess when common issues predominate over individual ones, and the Court's

statements to this point have, obviously, done more to disavow various tempting but fallacious

rules than they have to set forth a usable standard.

There is currently a split of authority between the United States Courts of Appeals over the

proper way to analyze predominance.  The Honorable Richard A. Posner, former United States

Circuit Judge for United States Court of Appeals for the Seventh Circuit, concludes that the

predominance inquiry boils down to "a question of efficiency."  Butler v. Sears, Roebuck & Co.,

702 F.3d 359, 362 (7th Cir. 2012), vacated, 569 U.S. 1015 (2013).  Judge Posner poses the

predominance question as: "Is it more efficient, in terms both of economy of judicial resources

and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in

separate trials?"  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  In Butler v. Sears, Roebuck &

Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-

machine owners who alleged that Sears' washing machines were prone to cultivate mold and

affirmed the district court's certification of the same class to pursue a claim that the machines'

control units were defective.  See 702 F.3d at 360-61, 363-64.  The Seventh Circuit certified the

class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages
> in a case such as this, involving a defect that may have imposed costs on tens of
> thousands of consumers yet not a cost to any one of them large enough to justify
> the expense of an individual suit.  If necessary a determination of liability could be
> followed by individual hearings to determine the damages sustained by each class
> member (probably capped at the cost of replacing a defective washing machine --
> there doesn't seem to be a claim that the odors caused an illness that might support
> a claim for products liability as distinct from one for breach of warranty).  But
> probably the parties would agree on a schedule of damages based on the cost of
> fixing or replacing class members' mold-contaminated washing machines.  The
> class action procedure would be efficient not only in cost, but also in efficacy, if
> we are right that the stakes in an individual case would be too small to justify the

> expense of suing, in which event denial of class certification would preclude any relief.
>
> . . . .
>
> [T]he district court will want to consider whether to create different classes of the control unit class for the different states. That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362. Along with numerous other class actions pending

appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and

remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v. Behrend."

Butler v. Sears, Roebuck & Co., 727 F.3d 796, 797 (7th Cir. 2013). On reconsideration, the

Seventh Circuit reaffirmed its prior decision, again in an opinion written by Judge Posner:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance. That's incorrect. An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment. [Wal-Mart, 564 U.S. at 338]. That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case). But predominance requires a qualitative assessment too; it is not bean counting. In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, [568 U.S. at 468], the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. . . . [at] 623 . . . , it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001)[(O'Malley)], we read that "common issues need only predominate, not outnumber individual issues." . . . As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original). The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars. But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

There is a single, central, common issue of liability: whether the Sears washing machine was defective. Two separate defects are alleged, but remember that this class action is really two class actions. In one the defect alleged involves mold, in the other the control unit. Each defect is central to liability. Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of classes. See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d [364,] 365[ 7th Cir. 2012] (10 classes).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02 (emphasis in original).[33]

---

[33]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

So how does the Supreme Court's Comcast decision bear on the rulings . . . in our first decision?

Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges. Comcast was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages. [569 U.S. at 37] (emphasis added). "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof*)." And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*." (emphasis the [Supreme] Court's). None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . .[the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

Unlike the situation in Comcast, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

The United States Court of Appeals for the Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[34]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently. This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups
>
> Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.
>
> Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in Comcast. But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.
>
> Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine damages on a class-wide basis. As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.

Butler v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[34]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim." Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

of people who individually would be without effective strength to bring their opponents into court at all'"); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.)(noting that "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits" because of litigation costs). Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 678 F.3d at 421 (citation omitted). That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making. See Amgen [Inc. v. Conn. Retirement Plans & Tr. Funds, 568 U.S. at 471 ]. Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action." Id. (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 107 (2009)). That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." Id. Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones. Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation." Id. at 1196 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 . . . (1997)).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 722 F.3d 838, 859 (7th Cir. 2013). The Sixth Circuit and Seventh Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied. See Butler v. Sears, Roebuck & Co., 727 F.3d at 802. This styling of the predominance inquiry is in keeping with the styling a leading class action treatise gave many years earlier:

> [A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class. Where the right to

recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense.  If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.

The predominance and efficiency criteria are of course intertwined.  When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class. When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

McLaughlin on Class Actions  § 5:23  (11th ed. 2016)(omission in original)(footnotes omitted)(quoting Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006 n.12 (11th Cir. 1997)).

Although the Sixth Circuit and the Seventh Circuit may agree about the definition of predominance, the Third Circuit, the Tenth Circuit, and the United States Court of Appeals for the Eleventh Circuit stake out a different test.

'Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.'  *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000).  Common issues of fact and law predominate if they '"ha[ve] a *direct impact* on every class member's effort to establish liability" *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member.'  *Vega* [*v. T-Mobile USA, Inc.*], 564 F.3d [1256,] 1270 [(11th Cir. 2009)](emphasis added)(quoting *Klay* [*v. Humana, Inc.*], 382 F.3d [1241,] 1255 [(11th Cir. 2004)]).  If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)." *Klay* [*v. Humana, Inc.*], 382 F.3d at 1255.  In practical terms, while "[i]t is not necessary that all questions of fact or law be common," *id.* at 1254 (citation omitted), "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."  *Id.* at 1255 (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978)).

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170

(emphasis in original)(first, eighth, tenth, and eleventh alterations in original).[35]  See Menocal v.

---

[35]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in Klay v. Humana, Inc., and gave renewed articulations of the test in 2009 in Vega v. T-Mobile USA, Inc., and, in 2010, in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170; Vega v. T-Mobile USA, Inc., 564 F.3d at 1270; Klay v. Humana, Inc., 382 F.3d at 1255.  In each case, the Eleventh Circuit made some reference to additionally adopting a United States Court of Appeals for the Fifth Circuit rule-of-thumb test:

> An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co . . .  In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."  Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important.  Id. ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.").  If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'")(quoting Klay v. Humana, Inc., 382 F.3d at 1255); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v. Humana, Inc.).

The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized.  The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

> We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered.  If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.

Alabama v. Blue Bird Body Co., 573 F.2d at 322 (footnote omitted).

GEO Group, Inc., 882 F.3d at 915; CGC Holding Co. v. Broad & Cassel, 773 F.3d at 1087-88;

Marcus v. BMW of N. Am., LLC, 687 F.3d at 600.   The Eleventh Circuit, however, imposes a

different, more rigorous, second step: the district court's trial plan must spend more time

adjudicating the common questions than it does adjudicating the individual questions.   See Sacred

Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170.   The Eleventh

Circuit's test may not be best -- the Court sees little reason why negative-value cases that can be

fairly and efficiently adjudicated via class action should not be certified[36] -- but it is commendable

---

[36]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases. Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's. "Predominate," the word that rule 23 uses, means "[t]o be of greater quantity or importance; preponderate." Predominate, The American Heritage Dictionary of the English Language, (5th ed. 2019), https://www.ahdictionary.com/word/search.html?q=predominate (last visited September 12, 2019). Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of an economic analysis. There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even these classes had not been allowed, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. Certification Order, at 8 n.12, 18 n.22. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that

are insusceptible of ready classification -- alone is fatal to predominance.  When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.

Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation, § 21.23 (4th ed. 2004); *see also Harding v. Tambrands Inc.*, 165 F.R.D. 623, 630 (D. Kan. 1996)[(Theis, J.)]("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." *Broussard* 155 F.3d at 340.  Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights." *Broussard* 155 F.3d at 344.  The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience.  *Id.* at 340.  The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party.  Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment.  By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," *Vega* [*v. T-Mobile USA, Inc.*], 564 F.3d at 1279, of such unlawful results, and thereby abused its discretion.

Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176.  These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real categories -- the class would be certifiable.  Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176.  The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different contractual language into a single category -- the sixth category.  Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176.  That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed Castano v. American Tobacco Company case, deciding the issue in a way one might expect:

Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action.  A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).  The proper interpretation of the

- 79 -

interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. See *In re N.D. Cal. Dalkon Shield IUD Prods. Liability Litig.*, 693 F.2d 847, 856 (9th Cir. 1982)(balancing severed issues against the remaining individual issues) . . .; *see also Jenkins* [*v. Raymark Indus. Inc.*], 109 F.R.D. [269,] 278 [(E.D. Tex. 1985)(Parker, J.)](comparing state of the art defense to individual questions of exposure and degree of injury in a class action certified only on the common issue of the state of the art defense). Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

Castano v. Am. Tobacco Co. 84 F.3d at 745 n.21. This logic is hardly unassailable. Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would not be "automatic certification in every case where there is a common issue," because superiority must still be satisfied. Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21. If a proposed class action is superior -- e.g., if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5), then it is not clear why certification "could not have been intended" by the rule. Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21. Moreover, it is a poor reading of the rule's text. Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate the "likely difficulties in managing a class action." Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D). Because rule 23 directs that "[t]he matters pertinent to these findings of [predominance and superiority] include: . . .likely difficulties in managing a class action," the Court, if it were writing on a clean slate, would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended," Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21. The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself. The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and

- 80 -

23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. [Am.] Tobacco Co., 84 F.3d [at ]745 n.21 . . ..

Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., concurring in part and dissenting in part).  Despite Judge Niemeyer's concern with creating a circuit split, disagreement among Courts of Appeals exist.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001)(stating that the district court abused its discretion in not considering partial certification); Zinser v. Accufix Research Inst., Inc. 253 F.3d 1180, 1189-90, 1192 n.8 (9th Cir. 2001)(discussing subclasses); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999)(treating "[d]ivided certification" as "worth consideration"). The Eleventh Circuit has refrained from taking a side on this question:

Some have been critical of the piecemeal certification of class action status for claims within a case.  See Gunnells v. Healthplan Servs., Inc., 348 F.3d . . .446-47 . . .(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d [at] 745 n.21 . . .("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.").  We did not directly address the legality of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original).  The Tenth Circuit also appears to have refrained from taking a side:

Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001).  Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d . . .898 . . ., with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998).  We do not need to

in that it is a test that district courts can use, rather than yet another meaningless recitation, see CGC Holding Co. v. Broad & Cassel, 773 F.3d at 1087 ("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues.'" (quoting William B. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2017)("Newberg"))), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'" (quoting Roper U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 406 n.11 (1980)), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]")(quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d at 600 (exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co., LLC v. Broad and Cassel.

Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate. Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so

---

rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3). The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12.

susceptible predominate over those that are not.  Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

      In this context, it is worth reiterating that our review on appeal is limited.  For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims.  But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree.  So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

      With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087-88 (emphasis in original).  See Menocal v. GEO Group, Inc., 882 F.3d at 915 (reiterating the test that the Tenth Circuit articulates in CGC Holding Co., LLC v. Broad & Cassel); Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 397 (distinguishing the Tenth Circuit test from other circuits' tests).

      **b.**    **Superiority.**

      The second requirement for certifying a (b)(3) class is superiority, which means that a class action would be superior to -- not merely just as good as or more convenient than -- all other available procedural mechanisms, including: (i) individual actions by class members; (ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation, see 28 U.S.C. § 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether cases.  The superiority requirement thus sets a high bar, but there are two ways that a proposed class can get an immediate leg up on certification, both of which involve rendering the aforementioned procedural devices impractical for the task at hand.

      First, the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without

aggregation.  These claims are the heart and soul of the class action, as the Supreme Court recently

reaffirmed:

> "The policy at the very core of the class action mechanism is to overcome
> the problem that small recoveries do not provide the incentive for any individual
> to bring a solo action prosecuting his or her rights.  A class action solves this problem
> by aggregating the relatively paltry potential recoveries into something worth
> someone's (usually an attorney's) labor."

Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d

338, 344 (7th Cir. 1997)).  The class action absolves absent plaintiffs of the otherwise prohibitive

obligations of having to hire their own attorneys, devote time and energy to their own discovery,

and potentially testify on their own behalf.

Second, the class may consist of such a large volume of similar cases that the judiciary

would be overwhelmed if it had to treat each separately.  While this consideration militates against

individual treatment and counsels towards aggregation, the court must carefully consider whether

another mass-aggregation form -- such as multidistrict litigation -- might be better suited to the

task.

In addressing whether a proposed class action is superior to other available methods of

adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D)

enumerates, although those factors are not exhaustive.  See Fed. R. Civ. P. 23 advisory committee's

notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem

Prods., Inc. v. Windsor, 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive list of factors

pertinent to a court's 'close look' at the predominance and superiority criteria.").  The first factor,

"the class members' interests in individually controlling the prosecution or defense of separate

actions," closely tracks the individual cases' money value.  Fed. R. Civ. P. 23(b)(3)(A).  When

individual actions are practical, they are preferred; the United States has a "'deep-rooted historic

tradition that everyone should have his own day in court,'" and adjudicating individual disputes is our federal judicial system's core activity.  Martin v. Wilks, 490 U.S. 755, 762 (1989)(quoting 18C Charles Alan Wright, et al., Federal Practice  Procedure, Jurisdiction & Related Matters § 4449, at 417 (1981)).  The proposed class members' emotional connection to the case may also be relevant: the stronger the attachment, the more reticent the court should be to certify the case.  See Vassalle v. Midland Funding, LLC, 708 F.3d 747, 758 (6th Cir. 2013); Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich. 2003)(Duggan, J.).  Courts should also consider the likelihood that proposed class members know they have a claim, and whether they are savvy enough to pursue it.[37]  See  Hicks  v.  Client  Servs.,  Inc.,  257  F.R.D.  699,  701  (S.D.  Fla. 2009)(Dimitrouleas, J.)(finding  superiority  because  "class  members  [most  likely  do  not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters").

Such questions arise particularly where the statute under which a plaintiff sues provides greater remedies for individual suits than for class suits, either by imposing a damage cap for class actions which does not apply to individual actions or by granting statutory damages to individual plaintiffs while requiring class plaintiffs to prove actual damages.  See, e.g., Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(2)(B) (capping individual damages at $1,000.00 and class action

---

[37]It is often the case that a plaintiff would receive greater remuneration -- damages or settlement less attorneys' fees and other expenses of litigation --- from an individual action than he would from his proportional share of the class recovery.  If the number of proposed class members likely to file individual claims ($n$), multiplied by the likely remuneration each would receive from an individual action ($i$), exceeds the entire class' recovery less attorneys' fees and expenses ($c$), then the Court will be hesitant to find superiority.  Thus, if $n \cdot i > c$, the Court will not generally certify a (b)(3) class.  The Court should bear in mind, however, that $n$ includes only those individuals who: (i) would, in the event of certification, become class members, i.e., they would not opt out; and (ii) would, nonetheless, in the event the class was not certified, file an individual action.  Thus, $n$ is likely to be a small number in most cases.

damages at $500,000.00); Truth in Lending Act, 15 U.S.C. § 1640(a) (capping individual damages

at $5,000.00 and class action damages at $500,000.00).  Although claims under these statutes may

be more lucratively brought as individual actions, courts should assess the real-world likelihood

that class members would bring their own actions.  As the Honorable Loretta A. Preska, Chief

United States District Judge for the Southern District of New York, wrote:

> [W]hile the potential for higher individual recoveries exists, realizing that potential
> requires assuming that each putative class member is "aware of her rights, willing
> to subject herself to all the burdens of suing and able to find an attorney willing to
> take her case."  *Mace v. Van Ru Credit Corp.*, 109 F.3d [at] 344 . . . .  Those
> transaction costs are not insubstantial and have prompted other courts in this Circuit
> to conclude that litigating as a class is superior

Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y. 2007)(Preska, C.J.).  See

Jancik v. Cavalry Portfolio Servs., LLC, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11

(D. Minn. July 3, 2007)(Davis, J.)("[T]he truth is that the putative plaintiffs in this case are not

likely to know their rights and are therefore not likely to pursue these claims on their own.").

The second enumerated (b)(3) factor, "the extent and nature of any litigation concerning

the controversy already begun by . . . class members," is closely linked to the first factor.  Fed. R.

Civ. P. 23(b)(3)(B).  The advisory notes to the rules state that "[t]he court is to consider the interests

of individual members of the class in controlling their own litigations and carrying them on as they

see fit.  In this connection the court should inform itself of any litigation actually pending by or

against the individuals."  Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).  This

passage suggests that the extent to which proposed class members -- or individuals who would

otherwise be proposed class members but for being specifically excluded from the definition by

virtue of their individual claims -- have already filed individual claims is probative evidence of the

extent to which they will continue to file individual claims in the event of certification denial and

indicates a higher "interest[] in individually controlling the prosecution."  Fed. R. Civ. P.

23(b)(3)(A).  It is also probative evidence whether the claims are truly negative value or whether the plaintiffs' counsel is merely representing that they are to enhance his argument for certification.

In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class.  See Fed. R. Civ. P. 23(c)(2)(B). The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so.  The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals who (i) have not yet filed an individual action, (ii) but are identifiable by proposed class counsel as having a claim, (iii) who are sent notice of their claim, (iv) who still, upon receiving notice, fail to meet with an attorney to file an individual claim or even to opt out of the class, and (v) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members.  As a practical matter, in most instances, this group contains few people, if any.  Individuals interested in litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action, and they will opt out of the class.  For this reason, the Court believes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it does provide one piece of useful, specific guidance.  The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases filed relative to the size of the proposed class -- but also of the "nature of any litigation . . . already

begun." Fed. R. Civ. P. 23(b)(3)(B).  The Court interprets this language to mean that it must look

at what procedural forms the already-filed cases have taken.  For example, if a group of asbestos

plaintiffs file for class certification, the court should decline to certify on the ground that asbestos

cases are consolidated in multidistrict litigation in the United States District Court for the Eastern

District of Pennsylvania.  See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D.

Pa. 2013)(Robreno, J.).  Furthermore, the Court concludes that, if a class has already been certified

to pursue certain claims, redundant classes should generally not be certified.[38]  See Newberg § 4:70

---

[38]The Court makes this statement confidently as it relates to "horizontally" competing
class actions: the Court should always strive to avoid having multiple overlapping or competing
class actions certified in the federal court system.  It is less clear how to handle a proposed class
action when there are one or more class actions pending in state court(s) whose outcome would
have res judicata impact on the Court's proposed class members.  Although the presence of
vertically competing class actions certainly bears on the superiority determination, the Court
must carefully evaluate such circumstances on a case-by-case basis.  The Court can envision a
scenario in which numerous heavily overlapping class actions languished across multiple state
courts without making progress, and in which the Court is capable of expeditiously certifying
and resolving a nationwide class action, and, in such circumstances, superiority might be met.

Under the Anti-Injunction Act, 28 U.S.C. § 2283, federal courts generally may not stay or
enjoin state court cases on the ground that they would interfere with a proposed class action or
even a certified class action.  See 28 U.S.C. § 2283 ("A court of the United States may not grant
an injunction to stay proceedings in a State court except as expressly authorized by Act of
Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").
There are possible exceptions, however, including that, pursuant to the All Writs Act, 28 U.S.C.
§ 1651, a district court may enjoin state court proceedings which would interfere with an imminent
settlement agreement.  See In re Diet Drugs, 282 F.3d 220, 233-39 (3d Cir. 2002).  In the seminal
case of In re Diet Drugs, the Honorable Anthony J. Scirica, United States Circuit Judge for the
Court of Appeals for the Third Circuit, noted that, although in personam cases may generally
proceed in parallel in state and federal courts, a fully-formed and imminent settlement in a federal
case constituted the equivalent of a res, thus permitting the federal court to enjoin the state court
from entertaining litigation which could destroy the settlement:

[C]ourts have analogized complex litigation cases to actions in rem.  As one court
reasoned, "the district court had before it a class action proceeding so far advanced
that it was the virtual equivalent of a res over which the district judge required full
control."  In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins.
Litig.), 770 F.2d 328, 337 (2d Cir. 1985).  See also Wesch v. Folsom, 6 F.3d 1465,
1470 (11th Cir. 1993); Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th
Cir. 1989)("[I]t makes sense to consider this case, involving years of litigation and

mountains of paperwork, as similar to a res to be administered."). The in rem analogy may help to bring into focus what makes these cases stand apart. In cases in rem, "the jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached." Kline v. Burke Const. Co., 260 U.S. 226, 229 (1922). Similarly, where complex cases are sufficiently developed, mere exercise of parallel jurisdiction by the state court may present enough of a threat to the jurisdiction of the federal court to justify issuance of an injunction. See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d at 337 (noting such cases, like cases in rem, are ones in which "it is intolerable to have conflicting orders from different courts"). What is ultimately important, in any event, is that in both kinds of cases state actions over the same subject matter have the potential to "so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case." Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 295 (1970).

In re Diet Drugs, 282 F.3d at 235 n.12. See Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996)(holding that a federal injunction is proper "[w]here a litigant's success in a parallel state court action would make a nullity of the district court's [discovery] ruling, and render ineffective its efforts effectively to manage the complex litigation at hand"); Carlough v. Amchem Prods., 10 F.3d 189, 203 (3d Cir. 1993)(affirming an injunction against a state-court class action where the "the stated purpose of the [state] suit [was] to challenge the legality of the federal class action"). Cf. In re Corrugated Container Antitrust Litig., 659 F.2d 1332, 1335 (5th Cir. 1981)(affirming an injunction against a South Carolina class action where the state court enjoined the defendants -- who also were defendants in a federal multidistrict suit -- from entering any settlement that contained any release of claims under South Carolina law, thereby "clearly interfer[ing] with the [federal] multidistrict court's ability to dispose of the broader action pending before it"). But see In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 134 F.3d 133 (3d Cir. 1998)(refusing to enjoin a Louisiana state court from approving a class settlement, even though a similar proposed class was pending certification in federal multidistrict litigation, because: (i) the federal court lacked personal jurisdiction over the absent class members, given that the federal class had not yet been certified nor notice served on the absent class members; (ii) the Full Faith and Credit Clause of the Constitution, and the Rooker-Feldman doctrine, barred review of the state court's approval of the settlement, because approval had already been finalized and final judgment entered; and (iii) the Anti-Injunction Act would have barred the federal court from enjoining the state court even if the state court's judgment were not finalized, as protecting the viability of a pre-certification class action is not "necessary in aid of [the federal court's] jurisdiction," nor is it necessary "to protect or effectuate its judgments"). See Dibble v. Wells Fargo Bank, Nat'l Ass'n, 226 F. Supp. 3d 1226, 1229 (D.N.M. 2016)(Browning, J.)(explaining that the three situations in which state proceedings have ended under the Rooker-Feldman doctrine are: (i) the highest court in the state has affirmed judgment below and all matters are resolved, (ii) neither party seeks further action in the state action, and (iii) the state court proceedings have resolved all federal matters but left state law or factual questions unresolved)(citing Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico, 410 F.3d 17, 26 (1st Cir. 2005)); Calvert v. Safranek, Nos. 06–1051, 06–1123, 2006 WL 3735508 at *1 (10th Cir. Dec. 20, 2006) (affirming

("[I]f a *class action* case is already pending, certification of another class suit might not be sensible or superior to the current litigation posture." (emphasis in original)).  Subsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims.[39]

The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute.  Fed. R. Civ. P. 23(b)(3)(C).  The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.  See Newberg § 4:71.  The second prong is whether the particular court at issue is a desirable

---

that the Rooker–Feldman doctrine removes the district court's jurisdiction to grant relief that would effectively negate a state court's judgement). In light of General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, it is generally safe to assume that a district court may never enjoin a state court from certifying or going forward with an overlapping class when the federal court has not yet certified and noticed its own class.

As a practical matter, many of the questions raised relating to competing state and federal class actions, CAFA's passage has obviated and has resulted in most truly nationwide class actions being immediately removable to federal court, see 28 U.S.C. § 1332(d), which defendants do so reliably that plaintiffs have begun filing them in federal court, rather than filing them in state court and waiting for them to be removed, see Emery G. Lee III & Thomas E. Willging, The Impact of the Class Action Fairness Act of 2005 on the Federal Courts 1-2 (Federal Judicial Center ed., 2008).

[39]If a class has already been certified relating to a matter, and a new plaintiff seeks both (i) certification of a larger class than was previously certified and (ii) to assert claims for which the previous class was not certified, then the new plaintiff could avoid overlap between the new and old class actions by splitting the new class into different classes or subclasses.  The already certified class action's claims could be asserted in the proposed class action only by individuals excluded from the already certified class' definition.  The entirety of the proposed class, including those individuals who are also members of the already certified class, could assert claims not included in the already certified class action.

forum for the litigation.  Some issues that reliably influence the determination of this prong include: (i) the parties', witnesses', and class counsel' geographic convenience, see Zinser v. Accufix Research Inst., Inc., 253 F.3d at 1191-92; (ii) the harm's locus, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001)(Bolton, J.); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000)(Arterton, J.); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004).  "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of the Albuquerque division, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge.  For example, if a district judge has already made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d at 1271; if he or she has other, similar actions consolidated in his court, see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400-BR, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009)(Britt, J.); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003); or even if he or she possesses particular expertise at handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority, see Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 411.

The fourth, final, and most important[40] factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual

---

[40]Newberg writes that the "manageability factor . . .is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication.  Indeed, the superiority discussion has, to this point, been playing *Hamlet* without the prince, and now, it is time to usher the prince onstage."  Newberg § 4:72.

issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).

The manageability factor "encompasses the whole range of practical problems that may render the

class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at

164.  The principal concern in a manageability inquiry is individualization.  A proposed class's

size, on its own, does not affect manageability; increasing the size of a proposed class only hurts

manageability if it introduces new proposed class members with individual issues.  See Carnegie

v. Household Int'l, Inc., 376 F.3d at 660-61.  Accordingly, several courts have held that, if the

predominance requirement is met, then the court should not decline to certify the class on

manageability grounds alone.

> [T]he predominance analysis has a "tremendous impact on the superiority
> analysis . . . for the simple reason that, the more common issues predominate over
> individual issues, the more desirable a class action lawsuit will be as a vehicle for
> adjudicating the plaintiffs' claims," Klay v. Humana, Inc., 382 F.3d at 1269, both
> relative to other forms of litigation such as joinder or consolidation, and in absolute
> terms of manageability, see Fed. R. Civ. P. 23(b)(3)(D).

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184.  See

Klay v. Humana, Inc., 382 F.3d at 1272 ("[W]here a court has already made a finding that common

issues predominate over individualized issues, we would be hard pressed to conclude that a class

action is less manageable than individual actions.").

When it comes to designing a fair management plan for trying a class action, district courts

have myriad tools which can be customized to suit the needs of individual cases: "[W]hen a judge

becomes convinced that a case is 'complex,' procedural innovation often replaces procedural

conservatism."  Jay Tidmarsh & Roger H. Transgrud, Modern Complex Litigation 34 (2d ed.

2010).  Most techniques that are truly "procedural" are fair game: cases can be bifurcated,[41]

---

[41]"Vertical" polyfurcation, which is what is typically meant when bifurcation is
discussed, is so named because the separately tried elements build on top of each other, and a

trifurcated, or polyfurcated; trials can be conducted in multiple stages or phases; and, provided that

each defendant's overall monetary liability can be ascertained, the sometimes difficult question of

how to distribute the damages among the class can be addressed with less formality.[42]

_____

negative verdict in one trial obviates the need for the second trial.  For example, if the jury comes
back for the defendant on a liability-only trial, then there is no need for a trial on damages.
Vertical polyfurcation also often requires that the separate trials be performed in a certain
sequence.  "Horizontal" polyfurcation is so named because the trials do not build on one another,
but rather sit analytically side-by-side.  "Severance" is similar to the criminal procedural
maneuver in which a defendant whose case is joined to be tried with another defendant's or
defendants' petitions the court for his or her own separate trial.  Fed. R. Crim. P. 14(a),
12(b)(3)(D).

[42]Defendants have a due-process right to have any damages against them proven in court.
The question of how to distribute those damages among the class, however, does not implicate
the defendants' rights at all, and, thus, that process can be conducted in a non-adversary fashion,
with the court supervising the class counsel's administration of an approved damages-
distribution scheme.  The judicial oversight and scrutiny that should apply to this process is more
analogous to a rule 23(e) settlement review than it is to a trial.  The relevant inquiry at the
certification stage is one of superiority: whether the class would be better off with an imperfect
damages-distribution scheme or with another available procedural device -- in negative value
cases, this question often equates to asking whether something is better than nothing.
    District courts have leeway to be creative when it comes to devising processes for
managing the distribution of class damages.  The Court is willing to go along with innovative
and cost-effective mechanisms for distributing class damages, even if they are imperfect,
especially when the alternative is denying certification.  One device of increasing popularity that
the Court is loath to use, however, is cy pres relief.

    The cy pres doctrine is an equitable doctrine under which courts
    "distribute unclaimed portions of a class-action judgment or settlement funds to a
    charity that will advance the interests of the class."  Black's Law Dictionary 444
    (9th ed. 2009).  It derives from the French expression "*cy pres comme possible*,"
    which means "as near as possible," and developed out of the law of trusts.  M.
    Redish, P. Julian, & S. Zyontz, Cy Pres Relief and the Pathologies of the Modern
    Class Action: a Normative and Empirical Analysis, 62 Fla. L. Rev. 617 (2010).

    . . ..

    The Court has a basic disagreement with the application of this doctrine
    for several reasons: (i) class actions are disputes between parties and the money
    damages should remain among the parties, rather than be distributed to some third
    party; (ii) it is unseemly for judges to engage in the selection of third[-]party
    beneficiaries and to distribute class action damages to third parties; (iii) judges are
    often not in the best position to choose a charitable organization that would best

Techniques that merely presume away substantive elements that a plaintiff normally has to prove, or that would impair a defendant's due-process rights, however, are impermissible.  In particular, the Supreme Court has expressly disavowed "trials by statistics" or "trials by formula," either as to liability or damages.  Wal-Mart, 564 U.S. at 367.  A trial by statistics involves a small but representative sample of class members presenting evidence on individual questions in their own cases and then inviting the jury to extrapolate its conclusions from the sample to the entire class.  See Wal-Mart, 564 U.S. at 367.  For example, counsel for a class of 5,000 might present

---

approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

Lane v. Page, 862 F. Supp. 2d at 1230-31 (citations omitted).  See In re Thornburg Mortg., Inc. Sec. Litig., 885 F. Supp. at 1105-12 (denying a joint request by the class representatives and the defendants to distribute much of the class damages to the Center for Civic Values).  The Tenth Circuit has never discussed cy pres relief in detail, see Tennille v. W. Union Co., 809 F.3d 555, 560 (10th Cir. 2015)(describing a fact pattern with a cy pres fund but not discussing the legal implications of the cy pres doctrine); United States v. New Mexico, 536 F.2d 1324, 1326 (10th Cir. 1976)(mentioning without elaboration, in a non-class action, that the district court had "refused to apply the doctrine of cy pres") -- but many scholars, see Martin H. Redish, Peter Julian & Samantha Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617, 641 (2010); Myriam Gilles & Gary B. Friedman, Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers, 155 U. Pa. L. Rev. 103, 153-154 (2006); Sam Yospe, Cy Pres Distribution in Class Action Settlements, 2009 Colum. Bus. L. Rev. 1014 (2009), have raised questions about its constitutionality, its compliance with the Rules Enabling Act, 28 U.S.C. § 2072, or both.  See also Robles v. Brake Masters Sys., Inc., No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at *16-17 (D.N.M. Jan. 21, 2011)(Browning, J.).  The Court would be more likely to let unused or undisbursable funds escheat to the state or revert to the defendant --- although reversion undermines the deterrent value of the class action -- than it is to use cy pres relief.  If the fund is disbursed under a claim system, and the total of the claims does not exhaust the entire fund, the Court would likely first look to distributing the unclaimed funds to the claimants on a pro rata basis.
    Still, the fact that cy pres relief is a commonly used method of distributing class damages underscores the point that courts need not approach the distribution of class damages with the same perfectionism with which they approach adversarial proceedings.  Even if the distribution is not completely fair -- if, for instance, a class member who sustained $100.00 in damage receives the same distribution as another class member who sustained $800.00 -- it is still better than cy pres relief, which gives the entire pot of damages to an interloper.

fifty class members' cases in the same way he would if he or she were trying them individually. Counsel would additionally present expert testimony that those fifty class members were representative of the class -- generally meaning that they were selected at random -- and that both (i) the proportion of the sample to which the defendant is liable, and (ii) the damage inflicted on the average individual in the sample, could be generalized to the entire class to a certain confidence interval and level.[43]   The defendants might put on their own sample, attack the representativeness of the plaintiffs' sample, or put on non-randomly selected class members whose cases were weak; they would almost certainly also present evidence defending against the individual cases of the plaintiffs' sample.  The jury, if it bought into the plaintiff's theory, might decide that the defendant was liable to twenty members of the sample for a total of $100,000.00, extrapolate from the sample to the entire class, and award the class ten million dollars in damages.[44]

---

[43]A confidence interval for a proportion estimate is also known as a "margin of error."  It is the "plus or minus" figure often displayed next to the proportion estimate in, e.g., public polling data.   See, e.g., Confidence Intervals, Yale University Department of Statistics, http://www.stat.yale.edu/Courses/1997-98/101/confint.htm; Confidence Interval, Wikipedia, http://en.wikipedia.org/wiki/Confidence_interval; Margin of Error, Wikipedia, http://en.wikipedia.org/wiki/Margin_of_error (collectively, "CI/CL Websites").  A confidence level is the percent certainty that the actual proportion fall within the margin of error of the stated estimate.  See CI/CL Websites.  For example, if Gallup, Inc. says that 39% of Americans -- with a confidence interval of +/- 3% and a confidence level of 95% -- approve of President Joseph R. Biden's job performance, then there is less than a 5% chance that the actual percentage of Americans who approve of President Biden's performance falls outside of the 36% to 42% range.

Even with the same sampling data, a confidence interval can be improved at the expense of confidence level and vice versa.  See CI/CL Websites.  For example, Gallup, Inc. might be able -- and the Court has not conducted the actual calculations -- to display the same data as having a +/- 8% margin of error and a 99% confidence level, or a +/- 1% margin of error and a 90% confidence level.  The use of a 95% confidence level, however, is a scientific and industry standard.

[44]The class contains 100 times as many individuals as the sample, and ten million dollars is 100 times $100,000.00.  The mathematics work out the same way if one considers only the twenty meritorious class members: the twenty sample class members were determined to be owed an average of $5,000.00 apiece, which, multiplied by the expected 2,000 meritorious class members in the entire class, again comes to ten million dollars.

The class could then devise a way, subject only to judicial approval, to divide up the ten million dollars -- or whatever remained of it after deducting class counsel's expenses and fees --

The Supreme Court bars this method of trying cases, because it violates the defendant's

right to have each element of each claim asserted against it by each class member specifically

proven. See Wal-Mart, 564 U.S. at 367.[45]  When issues are truly common, multiple class members'

claims -- or at least elements thereof -- can be specifically proven in one fell swoop; that this

common determination can be done forms the basis of the class action.  Truly individual issues,

on the other hand, must be adjudicated individually and not by statistical inference.[46]   In

among the class.  That plan might include an equal division among class members of $2,000.00 apiece, or an attempt to administratively determine the relative levels of harm suffered by each class member and distribute the damages proportionately.

[45]The Supreme Court based its holding -- or, more precisely, its dicta -- disclaiming trials by formula on the Rules Enabling Act, 28 U.S.C. § 2072(b), stating that trials by statistics effectively alter the substance of the law being applied, but there may additionally be Due Process concerns under the Fifth Amendment to the United States Constitution.  See Wal-Mart, 564 U.S. at 367 (citing Ortiz v. Fireboard Corp., 527 U.S. 815, 845 (1999)).

[46]While the Court fully agrees with Justice Scalia that courts cannot sacrifice the defendant's rights for the plaintiffs' economic convenience, the Court is not convinced that it, as Wal-Mart seems to suggest, should forego the advantages of class certification merely to convenience the defendant in carrying burdens which the defendant would have to carry even if the litigation was conducted individually.  If the defendant ordinarily bears the burden to produce certain evidence or prove certain allegations, that the burden might be exceptionally inconvenient for it do so on an individual basis against an enormous number of class members should not, in the Court's opinion, weigh against class certification.  For example, if a defendant is sued in a breach-of-contract class action in which 1,000 class members allege that the defendant was not properly performing a term in an identical form contract executed between the defendant and every class member, the defendant might wish to introduce individualized parole evidence -- such as oral communications contemporaneous with the signing of the written instrument explaining the disputed term -- or inject individual issues into the case by asserting affirmative defenses.  In the Court's opinion, the defendant would be free to pursue these strategies, but, just as it would in 1,000 individual suits, it must discover and present proof against each individual class member to whom these theories apply.  In the Court's view, just as plaintiffs cannot conduct trials by statistics, the defendant could not put one-hundred class members on the stand to testify to waiver and then expect anything more than a ten-percent decrease in class damages as a result.  Although this burden may seem unfair to the defendant, the defendant would have to expend the same energy and resources if the 1,000 suits were brought individually.  That such suits might never be brought -- because they would not be economically viable for the plaintiffs or because the plaintiffs are not aware of their claims -- should not, in the Court's view, excuse the defendant of its ordinary litigation burdens.  In short, the issues that should most cut against a finding of predominance are those individual questions

formulating a workable trial plan, the Court must also ensure that it does not run afoul of the

Seventh Amendment.  The Seventh Amendment contains two clauses:

> In Suits at common law, where the value in controversy shall exceed twenty dollars,
> [(i)] the right of trial by jury shall be preserved, and [(ii)] no fact tried by a jury,
> shall be otherwise re-examined in any Court of the United States, than according to
> the rules of the common law.

U.S. Const. amend. VII.

These clauses are known as the trial-by-jury clause and the reexamination clause,

respectively, and bifurcation has been challenged under both.  Plaintiffs often dislike bifurcation,

because it lowers their odds of success by excluding damages evidence from the liability phase --

evidence of the plaintiff's injuries that is often evocative -- and necessitating that they win two

trials instead of one.  They have, accordingly, argued that bifurcation -- a procedural innovation

which post-dates the Founding -- violates the trial-by-jury clause.  Whatever the merits of this

argument, the Supreme Court has rejected it:

> [W]e are not now concerned with the form of the ancient rule.  It is the Constitution
> which we are to interpret; and the Constitution is concerned, not with form, but
> with substance.  All of vital significance in trial by jury is that issues of fact be
> submitted for determination with such instructions and guidance by the court as
> will afford opportunity for that consideration by the jury which was secured by the
> rules governing trials at common law.  Beyond this, the Seventh Amendment does
> not exact the retention of old forms of procedure.  It does not prohibit the
> introduction of new methods for ascertaining what facts are in issue . . . .

Gas. Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 498 (1931)(citing Herron v. S. Pac. Co.,

283 U. S. 91 (1931); Walker v. N.M. & S. Pac. R., 165 U. S. 593, 596 (1897); In re Peterson, 253

U. S. 300, 309 (1920)).  The only restriction that the trial-by-jury clause places on trial-separation

---

that would ordinarily be the plaintiff's burden to answer at trial: elements of the prima facie case
and individualized rebuttals of any common affirmative defenses that the defendant asserts.  The
Court must, however, faithfully and fully apply Supreme Court and Tenth Circuit law.  The
Court concludes that Comcast Corp. v. Behrend and Wal-Mart require the Court to count time
spent adjudicating individual affirmative defenses against the predominance finding.

schemes is that, when a case contains both legal and equitable issues -- the former of which must

be submitted to a jury and the latter of which a judge can decide -- the judge may not rule on the

equitable issues before trial in such a way as to preclude the jury from trying the legal issues.  See

Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11 (1959).

> The court should take care when deciding which issues may and should be
> severed for separate trial and the order in which to try them[, as] the right to trial
> by jury on legal claims may not (except under "the most imperative circumstances")
> be lost by a prior determination of equitable claims.

Manual for Complex Litigation § 11.632, at 122 (quoting Beacon Theatres, Inc. v. Westover, 359

U.S. at 510-511).

The reexamination clause presents more formidable difficulties to polyfurcation.

Relatively few appellate judges have invalidated lower-court judgments or class-management

plans on this ground, by far the most famous being Judge Posner:

> [T]he district judge . . . exceeded his authority [at] the point at which his plan of
> action proposes to divide the trial of the issues that he has certified for class-action
> treatment from the other issues involved in the thousands of actual and potential
> claims of the representatives and members of the class.  Bifurcation and even finer
> divisions of lawsuits into separate trials are authorized in federal district courts.
> And a decision to employ the procedure is reviewed deferentially.  However, as we
> have been at pains to stress recently, the district judge must carve at the joint.  Of
> particular relevance here, the judge must not divide issues between separate trials
> in such a way that the same issue is reexamined by different juries.  The problem is
> not inherent in bifurcation.  It does not arise when the same jury is to try the
> successive phases of the litigation.  But most of the separate "cases" that compose
> this class action will be tried, after the initial trial in the Northern District of Illinois,
> in different courts, scattered throughout the country.  The right to a jury trial in
> federal civil cases, conferred by the Seventh Amendment, is a right to have juriable
> issues determined by the first jury impaneled to hear them (provided there are no
> errors warranting a new trial), and not reexamined by another finder of fact.  This
> would be obvious if the second finder of fact were a judge.  But it is equally true if
> it is another jury.  In this limited sense, a jury verdict can have collateral estoppel
> effect.
>
> The plan of the district judge in this case is inconsistent with the principle
> that the findings of one jury are not to be reexamined by a second, or third, or *n*th
> jury.  The first jury will not determine liability.  It will determine merely whether

one or more of the defendants was negligent under one of the two theories.  The first jury may go on to decide the additional issues with regard to the named plaintiffs.  But it will not decide them with regard to the other class members.  Unless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members not named as plaintiffs in the <u>Wadleigh</u> case, such issues as comparative negligence -- did any class members knowingly continue to use unsafe blood solids after they learned or should have learned of the risk of contamination with HIV? -- and proximate causation.  Both issues overlap the issue of the defendants' negligence.  Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant.  Proximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant.  It overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence.  A second or subsequent jury might find that the defendants' failure to take precautions against infection with Hepatitis B could not be thought the proximate cause of the plaintiffs' infection with HIV, a different and unknown blood-borne virus.  How the resulting inconsistency between juries could be prevented escapes us.

<u>In re Rhone-Poulenc Rorer, Inc.</u>, 51 F.3d at 1302-03 (citations omitted).

By and large, other courts have not accepted Judge Posner's Seventh Amendment concerns with polyfurcation.  The Tenth Circuit has not addressed the Seventh Amendment's impact on polyfurcation.  The Court nonetheless concludes it can make three statements confidently on the issue. First, Seventh Amendment concerns are sidestepped entirely when the same jury is used for both phases of the trial.  See <u>In re Rhone-Poulenc Rorer, Inc.</u>, 51 F.3d at 1303 ("The problem is not inherent in bifurcation.  It does not arise when the same jury is to try the successive phases of the litigation."); <u>Manual for Complex Litigation</u> § 11.632, at 122 ("Generally, when issues are severed for separate trials, they should be tried before the same jury unless they are entirely unrelated.").  Second, the Court must be cautious that no subsequent jury disturbs any issue that a prior jury definitively decided -- and the Court will use the test from the collateral-estoppel analysis

to determine whether a prior jury definitively established an issue.[47]  This requirement does not imply a need to "carve at the joint" -- whatever that means[48] -- but merely to do as the Seventh Amendment says, and prevent "reexamination."  Third, most minor reexamination issues -- i.e., issues submitted to different juries that overlap somewhat -- can be resolved by instructing the subsequent jury to adhere to the prior jury's findings and by carefully crafting the verdict form to reflect the prior jury's findings.  See In re Paoli R.R. Yard PCB Litig., 113 F.3d 444, 452 n.5 (3d Cir. 1997); EEOC v. Foster Wheeler Constructors, Inc., No. 98-C-1601, 1999 WL 528200, at *3 (N.D. Ill. July 13, 1999)(Coar, J.)("[A] well-constructed bifurcation scheme, used in tandem with clear instructions to the juries can delineate the roles of the two juries in order to avoid reexamination of any factual issues . . . ."); Steven S. Gensler, Bifurcation Unbound, 75 Wash. L. Rev. 705, 735-37 (2000); See also Zuniga v. Bernalillo Cty., 319 F.R.D. 640, 686 (D.N.M. 2016)(Browning, J.).

## ANALYSIS

The Court denies both the Thornton Class Certification Motion and the Irby Class Certification Motion.  To be certified under rule 23(b)(3), a class must meet all four of rule 23(a)'s requirements -- numerosity, commonality, typicality, and adequacy -- and both of rule 23(b)(3)'s requirements -- predominance and superiority.  Additionally, if the Court is to certify a class, the

---

[47]The Seventh Amendment defines collateral estoppel's contours.  See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 304 (2d Cir. 1999)(cited by Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 410 F. App'x 151, 159 (10th Cir. 2011)(unpublished)).

[48]The Tenth Circuit has never used this term.  It seems to imply that every case only has certain points at which it can be bifurcated, e.g., if a claim contains elements $A$ through $E$, but the "joint" is between $C$ and $D$, then the case cannot be bifurcated into a trial on $A$ and $B$ and a separate trial on $C$ through $E$.  Maybe the Court is reading too much into the metaphor.  In the Court's view, however, separate trials for $A$ and $B$ and $C$ through $E$ would be acceptable, so long as the $C$-through-$E$ jury respects the prior jury's findings on $A$ and $B$.

class must be identifiable.  See Fed. R. Civ. Pro. 23(c)(1)(B)("An order that certifies a class action must define the class and the class claims, issues, or defenses[.]").  This rule-based identifiability mandate reflects the "implied prerequisite of Rule 23" that a class must be "adequately defined and clearly ascertainable." Cherry v. Dometic Corp., 986 F.3d 1296, 1302 (11th Cir. 2021)(citing Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1304 (11th Cir. 2012)).

## I.     THE COURT WILL NOT CERTIFY THE PROPOSED KROGER CO. CLASS.

The Court will deny the Thornton Class Certification Motion because Thornton has not provided the Court with a definable "class" for rule 23's purposes, and because Thornton has not demonstrated that common questions of law or fact predominate over questions affecting individual class members.  More specifically, the Court will deny Thornton's Motion because: (i) the proposed class definition is inadequate because the proposed class is not sufficiently identifiable for Rule 23's purposes, because the members of her proposed class are not "currently and readily ascertainable based on objective criteria," Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. 169, 254 (D.N.M. 2016)(Browning, J.)(quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 592-93 (3d Cir. 2012)); (ii) given Thornton's inability to demonstrate a common manner for proposed class members to demonstrate loss, as the NMUPA requires, individual questions would predominate over common ones; (iii) Thornton has not presented to the Court an adequate method to quantify damages under the NMUPA, leading the Court to conclude that individual damage calculations will predominate over common damage calculations; and (iii) as it pertains to rule 23(b)(3), administrative feasibility concerns tilt against a conclusion that common questions predominate.  The Court discusses each conclusion in turn.

A.  **THE COURT CANNOT DEFINE THE PROPOSED CLASS USING OBJECTIVE CRITERIA AND, THEREFORE, THE COURT WILL NOT CERTIFY THORNTON'S PROPOSED CLASS.**

As the Court has noted, "[b]efore the Court analyzes whether the proposed class meets rule 23's requirements, the Court must identify the class based on the evidence introduced at the class certification hearing."  Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 254.  See Cherry v. Dometic Corp., 986 F.3d at 1302 ("A class is inadequately defined if it is defined through vague or subjective criteria.  And without an adequate definition for a proposed class, a district court will be unable to ascertain who belongs in it.")(citing DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970)).  This initial requirement is part of the basic notion of "a class," which is a foundational requirement of all parts of rule 23, and likewise foundational to the concept of a "class action."  Fed. R. Civ. Pro. 23(a)("One or more members of a class may sue or be sued as representative parties on behalf of all members . . . .").  To guide this threshold determination, "[a]ll courts essentially focus on the question of whether the class can be ascertained by objective criteria.  A class definition that depends on subjective criteria, such as class members' state of mind, will fail for lack of definiteness."  1 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 3:3 (6th ed. 2023).  Finally, the Tenth Circuit notes that "'[t]he district court has broad discretion to determine whether the class description is sufficiently definite.'"  Davoll v. Webb, 194 F.3d at 1146 (quoting 5 James W. Moore et al., Moore's Federal Practice § 23.21[5] at 23-61 (3d ed. 1999)),

In its Response in opposition to Thornton's Class Certification Motion, Kroger Co. leads with an argument pertaining to this threshold requirement.  See Defendant the Kroger Company's Response to Plaintiff Robin Thornton's Motion for Class Certification at 17-26, filed November 18, 2022 (Doc. 235)("Kroger Class Certification Response").  Kroger Co. quotes the Court's

statement in <u>Abraham v. WPX Prod. Prods., LLC</u> that "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria," 317 F.R.D. at 254, and then reads Thornton's purported class definition as imposing four requirements.  The requirements are that the member of the class

> must have: (1) reviewed a circular delivered in a mailer or newspaper and seen the "USDA Choice: Produced in the USA" graphic; (2) interpreted the graphic to mean that the beef advertised was from cattle born, raised, and harvested in the USA; (3) relied on that interpretation to purchase the beef; and (4) purchased beef that was not, in fact, born, raised, and harvested in the USA.

Kroger Class Certification Response at 18-19.[49]  Using this four-pronged proposed class definition as its touchstone, Kroger Co. offers four reasons why this proposed class is not capable of being "currently and readily ascertainable based on objective criteria," as rule 23's threshold requirement mandates.  <u>Abraham v. WPX Prod. Prods., LLC</u>, 317 F.R.D. at 254.  <u>See</u> Kroger Class Certification Response at 19-22.  First, Kroger Co. argues that it is "impossible" to know which of Kroger's customers reviewed an out-of-store advertising circular.  Kroger Class Certification Response at 19.  Second, Kroger Co. argues that -- even assuming Kroger customers saw the out-of-store advertisements -- "there is no objective way to know how they interpreted the 'USDA Choice:

---

[49]In her Reply in Support of the Motion to Certify Class at 6, filed December 2, 2022 (Doc. 246), Thornton does not challenge this four-pronged characterization, and the Court concludes that Kroger Co.'s enumeration is consistent with the wording Thornton uses in her Motion for Class Certification.  Therein, Thornton defines her class in the following manner:

> A class consisting of all persons from New Mexico that reviewed the advertisements of Kroger's New Mexico stores known as Smith's that they received in a mailer or newspaper from November 2018 to the cessation of the use of the Product of the USA Shield to make the decision to attend a Smith's store to purchase beef products that they relied upon to have been produced exclusively in the USA even though the geographic origin of the production of the beef products included foreign sources.

Thornton Class Certification Motion ¶ 1, at 8-9.

Produced in the USA' graphic."  Kroger Class Certification Response at 20.  Third, Kroger Co. contends that there is "no objective way to determine who relied on the interpretation of the 'USDA Choice: Produced in the USA' graphic that Thornton advocates to purchase a beef product." Kroger Class Certification Response at 21.  Fourth and finally, Kroger Co. asserts that there is no way to determine whether a beef product -- that was bought pursuant to a customer's reliance on the "USDA Choice: Produced in the USA" graphic -- was actually the product of cattle born in another country without "reviewing every individual beef purchase and seeking third party discovery from the beef packers concerning the source of the beef -- neither of which Thornton has done."  Kroger Class Certification Response at 22.  In essence, these arguments all attack the basic adequacy of the class definition itself.  Kroger alleges that the parameters of Thornton's class definition require significant inquiries into the state of mind of the members of the proposed class, and thus is not sufficiently anchored in any objective criteria, as required by rule 23.  See Kroger Class Certification Response at 17; 7A Charles Alan Wright et al., Federal Practice & Procedure § 1760 (4th ed. 2023)(noting "a class definition that requires inquiry into the state of mind or knowledge of its members will not be allowed to proceed under Rule 23").

Although Thornton does not -- in her Motion to Certify -- directly address whether her proposed class is able to be ascertained by objective criteria, in her Reply in Support of the Motion to Certify Class, filed December 2, 2022 (Doc. 246)("Thornton Certification Reply"), Thornton confronts Kroger Co.'s four arguments against ascertainability.  Much of Thornton's arguments on the score miss the mark, however, because they do not address directly Kroger Co.'s concerns about the lack of "objective criteria" to define the class, but rather focus on administrative feasibility.  See Thornton Certification Reply at 7 ("Ascertainabilty assesses whether it is administratively prohibitive to identify class members.").  As the Court notes above, see supra

n.27, administrative feasibility is a subject that the Court takes up in its analysis of the rule 23(b)(3)(D)'s manageability criteria, not as part of the threshold inquiry whether a "class" has been defined properly using objective criteria.  Accordingly, to the extent that Thornton's arguments regarding "ascertainability" rely on her assertions that her proposed class can be managed in an administratively feasible manner, those arguments do not address whether she has defined a class using "objective criteria."

More on point is Thornton's reliance on Menocal v. GEO Grp., Inc., 882 F.3d 905, 919 (10th Cir. 2018)("Menocal"), which she argues stands for the proposition that class-wide reliance can be inferred from circumstantial evidence, and thus she need not show "objective criteria" that her proposed class members relied on a specific interpretation of the "USDA Choice: Produced in the USA" graphic to purchase the beef.  See Thornton Certification Reply at 8-9.  The Court concludes, however, that Thornton's reliance on Menocal -- for this purpose -- lacks a sounds basis in the applicable law and relevant facts.  In that case, the Tenth Circuit reviewed a district court's certification of a class of immigration detainees who sought to challenge certain detention center work policies under a federal statute and under state unjust enrichment law.  One of the statutes under which the class brought suit was 18 U.S.C. § 1589, a provision that prohibits forced labor. A cause of action under Section 1589 requires a plaintiff to "prove that an unlawful means of coercion caused them to render labor" -- i.e., the statute contains a causation element.  Menocal, 882 F.3d at 918.  On appeal, the appellant-defendant in Menocal argued that this causation element was "not susceptible to generalized proof," 882 F.3d at 918, and thus that the plaintiffs had failed to show that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Accordingly, the appellant-defendant argued that proving this causation element across all the class members would involve

predominately individual inquiries and that thus certification of the class would be inappropriate under rule 23(b)(3).  Menocal, 882 F.3d at 918.

In this context -- a predominance analysis under rule 23(b)(3) -- the Tenth Circuit affirmed the district court's certification of the class, because the plaintiffs properly could prove causation by class-wide inference, and thus individual inquiries would not predominate.  Menocal, 882 F.3d at 918-922.   The Tenth Circuit reasoned that, because an individual plaintiff could rely on circumstantial evidence properly to form an inference of reliance under Section 1589, "a court may likewise allow a class to rely on circumstantial evidence that the class shares to establish causation on a class-wide basis."  Menocal, 882 F.3d at 919.  Accordingly, the Tenth Circuit rejected the appellant-defendant's predominance argument and affirmed the district court's certification of the class.

As this discussion indicates, while Menocal offers a useful analysis of proof-of-causation problems in class action suits as it pertains to predominance or commonality, the case offers no discussion on the question when a proposed class definition is defined adequately using objective criteria.[50]  Accordingly, while Menocal's analysis of the permissibility of inference in proving causation might be helpful to Thornton in attempting to demonstrate commonality or predominance, the case does not persuasively confront Kroger's assertions that her class definition

---

[50]Indeed, although the question of adequacy of the class definition was not at issue in Menocal, the Tenth Circuit's opinion notes in passing that the plaintiffs in the district court had sought to certify two separate classes: "(1) all detainees housed at the Aurora Facility in the past ten years (the "TVPA class"), and (2) all detainees who participated in the Aurora Facility's voluntary work program in the past three years (the "unjust enrichment class")."  882 F.3d at 910. These class definitions are defined using objective criteria and thus would pose no problems with rule 23's threshold inquiry.   Accordingly, Menocal's analysis had no need to speak to the "objective criteria" analysis, because the class definition there was undisputedly defined by objective criteria.

is inadequate.  The Court emphasizes that these inquiries -- threshold class definition and 23(b)(3) predominance -- are not to be conflated, despite some conceptual overlap.

As the Court notes above, see supra n.27, the correct analysis in assessing a rule 23(b)(3) class certification motion involves three broad steps.  First, the Court must "define the class" as rule 23(c)(1)(B) requires, which involves an inquiry into whether the outlines of class membership can be determined with reference to objective criteria.[51]  Once the Court determines whether the class membership is sufficiently definite according to objective criteria, the Court moves onto step two, wherein the Court analyzes the rule 23(a) requirements of numerosity, commonality, typicality, and adequacy.  Once the 23(a) analysis is complete, the Court finishes by assessing the proposed class with respect to 23(c)'s predominance and superiority analysis.  As the Court confirms in In re Santa Fe Natural Tobacco Co. Marketing and Sales Practices and Products Liability Litigation, No. MD 16-2695 JB/LF, 2023 WL 6121894, at *101-09 (D.N.M. Sept. 19, 2023)(Browning, J.), this final step involves -- among other things -- an assessment of "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  Accordingly, under the auspices of rule 23(b)(3)'s predominance analysis, the Court may consider -- as one factor -- the administrative feasibility determinations.  Thornton's arguments relying on Menocal conflate steps involving class definition with predominance analysis, while her arguments related to administrative feasibility conflate class definition with rule 23(b)(3)(D)'s manageability criteria. Neither argument is helpful in persuading the Court why her class definition is based on objective criteria.

Consequently, the Court concludes that Thornton's proposed class lacks a definition that

---

[51]This first step is sometimes referred to as the "ascertainability" analysis, but the Court uses that with more precision given the current split of authority as to the true scope of what ascertainability analysis involves.  See supra n.27 and accompanying text.

is adequate for rule 23's purposes, because the proposed class is defined according to subjective criteria. As Kroger Co. notes, Thornton's class definition involves two "state of mind" criteria that bear on who is a member of the proposed class: (i) how a given individual interpreted the "USDA Choice: Produced in the USA" graphic in the out-of-store mail or circular advertisements; and (ii) whether a given individual, in fact, relied on one particular interpretation of the "USDA Choice: Produced in the USA" graphic to purchase beef products from Kroger Co. See Kroger Class Certification Response at 18-19. A prospective class definition that relies so fundamentally on this type of subjective criteria is impermissible under rule 23. While a prospective class need not be "so ascertainable that every potential member can be identified at the commencement of the action," it must -- at least theoretically[52] -- "be able to be determined based on objective criteria." 7A Charles Alan Wright et al., Federal Practice & Procedure § 1760 (4th ed. 2023). According to the proposed class definition that Thornton provides in her Motion for Class Certification, the Court lacks any definition of the class members that is based on objective criteria, by which the Court could determine the group of individuals who belong in the proposed class. Accordingly, the Court will not certify the proposed class.

---

[52]As the Honorable William Pryor, Chief United States Circuit Judge for United States Court of Appeals for the Eleventh has noted:

> A class is "clearly ascertainable" if we are certain that its membership is "capable of being" determined. Ascertain, Webster's New International Dictionary (3d ed. 1993); Ascertainable, Webster's New International Dictionary (3d ed. 1993). But membership can be capable of determination without being capable of convenient determination. Administrative feasibility is not an inherent aspect of ascertainability.

Cherry v. Dometic Corp., 986 F.3d at 1303.

B.   **BECAUSE THE QUESTIONS OF LAW OR FACT COMMON TO THE PURPORTED CLASS MEMBERS DO NOT PREDOMINATE OVER INDIVIDUAL ONES, THE COURT WILL NOT CERTIFY THE PURPORTED CLASS.**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 622-23 (1997).  As the Tenth Circuit has noted, "the predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d 1076, 1087 (10th Cir. 2014)(citing 2 William B. Rubenstein et al., Newberg on Class Actions § 4:49, at 195-96 (5th ed. 2012)).  "Predominance regularly presents the greatest obstacle to class certification[.]" CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087.

Here, notwithstanding the issues with class definition outlined above, the Court concludes that common issues do not predominate over individual ones, for three reasons.  First, proof of Thornton's NMUPA claims invariably will require a significant predominance of individual inquiries as to whether the members of the purported class suffered any loss because of Kroger Co. making "an oral or written statement, a visual description or a representation of any kind that was either false or misleading." Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 5, 142 N.M. 437, 439, 166 P.3d 1091, 1093.  Second, because of Thornton's inability to proffer an adequate damages model, the Court concludes that "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013).  Third and finally, given the class definition that Thornton provides, the Court has significant concerns regarding the "difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  For these reasons, the Court concludes that common questions of law or fact do not predominate over questions that concern the proposed class' individual members, and therefore

the Court denies the Motion to Certify.

As to the Court's first predominance concern, the Court concludes that a significant number of individual showings under the NMUPA would dwarf the common questions. To understand why, the Court briefly outlines the NMUPA's legal contours. "The UPA provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices." Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132414 at *19 (D.N.M. Mar. 31, 2012)(Browning, J.)(citing Quynh Truong v. Allstate Ins. Co., 2010-NMSC-009, ¶ 22, 147 N.M. 583, 590, 227 P.3d 73, 80)). "Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising." Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 166 P.3d 1091, 1096, 142 N.M. 437, 442. As the Court of Appeals of New Mexico explains in Lohman v. Daimler-Chrysler Corp., the NMUPA has three basic elements:

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 5, 166 P.3d 1091, 1093, 142 N.M. 437, 439. In the statute, one example of an "unfair or deceptive trade practice" that has particular relevance to Thornton's allegations is "using deceptive representations or designations of geographic origin in connection with goods or services." N.M.S.A. § 57-12-2(D)(4). The Court previously has noted that the NMUPA does not require proof of detrimental reliance to sustain a claim. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d 1170 (D.N.M. 2010)(Browning, J.)(citing Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 35, 142 N.M. 437, 444, 166 P.3d 1091, 1098; Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶ 21, 135 N.M. 265, 270-71, 87 P.3d 545, 550-51). Nevertheless, "the UPA ... require[s] proof of a causal

link between conduct and loss." Smoot v. Physicians Life Ins. Co., 2004-NMCA-027, ¶ 21, 135 N.M. at 271, 87 P.3d at 551 (citing N.M.S.A. § 57-12-10(B)).  See N.M.S.A. § 57-12-10(B) (authorizing damages for "[a]ny person who suffers any loss of money or property . . . as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act")(emphasis added).  See Mulford v. Altria Grp., Inc., 242 F.R.D. 615, 625 (D.N.M. 2007)(Vasquez, J.)(noting that, in addition to establishing a statutory violation under the NMUPA, "[a] plaintiff must also establish causation, loss, and damages").

In this case, the Court concludes that individual questions whether Kroger Co.'s potentially "unfair or deceptive trade practice" caused a loss to the individual class members would predominate over the questions of law or fact common to the proposed class.  As both parties agree, not all the beef products sold during the time period relevant to Thornton's allegations originated -- in whole or in part -- from cattle born, raised, or harvested outside of the United States.  Stated differently, at least some -- and according to both parties' estimations, many -- of the customers who purchased the relevant beef products from Kroger Co.'s stores during the time period relevant to this lawsuit were buying beef products that were "Produced in the USA" (under any tenable interpretation of that phrase).  Litigating this class action would thus require numerous, complex individual showings, because the Court would need properly to identify the class members who purchased beef products that were the products of cattle that were -- at least partially -- born, raised, or harvested outside of the United States.  Individual customers who did not purchase beef products that fall into this category presumably did not suffer any loss, because they received a product that was, by any metric, "Produced in the USA."  See Mulford v. Altria Grp., Inc., 242 F.R.D. at 627 ("The need for individual evidence to determine if members of the proposed class suffered a loss strongly suggests that the proposed class is not sufficiently cohesive to warrant

adjudication by representation."); In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig., No. MD 16-2695 JB/LF, 2023 WL 6121894, at *164 (D.N.M. Sept. 19, 2023)(observing that the plaintiffs -- under a NMUPA theory -- had "not demonstrated a method of determining causation on a class-wide basis, and would need to engage in individualized inquiries to determine whether a given consumer purchased Natural American cigarettes for more than he or she otherwise would have paid if he or she had known the cigarettes were not actually safer or healthier.").  Thornton has made no showing that such individuals have suffered any loss, and thus the Court concludes that they would be unable to recover under the NMUPA, and therefore individual questions regarding which class members fall into this category would invariably predominate.

The second reason that the Court concludes that Thornton falls short of fulfilling the rule 23(b)(3) predominance analysis is because she has not proffered an adequate means by which to calculate damages.  Although much has been written and discussed with respect to the Supreme Court's opinion in Comcast Corp. v. Behrend, the case makes three important with respect to the individual determination of damages in class action lawsuits:

> First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided.  In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation.  See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d [1213,] 1220 [(10th Cir. 2013)]("[T]he district court should consider the extent to which material differences in damages determinations will require individualized inquiries.").  A class can have individual damage calculations, but the Court has to look at the issues of individual damage calculations at the class certification stage.  Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis.  In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.  Third, even if the methodology is

- 112 -

common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.  The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups.  The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.  See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1220 (describing that individualized damages issues might destroy predominance).

Payne v. Tri-State CareFlight, LLC, 332 F.R.D. 611, 667-68 (D.N.M. 2019)(Browning, J.).  Here, the Court struggles to apply these points of law to the proposed damages methodology in this case, because Thornton has not proposed any methodology with which to calculate damages.  Thornton's Class Certification Motion offers no indication -- and certainly no developed methodology -- how damages would be calculated under Thornton's NMUPA claim.  This absence was seized upon by Kroger Co. in its response, where Kroger Co. argued that -- under Comcast Corp. v. Behrend, 569 U.S. 27 (2013) -- the absence of any damages model that can measure damages on a classwide basis means that the question of individual damages inevitably would overwhelm the questions common to the class.  See Kroger Class Certification Response at 51.

In her Reply, Thornton asserts that she has provided a "[r]ough [d]amages [m]odel." Thornton Certification Reply at 31.  She contends that she "has in fact provided a refund model for damages methodology" and further states that "the record supports a common damages model for class members."  Thornton Certification Reply at 32.  She does not supply a record citation for either of these assertions, however, and the Court cannot find where in the record specifically she elaborates her damages model.  She then states: "Moreover, as discussed above, Plaintiff has provided sufficient evidence that suggests that the refund may not need to be a full refund based upon the survey responses regarding the price differential for consumers between American and foreign produced beef."  Thornton Certification Reply at 32.  This assertion cites to page 13 of Dr.

Robinson's "U.S.A. Beef Research" Report.

Upon review, the Court concludes that there is no discernable damages model in Dr. Robinson's Report.  The referenced report page contains information related to a part of the Sanderoff Survey that asks respondents their perspective -- i.e., their subjective assessment -- of the relative price per pound between various beef products -- steaks, ground beef, and roasts -- that were produced "in the United States" versus "outside of the United States."  Robinson Report at 13 (emphasis in original).  While this information might play some role in the eventual formulation of a damages model, and the subjective price disparity has some vague conceptual relationship to a "price premium" theory,[53] the Court concludes that this information -- on its own -- is some distance from the damages methodology that the Court must assess under Comcast Corp. v. Behrend, 569 U.S. 27, for the purposes of rule 23(b)(3) predominance analysis.  Moreover, Dr. Robinson stated in her deposition that she had "no idea" how potential damages would be distributed to the proposed class of individuals, see Transcript of Dr. Robinson Deposition (dated October 12, 2022), filed November 18, 2022 (Doc. 232-1)(Robinson, Walton)("Dr. Robinson Depo."), and at the Class Certification Hearing, she confirmed that she was "not retained to develop a damages model for a putative class in this case," Class Certification Hearing Transcript at 105:2-5 (Abrams, Robinson).

Looking elsewhere for a possible damages model, there is one other portion of Dr.

---

[53]In a recent case, the Court was asked to evaluate the adequacy of an expert's methodology used to calculate a price premium for the purposes of damages, and had to contend with the difficult question whether a proposed damages model that did not isolate the meaning of the challenged product representations was adequate given the applicable substantive law.  See In Re: Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. and Prods. Liab. Litig., No. MD 16-2695 JB/LF, 2023 WL 6121894, at *119-25 (D.N.M. Sept. 19, 2023)(Browning, J.).  Here, the Court cannot engage in a similar analysis regarding the adequacy of Thornton's damages model because she has not provided a model.

Robinson's Report that Dr. Robinson references obliquely as a possible damages model.  See Dr. Robinson Depo. at 214:2-5.  This section -- portions of which the Court has struck because of insufficient reliability under rule 702 of the Federal Rules of Evidence -- contains estimates of the total amount, in volume, of beef steaks and roasts that Kroger Co. sold during a five-year period between 2017 and 2021.  The Report then multiplies these numbers by Dr. Robinson's estimate of the "[a]nnual [a]verage [t]otal % [i]mported [b]eef in US [b]eef [s]upply."  Robinson Report at 16.  The resulting number reflects a potential total amount of beef that Kroger Co. sold by the Kroger Co. which came from "[i]mported [b]eef."  Robinson Report at 16.  Even if the Court were to accept this estimation's accuracy, this information does not form the basis of a damages model that would be appropriate to assess the proposed class' actual damages according to Thornton's NMUPA theory.  The NMUPA allows class members to receive "such actual damages as were suffered by each member of the class as a result of the unlawful method, act or practice."  N.M.S.A. § 57-12-10(E).  Even if the Court assumes -- for the sake of illustration -- that Dr. Robinson's seventeen-percent estimation of imported beef is correct, the Court still concludes that a "damages model" that does no more than award the members of the proposed class a refund of the imported beef received -- calculated by aggregate percentage -- does not appear to reflect "actual damages" under the NMUPA, and Thornton has not attempted to demonstrate how such a number would amount to the "actual damages" owed to the purported class' members.  In sum, because Thornton does not offer or explain any damages model to the Court -- and certainly not a damages model that is capable of measuring only the damages that are attributable to her underlying legal theory -- the Court concludes that Thornton has not shown that a common damage methodology will predominate over individual damage calculations.  See Comcast Corp. v. Behrend, 569 U.S. at 34 ("[I]t is clear that . . . respondents' model falls far short of establishing that damages are capable

of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.").

The Court's third and final issue with respect to the predominance analysis is manageability. The Court has concerns about manageability of Thornton's proposed class action. As discussed above, rule 23(b)(3)(D) requires the Court -- in its analysis of the questions of predominance and superiority -- to consider the "likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). In considering this factor, the Court sees a variety of issues related to how class could be managed, owing in large part to the criteria used to define it. As noted, Thornton agrees that her purported class consists of individuals who have:

> (1) reviewed a circular delivered in a mailer or newspaper and seen the 'USDA Choice: Produced in the USA' graphic; (2) interpreted the graphic to mean that the beef advertised was from cattle born, raised, and harvested in the USA; (3) relied on that interpretation to purchase the beef; and (4) purchased beef that was not, in fact, born, raised, and harvested in the USA.

Kroger Class Certification Response at 18-19. This class definition has two subjective components. It requires that: (i) class members interpreted the relevant logos to mean that the beef advertised was from cattle born, raised, and harvested in the United States; and (ii) those same individuals relied upon this particular interpretation to purchase the beef from Kroger Co.'s supermarkets. Moreover, not only do proposed class members have to fulfill both of these state-of-mind requirements, but they also must have been among the set of individuals who saw the circulars and purchased beef products that came from cattle that were not born, raised, and harvested in the United States. The Court is aware of no proposed methodology that reasonably could identify individuals who fulfill all of these requirements.

In her Reply, Thornton argues that practical identification of the proposed class members

would be feasible, stating: "Identification of class members can be accomplished by giving notice via the same advertising used by Kroger in the first instance and then requiring the class members to declare under penalty of perjury that they met the requirements noted above, electing to either join the class or opt out." Thornton Certification Reply 5.  At the outset, the Court notes that this "self-identification" model does not account for individuals who purchased beef products that came from cattle that were not born, raised, and harvested in the United States.  Putting this concern to one side, however, as other courts have noted, allowing proposed class members to self-identify has the potential of evoking constitutional issues, because forcing a defendant "to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, [has] serious due process implications." Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 594 (3d Cir. 2012).  Subsequently, "protecting defendants' due-process rights by allowing them to challenge each claimant's class membership is administratively infeasible," as it would invariably require a potentially large number of highly individualized inquiries. Karhu v. Vital Pharms., Inc., 621 F. App'x 945, 949 (11th Cir. 2015).  Given the manner in which the class is defined, and the individualized inquiries that would predominate in the proposed class' management, the Court concludes that the potential difficulties in managing the class action tilt against a conclusion that common questions predominate.[54]  See In re Santa Fe Nat. Tobacco Co.

---

[54]As the Court notes above, in her Reply in Support of the Motion to Certify Class at 6, filed December 2, 2022 (Doc. 246)("Thornton Certification Reply"), and also in her Closing Brief Support [sic] of the Thornton Motion to Certify Class; Proposed Findings of Fact and Conclusions of Law, filed April 10, 2023 (Doc. 275)("Thornton FOF"), Thornton alleges "willful spoliation of records that could identify class members achieved by industry collusion," see Thornton FOF at 1.  It is not immediately clear from these documents exactly which "records" Thornton contends have been spoliated.  Ultimately, the Court concludes that Thornton has not demonstrated these contentions of spoliation by a preponderance of the evidence.  But even assuming that there was -- in fact -- some documentation that made clear: (i) which specific individuals received the circulars with the challenged representations; (ii) which particular individuals bought the meat products that were advertised in those circulars; and (iii) which particular meat products purchased

Mktg. & Sales Pracs. & Prods. Liab. Litig., No. MD 16-2695 JB/LF, 2023 WL 6121894, at *109 (D.N.M. Sept. 19, 2023)(Browning, J.)(expressing concerns as to the administrative difficulties inherent in having proposed class members self-identify, especially where relevant receipts and records likely do not exist).  The Court denies Thornton's Motion to Certify.

## II.   <u>THE COURT WILL NOT CERTIFY THE PROPOSED PAY AND SAVE CLASS</u>.

Although Irby filed her Class Certification Motion against Pay and Save, Irby's Motion is almost identical to the one that Thornton filed against Kroger Co.  Many portions of the Motion are copied verbatim, and the class definition that Irby uses in her Class Certification Motion is identical in all relevant respects to Thornton's.  <u>Compare</u> Irby Class Certification Motion ¶ 1, at 7, <u>with</u> Thornton Class Certification Motion ¶ 1, at 8-9.  Moreover, both Irby and Thornton seek relief under the same statute -- the NMUPA -- and both use the same expert, Dr. Robinson.  Because of this similarity, the Court denies Irby's Motion for substantially identical reasons that led the Court to deny Thornton's Motion.  Namely, the Court denies Irby's Class Certification Motion, because: (i) she has not offered an adequate class definition that defines her proposed class according to objective criteria; and (ii) class definition issues notwithstanding, the Court concludes that questions of law or fact common to the class do not predominate over individual inquiries.

---

by customers at Kroger Co.'s stores were comprised of cattle not born, raised, and slaughtered in the United States, the Court still would have doubts about whether the class would be manageable. Such information would not only need to exist, the Court would have to subject these separate datasets to considerable cross-referencing to determine the exact individuals who fulfill all the requirements of Thornton's proposed class definition.  Even then, the individuals who fulfilled these objective requirements would need to somehow demonstrate that they also fulfill the two state-of-mind requirements that define Thornton's proposed class.  This hypothetical task, the Court concludes, would still suffer from considerable manageability issues under rule 23(b)(3)(D).

**A.    IRBY HAS NOT DEFINED HER PROPOSED CLASS USING OBJECTIVE CRITERIA AND THEREFORE THE COURT WILL NOT CERTIFY HER PROPOSED CLASS.**

Like the definition for Thornton's proposed class, Irby's class definition involves two discrete descriptors of the proposed class members' state of mind, i.e., interpretation of the relevant logo, and reliance upon that particular interpretation to go to the grocery store and purchase the product, and the definition also requires that individuals with these particular subjective interpretations also fulfill two objective conditions, i.e., that the individual viewed the advertisements, and also purchased beef products that were not produced exclusively in the United States.  A proposed class defined in this manner -- membership made contingent on a confluence of subjective and objective components -- creates problems for both the proposed class members and for the Defendants.

> Although formulations of [the "ascertainability" or "definiteness" doctrines] vary, all essentially require a putative class to be ascertainable with reference to objective criteria.  A definable class protects absent plaintiffs in two ways -- by enabling notice to be provided where necessary and by defining who is entitled to relief; and a definable class protects defendants by enabling a final judgment that clearly identifies who is bound by it.

1 William B. Rubenstein, Newberg and Rubenstein on Class Actions, § 3:1 (6th ed. 2023). Moreover, Irby's Reply to Pay and Save's definiteness arguments, see Reply in Support of the Motion to Certify Class 16-17, filed December 2, 2022 (Doc. 247)("Irby Certification Reply"), are verbatim identical to those forwarded in Thornton's Rely to Kroger Co., see Thornton Certification Reply 6-17, and the Court declines to take a different approach to its analysis as it did as to Thornton's claims.  Ultimately, for the same reasons as discussed above in evaluating the adequacy of Thornton's class definition, the Court concludes that Irby's proposed class definition is inadequate.

**B.    BECAUSE THE QUESTIONS OF LAW OR FACT COMMON TO THE PURPORTED CLASS DO NOT PREDOMINATE OVER INDIVIDUAL ONES, THE COURT WILL NOT CERTIFY THE PURPORTED CLASS.**

Irby's proposed class suffers from the same defects in terms of predominance as Thornton's proposed class.  Specifically, the Court concludes that, given the difficulty in determining the amount of partially imported beef products -- if any -- that each individual proposed class member consumed and how to quantify the loss associated with that alleged deception, individual questions of liability under the NMUPA will predominate over the questions common to the class.  See Mulford v. Altria Grp., Inc., 242 F.R.D. at 627 ("The need for individual evidence to determine if members of the proposed class suffered a loss strongly suggests that the proposed class is not sufficiently cohesive to warrant adjudication by representation."); In Re: Santa Fe Natural Tobacco Company Marketing & Sales Practices and Products Liability Litigation, No. MD 16-2695 JB/LF, 2023 WL 6121894, at *164 ("[Plaintiffs had] not demonstrated a method of determining causation on a class-wide basis, and would need . . . individualized inquiries to determine whether a given consumer purchased Natural American cigarettes for more than . . . she otherwise would have paid if . . . she had known the cigarettes were not actually safer or healthier").

Additionally, the lack of a proposed damage methodology -- discussed above in relation to Thornton's proposed class -- has equal relevance to Irby's proposed class.  As stated, both Plaintiffs share an expert, Dr. Robinson, and Irby has proffered no damage calculation that is specific to her class.  Because Irby has not provided a common damage methodology that corresponds to her underlying legal theory, the Court concludes that individual damage calculations will predominate over questions common to the class.  See Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2007)("And it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis.  Without presenting another methodology, respondents cannot show Rule 23(b)(3)

predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.").

Third, and finally, the Court concludes that Irby's proposed class will suffer greatly from manageability problems, and this factor also weighs against a finding that common questions of law or fact predominate over questions affecting individual members of the class. As is true for Thornton's proposed class, Irby gives little indication how the Court will manage her proposed class from a practical perspective. This concern is especially pertinent given her class definition. As was true for the Thornton class, Irby's only apparent solution is to have class members self-certify, see Irby Certification Reply 7-8, but for the same reasons discussed above, the Court does not believe that this solution is adequate -- on the facts of this case -- either from an administrative or from a due process perspective. For these reasons, the Court concludes that -- under rule 23(b)(3) -- questions of law or fact common to the proposed class do not predominate over individual inquiries. The Court therefore denies the Irby Class Certification Motion.

**IT IS ORDERED** that: (i) Plaintiff Thornton's Motion for Class Certification & Supporting Memorandum as to Defendant Kroger, filed October 17, 2022 (Doc. 214), is denied; (ii) Plaintiff Irby's Motion for Class Certification & Supporting Memorandum as to Defendant Pay and Save, filed October 17, 2022 (Doc. 215), is denied; (iii) Defendant the Kroger Company's Motion to Exclude Expert Testimony of Dr. Chadelle Robinson, filed November 18, 2022 (Doc. 232), is granted in part and denied in part; (iv) Dr. Robinson may testify to the material highlighted in the Court's Notice Of Filing Dr. Robinson Report; Highlighted Material is of Sufficient Reliability Under Rule 702 To Support Dr. Robinson's Testimony, Material Not Highlighted is Inadmissible, filed September 29, 2023 (Doc. 285), and may not testify to statements not highlighted in the Notice of Filing; and (v) Defendant the Kroger Company's Motion to Exclude Survey Evidence, filed

November 18, 2022 (Doc. 234), is denied.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Ethan M. Preston
Preston Law Offices
Dallas, Texas

-- and --

Marshall J. Ray
Law Offices of Marshall J. Ray, LLC
Albuquerque, New Mexico

-- and --

A. Blair Dunn
Jared Robert Vander Dussen
Western Agriculture, Resource and Business Advocates, LLP
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Monica R. Garcia
Butt Thornton & Baehr PC
Albuquerque, New Mexico

-- and --

Nathaniel Lampley, Jr.
Jessica K. Baverman
Jeffrey A. Miller
Victor Allen Walton, Jr.
Wesley Reese Abrams
Vorys, Sater, Seymour and Pease LLP
Cincinnati, Ohio

     *Attorneys for Defendants The Kroger Company and Albertsons*

Hugh N. Lyle
Mullin Hoard & Brown, LLP
Lubbock, Texas

-- and --

Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

    *Attorneys for Defendant Pay and Save, Inc.*